**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ARCLIN US HOLDINGS INC., et al., | ) | Bankr. Case No. 09 - _____ (   ) |
| | ) | |
| Debtors.[1] | ) | Jointly Administered |
| | ) | |

**DEBTORS' MOTION FOR AN ORDER (I) AUTHORIZING DEBTORS TO OBTAIN
POSTPETITION FINANCING, (II) AUTHORIZING USE OF CASH COLLATERAL,
(III) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (IV) GRANTING
ADEQUATE PROTECTION, (V) SCHEDULING A FINAL HEARING ON THE
DEBTORS' MOTION TO INCUR SUCH FINANCING ON A PERMANENT BASIS**

The above-captioned debtors and debtors-in-possession (collectively, the

"Debtors"), by and through their undersigned attorneys, hereby file this motion (the "Motion")

for entry of an interim order substantially in the form annexed hereto as Exhibit A (the "Interim

Order"), and a final order (the "Final Order," and, together with the Interim Order, the "DIP

Orders"):

- Authorizing the Debtors to obtain secured postpetition financing on a
  superpriority basis (the "DIP Facility"), and for the Debtors to guarantee the
  payment of each of the CCAA Debtors' (defined below) obligations
  thereunder pursuant to that certain Senior Secured, Super-Priority Debtor-in-
  Possession Credit Agreement (the "DIP Facility Agreement") by and among
  Arclin US Holdings Inc. and Arclin Canada Ltd., the guarantors party thereto,
  UBS AG, Stamford Branch ("UBS AG"), as administrative agent (the "DIP
  Administrative Agent"), UBS AG as collateral agent (the "DIP Collateral
  Agent," together with the DIP Administrative Agent, the "DIP Agent"), UBS
  Securities LLC ("UBSS") as Bookmanager and Syndication Agent, UBSS and
  Black Diamond Commercial Finance, L.L.C., as Joint Lead Arrangers
  (collectively, the "DIP Arrangers") and the lenders party thereto (collectively,
  the "DIP Lenders"), substantially in the form attached hereto as Exhibit B;

---

[1]  The Debtors are Arclin US Holdings Inc., Marmorandum LLC, Arclin Chemicals Holding Inc., Arclin
     Industries U.S.A. Inc., Arclin Fort Smith Inc., Arclin U.S.A. Inc., and Arclin Surfaces Inc.

- Authorizing the Debtors to execute and enter into the DIP Facility documents and to perform such other and further acts as may be required in connection with the DIP Facility documents;

- Granting liens and superpriority claims in connection with the DIP Facility pursuant to sections 364(c)(1), (c)(2), (c)(3) and (d) of the Bankruptcy Code);

- Authorizing the Debtors to use Cash Collateral (defined below) pursuant to section 363 of title 11 of the United States Code (the "Bankruptcy Code");

- Granting adequate protection to the Prepetition Lenders (defined below) pursuant to sections 363 and 364 of the Bankruptcy Code;

- Requesting an interim hearing pursuant to Federal Rule of Bankruptcy Procedure 4001 for entry of the proposed Interim Order; and

- Scheduling a final hearing pursuant to Federal Rule of Bankruptcy Procedure 4001 for entry of the proposed Final Order.

In support thereof, the Debtors respectfully represent as follows:

## JURISDICTION

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue of these cases and this Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The statutory predicates for the relief requested herein are sections 105(a), 361, 362, 363 and 364 of the Bankruptcy Code, Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2002-1, 4001-1 and 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

## INTRODUCTION

2.      On July 27, 2009 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 (the "Chapter 11 Cases") of the Bankruptcy Code.

Certain of the Debtors' non-debtor Canadian affiliates (the "CCAA Debtors" and, collectively with the Debtors, the "Arclin Group" or the "Company")[2] contemporaneously herewith filed for protection from their creditors in Canada (the "Canadian Proceeding") pursuant to Canada's Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended (the "CCAA"), before the Ontario (Commercial List) Superior Court of Justice (the "Canadian Court").[3]

3.     The Debtors continue to manage their properties and affairs as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code and the CCAA Debtors continue to manage their properties in accordance with the relevant provisions of the CCAA.  No trustee, examiner, or official committee has been appointed in these Chapter 11 Cases.

The Company's Business

4.     The Arclin Group is an integrated enterprise sharing logistical, operational, technical, and financial resources.  The Arclin Group develops, produces, and markets bonding and surfacing products and technology for the engineered materials markets. The resin bonding products are used predominantly in the manufacture of residential and industrial construction materials such as particleboard, medium density fiberboard, plywood and oriented strandboard. It has approximately 25% of the resins market in the United States and Canada.  The Company also produces paper overlays technologies and provides surfacing solutions for decorative panels, building products, and industrial specialty applications for North American and export markets.

---

[2]   The CCAA Debtors are: Arclin Canada Ltd., Arclin Holdings I L.P., Arclin Holdings II L.P., Arclin Holdings III Inc., Arclin Holdings IV Inc., Arclin Management Holdings Inc., Arclin Holdings GP I Inc., and Arclin Holdings GP II Inc.  It should be noted that the R.S.C. does not apply to partnerships; however, because the CCAA Debtors have requested that the Canadian Court extend the protections afforded under the CCAA to Arclin Holdings I L.P. and Arclin Holdings II L.P., those entities have been included in the definition of Canadian Debtors herein for ease of reference.

[3]   The Debtors' Mexican affiliates, Arclin Mexican Holdings S.A. de C.V., Arclin Mexico S.A. de C.V., and Arclin Operadora S.A. de C.V., are not subject to any insolvency proceedings.

5.     The Company, through its operating entities Arclin Canada, an Ontario Corporation, Arclin USA Inc., an Oregon corporation ("Arclin USA"), and Arclin Surfaces Inc., a Wisconsin corporation ("Arclin Surfaces" and collectively with Arclin Canada and Arclin USA, the "Operating Entities"), operates two business units – Building & Construction and Engineered Materials. Arclin Canada maintains six facilities located in Canada[4] and Arclin USA and Arclin Surfaces maintain eight facilities located in the United States. Each of the Operating Entities independently manages its own day-to-day operations. However, the Company is headquartered and performs most administrative, purchasing, and accounting functions through Arclin Canada's offices in Mississauga, Ontario, Canada.

6.     The Arclin Group's prepetition capital structure and the events leading up to the commencement of these cases are set forth in Declaration of D. Scott Maynard in Support of the First Day Motions (the "Maynard Declaration"), which was filed with the Court on the Petition Date.

First Lien Credit Facility

7.     Arclin Canada, a CCAA Debtor, and Arclin US are borrowers, and the remaining Debtors and CCAA Debtors are guarantors, under that certain credit loan agreement dated as of July 10, 2007 (as amended, supplemented or modified from time to time, the "First Lien Credit Facility"), with the lenders from time to time party thereto (the "First Lien Lenders"), UBS Securities LLC, as lead arranger and syndication agent, UBS Loan Finance LLC, as US swingline lender, UBS AG Canada Branch, as Canadian swingline lender, the Canadian issuing bank from time to time party thereto, any documentation agent from time to time party thereto,

---

[4]     Four of the six facilities are active plants, one of the six facilities (Sexsmith) is dormant and one of the six facilities (Mississauga) is the head office location that does not conduct any manufacturing.

and UBS AG, Stamford Branch, as US issuing bank, administrative agent for the First Lien Lenders and as collateral agent (the "First Lien Agent").

8.    The First Lien Credit Facility provides for (a) a term loan commitment of up to $200 million, (b) a revolving commitment of up to $20 million (the "Revolver"), (c) a swingline commitment of up to $2 million, and (d) a letter of credit sublimit of up to $5 million, secured by a first-priority lien on substantially all assets of the Company (the "Prepetition Collateral").[5]

9.    Pursuant to the First Lien Credit Facility, the Debtors were, as of the Petition Date, jointly and severally indebted to the First Lien Agent, the First Lien Lenders and the other First Lien secured parties exclusive of accrued but unpaid interest, costs, fees and expenses, in the principal amount of approximately $204,132,994 (which consists of approximately $183,532,994 in principal amount of prepetition term loans and $17,000,000 in principal amount of prepetition revolving loans and a $3,558,000 million interest hedge).  The Debtors' and CCAA Debtors' obligations under the First Lien Credit Facility are secured by a first priority lien on the Prepetition Collateral.

10.    On or about January 16, 2009, upon learning that the Company's fourth quarter 2008 results would not meet certain financial covenants under the First Lien Credit Facility, the First Lien Agent froze the availability under the Revolver.  On or about March 26, 2009, the First Lien Agent declared a default with respect to certain financial covenants under the First Lien Credit Facility.  In May, 2009 the Company failed to make scheduled interest

---

[5]    Borrowings under the First Lien Credit Facility are denominated in U.S. Dollars.

payments of approximately $2.83 million in the aggregate under the First Lien Credit Facility.[6] Such non-payments of interest constituted events of default under the First Lien Credit Facility.

11.     As of the Petition Date, the principal amount of approximately $204,132,994 was drawn and outstanding under the First Lien Credit Facility. As of the Petition Date, the Debtors had no availability under the First Lien Credit Facility.

Second Lien Credit Facility

12.     Arclin US is borrower, and the remaining Debtors and CCAA Debtors are guarantors, under a certain second lien credit agreement dated as of July 10, 2007 (as amended, the "Second Lien Credit Facility"), with the lenders from time to time party thereto (the "Second Lien Lenders" and, together with the First Lien Lenders, the "Prepetition Lenders"), UBS Securities LLC, as lead arranger, documentation agent and syndication agent, and The Bank of New York Mellon, as successor administrative agent and collateral agent for the Second Lien Lenders (the "Second Lien Agent" and, together with the First Lien Agent, the "Prepetition Agents"). The Second Lien Credit Facility provides for a term loan of up to $30 million,[7] secured by a second priority lien on the Prepetition Collateral.

13.     On or about March 26, 2009, the Second Lien Agent declared an event of default with respect to certain financial covenants under the Second Lien Credit Facility. In May, 2009 the Company failed to make scheduled interest payments of approximately $573,308 in the aggregate under the Second Lien Credit Facility. Such non-payments of interest constituted an event of default under the Second Lien Credit Facility.

---

[6]    The Company failed to make the following interest payments related to the First Lien Facility: $1,805,863 on the term debt; $174,333 on the revolver; and $848,304 on the interest hedge.

[7]    Borrowings under the Second Lien Credit Facility are denominated in U.S. Dollars.

14. As of the Petition Date, the principal amount of approximately $30,000,000 was drawn and outstanding under the Second Lien Credit Facility. As of the Petition Date, the Debtors had no availability under the Second Lien Credit Facility.

The Intercreditor Agreement

15. Pursuant to that certain agreement, dated as of July 10, 2007 (the "Intercreditor Agreement"), the Debtors and the Prepetition Agents are parties to an intercreditor arrangement that governs the respective rights, obligations and priorities of the Prepetition Lenders with respect to their relative interests in the Prepetition Collateral and certain other matters, including, without limitation, the DIP Facility. Pursuant to the Intercreditor Agreement, the First Lien Lenders' interests are senior in priority to the Second Lien Lenders' interests on all Prepetition Collateral.

Negotiations with Prepetition Lenders

16. In or about April 2009, the Company began discussions with the Prepetition Lenders to negotiate a de-leveraging of the Company's balance sheet. After several months of good faith, arm's length negotiations, the Company received an expression of interest in a financial restructuring of the Company (the "Expression of Interest") from certain of the Prepetition Lenders. In accordance with the Expression of Interest, it is anticipated that the restructuring of the Company will provide, among other things, for the following key terms:

- Each holder of a claim under the First Lien Credit Facility (a "First Lien Claim") will receive, in full satisfaction of its secured claim, its pro rata share of, directly or indirectly (i) 97% of the equity (the "Reorganized Company Equity") in the restructured Company, subject to dilution on account of the Reorganized Company Equity to be reserved for a management incentive plan (the "MIP") to be developed by the Company's board of directors and warrants to be issued to holders of the claims under the Second Lien Credit Facility (the "Second Lien Claims") and (ii) a new, second lien term loan in the amount of $60 million.

- Each holder of a Second Lien Claim will receive, in full satisfaction of its secured claim, its pro rata share of (i) 3% of the Reorganized Company Equity, and (ii)(A) warrants for 4% of the Reorganized Company Equity, with a term of four years and a strike price equal to an equity value of $145 million; plus (B) warrants for 4% of the Reorganized Company Equity, with a term of five years and a strike price equal to an equity value of $145 million; plus (C) warrants for 4% of the Reorganized Company Equity, with a term of four years and a strike price equal to an equity value of $175 million; plus (D) warrants for 4% of the Reorganized Company Equity, with a term of five years and a strike price equal to an equity value of $175 million (the "Warrant Package"), subject to dilution in each of clauses (i) and (ii) of this sentence on account of the MIP.

- Management will receive 10% of the Reorganized Company Equity in accordance with the MIP.

## RELIEF REQUESTED

17.     By this Motion, pursuant to Bankruptcy Code sections 105(a), 361, 362, 363 and 364 of the Bankruptcy Code, Rules 2002, 4001, 6004, 9014 of the Bankruptcy Rules and Rules 2002-1, 4001-1 and 6004-1 of the Local Rules, the Debtors request that the Court grant the following relief:

    i.    authorizing the Debtors to obtain credit and incur debt under the DIP Facility on an interim basis (the "Interim Period"), up to an aggregate principal amount of $15,000,000;

    ii.    authorizing pursuant to the Final Order, borrowings under the DIP Facility up to an aggregate amount of $25,000,000;

    iii.    authorizing the Guarantors (defined below) to guarantee all obligations under the DIP Facility on a joint and several basis;

    iv.    authorizing the use of the proceeds of the DIP Facility, subject to the Budget (defined below) (i) to fund postpetition operating expenses and other general corporate needs, including working capital needs, (ii) to pay certain transaction fees and other costs and expenses of administration of these Chapter 11 Cases, (c) to pay the Prepetition Agents and Prepetition Lenders Adequate Protection (defined below) and (d) to pay fees and expenses (including, without limitation, reasonable attorneys' fees and expenses) owed to the DIP Agent and the DIP Arrangers under the DIP Facility and the other DIP Facility documents;

v.      authorizing the Debtors to grant to the DIP Lenders super-priority claims pursuant to section 364(c)(1) of the Bankruptcy Code, subject to the Carve-Out (defined below);

vi.      authorizing the Debtors to grant to the DIP Lenders (i) valid and enforceable perfected senior liens pursuant to section 364(c)(2) and (d) of the Bankruptcy Code in all assets securing the Debtors' obligations under the First Lien Credit Facility and the Second Lien Credit Facility, including, without limitation (a) perfected first priority pledges of all of the equity interests of Borrowers (defined below) and each of Borrowers' direct and indirect subsidiaries, plus all Guarantors except Arclin Holdings I L.P., Arclin Management Holdings Inc., Arclin Holdings GP I Inc., and Arclin Holdings GP II Inc, (b) perfected super-priority security interests in and mortgages on all tangible and intangible assets of Borrowers and the Guarantors, wherever located, now or hereafter owned, and (c) upon entry of the Final Order, any avoidance actions under Chapter 5 of the Bankruptcy Code (the "Avoidance Actions"), subject to the Carve-Out and other priority liens (collectively, the "DIP Facility Liens"), and (ii) DIP Junior Liens on all other assets of the Borrowers and each of Borrowers' direct and indirect subsidiaries, that are subject to valid and perfected liens in existence as of the Petition Date or to valid liens in existence as of the Petition Date that are perfected subsequent to the Petition Date as permitted by the Bankruptcy Code (other than the liens, claims, and interests of the Prepetition Lenders and any Replacement Liens (defined below)) which such DIP Facility Liens and Junior DIP Liens shall be subject only to the Carve-Out and other priority liens;

vii.     authorizing the use of "cash collateral," as such term is defined in Section 363 of the Bankruptcy Code (the "Cash Collateral"), in which the Prepetition Lenders have an interest on the terms and conditions set forth in the DIP Orders;

viii.    granting adequate protection to the Prepetition Lenders, as set forth in the DIP Orders;

ix.      approving, in connection with entry of the Final Order, a waiver of the provisions of section 506(c) of the Bankruptcy Code;

x.      authorizing the Debtors to pay all fees associated with the DIP Facility, as set forth in the DIP Facility and the related Fee Letters (the "Fee Letters");

xi.      scheduling a hearing to consider entry of the Final Order granting the relief requested in this Motion on a final basis;

<u>The Debtors' Need for Postpetition Financing</u>

18.     The Debtors urgently require postpetition financing to continue their operations during the pendency of the Chapter 11 Cases.  If the Debtors are unable to obtain sufficient operating liquidity to meet their postpetition obligations on a timely basis, a permanent and irreplaceable loss of business, causing a loss of value to the detriment of the Debtors and their creditors, will occur. This potential loss of revenue and going concern value would be extremely harmful to the Debtors and their estates and creditors at this critical juncture.

19.     Given the Debtors' current financial condition, financing arrangements and capital structure, the Debtors cannot obtain unsecured credit or other financial accommodations allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code.  Postpetition financing is not otherwise available without the Debtors (i) granting, pursuant to section 364(c)(1) of the Bankruptcy Code, claims having priority over any and all administrative expenses of the kinds specified in sections 503(b) and 507(b), of the Bankruptcy Code, other than as described below in respect of the Carve-Out and (ii) securing, pursuant to section 364(c) of the Bankruptcy Code, such indebtedness and obligations with security interests in and liens on substantially all of the Debtors' assets as described below.

20.     In order to continue to operate their businesses in the ordinary course, the Debtors determined, in the exercise of their sound business judgment, that a postpetition credit facility that permits the Debtors to obtain up to $25 million in new funds is critical.

<u>The Debtors' Efforts to Obtain Postpetition Financing</u>

21.     The Debtors' investment bankers, Alvarez & Marsal Securities, LLC ("A&M Corporate Finance"), contacted several parties regarding the possibility of providing postpetition financing to the Debtors, including the Second Lien Lenders.

22. Because the obligations owed by the Debtors to the First Lien Lenders under the First Lien Credit Facility are secured by substantially all of the real and personal property of the Debtors, the liens of the First Lien Lenders would have to be primed in order to obtain postpetition financing. Considering that "priming" the First Lien Lenders would not be possible without an extended, contested hearing on whether the requirements of section 364(d) of the Bankruptcy Code had been satisfied (assuming a lender could be found who would lend on that basis), none of the parties contacted by A&M Corporate Finance submitted financing proposals. Indeed, the First Lien Lenders advised the Debtors that they would not consent to be primed by another lender group.

23. Additionally, in order to obtain financing from a new third-party lender, such lender also would have required payment of work fees and a period of time in which to complete substantial due diligence, while, on the other hand, the knowledge the First Lien Lenders possessed about the Debtors' business permitted a shortened due diligence period for such lenders.

24. Consequently, after considering their limited alternatives and taking into account the need to obtain financing on a timely basis, the Debtors determined in their business judgment to accept the DIP Lenders' proposal as the only truly viable option for the Debtors. The Debtors believe that the terms of the DIP Facility are competitive in the marketplace, address the Debtors' working capital and liquidity needs, and present the best option available to enable the Debtors to continue to operate their business and maintain their going concern value.

The DIP Facility

25. The Debtors and the First Lien Lenders engaged in good faith and extensive arm's-length negotiations that culminated in an agreement by the First Lien Lenders to

provide the Debtors up to $25 million of postpetition financing, on the terms and subject to the

conditions set forth in the DIP Facility and the Fee Letters.

26. The negotiations also addressed issues regarding the form of the Interim

Order approving the DIP Facility and related documents and the provision of adequate protection

for the Prepetition Lenders.

**A.     Terms and Conditions of the DIP Facility**

| TERM | DESCRIPTION |
|------|-------------|
| Parties: | *Borrowers*: Arclin US Holdings Inc., a Delaware corporation (the "US Borrower") and Arclin Canada Ltd. (the "Canadian Borrower" and, together with the US Borrower, the "Borrowers").<br><br>*Guarantors*: The guarantors under the First Lien Credit Facility<br><br>*Administrative Agent*: UBS<br><br>*DIP Arrangers*: Black Diamond Commercial Finance, L.L.C. and UBSS.<br><br>*Collateral Agent*: UBS<br><br>*Syndication Agent*: UBSS<br><br>*DIP Lenders*: Some or all of the lenders under the First Lien Credit Facility. |
| Type and Amount of DIP Facility: | $25,000,000 senior secured, super-priority revolving credit facility (the "DIP Commitment" and each individual loan, a "DIP Loan" and collectively, the "DIP Loans"); $15,000,000 available upon entry of the Interim Order and an interim order in the Canadian Court (the "Canadian Interim Order") authorizing and approving the DIP Facility. |
| Use of Proceeds: | The proceeds of the DIP Loans shall be subject to and used in a manner consistent with a budget (the "Budget") in form and substance acceptable to the Administrative Agent, the DIP Arrangers and the DIP Lenders having more than 50% of the sum of all outstanding DIP Loans and unused DIP Commitments (the "Required Lenders") to (i) to fund postpetition operating expenses and other general corporate needs; (ii) to pay certain administrative expenses of these Chapter 11 Cases; (iii) to pay court approved critical vendors; and (iv) to make such other court approved payments, contemplated by and consistent with the Budget. |
| Interest Rate: | Alternate Base Rate plus 7.00%; Adjusted LIBOR Rate plus 6.00% (with a 3.00% floor); default rates increase by 2.00%. |

| | |
|---|---|
| **Maturity and Extension:** | December 1, 2009, which may be extended by up to two distinct three-month periods with the approval of the Administrative Agent, the DIP Arrangers, and the Required Lenders. |
| **Carve-Out:** | Carve-Out for (i) allowed, accrued, but unpaid professional fees and expenses of the Debtors and the Committee (to the extent consistent with the Budget on a cumulative basis) which have accrued and been incurred prior to the occurrence of an Event of Default (as defined in the DIP Facility); (ii) allowed, accrued but unpaid professional fees and expenses incurred by the Debtors and the Committee incurred after an Event of Default (that is not cured or waived) in an aggregate amount not to exceed $750,000; and (iii) US Trustee and Bankruptcy Court clerk fees. |
| **Availability:** | The lesser of: (i) $15,000,000 upon entry of the Interim Order and $25,000,000 upon entry of the Final Order; (ii) the Borrowing Base (to be calculated in accordance with formulas set forth in the DIP Facility); and (iii) the applicable amount set forth in the Budget (inclusive of a cushion for deviations permitted by the budget covenant and a reserve for the Carve-Out). |
| **Fees:** | *Initial Fee:* 2.00% of the DIP Commitment to be paid upon the Closing Date. |
| | *Reduction Fee:* 2.00% of the amount of any permanent reduction of the DIP Commitment to be paid upon such reduction of the DIP Commitment. |
| | *Exit Fee:* 2.00% of the amount of the DIP Commitment as of the Maturity Date (after taking into account any permanent reductions made) to be paid upon the Maturity Date. |
| | *Commitment Fee:* A commitment fee (the "Commitment Fee") shall accrue on the unused amounts of the DIP Commitments. Such Commitment Fee will be 1.50% *per annum.* Accrued Commitment Fees will be payable monthly in arrears (calculated on a 360-day year basis) for the account of the DIP Lenders from the Closing Date. |
| | *Other Fees* As set forth in the Fee Letter. |
| | All fees payable to the Administrative Agent for the benefit of the DIP Lenders shall be fully earned on the date such payment is due and shall be non-refundable. |
| **Prepayments:** | No prepayment penalties for any prepayments. |
| **Security:** | Secured by valid, binding, continuing, enforceable, fully perfected and unavoidable first priority senior priming security interest in, and liens upon ("the DIP Facility Liens"), all tangible and intangible assets of the Debtors excluding the Excluded Property (defined below), wherever located, now or hereafter owned, and to the extent not otherwise included, all proceeds, tort claims and other rights to payments not otherwise included in the foregoing and products of the foregoing and all accessions to, substitutions and replacements for, and rents and profits of, each of the foregoing and, upon entry of the Final Order, any Avoidance Actions (collectively, the "Collateral"). |
| | The DIP Facility Liens will be subject only to (i) certain Permitted Liens (to be determined and defined by the parties prior to final documentation and intended to include the Permitted Liens under the First Lien Credit Facility) and (ii) the |

| | |
|---|---|
| | Carve-Out. |
| | The DIP Facility will also be secured by junior liens (the "DIP Junior Liens") on all other assets of the Borrowers and Guarantors that are subject to valid and perfected liens in existence as of the Petition Date or to valid liens in existence as of the Petition Date that are perfected subsequent to the Petition Date as permitted by the Bankruptcy Code excluding the Excluded Property (other than the liens, claims, and interests of the Prepetition Lenders and any Replacement Liens) which such DIP Facility Liens and Junior DIP Liens shall be subject only to (i) certain Permitted Liens and (ii) the Carve-Out. |
| | "Excluded Property" shall mean: (i) any permit or license issued by a governmental authority to any of Debtors, the CCAA Debtors or their affiliates (a "Pledgor") or any agreement to which any Pledgor is a party, in each case, only to the extent and for so long as the terms or any requirement of law applicable thereto, validly prohibit the creation by such Pledgor of a security interest in favor of the Collateral Agent (after giving effect to certain provisions of the UCC (or any successor provision or provisions) or any other applicable law or principles of equity); (ii) equipment owned by any Pledgor on the date hereof or hereafter acquired that is subject to a lien securing a purchase money obligation or capital lease obligation permitted to be incurred pursuant to the provisions of the DIP Facility if the contract or other agreement in which such lien is granted (or the documentation providing for such purchase money obligation or capital lease obligation) validly prohibits the creation of any other lien on such equipment; and (iii) any intent-to-use trademark application to the extent and for so long as creating by a Pledgor of a security interest therein would result in the loss by such Pledgor of any material rights therein; provided, however, that Excluded Property shall not include any proceeds, substitutions or replacements of any Excluded Property referred to in clause (i), (ii) or (iii) (unless such proceeds, substitutions or replacements would constitute Excluded Property referred to in clause (i), (ii) or (iii)). |
| | The Collateral shall not include any lien on any property that is Excluded Property, provided that such exclusion shall apply only so long as any such property remains Excluded Property. |
| **Adequate Protection for Existing Prepetition Lenders:** | For the First Lien Lenders: To the extent of diminution in value of the First Lien Agent's and the First Lien Lenders' interest in the Prepetition Collateral: (i) First Lien Replacement Liens (defined below), subordinate only to (a) the liens in favor of the DIP Facility, (b) the Carve-Out, and (c) specified senior Permitted Liens; (ii) First Lien Superpriority Administrative Expense Claims (defined below), subordinate only to (a) the superpriority claims in favor of the DIP Facility, and (b) the Carve-Out; and (iii) timely pay the reasonable fees and expenses of the professionals retained by the First Lien Agent. |
| | For the Second Lien Lenders: To the extent of diminution in value of the Second Lien Agent's and the Second Lien Lenders' interest in the Prepetition Collateral: (i) Second Lien Replacement Liens (defined below), subordinate only to (a) the liens in favor of the DIP Facility, (b) First Lien Replacement Liens, (c) First Priority Lien Prepetition Collateral, (d) the Carve-Out, and (e) specified senior Permitted Liens; and (ii) allowed superpriority administrative claims arising under section 507(b) of the Bankruptcy Code, subordinate only to (a) the superpriority claims in favor of the DIP Facility, (b) First Lien Superpriority Administrative |

| | |
|---|---|
| | Expense Claims, and (c) the Carve-Out. |
| **Affirmative Covenants:** | Usual and customary, consistent with the affirmative covenants contained in the First Lien Credit Facility (as modified to take account of current financial condition of the Debtors and the commencement of these Chapter 11 Cases). |
| **Negative Covenants:** | Usual and customary, consistent with the negative covenants contained in the First Lien Credit Facility (as modified to take account of current financial condition of the Debtors and the commencement of these Chapter 11 Cases, including, without limitation, a covenant restricting the aggregate amount of payments made under critical vendor programs to $13,000,000). |
| **Financial Covenants:** | 1. Actual ending cash (tested on a weekly basis) to be greater than amount set forth for such date in the Budget, with a permitted variance of $4,000,000.<br><br>2. Excess Availability (defined in the DIP Facility) at all times greater than or equal to $2,000,000.<br><br>3. Minimum EBITDA. |
| **Events of Default:** | Usual and customary, consistent with the events of default contained in the First Lien Credit Facility (as modified to take account of current financial condition of the Debtors and the commencement of these Chapter 11 Cases).<br><br>Various bankruptcy related defaults including the requirement that any refinancing of the DIP Facility include the payment in full in cash of the amounts due under the First Lien Credit Documents. |
| **Milestones:** | (i)   file a US Plan (defined below) and Disclosure Statement (defined below) with the Bankruptcy Court on or prior to September 21, 2009;<br><br>(ii)   file (a) the CCAA Plan (defined below) and (b) a motion requesting an order of the Canadian Court calling for meetings of creditors to vote on the CCAA Plan, in each case, with the Canadian Court on or prior to September 21, 2009;<br><br>(iii)   obtain an order calling for meetings of creditors to vote on the CCAA Plan from the Canadian Court on or prior to October 8, 2009;<br><br>(iv)   obtain entry of an order approving the Disclosure Statement by the Bankruptcy Court on or prior to October 26, 2009;<br><br>(v)   file and serve a motion to sanction the CCAA Plan on or prior to December 3, 2009;<br><br>(vi)   commence a hearing with respect to confirmation of the US Plan on or prior to December 10, 2009;<br><br>(vii)   commence a hearing with respect to sanction of the CCAA Plan on or prior to December 10, 2009;<br><br>(viii)   obtain entry of an order by the Bankruptcy Court confirming the US Plan (the "US Confirmation Order") on or prior to December 14, 2009; |

| | |
|---|---|
| | (ix)  obtain an order from the Canadian Court sanctioning the CCAA Plan (the "CCAA Sanction Order") on or prior to December 14, 2009; and<br><br>(x)  cause the effective date of the US Plan and the implementation date of the CCAA Plan to occur no later than 21 days after the entry of the US Confirmation Order and CCAA Sanction Order.<br><br>"CCAA Plan" is a plan of reorganization, compromise or arrangement in respect of the CCAA Case containing terms and conditions reasonably acceptable to the Administrative Agent, the DIP Arrangers and the Required Lenders.<br><br>"Disclosure Statement" is a disclosure statement  in respect of the Chapter 11 Cases containing terms and conditions reasonably acceptable to the Administrative Agent, the DIP Arrangers and the Required Lenders.<br><br>"US Plan" is a plan of reorganization in respect of the Chapter 11 Cases containing terms and conditions reasonably acceptable to the Administrative Agent, the DIP Arrangers and the Required Lenders. |
| **Financial Reports:** | Usual and customary, consistent with the financial reporting contained in the First Lien Credit Facility (as modified to take account of current financial condition of the Debtors and the commencement of these Chapter 11 Cases). |
| **Governing Law:** | New York. |

## B.     Highlighted Provisions under Local Rule 4001-2

27.     In accordance with Local Rule 4001-2(a)(i)(A)-(G), the Debtors also draw the Court's attention to certain material provisions of the DIP Facility and the proposed relief set forth in the attached Interim Order:

i.      **Local Rule 4001-2(a)(i)(A) requires the disclosure of provisions that grant cross-collateralization protection.**  There are no provisions in the DIP Facility or the Interim Order that grant cross-collateralization protection.

ii.      **Local Rule 4001-2(a)(i)(B) requires the disclosure of provisions or findings of fact that bind the estate with respect to validity, amount, or perfection of liens or a waiver of claims, without first giving certain parties in interest an opportunity to conduct an investigation.**  There are no provisions in the DIP Facility or the Interim Order that deny parties in interest an opportunity to conduct an investigation regarding the provisions or findings of fact that bind the estate with respect to the validity, amount, or perfection of liens or a waiver of claims.  Parties in interest have until seventy-five days from the date of entry of the Interim Order to investigate.  (Interim Order ¶ 6).

iii. **Local Rule 4001-2(a)(i)(C) requires disclosure of provisions that seek to waive, without notice, whatever rights the estate may have under section 506(c) of the Bankruptcy Code.** The Interim Order does not provide for an immediate waiver of the Debtors' rights under section 506(c) of the Bankruptcy Code. However, the Debtors highlight that the Interim Order does provide for a waiver of the Debtors' rights under section 506(c) of the Bankruptcy Code effective upon approval at the Final Hearing. (Interim Order ¶ 7); (DIP Facility § 2.18(d)).

iv. **Local Rule 4001-2(a)(i)(D) requires disclosure of provisions that immediately grant the prepetition secured creditor liens on avoidance actions.** The Interim Order does not immediately grant of liens on the Avoidance Actions to the Prepetition Lenders. The Interim Order does however provide that, upon entry of the Final Order, the Collateral upon which the Prepetition Lenders will be granted Replacement Liens will include the Avoidance Actions. (Interim Order ¶¶ 9-10).

v. **Local Rule 4001-2(a)(i)(E) requires disclosure of provisions that use postpetition loans to repay prepetition debt, other than as provided in section 522(b).** There are no provisions in the DIP Facility or the Interim Order that use postpetition loans to repay prepetition debt. However, the DIP Facility provides that it is an event of default under the DIP Facility if the Debtors refinance the DIP Facility and do not pay in full in cash the amounts due under the First Lien Credit Documents or convert such amounts due into debt or equity. (DIP Facility § 8.01(p)).

vi. **Local Rule 4001-2(a)(i)(F) requires disclosure of provisions that provide disparate treatment to professionals retained by the Creditors Committee from professionals retained by the Debtors.** There are no provisions in the DIP Facility or the Interim Order that provide disparate treatment to professionals retained by the Creditors Committee from professionals retained by the Debtors.

vii. **Finally, Local Rule 4001-2(a)(i)(G) requires disclosure of provisions that prime any secured liens without the consent of the lienholder.** The Prepetition Lenders are consenting to any liens provided to the DIP Lenders priming their liens in exchange for adequate protection. (Interim Order ¶ M).

28. As described above, the DIP Facility is an essential component of the overall de-leveraging of the Company's balance sheet. The DIP Lenders would not agree to provide the DIP Facility and the Prepetition Lenders would not allow the use of Cash Collateral without the inclusion of these terms, each of which was heavily negotiated between the parties.

These "extraordinary" provisions are all justified under the circumstances. Therefore, the Debtors determined in the exercise of their sound business judgment that agreeing to such provisions was appropriate under the circumstances of these cases to permit the Debtors to obtain immediate and much needed liquidity on the most competitive terms available to the Debtors.

**BASIS FOR RELIEF REQUESTED**

**A.      The Debtors Satisfy the Requirements for Obtaining
          Credit Under Section 364(c) of the Bankruptcy Code.**

          29.      The Debtors propose to obtain financing under the DIP Facility by providing security interests and liens as set forth above pursuant to section 364(c) of the Bankruptcy Code. The statutory requirement for obtaining postpetition credit under 364(c) of the Bankruptcy Code[8] is a finding, made after notice and a hearing, that the debtors-in-possession are "unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code] as an administrative expense." See In re Garland Corp., 6 B.R. 456, 461 n.11 (1st Cir. B.A.P. 1980) (secured credit under section 364(c)(2) is authorized, after notice and a hearing, upon showing that unsecured credit cannot be obtained); In re The Crouse Group, Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (debtor seeking unsecured credit under section 364(c) of the Bankruptcy Code must prove that it was unable to obtain unsecured credit pursuant to section 364(b) of the Bankruptcy Code); In re Ames Dep't Stores, Inc., 115 B.R. 34, 37 (Bankr.

---

[8]      Section 364(c) of the Bankruptcy Code provides that:

(c)      If the trustee [or debtor-in-possession] is unable to obtain unsecured credit allowable under § 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –
(1)      with priority over any and all administrative expenses of the kind specified in § 503(b) or 507(b) of this title;
(2)      secured by a lien on property of the estate that is not otherwise subject to a lien; or
(3)      secured by a junior lien on property of the estate that is subject to a lien.

S.D.N.Y. 1990) (debtor must show that it has made a reasonable effort to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code).

30.     Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code. Specifically, courts look to whether:

i.      the debtor is unable to obtain unsecured credit under section 364(b), i.e., by allowing a lender only an administrative claim;

ii.     the credit transaction is necessary to preserve the assets of the estate; and

iii.    the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.

In re Ames Dep't Stores, Inc., 115 B.R. at 37-39, In re The Crouse Group, Inc., 71 B.R. at 549.

31.     Based on current capital market conditions and discussions with potential lenders, postpetition financing on an unsecured basis or on a junior priority basis alone is unobtainable. The Debtors conducted substantial negotiations in connection with the DIP Facility and obtained the best financing proposal with the least amount of risk, the terms of which will be subject to objection from other parties-in-interest.

32.     Without postpetition financing, the Debtors would be unable to operate their business as a going concern, which would significantly impair the value of the Debtors' assets and limit their ability to repay their debts. Given the Debtors' circumstances and the advantages of the DIP Facility, the Debtors believe the terms of the DIP Facility are fair, reasonable, and adequate, all as more fully set forth below.

**B.      The Debtors Satisfy the Requirements for Obtaining
          Credit Under Section 364(d) of the Bankruptcy Code.**

33.     The Prepetition Lenders have consented to being primed. If a debtor is unable to obtain credit solely under the provisions of section 364(c) of the Bankruptcy Code, the

debtor may obtain credit by a senior or equal lien on property of the estate that is already subject to a lien (a "Priming Lien"). See 11 U.S.C. § 364(d). Section 364(d)(1) of the Bankruptcy Code authorizes a debtor-in-possession to incur superpriority senior secured Priming Liens if: (a) the debtor is unable to obtain financing from any other source and (b) the interests of the secured creditors whose liens are being primed by the postpetition financing are adequately protected. See 11 U.S.C. §§ 364(d)(1)(A) and (B).

34.     Under section 364(d)(1)(A) of the Bankruptcy Code, the adequacy of a debtors' efforts to obtain postpetition financing is a case specific inquiry. However, courts have generally found that a good-faith effort to seek credit from other sources is sufficient to carry the burden under section 364(d)(1). See Bray v. Shenandoah Fed. Sav. & Loan Assoc. (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986) ("there is no duty to seek credit from every possible lender"); In re 425 Cent. Park Ave. Corp., 136 B.R. 626, 630 (Bankr. S.D.N.Y. 1992) (the Bankruptcy Code "does not require the debtor to seek alternate financing from every possible lender").

35.     In determining whether to approve a financing agreement pursuant to section 364, courts may also consider: (i) whether the proposed financing is necessary to preserve estate assets and is necessary, essential, and appropriate for continued operation of the debtors' business; (ii) whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtors and proposed lender(s); (iii) whether the proposed financing agreement adequately protects prepetition secured creditors; and (iv) whether the proposed financing agreement was negotiated at arm's length and entry thereto is an exercise of sound and reasonable business judgment and in the best interest of the debtors' estate and its creditors. See Bland v. Farmworker Creditors, 308 B.R. 109, 113-14 (S.D. Ga. 2003).

36. The Debtors could not obtain financing on less onerous terms than those of the DIP Facility. Alvarez & Marsal Securities, LLC and their affiliates approached other potential sources of financing, none of which were willing to provide postpetition financing. Additionally, without the DIP Facility, the Debtors would be unable to operate their business as a going concern, which would significantly impair the value of the Debtors' assets and limit their ability to repay their debts. Moreover, the proposed financing is consensual between the Prepetition Lenders. Finally, the terms and conditions of the proposed DIP Facility are fair, reasonable, and were negotiated in good faith and at arm's length.

## C. The Prepetition Lenders are Adequately Protected.

37. The Bankruptcy Code does not explicitly define "adequate protection." However, section 361 suggests that adequate protection may be provided by (i) periodic cash payments to the extent that there is a decrease in the lien holder's interest in that property; (ii) providing additional or replacement liens; or (iii) other relief resulting in the realization of the "indubitable equivalent" of the lien holder's interest in the property. See 11 U.S.C. § 361. The third possibility is regarded as a "catch-all" provision, affording courts discretion, on a case-by-case basis, to determine what level of protection is appropriate to provide a secured party. See In re Swedeland Dev. Group, Inc., 16 F.3d 552, 564 (3d. Cir. 1994).

38. The goal of adequate protection is to protect a secured lender against a diminution in the value of its collateral during the reorganization process. See, e.g., Swedeland, 16 F.3d at 564; In re Shaw Indus., Inc., 300 B.R. 861, 865 (Bankr. W.D. Pa. 2003).

39. The measures of protection provided to the Prepetition Lenders in the proposed Interim Order, pursuant to and in accordance with sections 361 and 363(e) of the Bankruptcy Code, constitute adequate protection for any diminution in the value of their

Prepetition Collateral resulting from, among other things (i) the use by the Debtors of the Cash Collateral; (ii) the use, sale, lease, other disposition or depreciation of the Prepetition Collateral; and (iii) the imposition of the automatic stay. The proposed Interim Order provides that the First Lien Lenders will receive:

     i.    A grant of replacement liens (the "First Lien Replacement Liens") on all of the Collateral, subordinate only to (i) the liens in favor of the DIP Facility, (ii) the Carve-Out and (iii) specified senior Permitted Liens;

     ii.    Allowance of superpriority administrative claims (the "First Lien Superpriority Administrative Claims) arising under section 507(b) of the Bankruptcy Code, subordinate only to (i) the superpriority claims in favor of the DIP Facility and (ii) the Carve-Out; and

     ii.    Timely payment of reasonable fees and expenses of the professionals retained by the First Lien Agent (including counsel and financial advisors in accordance with the engagement letters previously approved by the Borrowers).

The proposed Interim Order provides that the Second Lien Lenders will receive:

     i.    A grant of replacement liens (the "Second Lien Replacement Liens," together with the First Lien Replacement Liens, the "Replacement Liens") on all of the Collateral, subordinate only to (i) the liens in favor of the DIP Facility, (ii) the First Lien Replacement Liens, (iii) the liens under the First Lien Credit Facility, (iv) the Carve-Out, and (v) specified senior Permitted Liens; and

     ii.    Allowance of superpriority administrative claims arising under section 507(b) of the Bankruptcy Code, subordinate only to (i) the superpriority claims in favor of the DIP Facility, (ii) the First Lien Superpriority Administrative Claims, and (iii) the Carve-Out.

The Debtors submit that the foregoing provisions adequately protect the Prepetition Lenders for any potential diminution in the value of their Prepetition Collateral subsequent to the Petition Date.

**D.      The DIP Facility Provides the Best Financing Terms Available the Debtors.**

40.      The Debtors have made a concerted, good-faith effort to obtain credit on the most favorable terms available.  The proposed terms of the DIP Facility are fair, reasonable, and adequate given the severe credit crisis that exists in today's financial market.

41.      Likewise, the various fees and charges required by the DIP Lenders under the DIP Facility and the Fee Letters are necessary to secure their agreement to provide the financing notwithstanding the volatility that exists in today's capital markets.  The terms and conditions of the DIP Facility and the Fee Letters were negotiated by the parties in good faith and at arm's length, and are fair and reasonable under the circumstances.  Accordingly, the Lenders under the DIP Facility should be accorded the benefits of Section 364(e) of the Bankruptcy Code in respect of such agreement.

42.      Bankruptcy Courts consistently defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision is arbitrary and capricious.  In re Curlew Valley Assocs., 14 B.R. 506, 514 n.11a (Bankr. D. Utah 1981); see In re Trans World Airlines, Inc., 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that an interim loan, receivables facility and asset-based facility were approved because they "reflect[ed] sound and prudent business judgment … [were] reasonable under the circumstances and in the best interest of [the debtor] and its creditors"); cf. Group of Inst. Investors v. Chicago, Mil., St. P. & Pac. Ry., 318 U.S. 523, 550 (1943) (holding that decisions regarding assumption or rejection of leases are left to the business judgment of the debtor); In re Simasko Prod. Co., 47 B.R. 444, 449 (D. Colo. 1985) ("[b]usiness judgments should be left to the board room and not to this Court.").  In fact, one court has noted that "[m]ore exacting scrutiny [of the debtor's business decisions] would slow the administration of the debtor's estate and increase its cost, interfere

with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." <u>Richmond Leasing Co. v. Capital Bank, N.A.</u>, 762 F.2d 1303, 1311 (5th Cir. 1985). Bankruptcy courts generally will not second-guess a debtor-in-possession's business decisions involving "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code." <u>Curlew Valley</u>, 14 B.R. at 513-14. Consistent with this authority, the Debtors respectfully submit that the Court should approve the Debtors' decision to accept and enter into the DIP Facility.

**E.** **Approval of the DIP Facility Is In the Best Interests of the Debtors' Estates.**

43. A denial of the Debtors' requested relief will cause immediate and irreparable harm to the Debtors and their estates, and will also have a detrimental effect on the Prepetition Collateral. The Debtors require access to ongoing working capital which is critical to the Debtors' entire business. Absent access to the DIP Facility and the use by the Debtors of the Cash Collateral, the Debtors would have no ability to meet their ongoing obligations to suppliers, vendors, employees, and other creditors. If the Debtors are unable to pay their ongoing obligations, they will not be able to operate. In contrast, the Debtors' access to the DIP Facility and continued use of Cash Collateral will ensure that the "going concern" value of their assets is preserved, a value substantially greater than the value which would be realized from a piecemeal liquidation of those assets if the Debtors were forced to cease operations immediately.

44. The Debtors submit for all of these reasons that ample justification exists for the relief requested herein.

**REQUEST FOR INTERIM RELIEF**

45. Bankruptcy Rule 4001(b) permits a court to approve a debtor's request for use of cash collateral during the 15-day period following the filing of a motion for authority to

use cash collateral "as is necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2). Similarly, Bankruptcy Rule 4001(c) permits a court to approve a debtor's request for authority to obtain financing during the same period "to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(c)(2). In examining such requests under Bankruptcy Rule 4001, courts apply the same business judgment standard as is applicable to other business decisions. See, e.g., Ames Dept. Stores Inc., 115 B.R. at 38. The Debtors submit that, for the reasons set forth herein, authority to obtain postpetition financing and use Cash Collateral on an interim basis as requested in this Motion is necessary to avert immediate and irreparable harm to the Debtors' business.

## REQUEST FOR A FINAL HEARING

46. Pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2), the Debtors respectfully request that the Court set a date for the Final Hearing that is no later than thirty (30) days following the Petition Date.

## WAIVER OF RULE 6004 STAY

47. Because the relief requested herein is essential to prevent irreparable harm to the Debtors' reorganization efforts, the Debtors submit that cause exists for a waiver of the 10-day stay imposed by Bankruptcy Rule 6004(h), to the extent applicable.

## NOTICE

48. No trustee, examiner, or statutory committee has been appointed in the Chapter 11 Cases. Notice of this Motion has been provided via e-mail, facsimile, telephone, and/or hand delivery to (i) the Office of the United States Trustee for Region 3, serving the District of Delaware (the "U.S. Trustee"); (ii) the creditors (excluding insiders) holding the 30

largest unsecured claims on a consolidated basis against the Debtors; (iii) all of the Debtors' secured creditors of record other than the Prepetition Lenders; (iv) the Internal Revenue Service; (v) the United States Securities and Exchange Commission; (vi) United States Attorney's Office; (vii) the United States Attorney General; (viii) counsel to the Prepetition Agents, for themselves and for the Prepetition Lenders; and (ix) counsel to the DIP Agent, for itself and for the DIP Lenders.   As this Motion is seeking first-day relief, notice of this Motion and any order entered hereon will be served on all parties required by Rule 9013-1(m) of the Local Rules for the United States Bankruptcy Court for the District of Delaware.  Due to the urgency of the circumstances surrounding this Motion and the nature of the relief requested herein, the Debtors respectfully submit that no further notice of this Motion is required.

## NO PRIOR RELIEF

49.     No previous motion for the relief sought herein has been made to this or any other Court.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court enter an order,

substantially in the form attached hereto as Exhibit A, (i) granting the relief requested herein and

(ii) granting such other relief and further relief as the Court may deem just and proper.

Dated:   July 27, 2009
          Wilmington, Delaware

_____
Frederick B. Rosner (DE 3995)
MESSANA ROSNER & STERN LLP
1000 N. West Street, Suite 1200
Wilmington, Delaware 19801
Telephone:  (302) 295-4877
Email: frosner@mrs-law.com

-and-

Glenn E. Siegel
Brian E. Greer
Andrew L. Buck
DECHERT LLP
1095 Avenue of the Americas
New York, New York  10112
Telephone:  (212) 698-3500
Facsimile:  (212) 698-3599
Email:  brian.greer@dechert.com

Proposed Co-Counsel for the Debtors
and Debtors-in-Possession