**$25,000,000**

**SENIOR SECURED, SUPER-PRIORITY**

**DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

**dated as of July __, 2009,**

**among**

**ARCLIN CANADA LTD.,**
**as Canadian Borrower,**

**ARCLIN US HOLDINGS INC.,**
**as US Borrower,**

**ARCLIN HOLDINGS I L.P.,**
**as Holding LP1**

**and**

**THE OTHER GUARANTORS PARTY HERETO,**
**as Guarantors,**

**THE LENDERS PARTY HERETO**

**and**

**UBS SECURITIES LLC,**
**as Joint Lead Arranger, Bookmanager and Syndication Agent,**

**and**

**BLACK DIAMOND COMMERCIAL FINANCE, L.L.C.,**
**as Joint Lead Arranger,**

**and**

**UBS AG, STAMFORD BRANCH,**
**as Administrative Agent and Collateral Agent**

# TABLE OF CONTENTS

Section                                                                                                          Page

## ARTICLE I

### DEFINITIONS

SECTION 1.01    Defined Terms ...................................................................................................... 2
SECTION 1.02    Classification of Loans and Borrowings................................................................ 38
SECTION 1.03    Terms Generally ................................................................................................... 38
SECTION 1.04    Accounting Terms; GAAP .................................................................................... 38
SECTION 1.05    Resolution of Drafting Ambiguities ...................................................................... 39

## ARTICLE II

### THE CREDITS

SECTION 2.01    Commitments........................................................................................................ 39
SECTION 2.02    Loans ................................................................................................................... 39
SECTION 2.03    Borrowing Procedure............................................................................................ 40
SECTION 2.04    Evidence of Debt; Repayment of Loans ............................................................... 41
SECTION 2.05    Fees ..................................................................................................................... 41
SECTION 2.06    Interest on Loans.................................................................................................. 42
SECTION 2.07    Termination and Reduction of Commitments ........................................................ 43
SECTION 2.08    Interest Elections .................................................................................................. 44
SECTION 2.09    [Intentionally Omitted] ......................................................................................... 45
SECTION 2.10    Optional and Mandatory Prepayments of Loans. .................................................. 45
SECTION 2.11    Alternate Rate of Interest ..................................................................................... 47
SECTION 2.12    Yield Protection ................................................................................................... 47
SECTION 2.13    Breakage Payments.............................................................................................. 48
SECTION 2.14    Payments Generally; Pro Rata Treatment; Sharing of Setoffs................................ 49
SECTION 2.15    Taxes................................................................................................................... 51
SECTION 2.16    Mitigation Obligations; Replacement of Lenders................................................... 53
SECTION 2.17    Determination of Borrowing Base ......................................................................... 54
SECTION 2.18    Super-Priority Nature of Obligations and Lenders' Liens ...................................... 58
SECTION 2.19    Extension ............................................................................................................. 61

## ARTICLE III

### REPRESENTATIONS AND WARRANTIES

SECTION 3.01    Organization; Powers........................................................................................... 61
SECTION 3.02    Authorization; Enforceability ............................................................................... 62
SECTION 3.03    No Conflicts......................................................................................................... 62
SECTION 3.04    Financial Statements; Projections......................................................................... 62
SECTION 3.05    Properties............................................................................................................ 63
SECTION 3.06    Intellectual Property............................................................................................. 64
SECTION 3.07    Equity Interests and Subsidiaries.......................................................................... 64

SECTION 3.08    Litigation; Compliance with Laws ..........................................................65
SECTION 3.09    Agreements ................................................................................................65
SECTION 3.10    Federal Reserve Regulations ......................................................................66
SECTION 3.11    Investment Company Act ............................................................................66
SECTION 3.12    Use of Proceeds ........................................................................................66
SECTION 3.13    Taxes ..........................................................................................................67
SECTION 3.14    No Material Misstatements ........................................................................67
SECTION 3.15    Labor Matters ............................................................................................67
SECTION 3.16    [Intentionally Omitted]. .............................................................................67
SECTION 3.17    Employee Benefit Plans .............................................................................67
SECTION 3.18    Environmental Matters ...............................................................................69
SECTION 3.19    Insurance ....................................................................................................70
SECTION 3.20    Security Documents ...................................................................................70
SECTION 3.21    Bank Accounts ...........................................................................................71
SECTION 3.22    Anti-Terrorism Law ...................................................................................71
SECTION 3.23    Reorganization Matters ..............................................................................72
SECTION 3.24    Location of Material Inventory ...................................................................73
SECTION 3.25    Accuracy of Borrowing Base .....................................................................73
SECTION 3.26    Post-Appraisal Asset Dispositions .............................................................73

## ARTICLE IV

## CONDITIONS TO CREDIT EXTENSIONS

SECTION 4.01    Conditions to Initial Credit Extension ........................................................73
SECTION 4.02    Conditions to All Credit Extensions ...........................................................78

## ARTICLE V

## AFFIRMATIVE COVENANTS

SECTION 5.01    Financial Statements, Reports, etc. .............................................................79
SECTION 5.02    Litigation and Other Notices ......................................................................84
SECTION 5.03    Existence; Businesses and Properties .........................................................84
SECTION 5.04    Insurance ....................................................................................................85
SECTION 5.05    Obligations and Taxes ................................................................................86
SECTION 5.06    Employee Benefits ......................................................................................87
SECTION 5.07    Maintaining Records; Access to Properties and Inspections; Annual
                Meetings ..................................................................................................88
SECTION 5.08    Use of Proceeds ........................................................................................89
SECTION 5.09    Compliance with Environmental Laws; Environmental Reports ..............89
SECTION 5.10    Location of Material Inventory ...................................................................90
SECTION 5.11    Additional Collateral; Additional Guarantors............................................90
SECTION 5.12    Security Interests; Further Assurances .......................................................91
SECTION 5.13    Information Regarding Collateral ...............................................................92
SECTION 5.14    Post-Closing Collateral Matters .................................................................93
SECTION 5.15    Affirmative Covenants With Respect to Leases .........................................93
SECTION 5.16    Post Closing Mortgaged Property...............................................................93
SECTION 5.17    Cooperation with Advisors ........................................................................93

SECTION 5.18    Cash Management System.................................................................................93
SECTION 5.19    Milestones.................................................................................................................95

## ARTICLE VI

## NEGATIVE COVENANTS

SECTION 6.01    Indebtedness ..............................................................................................96
SECTION 6.02    Liens ..........................................................................................................97
SECTION 6.03    Sale and Leaseback Transactions ...............................................................99
SECTION 6.04    Investment, Loan and Advances.................................................................99
SECTION 6.05    Mergers and Consolidations ....................................................................100
SECTION 6.06    Asset Sales...............................................................................................100
SECTION 6.07    Acquisitions .............................................................................................101
SECTION 6.08    Dividends..................................................................................................102
SECTION 6.09    Transactions with Affiliates......................................................................102
SECTION 6.10    Financial Covenants.................................................................................103
SECTION 6.11    Prepayments of Other Indebtedness; Modifications of Organizational
                         Documents and Other Documents, etc......................................................103
SECTION 6.12    Limitation on Certain Restrictions on Subsidiaries ..................................104
SECTION 6.13    Limitation on Issuance of Capital Stock...................................................105
SECTION 6.14    Limitation on Creation of Subsidiaries ....................................................105
SECTION 6.15    Business ...................................................................................................105
SECTION 6.16    Limitation on Accounting Changes ..........................................................108
SECTION 6.17    Fiscal Year................................................................................................108
SECTION 6.18    No Further Negative Pledge......................................................................108
SECTION 6.19    Anti-Terrorism Law; Anti-Money Laundering...........................................108
SECTION 6.20    Embargoed Person...................................................................................108
SECTION 6.21    Critical Vendor and Other Payments ........................................................109
SECTION 6.22    Prepetition Indebtedness..........................................................................109

## ARTICLE VII

## GUARANTEE

SECTION 7.01    The Guarantee...........................................................................................109
SECTION 7.02    Obligations Unconditional........................................................................110
SECTION 7.03    Reinstatement...........................................................................................111
SECTION 7.04    Subrogation; Subordination .....................................................................111
SECTION 7.05    Remedies ..................................................................................................111
SECTION 7.06    Instrument for the Payment of Money ......................................................111
SECTION 7.07    Continuing Guarantee...............................................................................111
SECTION 7.08    General Limitation on Guarantee Obligations..........................................111
SECTION 7.09    [Intentionally Omitted] .............................................................................112
SECTION 7.10    Right of Contribution................................................................................112

## ARTICLE VIII

## EVENTS OF DEFAULT

SECTION 8.01    Events of Default ................................................................................................112
SECTION 8.02    Rescission ............................................................................................................119
SECTION 8.03    Application of Proceeds.......................................................................................119

## ARTICLE IX

## THE ADMINISTRATIVE AGENT AND THE COLLATERAL AGENT

SECTION 9.01    Appointment and Authority...................................................................................120
SECTION 9.02    Rights as a Lender ...............................................................................................122
SECTION 9.03    Exculpatory Provisions ........................................................................................122
SECTION 9.04    Reliance by Agent ................................................................................................123
SECTION 9.05    Delegation of Duties.............................................................................................123
SECTION 9.06    Resignation of Agent ............................................................................................123
SECTION 9.07    Non-Reliance on Agent and Other Lenders...........................................................124
SECTION 9.08    No Other Duties, etc ............................................................................................124
SECTION 9.09    Actions in Concert ...............................................................................................124
SECTION 9.10    Enforcement..........................................................................................................124
SECTION 9.11    Borrowing Base Certificates .................................................................................124

## ARTICLE X

## MISCELLANEOUS

SECTION 10.01    Notices..................................................................................................................125
SECTION 10.02    Waivers; Amendment ...........................................................................................128
SECTION 10.03    Expenses; Indemnity; Damage Waiver..................................................................130
SECTION 10.04    Successors and Assigns.........................................................................................132
SECTION 10.05    Survival of Agreement..........................................................................................134
SECTION 10.06    Counterparts; Integration; Effectiveness ...............................................................135
SECTION 10.07    Severability...........................................................................................................135
SECTION 10.08    Right of Setoff ......................................................................................................135
SECTION 10.09    Governing Law; Jurisdiction; Consent to Service of Process....................................135
SECTION 10.10    Waiver of Jury Trial..............................................................................................136
SECTION 10.11    Headings ...............................................................................................................136
SECTION 10.12    Treatment of Certain Information; Confidentiality .................................................136
SECTION 10.13    USA PATRIOT Act Notice ...................................................................................137
SECTION 10.14    Interest Rate Limitation ........................................................................................137
SECTION 10.15    Lender Addendum .................................................................................................137
SECTION 10.16    Obligations Absolute ............................................................................................137
SECTION 10.17    Conflicts with Other Loan Documents...................................................................138
SECTION 10.18    Judgment Currency................................................................................................138
SECTION 10.19    Parties Including Trustees; Bankruptcy Court Proceedings ......................................139

## SCHEDULES

| | |
|---|---|
| Schedule 1.01(a) | First Day Orders |
| Schedule 1.01(b) | Guarantors |
| Schedule 1.01(c) | Intercompany Loan Documents |
| Schedule 1.01(d) | Projections |
| Schedule 3.06(c) | Violations or Proceedings |
| Schedule 3.07 | Ownership of Equity Interests |
| Schedule 3.17 | ERISA and Other Pension Matters |
| Schedule 3.17(a) | U.S. Underfunded Plans |
| Schedule 3.17(c) | Canadian Pension Plan Funding Status |
| Schedule 3.18 | Environmental Matters |
| Schedule 3.19 | Insurance |
| Schedule 4.01(g) | Local Counsel |
| Schedule 4.01(k)(vi) | Landlord Access Agreements |
| Schedule 5.14 | Post-Closing Matters |
| Schedule 5.18 | Cash Management System |
| Schedule 5.19 | Milestones |
| Schedule 6.01(b) | Existing Indebtedness |
| Schedule 6.02(c) | Existing Liens |
| Schedule 6.04(b) | Existing Investments |

## EXHIBITS

| | |
|---|---|
| Exhibit A | Form of Administrative Questionnaire |
| Exhibit B | Form of Assignment and Assumption |
| Exhibit C | Form of Interim Order; Form of CCAA Initial Order |
| Exhibit D-1 | Form of Borrowing Request |
| Exhibit D-2 | Form of Interest Election Request |
| Exhibit E | Form of Compliance Certificate |
| Exhibit F | Form of Joinder Agreement |
| Exhibit G | Form of Landlord Access Agreement |
| Exhibit H | Form of Borrowing Base Certificate |
| Exhibit I | Form of Lender Addendum |
| Exhibit J-1 | Form of Mortgage |
| Exhibit J-2 | Form of Deed of Trust |
| Exhibit K | Form of Note |
| Exhibit L-1 | Form of Perfection Certificate |
| Exhibit L-2 | Form of Perfection Certificate Supplement |
| Exhibit M | Form of Security Agreement |
| Exhibit N | Form of Opinion of Company Counsel |
| Exhibit P | Form of Intercompany Note |
| Exhibit Q | Form of Non-Bank Certificate |

| LA\1978870.15||{00001116. }

# SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT

This SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT (this "**Agreement**") dated as of July __, 2009, among ARCLIN CANADA LTD., a corporation incorporated under the laws of Ontario ("**Canadian Borrower**"), as a debtor company, ARCLIN US HOLDINGS INC., a Delaware corporation ("**US Borrower**" and, together with Canadian Borrower, the "**Borrowers**" and each individually, a "**Borrower**"), as debtor and debtor-in-possession, the Guarantors (such term and each other capitalized term used but not defined herein having the meaning given to it in <u>Article I</u>), as debtor companies and debtors and debtors-in-possession, as the case may be, the Lenders, UBS SECURITIES LLC and BLACK DIAMOND COMMERCIAL FINANCE, L.L.C., as joint lead arrangers (in such capacity, collectively, "**Joint Lead Arrangers**"), UBS SECURITIES LLC, as syndication agent (in such capacity, "**Syndication Agent**"), and UBS AG, STAMFORD BRANCH, as administrative agent (in such capacity, "**Administrative Agent**") for the Lenders and as collateral agent (in such capacity, "**Collateral Agent**") for the Secured Parties.

## WITNESSETH:

WHEREAS, on July __, 2009 (the "**Petition Date**"), the US Borrower and some or all of the US Guarantors commenced Chapter 11 Case Nos. [__] through [__] as administratively consolidated at Chapter 11 Case No. [__] (each a "**Chapter 11 Case**" and collectively, the "**Chapter 11 Cases**") by filing separate voluntary petitions for reorganization under Chapter 11, 11 U.S.C. §§ 101 <u>et. seq.</u> (the "**Bankruptcy Code**") with the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**");

WHEREAS, from and after the Petition Date, each of the US Borrower and the US Guarantors continues to operate its business and manage its property as a debtor and debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, on July __, 2009 (the "**CCAA Filing Date**") the Canadian Borrower and some or all of the Canadian Guarantors filed an application with the Ontario Superior Court of Justice (Commercial List) (the "**Canadian Court**") for relief and commenced proceedings (the "**CCAA Case**") under the *Companies' Creditors Arrangement Act* (the "**CCAA**") and have continued in possession of their assets and in the management of their business pursuant to the CCAA and the CCAA Initial Order (as defined herein);

WHEREAS, prior to the Petition Date, the Prepetition First Lien Lenders provided financing to the Borrowers pursuant to that certain credit agreement, dated as of July 10, 2007 (the "**Original Closing Date**"), among the Borrowers, the guarantors party thereto, the Prepetition Agents and the Prepetition First Lien Lenders (as amended, modified or supplemented through the Petition Date, the "**Prepetition First Lien Credit Agreement**"); and

WHEREAS, the Borrowers have requested that the Lenders provide a senior secured, super-priority revolving credit facility to the Borrowers of up to $25,000,000 in the aggregate to fund the working capital requirements and other financing needs of the Loan Parties during the pendency of the Chapter 11 Cases and the CCAA Case to be used in accordance with <u>Section 3.12</u> herein.

NOW, THEREFORE, the Lenders are willing to extend such credit to Borrowers on the terms and subject to the conditions set forth herein. Accordingly, the parties hereto agree as follows:

# ARTICLE I

## DEFINITIONS

**SECTION 1.01** **Defined Terms**.  As used in this Agreement, the following terms shall have the meanings specified below:

"**364/546 Liens**" shall have the meaning assigned to such term in <u>Section 2.18(b)</u>.

"**ABR**", when used in reference to any Loan or Borrowing, is used when such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate.

"**ABR Borrowing**" shall mean a Borrowing comprised of ABR Loans.

"**ABR Loan**" shall mean any Loan bearing interest at a rate determined by reference to the Alternate Base Rate in accordance with the provisions of <u>Article II</u>.

"**Account Debtor**" shall mean any person who may become obligated to another person under, with respect to, or on account of, an Account.

"**Accounts**" shall mean, with respect to any US Loan Party, any and all assets which constitute "accounts," as such term is defined in the UCC as in effect on the date hereof in the State of New York and, with respect to any Canadian Loan Party, "accounts" as defined in the PPSA, and, in all cases, in which the relevant person now or hereafter has rights.

"**Adjusted LIBOR Rate**" shall mean, with respect to any Eurodollar Borrowing for any Interest Period, the greater of (i) (a) an interest rate per annum (rounded upward, if necessary, to the nearest 1/100th of 1%) determined by the Administrative Agent to be equal to the LIBOR Rate for such Eurodollar Borrowing in effect for such Interest Period divided by (b) 1 *minus* the Statutory Reserves (if any) for such Eurodollar Borrowing for such Interest Period, and (ii) 3.00%.

"**Administration Charge**" means the charge provided for in the CCAA Initial Order, which charge shall not exceed Can$1,500,000, to secure the Administration Charge Expenses.

"**Administration Charge Expenses**" means (a) all fees and expenses required to be paid to the Monitor, including the fees and expenses of the Monitor's legal counsel and (b) all fees and expenses of counsel to the Canadian Loan Parties, the financial advisor to the Canadian Loan Parties and such other advisors retained by the Canadian Loan Parties, subject to and in accordance with the CCAA Initial Order.

"**Administrative Agent**" shall have the meaning assigned to such term in the preamble hereto and includes each other person appointed as the successor pursuant to <u>Article X</u>.

"**Administrative Agent Fees**" shall have the meaning assigned to such term in <u>Section 2.05(b)</u>.

"**Administrative Questionnaire**" shall mean an Administrative Questionnaire in substantially the form of <u>Exhibit A</u>.

"**Advisors**" shall mean outside legal counsel (including local counsel), auditors, accountants, consultants, appraisers or other advisors of the Administrative Agent, the Joint Lead Arrangers, the Collateral Agent and the Lenders.

"**Affiliate**" shall mean, when used with respect to a specified person, another person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the person specified; *provided*, *however*, that, for purposes of Section 6.09, the term "Affiliate" shall also include (i) any person that directly or indirectly owns more than 10% of any class of Equity Interests of the person specified or (ii) any person that is an executive officer or director of the person specified.

"**Agents**" shall mean the Administrative Agent and the Collateral Agent; and "**Agent**" shall mean any of them.

"**Aggregate Revolver Outstandings**" means, at any date of determination, the sum for all Borrowers of (a) the unpaid balance of Loans plus (b) the aggregate amount of Pending Loans.

"**Agreement**" shall have the meaning assigned to such term in the preamble hereto.

"**Alternate Base Rate**" shall mean, for any day, a fluctuating rate per annum (rounded upward, if necessary, to the nearest 1/100th of 1%) equal to the greater of (a) the Base Rate in effect on such day and (b) the Federal Funds Effective Rate in effect on such day *plus* 0.50%. If the Administrative Agent shall have determined (which determination shall be conclusive absent manifest error) that it is unable to ascertain the Federal Funds Effective Rate for any reason, including the inability or failure of the Administrative Agent to obtain sufficient quotations in accordance with the terms of the definition thereof, the Alternate Base Rate shall be determined without regard to clause (b) of the preceding sentence until the circumstances giving rise to such inability no longer exist. Any change in the Alternate Base Rate due to a change in the Base Rate or the Federal Funds Effective Rate shall be effective on the effective date of such change in the Base Rate or the Federal Funds Effective Rate, respectively.

"**Anti-Terrorism Laws**" shall have the meaning assigned to such term in Section 3.22(a).

"**Applicable Margin**" shall mean, for any day, with respect to any (a) Loan that is a Eurodollar Loan, 6.00%, and (b) Loan that is an ABR Loan, 7.00%.

"**Applicable Order**" means the Interim Order (until such time as the Final Order shall have been entered and, thereafter, the Final Order) and the CCAA Initial Order.

"**Appraisal**" shall mean (a) (i) on the Closing Date, the machinery and equipment appraisal prepared by Thomas Industries, Inc. dated June 1, 2009 and (ii) thereafter, the most recent machinery and equipment appraisal conducted by an independent appraisal firm acceptable to the Collateral Agent and delivered pursuant to Section 5.07(c) hereof and/or, as applicable, (b) if requested by the Collateral Agent, the most recent accounts receivable and inventory appraisal conducted by an independent appraisal firm acceptable to the Collateral Agent and delivered pursuant to Section 5.07(b) hereof; provided that, in the case of clauses (a)(ii) and (b), the Collateral Agent shall consult with the Joint Lead Arrangers regarding the identity of the independent appraisal firm to the extent such firm is not Thomas Industries, Inc.

"**Approved Budget**" means (a) a weekly delivered rolling 13-week post-petition budget that is acceptable to the Administrative Agent, the Joint Lead Arrangers and the Required Lenders, the initial version of which is approved by the Bankruptcy Court and attached as an exhibit to the Interim Order and (b) a weekly delivered 13 week cash flow forecast detailing projected cash receipts and cash disbursements of the Canadian Loan Parties that is acceptable to the Administrative Agent, the Joint Lead Arrangers and the Required Lenders, the initial version of which is filed with the Canadian Court; provided that any Approved Budget may be subsequently amended, supplemented or replaced by the Borrowers with the approval of the Administrative Agent, the Joint Lead Arrangers and the Required Lenders and without further approval of the Bankruptcy Court or the Canadian Court, as applicable (with any such supplement that solely adds an additional Measurement Period deemed acceptable if no objection thereto is made by the Administrative Agent, the Joint Lead Arrangers or the Required Lenders within two (2) Business Days of receipt thereof); provided further that amounts that were budgeted for a prior Measurement Period but not spent in such Measurement Period shall be added to the budgeted amounts for the immediately succeeding Measurement Period without reduction of the amounts that would otherwise have been budgeted and acceptable to the Administrative Agent, the Joint Lead Arrangers and the Required Lenders (provided that, other than with respect to professional fees and expenses of counsel to the Loan Parties and the Committee, such carried forward amounts may not be further carried forward for any succeeding Measurement Period).

"**Approved Fund**" shall mean any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"**Arclin Mexico**" shall mean Arclin Mexico S.A. de C.V.

"**Arclin Surfaces**" shall mean Arclin Surfaces Inc.

"**Arclin U.S.A.**" shall mean Arclin U.S.A. Inc.

"**Asset Sale**" shall mean (a) any conveyance, sale, lease, sublease, assignment, transfer or other disposition (including by way of merger or consolidation and including any Sale and Leaseback Transaction) of any property excluding sales of inventory and dispositions of cash and Cash Equivalents, in each case, in the ordinary course of business, by Holding LP1, ManagementCo, GPCo1, GPCo2 or any of their respective Subsidiaries and (b) any issuance or sale of any Equity Interests of any Subsidiary of Holding LP1, ManagementCo, GPCo1 or GPCo2, in each case, to any person other than (i) Borrowers, (ii) any Subsidiary Guarantor or (iii) other than for purposes of Section 6.06, any other Subsidiary.

"**Assignment and Assumption**" shall mean an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 10.04(b)), and accepted by the Administrative Agent, in substantially the form of Exhibit B, or any other form approved by the Administrative Agent.

"**Attributable Indebtedness**" shall mean, when used with respect to any Sale and Leaseback Transaction, as at the time of determination, the present value (discounted at a rate equivalent to each Borrower's then-current weighted average cost of funds for borrowed money as at the time of determination, compounded on a semi-annual basis) of the total obligations of the lessee for rental payments during the remaining term of the lease included in any such Sale and Leaseback Transaction.

-4-

"**Audited Financial Statements**" shall have the meaning assigned to such term in Section 5.01(a).

"**Bailee Letter**" shall have the meaning assigned thereto in the Security Agreement.

"**Bankruptcy Code**" has the meaning given that term in the recitals hereto.

"**Bankruptcy Court**" has the meaning given that term in the recitals hereto.

"**Bankruptcy Rules**" shall mean the Federal Rules of Bankruptcy Procedure, as the same may from time to time be in effect and applicable to the Chapter 11 Cases.

"**Base Rate**" shall mean, for any day, a rate per annum that is equal to the corporate base rate of interest established by the Administrative Agent from time to time; each change in the Base Rate shall be effective on the date such change is effective. The corporate base rate is not necessarily the lowest rate charged by the Administrative Agent to its customers.

"**BIA**" shall mean the *Bankruptcy and Insolvency Act* (Canada) as such legislation now exists or may from time to time hereafter be amended, modified, recodified, supplemented or replaced, together with all rules, regulations and interpretations thereunder or related thereto.

"**Blocked Account**" shall have the meaning assigned to such term in Section 5.18(b).

"**Blocked Account Agreement**" shall have the meaning assigned to such term in Section 5.18(b).

"**Board**" shall mean the Board of Governors of the Federal Reserve System of the United States.

"**Board of Directors**" shall mean, with respect to any person, (i) in the case of any corporation (including any company incorporated under the laws of Canada (or any province thereof) or Mexico), the board of directors (or similar body) of such person, (ii) in the case of any limited liability company, the managers or board of managers of such person, (iii) in the case of any partnership, the Board of Directors of the general partner of such person and (iv) in any other case, the functional equivalent of the foregoing.

"**Borrowers**" shall have the meaning assigned to such term in the preamble hereto.

"**Borrowing**" shall mean Loans of the same Type, made, converted or continued on the same date and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect.

"**Borrowing Availability**" shall mean, at any time the lesser of (a) the Maximum Amount minus the Aggregate Revolver Outstandings or (b) the Borrowing Base minus the Aggregate Revolver Outstandings.

"**Borrowing Base**" shall mean at any time, subject to adjustment as provided in Section 2.17, the US dollar amount equal to the sum of, without duplication:

(a)     the book value of Eligible Accounts of the Borrowing Base Parties multiplied by the advance rate of 85%, **plus**

-5-

(b) the lesser of (i) if an inventory Appraisal has been prepared and delivered to the Administrative Agent pursuant to <u>Section 5.07</u> prior to such time, the advance rate of 85% multiplied by the Net Recovery Cost Percentage multiplied by the Cost of Eligible Raw Materials of US Borrower and Canadian Borrower and (ii) the advance rate of 25% multiplied by the Cost of Eligible Raw Materials of US Borrower and Canadian Borrower, <u>plus</u>

(c) the lesser of (i) if an inventory Appraisal has been prepared and delivered to the Administrative Agent pursuant to <u>Section 5.07</u> prior to such time, the advance rate of 85% multiplied by the Net Recovery Cost Percentage multiplied by the Cost of Eligible Raw Materials of Arclin Surfaces and (ii) the advance rate of 40% multiplied by the Cost of Eligible Raw Materials of Arclin Surfaces, <u>plus</u>

(d) the lesser of (i) if an inventory Appraisal has been prepared and delivered to the Administrative Agent pursuant to <u>Section 5.07</u> prior to such time, the advance rate of 85% multiplied by the Net Recovery Cost Percentage multiplied by the Cost of Eligible Intermediate Inventory of US Borrower and Canadian Borrower and (ii) the advance rate of 25% multiplied by the Cost of Eligible Intermediate Inventory of US Borrower and Canadian Borrower, <u>plus</u>

(e) the lesser of (i) if an inventory Appraisal has been prepared and delivered to the Administrative Agent pursuant to <u>Section 5.07</u> prior to such time, the advance rate of 85% multiplied by the Net Recovery Cost Percentage multiplied by the Cost of Eligible Finished Goods of the Borrowing Base Parties and (ii) the advance rate of 40% multiplied by the Cost of Eligible Finished Goods of the Borrowing Base Parties, <u>minus</u>

(f) a Reserve in the amount of the Carve-Out, <u>minus</u>

(g) a Reserve in the amount of the Priority Payables, <u>minus</u>

(h) a Reserve in the amount of the Administration Charge, <u>minus</u>

(i) effective immediately upon notification thereof to Borrowers by the Collateral Agent, any other Reserves established from time to time by the Collateral Agent or the Administrative Agent pursuant to <u>Section 2.17(c)</u>.

The Borrowing Base at any time shall be determined by reference to the most recent Borrowing Base Certificate theretofore delivered to the Collateral Agent and the Administrative Agent with such adjustments as Administrative Agent and Collateral Agent deem appropriate in their Permitted Discretion to assure that the Borrowing Base is calculated in accordance with the terms of this Agreement.

"**Borrowing Base Certificate**" shall mean an Officers' Certificate from a Borrower, substantially in the form of (or in such other form as may, from time to time, be mutually agreed upon by Borrower, Collateral Agent and Administrative Agent), and containing the information prescribed by <u>Exhibit H</u>, delivered to the Administrative Agent and the Collateral Agent setting forth Borrower's calculation of the Borrowing Base.

"**Borrowing Base Parties**" shall mean, collectively, Canadian Borrower, US Borrower and Arclin Surfaces.

"**Borrowing Request**" shall mean a request by a Borrower in accordance with the terms of <u>Section 2.03</u> and substantially in the form of <u>Exhibit D-1</u>, or such other form as shall be approved by the Administrative Agent.

-6-

"**Business Day**" shall mean any day other than a Saturday, Sunday or other day on which banks in New York City are authorized or required by law to close; *provided*, *however*, that when used in connection with a Eurodollar Loan, the term "Business Day" shall also exclude any day on which banks are not open for dealings in US dollar deposits in the London interbank market.

"**Can$**" shall mean the lawful money of Canada.

"**Canadian Benefit Plans**" shall mean all material employee benefit plans that are not Canadian Pension Plans, including, without limitation, all profit sharing, savings, post-retirement, supplemental retirement, retiring allowance, severance, pension, deferred compensation, welfare, bonus, incentive compensation, phantom stock, legal services, supplementary unemployment benefit plans or arrangements and all life, health, dental and disability plans and arrangements, maintained or contributed to by Canadian Borrower or any of its Subsidiaries for its employees or former employees employed in Canada.

"**Canadian Borrower**" shall have the meaning assigned to such term in the preamble hereto.

"**Canadian Court**" shall have the meaning assigned to such term in the recitals hereto.

"**Canadian Guarantors**" shall mean, collectively, the Guarantors organized under the laws of Canada or any province thereof.

"**Canadian Loan Parties**" shall mean, collectively, the Canadian Borrower and the Canadian Guarantors.

"**Canadian Mortgage**" shall mean each Mortgage entered into by a Canadian Loan Party.

"**Canadian Obligations**" shall mean the Obligations of Canadian Borrower and the Canadian Guarantors.

"**Canadian Pension Plans**" means all "registered pension plans", as defined in the ITA, established, maintained or contributed to by Canadian Borrower or any of its Subsidiaries for its employees or former employees employed in Canada.

"**Canadian Security Agreements**" shall mean, collectively, (i) that certain Security Agreement dated as of the Closing Date in favor of Collateral Agent for the benefit of the Secured Parties by ManagementCo, GPCo1, GPCo2, Holding LP1, Holding LP2, Holdco3, Holdco4 and Canadian Borrower, which is governed by the laws of the Province of Ontario and any federal laws of Canada applicable therein, (ii) that certain Pledge Agreement dated as of the Closing Date in favor of Collateral Agent for the benefit of the Secured Parties by ManagementCo, GPCo1, GPCo2, Holding LP1, Holding LP2, Holdco3, Holdco4 and Canadian Borrower, which is governed by the laws of the Province of Ontario and any federal laws of Canada applicable therein, and (iii) any Deed of Hypothec, Debenture and Pledge that may hereafter be executed referred to in Section 9.01, and each other security document or pledge agreement delivered in accordance with applicable Canadian law to create a valid, perfected security interest in any property as Collateral for all or part of the Canadian Obligations, as the same may from time to time be modified, amended, extended or reaffirmed in accordance with the terms thereof.

| LA\1978870.15||{00001116. }

"**Canadian Subsidiary**" shall mean a Subsidiary that is organized or incorporated, as appropriate, under the laws of Canada or any province thereof.

"**Can SPV Co**" shall mean Arclin Parent Holdings Inc., a corporation incorporated under the laws of Ontario.

"**Capital Assets**" shall mean, with respect to any person, all equipment, fixed assets and Real Property or improvements of such person, or replacements or substitutions therefor or additions thereto, that, in accordance with GAAP, have been or should be reflected as additions to property, plant or equipment on the balance sheet of such person.

"**Capital Expenditures**" shall mean, for any period, without duplication, all expenditures made directly or indirectly by Holding LP1, ManagementCo, GPCo1, GPCo2 and their respective Subsidiaries during such period for Capital Assets (whether paid in cash or other consideration, financed by the incurrence of Indebtedness or accrued as a liability).

"**Capital Lease Obligations**" of any person shall mean the obligations of such person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"**Carve-Out**" shall have the meaning assigned to such term in <u>Section 2.18(d)</u>.

"**Carve-Out Expenses**" shall have the meaning assigned to such term in <u>Section 2.18(d)</u>.

"**Cash Collateral Account**" shall mean a collateral account in the form of a deposit account established and maintained (in its name or that of Borrowers) by the Collateral Agent for the benefit of the Secured Parties from the proceeds of Collateral collected in the Collection Account that have either not been released to Borrowers or not been applied immediately to outstanding Obligations.

"**Cash Equivalents**" shall mean, as to any person, (a) securities issued, or directly, unconditionally and fully guaranteed or insured, by the United States or Canada or any agency or instrumentality thereof (*provided* that the full faith and credit of the United States or Canada, as applicable, is pledged in support thereof) having maturities of not more than one year from the date of acquisition by such person; (b) time deposits and certificates of deposit of any Lender or any commercial bank having, or which is the principal banking subsidiary of a bank holding company organized under the laws of the United States, any state thereof, the District of Columbia or Canada having, capital and surplus aggregating in excess of $500,000,000 and a rating of "A" (or such other similar equivalent rating) or higher by at least one nationally recognized statistical rating organization (as defined in Rule 436 under the Securities Act) with maturities of not more than one year from the date of acquisition by such person; (c) repurchase obligations with a term of not more than 30 days for underlying securities of the types described in clause (a) above entered into with any bank meeting the qualifications specified in clause (b) above, which repurchase obligations are secured by a valid perfected security interest in the underlying securities; (d) commercial paper issued by any person incorporated in the United States or Canada rated at least A-1 or the equivalent thereof by Standard & Poor's Rating Service or at least P-1 or the equivalent thereof by Moody's Investors Service Inc., and in each case maturing not more than one year after the date of acquisition by such person; (e) investments in money market funds substantially all

-8-

of whose assets are comprised of securities of the types described in clauses (a) through (d) above; and (f) demand deposit accounts maintained in the ordinary course of business.

"**Cash Management Systems**" shall have the meaning assigned to such term in Section 5.18.

"**Casualty Event**" shall mean any involuntary loss of title, any involuntary loss of, damage to or any destruction of, or any condemnation or other taking (including by any Governmental Authority) of, any property of Holding LP1, ManagementCo, GPCo1, GPCo2 or any of their respective Subsidiaries. "Casualty Event" shall include but not be limited to any taking of all or any part of any Real Property of any person or any part thereof, in or by condemnation or other eminent domain proceedings pursuant to any Requirement of Law, or by reason of the temporary requisition of the use or occupancy of all or any part of any Real Property of any person or any part thereof by any Governmental Authority, civil or military, or any settlement in lieu thereof.

"**CCAA**" shall have the meaning assigned to such term in the recitals hereto.

"**CCAA Case**" shall have the meaning assigned to such term in the recitals hereto.

"**CCAA DIP Charge**" means the court ordered charge made by the Canadian Court which secures the Obligations of the Canadian Loan Parties on all of the assets, property and undertaking of the Canadian Loan Parties in priority to all Liens other than the Administration Charge.

"**CCAA Filing Date**" shall have the meaning assigned to such term in the recitals hereto.

"**CCAA Initial Order**" means collectively, the initial order of the Canadian Court issued on the CCAA Filing Date, in form and substance satisfactory to the Administrative Agent and the Joint Lead Arrangers (solely to the extent reasonably available and in attendance in person (or through counsel) at the hearing with respect to the entry of the Final Order), together with all extensions, modifications and amendments thereto approving this Agreement and providing for the CCAA DIP Charge and also providing that any material amendments to the Agreement require approval of the Canadian Court.

"**CERCLA**" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. § 9601 *et seq.* and all implementing regulations.

A "**Change in Control**" shall be deemed to have occurred if:

(a)     GPCo1 at any time ceases to own 100% of the general partner interest of Holding LP1;

(b)     Holding LP1 at any time ceases to own 100% of the Equity Interests of Holding LP2 (other than the general partner interests held by GPCo2);

(c)     GPCo2 at any time ceases to own 100% of the general partner interests of Holding LP2;

(d)     Holding LP2 at any time ceases to own 100% of the Equity Interests of Holdco3 (other than (i) up to 70% of the Voting Stock and up to 1% of the Economic Interests of Holdco3 owned by ManagementCo and (ii) up to 15% of the Economic Interests of Holdco3 owned by management or directors of Holding LP1 or its Subsidiaries);

| LA\1978870.15||{00001116. }

(e) ManagementCo at any time ceases to own all of the Voting Stock and all of the Economic Interests (in each case, not owned by Holding LP2 or the management or directors of Holdco3 or its Subsidiaries) of Holdco3;

(f) Holdco3 at any time ceases to own 100% of the Equity Interests of Holdco4 (other than up to 70% of the Voting Stock and up to 1% of the Economic Interests of Holdco4 owned by ManagementCo);

(g) ManagementCo at any time ceases to own all of the Voting Stock and all of the Economic Interests (in each case, not owned by Holdco3) of Holdco4;

(h) Holdco4 at any time ceases to own 100% of the Equity Interests of the Canadian Borrower (other than up to 70% of the Voting Stock and up to 1% of the Economic Interests of the Canadian Borrower owned by ManagementCo);

(i) ManagementCo at any time ceases to own all of the Voting Stock and all of the Economic Interests (in each case, not owned by Holdco4) of the Canadian Borrower;

(j) Canadian Borrower at any time ceases to own 100% of the Equity Interests of US Borrower (other than up to 70% of the Voting Stock and up to 1% of the Economic Interests of US Borrower owned by ManagementCo);

(k) ManagementCo at anytime ceases to own all of the Voting Stock and all of the Economic Interests (in each case, not owned by Canadian Borrower) of US Borrower;

(l) at any time a change of control occurs under any Material Indebtedness;

(m) [Intentionally Omitted]; or

(n) (x) the Sponsor shall fail to own, directly or indirectly, or to have, directly or indirectly, the power to vote or direct the voting (whether by proxy, contract or otherwise) of, Voting Stock of Holding LP1 or Holdco3 representing 100% of the voting power of the total outstanding Voting Stock of Holding LP1 or Holdco3 (it being understood and agreed that a Change in Control shall not be deemed to have occurred if the Sponsor fails to "own" such Voting Stock, if the Sponsor does have the "power" to vote or direct the voting of such Voting Stock as set forth above) or shall fail to have, directly or indirectly, the contractual power to direct the management of, or designate a plurality of the members of the Board of Directors of, Holding LP1 or Holdco3 or (y) the Sponsor ceases to own, directly or indirectly, Equity Interests representing 100% (excluding the Economic Interests of Holdco3 owned by management or directors of Holding LP1 or its Subsidiaries as of the Petition Date) of the total Economic Interests of Holding LP1 or Holdco3.

For purposes of this definition, a person shall not be deemed to have beneficial ownership of Equity Interests subject to a stock purchase agreement, merger agreement or similar agreement until the consummation of the transactions contemplated by such agreement.

"**Change in Law**" shall mean the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking into effect of any law, treaty, order, policy, rule or regulation, (b) any change in any law, treaty, order, policy, rule or regulation or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request,

enforceable guideline or enforceable directive (whether or not having the force of law) by any Governmental Authority.

"**Chapter 11 Cases**" shall have the meaning assigned to such term in the recitals hereto.

"**Charges**" shall have the meaning assigned to such term in Section 10.14.

"**Closing Date**" shall mean the date of the initial Credit Extension hereunder.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended.

"**Collateral**" shall mean, collectively, all of the Security Agreement Collateral, the Mortgaged Property and all other property of whatever kind and nature subject or purported to be subject from time to time to a Lien under any Security Document.

"**Collateral Agent**" shall have the meaning assigned to such term in the preamble hereto.

"**Collection Account**" shall have the meaning assigned to such term in Section 5.18(c)

"**Commitment**" shall mean, with respect to each Lender, the commitment of such Lender to make Loans hereunder to Borrowers up to the amount set forth on Schedule I to the Lender Addendum executed and delivered by such Lender, or in the Assignment and Assumption pursuant to which such Lender assumed its Commitment, as applicable, as the same may be (a) reduced from time to time pursuant to Section 2.07 and (b) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to Section 10.04.

"**Commitment Fee**" shall have the meaning assigned to such term in Section 2.05(a).

"**Committee**" shall mean, collectively, any official committee of unsecured creditors (and any other committee) appointed by the United States Trustee or by order of the Bankruptcy Court in any Chapter 11 Cases and each such Committee shall be referred to herein as a Committee.

"**Companies**" shall mean Holding LP1 and its Subsidiaries; and "**Company**" shall mean any one of them.

"**Compliance Certificate**" shall mean a certificate of a Financial Officer substantially in the form of Exhibit E.

"**Concentration Account**" shall have the meaning assigned to such term in Section 5.18(c).

"**Concentration Account Bank**" shall have the meaning assigned to such term in Section 5.18(c).

"**Consolidated Amortization Expense**" shall mean, for any period, the amortization expense of Holding LP1 and its Subsidiaries for such period, determined on a consolidated basis in accordance with GAAP.

"**Consolidated Current Assets**" shall mean, as at any date of determination, the total assets of Holding LP1 and its Subsidiaries which may properly be classified as current assets on a

consolidated balance sheet of Holding LP1 and its Subsidiaries in accordance with GAAP, excluding cash and Cash Equivalents.

"**Consolidated Current Liabilities**" shall mean, as at any date of determination, the total liabilities of Holding LP1 and its Subsidiaries which may properly be classified as current liabilities (other than the current portion of any Loans) on a consolidated balance sheet of Holding LP1 and its Subsidiaries in accordance with GAAP.

"**Consolidated Depreciation Expense**" shall mean, for any period, the depreciation expense of Holding LP1 and its Subsidiaries for such period, determined on a consolidated basis in accordance with GAAP.

"**Consolidated EBITDA**" shall mean, for any period, Consolidated Net Income for such period, adjusted by (x) *adding thereto*, in each case only to the extent (and in the same proportion) deducted in determining such Consolidated Net Income and without duplication (and with respect to the portion of Consolidated Net Income attributable to any Subsidiary of Holding LP1 only if a corresponding amount would be permitted at the date of determination to be distributed to Holding LP1 by such Subsidiary without prior approval (that has not been obtained), pursuant to the terms of its Organizational Documents and all agreements, instruments and Requirements of Law applicable to such Subsidiary or its equityholders):

(a)      Consolidated Interest Expense for such period,

(b)      Consolidated Amortization Expense for such period,

(c)      Consolidated Depreciation Expense for such period,

(d)      Consolidated Tax Expense for such period,

(e)      [Intentionally Omitted],

(f)      [Intentionally Omitted], and

(g)      the aggregate amount of all other non-cash charges reducing Consolidated Net Income (excluding any non-cash charge that results in an accrual of a reserve for cash charges in any future period) for such period, and

(y) *subtracting therefrom* the aggregate amount of all non-cash items increasing Consolidated Net Income (other than the accrual of revenue or recording of receivables in the ordinary course of business) for such period.

Consolidated EBITDA shall be calculated on a Pro Forma Basis to give effect to any Asset Sales (other than any dispositions in the ordinary course of business) consummated at any time on or after the first day of the Test Period thereof as if each such Asset Sale had been consummated on the day prior to the first day of such period.

"**Consolidated Interest Expense**" shall mean, for any period, the total consolidated interest expense of Holding LP1 and its Subsidiaries for such period determined on a consolidated basis in accordance with GAAP *plus*, without duplication:

-12-

(a)     imputed interest on Capital Lease Obligations and Attributable Indebtedness of each Borrower and its Subsidiaries for such period;

(b)     commissions, discounts and other fees and charges owed by Holding LP1 or any of its Subsidiaries with respect to letters of credit securing financial obligations, banker's acceptance financing and receivables financings for such period;

(c)     amortization of debt issuance costs, debt discount or premium and other financing fees and expenses incurred by Holding LP1 or any of its Subsidiaries for such period;

(d)     cash contributions to any employee stock ownership plan or similar trust made by Holding LP1 or any of its Subsidiaries to the extent such contributions are used by such plan or trust to pay interest or fees to any person (other than a holding company or a Wholly-Owned Subsidiary) in connection with Indebtedness incurred by such plan or trust for such period;

(e)     all interest paid or payable with respect to discontinued operations Holding LP1 or any of its Subsidiaries for such period;

(f)     the interest portion of any deferred payment obligations of Holding LP1 or any of its Subsidiaries for such period; and

(g)     all interest on any Indebtedness of Holding LP1 or any of its Subsidiaries of the type described in clause (f) or (k) of the definition of "Indebtedness" for such period.

Consolidated Interest Expense shall be calculated on a Pro Forma Basis to give effect to any Indebtedness incurred, assumed or permanently repaid or extinguished during the relevant Test Period in connection with Asset Sales (other than any dispositions in the ordinary course of business) as if such incurrence, assumption, repayment or extinguishing had been effected on the first day of such period.

Notwithstanding the foregoing, Consolidated Interest Expense shall be deemed to exclude interest on any loan between or among the Loan Parties, including the Holdco Intercompany Loan and the Subordinated Equity Holder Loan (in the case of any such Subordinated Equity Holder Loan interest paid in cash, if and only to the extent such cash interest had been re-contributed in accordance with the Prepetition First Lien Credit Agreement).

"Consolidated Net Income" shall mean, for any period, the consolidated net income (or loss) of Holding LP1 and its Subsidiaries determined on a consolidated basis in accordance with GAAP; *provided* that there shall be excluded from such net income (to the extent otherwise included therein), without duplication:

(a)     the net income (or loss) of any person (other than a Subsidiary of Holding LP1) in which any person other than Holding LP1 and its Subsidiaries has an ownership interest, except to the extent that cash in an amount equal to any such income has actually been received by Holding LP1 or (subject to clause (b) below) any of its Subsidiaries during such period;

(b)     the net income of any Subsidiary of Holding LP1 during such period to the extent that the declaration or payment of dividends or similar distributions by such Subsidiary of that income is not permitted by operation of the terms of its Organizational Documents or any agreement, instrument or Requirement of Law applicable to that Subsidiary during such period,

-13-

except that Holding LP1's equity in net loss of any such Subsidiary for such period shall be included in determining Consolidated Net Income;

      (c)     any gain (or loss), together with any related provisions for taxes on any such gain (or the tax effect of any such loss), realized during such period by Holding LP1 or any of its Subsidiaries upon any Asset Sale (other than any dispositions in the ordinary course of business) by Holding LP1 or any of its Subsidiaries;

      (e)     gains and losses due solely to fluctuations in currency values and the related tax effects determined in accordance with GAAP for such period;

      (f)     earnings resulting from any reappraisal, revaluation or write-up of assets;

      (g)     unrealized gains and losses with respect to Hedging Obligations for such period;

      (h)     any restructuring charges, including with respect to any reductions in workforce or plant closures in a maximum aggregate amount not to exceed $800,000; and

      (i)     any extraordinary or nonrecurring gain (or extraordinary or nonrecurring loss), together with any related provision for taxes on any such gain (or the tax effect of any such loss), recorded or recognized by Holding LP1 or any of its Subsidiaries during such period.

      For purposes of this definition of "Consolidated Net Income," (1) "**nonrecurring**" means any gain or loss as of any date that is not reasonably likely to recur within the two years following such date; *provided* that if there was a gain or loss similar to such gain or loss within the two years preceding such date, such gain or loss shall not be deemed nonrecurring and (2) Consolidated Net Income shall be reduced (to the extent not already reduced thereby) by the amount of any payments to or on behalf of Holding LP1 made pursuant to <u>Section 6.08(c)</u>; *provided further* that if an event giving rise to gain or loss straddles two years, such gain or loss shall not thereby be deemed not to be nonrecurring under the immediately preceding proviso.

      "**Consolidated Tax Expense**" shall mean, for any period, the tax expense of Holding LP1 and its Subsidiaries, for such period, determined on a consolidated basis in accordance with GAAP.

      "**Contested Collateral Lien Conditions**" shall mean, with respect to any Permitted Lien of the type described in clauses (a), (b), (e) and (f) of <u>Section 6.02</u>, the following conditions:

      (a)     Borrowers shall cause any proceeding instituted contesting such Lien to stay the sale or forfeiture of any portion of the Collateral on account of such Lien;

      (b)     at the option and at the request of the Administrative Agent, to the extent such Lien is in an amount in excess of $250,000, the appropriate Loan Party shall maintain cash reserves in an amount sufficient to pay and discharge such Lien and the Administrative Agent's reasonable estimate of all interest and penalties related thereto; and

      (c)     such Lien shall in all respects be subject and subordinate in priority to the Lien and security interest created and evidenced by the Security Documents, except if and to the extent that the Requirement of Law creating, permitting or authorizing such Lien provides that such Lien is or must be superior to the Lien and security interest created and evidenced by the Security Documents.

| LA\1978870.15||{00001116. }

"**Contingent Obligation**" shall mean, as to any person, any obligation, agreement, understanding or arrangement of such person guaranteeing or intended to guarantee any Indebtedness, leases, dividends or other obligations ("**primary obligations**") of any other person (the "**primary obligor**") in any manner, whether directly or indirectly, including any obligation of such person, whether or not contingent, (a) to purchase any such primary obligation or any property constituting direct or indirect security therefor; (b) to advance or supply funds (i) for the purchase or payment of any such primary obligation or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor; (c) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation; (d) with respect to banker's acceptances, letters of credit and similar credit arrangements, until a reimbursement obligation arises (which reimbursement obligation shall constitute Indebtedness); or (e) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof; *provided*, *however*, that the term "Contingent Obligation" shall not include endorsements of instruments for deposit or collection in the ordinary course of business, any "earn-out" obligations or any product warranties. The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Contingent Obligation is made (or, if less, the maximum amount of such primary obligation for which such person may be liable, whether singly or jointly, pursuant to the terms of the instrument evidencing such Contingent Obligation) or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such person is required to perform thereunder) as determined by such person in good faith.

"**Control**" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of voting securities, by contract or otherwise, and the terms "**Controlling**" and "**Controlled**" shall have meanings correlative thereto.

"**Control Agreement**" shall have the meaning assigned to such term in the US Security Agreement.

"**Cost**" shall mean, as determined by Collateral Agent in good faith, with respect to Inventory, the lower of (a) landed cost computed on an average cost basis in accordance with GAAP and in a manner consistent with the Borrowers' existing accounting practices or (b) market value; *provided*, that for purposes of the calculation of the Borrowing Base, (i) the Cost of the Inventory shall not include: (A) the portion of the cost of Inventory equal to the profit earned by any Affiliate of the Borrowing Base Parties on the sale thereof to the Borrowing Base Parties or (B) write-ups or write-downs in cost with respect to currency exchange rates, and (ii) notwithstanding anything to the contrary contained herein, the cost of the Inventory shall be computed in the same manner and consistent with the most recent inventory Appraisal or, in the absence thereof, Field Exam, which has been received and approved by Collateral Agent in its reasonable discretion.

"**Credit Extension**" shall mean the making of a Loan by a Lender.

"**Debt Issuance**" shall mean the incurrence by Holding LP1, ManagementCo, GPCo1, GPCo2 or any of their respective Subsidiaries of any Indebtedness after the Closing Date (other than as permitted by Section 6.01).

"**Default**" shall mean any event, occurrence or condition which is, or upon notice, lapse of time or both would constitute, an Event of Default.

-15-

"**Default Rate**" shall have the meaning assigned to such term in <u>Section 2.06(e)</u>.

"**Directors' Charge**" means the charge provided for in the CCAA Initial Order, which charge shall not exceed Can$2,750,000, to secure the Directors' Charge Expenses.

"**Directors' Charge Expenses**" means those indemnities, disbursements, expenses and fees secured by the Directors' Charge, subject to and in accordance with the terms of the CCAA Initial Order.

"**Disqualified Capital Stock**" shall mean any Equity Interest which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, (a) matures (excluding any maturity as the result of an optional redemption by the issuer thereof) or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part, on or prior to the first anniversary of the Final Maturity Date, (b) is convertible into or exchangeable (unless at the sole option of the issuer thereof) for (i) debt securities or (ii) any Equity Interests referred to in (a) above, in each case at any time on or prior to the first anniversary of the Final Maturity Date, or (c) contains any repurchase obligation which may come into effect prior to payment in full of all Obligations; *provided*, *however*, that any Equity Interests that would not constitute Disqualified Capital Stock but for provisions thereof giving holders thereof (or the holders of any security into or for which such Equity Interests is convertible, exchangeable or exercisable) the right to require the issuer thereof to redeem such Equity Interests upon the occurrence of a change in control or an asset sale occurring prior to the first anniversary of the Final Maturity Date shall not constitute Disqualified Capital Stock if such Equity Interests provide that the issuer thereof will not redeem any such Equity Interests pursuant to such provisions prior to the repayment in full of the Obligations.

"**Dividend**" with respect to any person shall mean that such person has declared or paid a dividend or returned any equity capital to the holders of its Equity Interests or authorized or made any other distribution, payment or delivery of property (other than Qualified Capital Stock of such person) or cash to the holders of its Equity Interests as such, or redeemed, retired, purchased or otherwise acquired, directly or indirectly, for consideration any of its Equity Interests outstanding (or any options or warrants issued by such person with respect to its Equity Interests), or set aside any funds for any of the foregoing purposes, or shall have permitted any of its Subsidiaries to purchase or otherwise acquire for consideration any of the Equity Interests of such person outstanding (or any options or warrants issued by such person with respect to its Equity Interests), or paid, made or set apart any payment or prepayment of principal of, premium, if any, or interest on, or redeemed, purchased, retired, defeased (including in-substance or legal defeasance), or paid, made or set apart a sinking fund or similar payment with respect to, the Subordinated Equity Holder Loan or the Holdco Intercompany Loan. Without limiting the foregoing, "Dividends" with respect to any person shall also include all payments made or required to be made by such person with respect to any stock appreciation rights, plans, equity incentive or achievement plans or any similar plans or setting aside of any funds for the foregoing purposes.

"**Dollar Equivalent**" shall mean, as to any amount denominated in Canadian dollars as of any date of determination, the amount of US dollars that would be required to purchase the amount of Canadian dollars based upon the Spot Selling Rate.

"**Domestic Subsidiary**" shall mean any Subsidiary that is organized or existing under the laws of the United States, any state thereof or the District of Columbia.

-16-

"**Economic Interests**" shall mean the Equity Interests of a person that generally entitle the holder of such interests to the assets of such person upon liquidation.

"**Eligible Accounts**" shall have the meaning assigned to such term in <u>Section 2.17(a)</u>.

"**Eligible Assignee**" shall mean (i) any Lender, (ii) an Affiliate of any Lender, (iii) an Approved Fund of a Lender and (iv) any other person approved by the Administrative Agent (such approval not to be unreasonably withheld or delayed); *provided* that in all cases "Eligible Assignee" shall not include Holding LP1, ManagementCo, GPCo1, GPCo2 or any of their respective Affiliates or Subsidiaries or any natural person.

"**Eligible Finished Goods**" shall mean Eligible Inventory constituting finished goods to be sold by any Borrowing Base Party in the ordinary course of business of such Borrowing Base Party, excluding Eligible Raw Materials and Eligible Intermediate Inventory.

"**Eligible Intermediate Inventory**" shall mean Eligible Inventory constituting work-in-process, excluding Eligible Finished Goods and Eligible Raw Materials.

"**Eligible Inventory**" shall have the meaning assigned to such term in <u>Section 2.17(b)</u>.

"**Eligible Raw Materials**" shall mean Eligible Inventory constituting raw materials used or consumed by the Borrowing Base Parties in the ordinary course of business in the manufacture or production of other inventory, excluding Eligible Finished Goods and Eligible Intermediate Inventory.

"**Embargoed Person**" shall have the meaning assigned to such term in <u>Section 6.20</u>.

"**Environment**" shall mean ambient air, indoor air, surface water and groundwater (including potable water, navigable water and wetlands), the land surface or subsurface strata, natural resources, the workplace or as otherwise defined in any Environmental Law.

"**Environmental Claim**" shall mean any written claim, notice, demand, order, action, suit, proceeding or other written communication alleging liability for or obligation with respect to any investigation, remediation, removal, cleanup, response, corrective action, damages to natural resources, personal injury, property damage, fines, penalties or other costs resulting from, related to or arising out of (i) the presence, Release or threatened Release in or into the Environment of Hazardous Material at any location or (ii) any violation or alleged violation of any Environmental Law, and shall include any written claim seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief resulting from, related to or arising out of the presence, Release or threatened Release of Hazardous Material or alleged injury or threat of injury to health, safety or the Environment.

"**Environmental Law**" shall mean any and all present and future, foreign or domestic, federal or state (or any subdivision of any of them), treaties, laws, statutes, ordinances, regulations, rules, decrees, orders, judgments, consent orders, consent decrees, code or other binding requirements, and the common law, relating to protection of public health or the Environment, the Release or threatened Release of Hazardous Material, natural resources or natural resource damages, or occupational safety or health (to the extent related to exposure to Hazardous Material), and any and all Environmental Permits.

"**Environmental Permit**" shall mean any permit, license, approval, registration, notification, exemption, consent or other authorization required by or from a Governmental Authority under Environmental Law.

"**Equipment**" shall have the meaning assigned to such term in the Security Agreement.

"**Equity Interest**" shall mean, with respect to any person, any and all shares, interests, participations or other equivalents, including membership interests (however designated, whether voting or nonvoting), of equity of such person, including, if such person is a partnership, partnership interests (whether general or limited) and any other interest or participation that confers on a person the right to receive a share of the profits and losses of, or distributions of property of, such partnership, whether outstanding on the date hereof or issued after the Closing Date, but excluding debt securities convertible or exchangeable into such equity.

"**Equity Issuance**" shall mean, without duplication, (i) any issuance or sale by Holding LP1, ManagementCo, GPCo1 or GPCo2 after the Closing Date of any Equity Interests in Holding LP1, ManagementCo, GPCo1 or GPCo2 (including any Equity Interests issued upon exercise of any warrant or option) or any warrants or options to purchase Equity Interests or (ii) any contribution to the capital of Holding LP1; *provided*, *however*, that an Equity Issuance shall not include any Preferred Stock Issuance or Debt Issuance.

"**ERISA**" shall mean the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time.

"**ERISA Affiliate**" shall mean, with respect to any person, any trade or business (whether or not incorporated) that, together with such person, is treated as a single employer under Section 414 of the Code.

"**ERISA Event**" shall mean, other than an ERISA Event consisting of either the filing of the Chapter 11 Cases and the CCAA Case or the liquidation of any Loan Party subject to the Chapter 11 Cases and the CCAA Case, (a) any "reportable event," as defined in Section 4043 of ERISA or the regulations issued thereunder, with respect to a Plan (other than an event for which the 30-day notice period is waived by regulation); (b) the existence with respect to any Plan of an "accumulated funding deficiency" (as defined in Section 412 of the Code), whether or not waived; (c) the failure to make by its due date a required installment under Section 412(m) of the Code with respect to any Plan or the failure to make any required contribution to a Multiemployer Plan; (d) the filing pursuant to Section 412(d) of the Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (e) the incurrence by any Company or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan; (f) the receipt by any Company or any of its ERISA Affiliates from the PBGC or a plan administrator of any notice relating to the intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan, or the occurrence of any event or condition which could reasonably be expected to constitute grounds under ERISA for the termination of, or the appointment of a trustee to administer, any Plan; (g) the incurrence by any Company or any of its ERISA Affiliates of any liability with respect to the withdrawal from any Plan or Multiemployer Plan; (h) the receipt by any Company or its ERISA Affiliates of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA; (i) the "substantial cessation of operations" within the meaning of Section 4062(e) of ERISA with respect to a Plan; (j) the making of any amendment to any Plan which could result in the imposition of a lien or the posting of a bond or other security; and (k) the occurrence of a nonexempt prohibited transaction (within the meaning of Section 4975 of the Code or Section 406 of ERISA) which could reasonably be expected to result in liability to any Company.

-18-

"**Eurodollar Borrowing**" shall mean a Borrowing comprised of Eurodollar Loans.

"**Eurodollar Loan**" shall mean any Loan bearing interest at a rate determined by reference to the Adjusted LIBOR Rate in accordance with the provisions of <u>Article II</u>.

"**Event of Default**" shall have the meaning assigned to such term in <u>Section 8.01</u>.

"**Exceptions**" shall mean, collectively, (i) with respect to the US Loan Parties, the Permitted Senior Liens and the Carve-Out and (ii) with respect to the Canadian Loan Parties, the Permitted Senior Liens to the extent such Liens have priority by operation of applicable Requirements of Law, the Administration Charge and any Liens securing Priority Payables.

"**Excess Amount**" shall have the meaning assigned to such term in <u>Section 2.10(h)</u>.

"**Excess Availability**" shall mean, at any time, (a) Borrowing Availability <u>less</u> (b) in the exercise of Collateral Agent's and Administrative Agent's Permitted Discretion, the aggregate amount of all the outstanding and unpaid trade payables and other obligations of any Borrowing Base Party arising after the Petition Date which are not paid within thirty (30) days past the due date according to their original terms of sale (other than trade payables or other obligations being contested or disputed by any Borrowing Base Party in good faith, in a maximum aggregate amount at any time not to exceed $250,000), in each case as of such date of determination <u>less</u> (c) in the exercise of Collateral Agent's and Administrative Agent's Permitted Discretion, and without duplication, the amount of checks issued by any Borrowing Base Party after the Petition Date to pay trade payables and other obligations but which are not paid within thirty (30) days past the due date according to their original terms of sale (other than trade payables or other obligations being contested or disputed by any Borrowing Base Party in good faith, in a maximum aggregate amount at any time not to exceed $250,000), in each case as of such date of determination, but which either have not yet been sent or are subject to other arrangements which are expected to delay the prompt presentation of such checks for payment.  If the Collateral Agent and Administrative Agent elect to include any of the items from clauses (b) and (c) in the calculation of Excess Availability, they shall not deduct amounts that are owing to persons for which Reserves have already been taken (e.g., due to Priority Payables) or, to the extent administratively feasible, amounts owing for Inventory that has not been included in the Borrowing Base.

"**Exchange Act**" shall mean the Securities Exchange Act of 1934, as amended.

"**Excluded Taxes**" shall mean, with respect to the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of Borrowers hereunder, (a) taxes imposed on or measured by its overall net income (however denominated), franchise taxes imposed on it (in lieu of net income taxes) and branch profits taxes imposed on it, by a jurisdiction (or any political subdivision thereof) as a result of the recipient being organized or having an office in such jurisdiction and (b) in the case of a Foreign Lender, any US federal withholding tax that (i) is imposed on amounts payable to such Foreign Lender at the time such Foreign Lender becomes a party hereto (or designates a new lending office), except (x) to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from Borrowers with respect to such withholding tax pursuant to <u>Section 2.15(a)</u> or (y) if such Foreign Lender is an assignee pursuant to a request by Borrowers under <u>Section 2.16</u>; *provided* that this subclause (b)(i) shall not apply to any Tax imposed on a Lender in connection with an interest or participation in any Loan or other obligation that such Lender was required to acquire

pursuant to Section 2.14(d), or (ii) is attributable to such Foreign Lender's failure to comply with Section 2.15(e).

"**Executive Order**" shall have the meaning assigned to such term in Section 3.22(a).

"**Existing Lien**" shall have the meaning assigned to such term in Section 6.02(c).

"**Exit Fee**" shall have the meaning assigned to such term in Section 2.05(e).

"**Exit Fee Date**" shall have the meaning assigned to such term in Section 2.05(e).

"**Exposure**" shall mean, with respect to any Lender at any time, the aggregate principal amount of all outstanding Loans of such Lender.

"**Extension Effectiveness Date**" shall have the meaning assigned to such term in Section 2.19.

"**Extension Notice**" shall have the meaning assigned to such term in Section 2.19.

"**Extension Period**" shall have the meaning assigned to such term in Section 2.19.

"**Federal Funds Effective Rate**" shall mean, for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System of the United States arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for the day for such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by it.

"**Fees**" shall mean the Commitment Fees, the Upfront Fee, the Reduction Fee, the Exit Fee and the Administrative Agent Fees.

"**Field Exam**" shall mean (a) on the Closing Date, the accounts receivable and inventory field examination prepared by Boston & Associates, P.C. dated May 19, 2009 and (b) thereafter, the most recent accounts receivable and inventory field examination conducted by an independent field audit firm acceptable to the Collateral Agent and delivered pursuant to Section 5.07(b) hereof; provided that, in the case of clause (b), the Collateral Agent shall consult with the Joint Lead Arrangers regarding the identity of the independent appraisal firm to the extent such firm is not Boston & Associates, P.C.

"**Final Maturity Date**" shall mean the earlier of (i) the date on which all the Loans have been indefeasibly repaid in full in cash and all of the Commitments have been permanently and irrevocably terminated, (ii) the Scheduled Termination Date, (iii) the date of the closing of a sale of all or substantially all of the Loan Parties' assets pursuant to Section 363 of the Bankruptcy Code (and a sale with similar effect pursuant to an order of the Canadian Court) in any Bankruptcy Case or the CCAA Case, (iv) 5 days after the Petition Date if each of the Interim Order and the CCAA Initial Order shall not have been entered by the Bankruptcy Court and the Canadian Court, respectively, on or before such date, (v) 30 days after the entry of the Interim Order if the Final Order shall not have been entered by the Bankruptcy Court on or before such date, (vi) the effective date of a confirmed plan of reorganization for the US Loan Parties pursuant to Chapter 11 of the Bankruptcy Code and plan of arrangement or compromise for the Canadian Loan Parties under the CCAA, (vii) the date of dismissal of any Bankruptcy Case or the CCAA Case or the conversion of any Loan Party to a case under Chapter 7 of the Bankruptcy

-20-

Code or the date of a liquidation pursuant to Chapter 7 of the Bankruptcy Code or a conversion of the CCAA Case to a liquidation proceeding under the BIA or a receivership under the WURA and (viii) the date of termination of the commitments and/or acceleration of any outstanding extensions of credit following the occurrence and during the continuance of an Event of Default.

"**Final Order**" shall mean, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court, which order shall be substantially in the form of the Interim Order and shall otherwise be reasonably satisfactory in form and substance to the Administrative Agent, the Joint Lead Arrangers (solely to the extent reasonably available and in attendance in person (or through counsel) at the hearing with respect to the entry of the Final Order) and the Required Lenders, and the CCAA Initial Order, in each case from which no appeal or motion to reconsider has been timely filed and such orders are not in any respect subject of a stay pending appeal (unless the Administrative Agent, the Joint Lead Arrangers (solely to the extent reasonably available and in attendance in person (or through counsel) at the hearing with respect to the entry of the Final Order) and the Required Lenders waive such requirement), together with all extensions, modifications, amendments or supplements thereto, in form and substance reasonably satisfactory to the Administrative Agent, the Joint Lead Arrangers (solely to the extent reasonably available and in attendance in person (or through counsel) at the applicable hearing) and the Required Lenders and their counsel.

"**Financial Officer**" of any person shall mean the chief executive officer, chief financial officer, principal accounting officer, treasurer or controller of such person.

"**Financing Orders**" shall mean the Interim Order, the Final Order, the CCAA Initial Order, and any amendment, modification or supplement thereto in form and substance reasonably acceptable to the Administrative Agent, the Joint Lead Arrangers (solely to the extent reasonably available and in attendance in person (or through counsel) at the hearing with respect to the entry of the applicable Financing Order) and the Required Lenders.

"**FIRREA**" shall mean the Federal Institutions Reform, Recovery and Enforcement Act of 1989, as amended.

"**First Day Orders**" shall mean the "first day" orders set forth on Schedule 1.01(a), which shall be in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders.

"**Foreign Lender**" shall mean any Lender that is not, for United States federal income tax purposes, (i) an individual who is a citizen or resident of the United States, (ii) a corporation, partnership or other entity treated as a corporation or partnership created or organized in or under the laws of the United States, or any political subdivision thereof, (iii) an estate whose income is subject to US federal income taxation regardless of its source or (iv) a trust if a court within the United States is able to exercise primary supervision over the administration of such trust and one or more United States persons have the authority to control all substantial decisions of such trust.

"**Foreign Plan**" shall mean any employee benefit plan, program, policy, arrangement or agreement (other than the Canadian Benefit Plans or Canadian Pension Plans) maintained or contributed to by any Company with respect to employees employed outside the United States.

-21-

"**Foreign Securities Collateral**" shall mean all certificates, agreements, instruments or other writings representing or evidencing Equity Interests of a Company organized outside the United States.

"**Foreign Subsidiary**" shall mean a Subsidiary that is organized or incorporated, as appropriate, under the laws of a jurisdiction other than the United States, any state thereof, the District of Columbia, Canada or any province thereof.

"**Fund**" shall mean any person that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"**GAAP**" shall mean generally accepted accounting principles in the United States applied on a consistent basis; provided that, other than for purposes of any provisions set forth herein requiring any reconciliation from International Financial Reporting Standards to GAAP, for any period ended on or prior to December 31, 2007, GAAP shall mean International Financial Reporting Standards, applied on a consistent basis.

"**Governmental Authority**" shall mean the government of the United States, the government of Canada or any other nation, or of any political subdivision thereof, whether state, provincial, territorial or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"**Governmental Real Property Disclosure Requirements**" shall mean any Requirement of Law of any Governmental Authority requiring notification of the buyer, lessee, mortgagee, assignee or other transferee of any Real Property, facility, establishment or business, or notification, registration or filing to or with any Governmental Authority, in connection with the sale, lease, mortgage, assignment or other transfer (including any transfer of control) of any Real Property, facility, establishment or business, of the actual or threatened presence or Release in or into the Environment, or the use, disposal or handling of Hazardous Material on, at, under or near the Real Property, facility, establishment or business to be sold, leased, mortgaged, assigned or transferred.

"**GPCo1**" shall mean Arclin Holdings GP I Inc., a corporation incorporated under the laws of Ontario.

"**GPCo2**" shall mean Arclin Holdings GP II Inc., a corporation incorporated under the laws of Ontario.

"**Guaranteed Obligations**" shall have the meaning assigned to such term in Section 7.01.

"**Guarantees**" shall mean the guarantees issued pursuant to Article VII by each of the Guarantors.

"**Guarantors**" shall mean Holding LP1, Holding LP2, Holdco3, Holdco4, ManagementCo, GPCo2, GPCo1, Canadian Borrower, US Borrower and the Subsidiary Guarantors.

-22-

"**Hazardous Materials**" shall mean the following: hazardous substances; hazardous wastes; polychlorinated biphenyls ("**PCBs**") or any substance or compound containing PCBs; asbestos or any asbestos-containing materials in any form or condition; radon or any other radioactive materials including any source, special nuclear or by-product material; petroleum, crude oil or any fraction thereof; and any other pollutant or contaminant or chemicals, wastes, materials, compounds, constituents or substances, subject to regulation or which can give rise to liability under any Environmental Laws.

"**Hedging Agreement**" shall mean any swap, cap, collar, forward purchase or similar agreements or arrangements dealing with interest rates, currency exchange rates or commodity prices, either generally or under specific contingencies.

"**Hedging Obligations**" shall mean obligations under or with respect to Hedging Agreements.

"**Holdco Intercompany Loan**" shall mean that certain intercompany indebtedness evidenced by intercompany notes made by Holdco3 to Holding LP2, as amended in accordance with the terms hereof.

"**Holdco3**" shall mean Arclin Holdings III Inc., a corporation incorporated under the laws of Ontario.

"**Holdco3 Management Agreements**" shall mean (a) that certain securityholders agreement to be entered into between Holdco3, Holding LP2, ManagementCo and certain management and directors of Holdco3 and its Subsidiaries, in a form reasonably acceptable to the Administrative Agent, (b) the ManagementCo Voting Agreements, and (c) that certain voting trust agreement between Holdco3, ManagementCo, certain management and directors of Holding LP1 or its Subsidiaries and the other parties thereto, in a form reasonably acceptable to the Administrative Agent.

"**Holdco4**" shall mean Arclin Holdings IV Inc., a corporation incorporated under the laws of Ontario.

"**Holding LP1**" shall mean Arclin Holdings I L.P., a limited partnership formed under the laws of Ontario.

"**Holding LP2**" shall mean Arclin Holdings II L.P., a limited partnership formed under the laws of Ontario.

"**Immaterial Foreign Subsidiary**" shall mean any one or more Foreign Subsidiaries designated by the Borrowers in writing to the Administrative Agent (a) which generate, alone or in the aggregate, revenues from operations less than 5% of the revenues from operations of Holding LP1 and its Subsidiaries on a consolidated basis for the twelve-month period ended at the end of the period covered by the financial statements set forth below; and (b) which holds assets, alone or in the aggregate, of less than 10% of the assets of Holding LP1 and its Subsidiaries on a consolidated basis as of the last date of the period covered by the financial statements set forth below (it being understood and agreed that, as of the Closing Date, the Borrowers shall have designated Mexico AcquisitionCo and its Subsidiaries, as well as Arclin Operadora, S.A. de C.V. as Immaterial Foreign Subsidiaries). All such determinations shall be made based on the financial statements of the Loan Parties delivered pursuant to <u>Section 5.01(a)</u> and <u>Section 5.01(b)</u> of this Agreement.

| LA\1978870.15||{00001116. }

"**Indebtedness**" of any person shall mean, without duplication, (a) all obligations of such person for borrowed money or advances; (b) all obligations of such person evidenced by bonds, debentures, notes or similar instruments; (c) all obligations of such person upon which interest charges are customarily paid or accrued; (d) all obligations of such person under conditional sale or other title retention agreements relating to property purchased by such person; (e) all obligations of such person issued or assumed as the deferred purchase price of property or services (excluding trade accounts payable and accrued obligations incurred in the ordinary course of business on normal trade terms and not overdue by more than 90 days); (f) all Indebtedness of others secured by any Lien on property owned or acquired by such person, whether or not the obligations secured thereby have been assumed, but limited to the fair market value of such property; (g) all Capital Lease Obligations, Purchase Money Obligations and synthetic lease obligations of such person; (h) all Hedging Obligations (other than, for purposes of Section 6.10 only, Hedging Obligations in respect of Indebtedness) to the extent required to be reflected on a balance sheet of such person; (i) all Attributable Indebtedness of such person; (j) all obligations of such person for the reimbursement of any obligor in respect of letters of credit, letters of guaranty, banker's acceptances and similar credit transactions; and (k) all Contingent Obligations of such person in respect of Indebtedness or obligations of others of the kinds referred to in clauses (a) through (j) above. The Indebtedness of any person shall include the Indebtedness of any other entity (including any partnership in which such person is a general partner) to the extent such person is liable therefor as a result of such person's ownership interest in or other relationship with such entity, except (other than in the case of general partner liability) to the extent that terms of such Indebtedness expressly provide that such person is not liable therefor.

"**Indemnified Taxes**" shall mean all Taxes other than Excluded Taxes.

"**Indemnitee**" shall have the meaning assigned to such term in Section 10.03(b).

"**Information**" shall have the meaning assigned to such term in Section 10.12.

"**Insurance Policies**" shall mean the insurance policies and coverages required to be maintained by each Loan Party which is an owner of Mortgaged Property with respect to the applicable Mortgaged Property pursuant to Section 5.04 and all renewals and extensions thereof.

"**Insurance Requirements**" shall mean, collectively, all provisions of the Insurance Policies, all requirements of the issuer of any of the Insurance Policies and all orders, rules, regulations and any other requirements of the National Board of Fire Underwriters (or any other body exercising similar functions) binding upon each Loan Party which is an owner of Mortgaged Property and applicable to the Mortgaged Property or any use or condition thereof.

"**Intellectual Property**" shall have the meaning assigned to such term in Section 3.06(a).

"**Intercompany Loan Document**" shall mean each of the intercompany loan agreements existing as of the Closing Date, and listed on Schedule 1.01(c) hereto, together with any future intercompany loan agreement, Intercompany Note or other instrument evidencing, or governing the terms of, any extension of credit by any Loan Party to Holding LP1 or any of its Subsidiaries.

"**Intercompany Note**" shall mean a promissory note substantially in the form of Exhibit P.

"**Intercreditor Agreement**" means that certain Intercreditor Agreement, dated as of the Original Closing Date, among the Prepetition First Lien Collateral Agent, the Prepetition Second Lien Collateral Agent and the Loan Parties, as amended, restated, supplemented or otherwise modified from time to time.

"**Interest Election Request**" shall mean a request by a Borrower to convert or continue a Borrowing in accordance with <u>Section 2.08(b)</u>, substantially in the form of <u>Exhibit D-2</u>.

"**Interest Payment Date**" shall mean (a) with respect to any ABR Loan, the last Business Day of each calendar month to occur during any period in which such Loan is outstanding, (b) with respect to any Eurodollar Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part and, in the case of a Eurodollar Loan with an Interest Period of more than three months' duration, each day prior to the last day of such Interest Period that occurs at intervals of three months' duration after the first day of such Interest Period, and (c) the Final Maturity Date or such earlier date on which the Commitments are terminated.

"**Interest Period**" shall mean, with respect to any Eurodollar Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is one, two or three months thereafter, as the applicable Borrower may elect; *provided* that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, and (b) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period. For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"**Interim Order**" shall mean collectively, the order of the Bankruptcy Court entered in the Chapter 11 Cases after an interim hearing (assuming satisfaction of the standards prescribed in Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law) substantially in the form of <u>Exhibit C</u> and reasonably satisfactory in form and substance to the Administrative Agent and the Joint Lead Arrangers (solely to the extent reasonably available and in attendance in person (or through counsel) at the hearing with respect to the entry of the Final Order), which, among other matters, but not by way of limitation, authorizes, on an interim basis, the Loan Parties to execute and perform under the terms of this Agreement and the other Loan Documents, together with all extensions, modifications, amendments and supplements thereto, in form and substance reasonably satisfactory to the Administrative Agent, the Joint Lead Arrangers (solely to the extent reasonably available and in attendance in person (or through counsel) at the hearing with respect to any such extensions, modifications, amendments and supplements), the Required Lenders and their counsel.

"**Inventory**" shall mean any and all assets which, with respect to any US Loan Party, constitute "inventory," as such term is defined in the UCC as in effect on the date hereof in the State of New York and, with respect to any Canadian Loan Party, "inventory" as defined in the PPSA, in any case, wherever located, and in which the relevant person now or hereafter has rights.

"**Investments**" shall have the meaning assigned to such term in <u>Section 6.04</u>.

"**Involuntary Liens**" shall mean any Lien permitted by clause (a), (b), (e), (f) or (i) of Section 6.02.

"**ITA**" means the Income Tax Act (Canada), as amended.

"**Joinder Agreement**" shall mean a joinder agreement substantially in the form of Exhibit F.

"**Joint Lead Arrangers**" shall have the meaning assigned to such term in the preamble hereto.

"**Judgment Currency**" shall have the meaning assigned to such term in Section 10.18(a).

"**Judgment Currency Conversion Date**" shall have the meaning assigned to such term in Section 10.18(a).

"**Landlord Access Agreement**" shall mean a Landlord Access Agreement, substantially in the form of Exhibit G, or such other form as may reasonably be acceptable to the Administrative Agent.

"**Leases**" shall mean any and all leases, subleases, tenancies, options, concession agreements, rental agreements, occupancy agreements, franchise agreements, access agreements and any other agreements (including all amendments, extensions, replacements, renewals, modifications and/or guarantees thereof), whether or not of record and whether now in existence or hereafter entered into, affecting the use or occupancy of all or any portion of any Real Property.

"**Lender Addendum**" shall mean with respect to any Lender on the Closing Date, a lender addendum in the form of Exhibit I, to be executed and delivered by such Lender on the Closing Date as provided in Section 10.15.

"**Lenders**" shall mean (a) the financial institutions that have become a party hereto pursuant to a Lender Addendum and (b) any financial institution that has become a party hereto pursuant to an Assignment and Assumption, other than, in each case, any such financial institution that has ceased to be a party hereto pursuant to an Assignment and Assumption.

"**LIBOR Rate**" shall mean, with respect to any Eurodollar Borrowing denominated in US dollars for any Interest Period, the rate per annum determined by the Administrative Agent to be the arithmetic mean of the offered rates for deposits in US dollars with a term comparable to such Interest Period that appears on the Reuters Screen which displays an average British Bankers Association Interest Settlement Rate (as defined below) at approximately 11:00 a.m., London, England time, on the second full Business Day preceding the first day of such Interest Period; *provided, however*, that (i) if no comparable term for an Interest Period is available, the LIBOR Rate shall be determined using the weighted average of the offered rates for the two terms most nearly corresponding to such Interest Period and (ii) if there shall at any time no longer exist a Reuters Screen which displays the average British Bankers Association Interest Settlement Rate, "LIBOR Rate" shall mean, with respect to each day during each Interest Period pertaining to Eurodollar Borrowings comprising part of the same Borrowing, the rate per annum equal to the rate at which the Administrative Agent is offered deposits in US dollars at approximately 11:00 a.m., London, England time, two Business Days prior to the first day of such Interest Period in the London interbank market for delivery on the first day of such Interest Period for the number of days comprised therein and in an amount comparable to its portion of the amount of such Eurodollar

-26-

Borrowing to be outstanding during such Interest Period. "**British Bankers Association Interest Settlement Rate**" shall mean the rate on the display designated as the LIBOR01 page (or other appropriate page if US dollars does not appear on such page) on the Reuters Screen (or such other page as may replace such page on such service for the purpose of displaying the rates at which US dollar deposits are offered by leading banks in the London interbank deposit market).

"**Lien**" shall mean, with respect to any property, (a) any mortgage, deed of trust, lien, pledge, encumbrance, claim, charge, assignment, hypothec, security interest or encumbrance of any kind or any arrangement to provide priority or preference or any filing of any financing statement under the UCC, the PPSA or any other similar notice of lien under any similar notice or recording statute of any Governmental Authority, including any easement, servitude, right-of-way or other encumbrance on title to Real Property, in each of the foregoing cases whether voluntary or imposed by law, and any agreement to give any of the foregoing; (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such property; and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"**Loan Documents**" shall mean this Agreement, the Notes (if any), the Security Documents and the Applicable Order.

"**Loan Parties**" shall mean Holding LP1, Canadian Borrower, US Borrower and the other Guarantors.

"**Loans**" shall mean a Loan made by the Lenders to the Borrowers pursuant to <u>Section 2.01</u> denominated in US dollars and bearing interest on the basis of the Alternate Base Rate or the Adjusted LIBOR Rate.

"**ManagementCo**" means Arclin Management Holdings Inc., a corporation incorporated under the laws of Ontario.

"**ManagementCo Voting Agreement**" shall mean (a) that certain Amended and Restated Voting and Call Agreement dated as of August 24, 2007 among ManagementCo, the Sponsor, Randy Schwartzhoff and Claudio D'Ambrosio (successor in interest to Garry McClean), as in effect on the date hereof and as the same may be amended, amended and restated or otherwise modified in accordance with the terms hereof and (b) that certain Amended and Restated Voting and Call Agreement dated as of July 10, 2007 among ManagementCo, the Sponsor, GPCo1, GPCo2, Holdco3, Holdco4, and the other parties thereto, as in effect on the date hereof and as the same may be amended, amended and restated or otherwise modified in accordance with the terms hereof.

"**Margin Stock**" shall have the meaning assigned to such term in Regulation U.

"**Marmorandum**" shall have the meaning assigned to such term in the first recital hereto.

"**Material Adverse Effect**" shall mean, other than the events leading up to the filing of the Chapter 11 Cases and the CCAA Case that have been disclosed to the Lenders prior to the Closing Date and the filing of the Chapter 11 Cases and the CCAA Case, which shall be deemed not to constitute or give rise to a Material Adverse Effect, (a) a material adverse effect on the business, property, results of operations, prospects or condition, financial or otherwise, or material agreements of Holding LP1 and its Subsidiaries, taken as a whole; (b) material impairment of the ability of the Loan Parties, taken as a

whole, to fully and timely perform any of their obligations under any Loan Document; (c) material impairment of the rights of or benefits or remedies available to the Lenders or the Collateral Agent under any Loan Document; or (d) a material adverse effect on the Collateral or the Liens in favor of the Collateral Agent (for its benefit and for the benefit of the other Secured Parties) on the Collateral or the priority of such Liens.

"**Material Indebtedness**" shall mean (a) Indebtedness under the Prepetition Loan Documents and (b) any other Indebtedness (other than the Loans) or Hedging Obligations of Holding LP1 or any of its Subsidiaries in an aggregate outstanding principal amount exceeding $5,000,000. For purposes of determining Material Indebtedness, the "principal amount" in respect of any Hedging Obligations of any Loan Party at any time shall be the maximum aggregate amount (giving effect to any netting agreements) that such Loan Party would be required to pay if the related Hedging Agreement were terminated at such time.

"**Maximum Amount**" shall mean, as of any date of determination, the lesser of (i) an amount equal to the Commitment of all Lenders as of that date in the aggregate, or (ii) prior to the issuance and entry of the Final Order, the maximum amount of Loans permitted by the Interim Order and the CCAA Initial Order.

"**Maximum Rate**" shall have the meaning assigned to such term in Section 10.14.

"**Measurement Period**" means the initial period commencing on the Petition Date and ending on the Saturday of the first full calendar week after the Petition Date and each full calendar week ending on Saturday thereafter.

"**Mexico**" means the United Mexican States (Estados Unidos Mexicanos).

"**Mexico AcquisitionCo**" shall mean Arclin Mexican Holdings, S.A. de C.V.

"**Monitor**" shall mean Ernst & Young, Inc. or its successor.

"**Mortgage**" shall mean an agreement, including, but not limited to, a mortgage, deed of trust or any other document, creating and evidencing a Lien on a Mortgaged Property, which shall be substantially in the form of Exhibit J-1 or Exhibit J-2, as applicable, the Deed of Hypothec referred to in Section 9.01 or other form reasonably satisfactory to the Collateral Agent, in each case, with such schedules and including such provisions as shall be necessary to conform such document to applicable local or foreign law or as shall be customary under applicable local or foreign law.

"**Mortgaged Property**" shall mean (a) each Real Property identified as a Mortgaged Property on Schedule 7(a) to the Perfection Certificate dated the Closing Date and (b) each Real Property, if any, which shall be subject to a Mortgage delivered after the Closing Date pursuant to Section 5.11(c) and/or Section 5.16.

"**Multiemployer Plan**" shall mean a multiemployer plan within the meaning of Section 4001(a)(3) or Section 3(37) of ERISA (a) to which any Company or any ERISA Affiliate is then making or accruing an obligation to make contributions; (b) to which any Company or any ERISA Affiliate has within the preceding five plan years made contributions; or (c) with respect to which any Company could reasonably be expected to incur liability.

"**Net Cash Proceeds**" shall mean:

-28-

(a)     with respect to any Asset Sale (other than any issuance or sale of Equity Interests), the cash proceeds received by Holding LP1 or any of its Subsidiaries (including cash proceeds subsequently received (as and when received by Holding LP1 or any of its Subsidiaries) in respect of non-cash consideration initially received) net of (i) selling expenses (including reasonable brokers' fees or commissions, legal, accounting and other professional and transactional fees, transfer and similar taxes and Holding LP1's good faith estimate of income taxes paid or payable in connection with such sale); (ii) amounts provided as a reserve, in accordance with GAAP, against (x) any liabilities under any indemnification obligations associated with such Asset Sale or (y) any other liabilities retained by Holding LP1 or any of its Subsidiaries associated with the properties sold in such Asset Sale (*provided* that, to the extent and at the time any such amounts are released from such reserve, such amounts shall constitute Net Cash Proceeds); (iii) Holding LP1's good faith estimate of payments required to be made with respect to unassumed liabilities relating to the properties sold within 90 days of such Asset Sale (*provided* that, to the extent such cash proceeds are not used to make payments in respect of such unassumed liabilities within 90 days of such Asset Sale, such cash proceeds shall constitute Net Cash Proceeds); and (iv) the principal amount, premium or penalty, if any, interest and other amounts on any Indebtedness for borrowed money (other than the Prepetition Obligations) which is secured by a Lien on the properties sold in such Asset Sale (so long as such Lien was a Permitted Senior Lien and was permitted to encumber such properties under the Loan Documents at the time of such sale) and which is repaid with such proceeds (other than any such Indebtedness assumed by the purchaser of such properties);

(b)     with respect to any Debt Issuance, any Equity Issuance or any other issuance or sale of Equity Interests by Holding LP1 or any of its Subsidiaries, the cash proceeds thereof, net of customary fees, commissions, costs and other expenses incurred in connection therewith; and

(c)     with respect to any Casualty Event, the cash insurance proceeds, condemnation awards and other compensation received in respect thereof, net of all reasonable costs and expenses incurred in connection with the collection of such proceeds, awards or other compensation in respect of such Casualty Event.

"**Net Recovery Cost Percentage**" shall mean the fraction, expressed as a percentage, (a) the numerator of which is the amount equal to the recovery on the aggregate amount of the Inventory at such time on a "net orderly liquidation value" basis as set forth in the most recent inventory Appraisal received by Collateral Agent in accordance with Section 5.07, net of operating expenses, liquidation expenses and commissions reasonably anticipated in the disposition of such assets, and (b) the denominator of which is the original Cost of the aggregate amount of the Inventory subject to appraisal.

"**Net Working Capital**" shall mean, at any time, Consolidated Current Assets at such time minus Consolidated Current Liabilities at such time.

"**Notes**" shall mean any notes evidencing the Loans issued pursuant to this Agreement, if any, substantially in the form of Exhibit K.

"**Obligation Currency**" shall have the meaning assigned to such term in Section 10.18(a).

"**Obligations**" shall mean (a) obligations of Borrowers and the other Loan Parties from time to time arising under or in respect of the due and punctual payment of (i) the principal of and

-29-