premium, if any, and interest (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) on the Loans, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise and (ii) all other monetary obligations, including fees, costs, expenses and indemnities, whether primary, secondary, direct, contingent, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), of Borrowers and the other Loan Parties under this Agreement and the other Loan Documents, and (b) the due and punctual performance of all covenants, agreements, obligations and liabilities of Borrowers and the other Loan Parties under or pursuant to this Agreement and the other Loan Documents.

"**OFAC**" shall have the meaning assigned to such term in <u>Section 3.22(b)(v)</u>.

"**Officers' Certificate**" shall mean a certificate executed by the chairman of the Board of Directors (if an officer), the chief executive officer or the president and one of the Financial Officers, each in his or her official (and not individual) capacity.

"**Organizational Documents**" shall mean, with respect to any person, (i) in the case of any corporation, the certificate of incorporation or amalgamation, by-laws and, if any, shareholder agreements (or similar documents) of such person, (ii) in the case of any limited liability company, the certificate of formation and operating agreement (or similar documents) of such person, (iii) in the case of any limited partnership, the certificate of formation and limited partnership agreement (or similar documents) of such person, (iv) in the case of any general partnership, the partnership agreement (or similar document) of such person, (v) with respect to any Foreign Subsidiary (or Canadian Subsidiary), the equivalent of the foregoing in its jurisdiction of incorporation or organization, and (vi) in any other case, the functional equivalent of the foregoing.

"**Original Closing Date**" shall have the meaning assigned to such term in the recitals hereto.

"**Other Taxes**" shall mean all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or under any other Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document.

"**Participant**" shall have the meaning assigned to such term in <u>Section 10.04(d)</u>.

"**PBGC**" shall mean the Pension Benefit Guaranty Corporation referred to and defined in ERISA.

"**Pending Loans**" means, at any time, the aggregate principal amount of all Loans requested in any Borrowing Request received by the Administrative Agent which have not yet been advanced (unless such request is not funded in due course or is otherwise no longer outstanding). For purposes of determining the Aggregate Revolver Outstandings at the time of any particular Borrowing Request, the term "Pending Loans" shall not include the amount of Loans requested in such Borrowing Request.

"**Perfection Certificate**" shall mean a certificate in the form of Exhibit L-1 or any other form approved by the Collateral Agent, as the same shall be supplemented from time to time by a Perfection Certificate Supplement or otherwise.

"**Perfection Certificate Supplement**" shall mean a certificate supplement in the form of Exhibit L-2 or any other form approved by the Collateral Agent.

"**Permitted Collateral Liens**" means (i) in the case of Collateral other than Mortgaged Property, the Liens described in clauses (a), (b), (c), (d), (e), (f), (g), (h), (i), (k), (l), (m) and (s) of Section 6.02, (ii) in the case of Mortgaged Property, "**Permitted Collateral Liens**" shall mean the Liens described in clauses (a), (b), (c), (d), (e), (f), (k), (r) and (s) of Section 6.02 and (iii) Liens created pursuant to any Prepetition Loan Documents; *provided*, *however*, on the Closing Date or upon the date of delivery of each additional Mortgage under Section 5.11 or 5.12, Permitted Collateral Liens shall mean only those Liens set forth in Schedule B to the applicable Mortgage.

"**Permitted Discretion**" shall mean a determination by the Collateral Agent and/or Administrative Agent (or, if the respective is to both, then collectively by them) made in good faith and in the exercise of reasonable (from the perspective of a secured asset based lender) business judgment.

"**Permitted Liens**" shall have the meaning assigned to such term in Section 6.02.

"**Permitted Senior Liens**" shall have the meaning assigned to such term in Section 2.18(b).

"**person**" shall mean any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"**Petition Date**" has the meaning given that term in the recitals hereto and, as the context may require, collectively with the CCAA Filing Date, shall be referred to as the "Petition Date".

"**Plan**" shall mean any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA which is maintained or contributed to by any Company or its ERISA Affiliate or with respect to which any Company could reasonably be expected to incur liability (including under Section 4069 of ERISA).

"**Pledge**" shall have the meaning assigned to such term in Section 9.01.

"**Post Closing Mortgaged Property**" shall have the meaning assigned to such term in Section 5.16.

"**Post-Event of Default Carve-Out Expenses**" shall have the meaning assigned to such term in Section 2.18(d).

"**PPSA**" shall mean the Personal Property Security Act as in effect in the Province of Ontario, the Civil Code of Quebec as in effect in the Province of Quebec, or any other Canadian federal or provincial statute pertaining to the granting, perfecting, priority or ranking of security interests, Liens, hypothecs on personal property, and any successor statutes, together with any regulations thereunder, in each case as in effect from time to time. References to sections of the PPSA shall be construed to also refer to any successor sections.

"**Pre-Event of Default Carve-Out Expenses**" shall have the meaning assigned to such term in <u>Section 2.18(d)</u>.

"**Preferred Stock**" shall mean, with respect to any person, any and all preferred or preference Equity Interests (however designated) of such person whether now outstanding or issued after the Closing Date.

"**Preferred Stock Issuance**" shall mean the issuance or sale by Holding LP1 or any of its Subsidiaries of any Preferred Stock after the Closing Date.

"**Premises**" shall have the meaning assigned thereto in the applicable Mortgage.

"**Prepetition**" shall mean the time period ending immediately prior to the filing of the Chapter 11 Cases and the CCAA Case.

"**Prepetition Agents**" shall mean, collectively, the Prepetition First Lien Agents and the Prepetition Second Lien Agents.

"**Prepetition Credit Agreements**" shall mean, collectively, the Prepetition First Lien Credit Agreement and the Prepetition Second Lien Credit Agreement.

"**Prepetition First Lien Agents**" shall mean, collectively, the "Administrative Agent" and the "Collateral Agent" as each such term is defined in the Prepetition First Lien Credit Agreement.

"**Prepetition First Lien Collateral**" shall mean "Collateral" as such term is defined in the Prepetition First Lien Credit Agreement.

"**Prepetition First Lien Collateral Agent**" shall mean the "Collateral Agent" as such term is defined in the Prepetition First Lien Credit Agreement.

"**Prepetition First Lien Credit Agreement**" shall have the meaning assigned thereto in the recitals hereto.

"**Prepetition First Lien Lenders**" shall mean the "Lenders" as such term is defined in the Prepetition First Lien Credit Agreement.

"**Prepetition First Lien Loan Documents**" shall mean the "Loan Documents" as such term is defined in the Prepetition First Lien Credit Agreement.

"**Prepetition First Lien Obligations**" shall mean the "Secured Obligations" as such term is defined in the Prepetition First Lien Credit Agreement.

"**Prepetition Lenders**" shall mean, collectively, the Prepetition First Lien Lenders and the Prepetition Second Lien Lenders.

"**Prepetition Loan Documents**" shall mean, collectively, the Prepetition First Lien Loan Documents and the Prepetition Second Lien Loan Documents.

"**Prepetition Obligations**" shall mean, collectively, the Prepetition First Lien Obligations and the Prepetition Second Lien Obligations.

-32-

"**Prepetition Second Lien Agents**" shall mean, collectively, the "Administrative Agent" and the "Collateral Agent" as each such term is defined in the Prepetition Second Lien Credit Agreement.

"**Prepetition Second Lien Collateral Agent**" shall mean the "Collateral Agent" as such term is defined in the Prepetition Second Lien Credit Agreement.

"**Prepetition Second Lien Credit Agreement**" shall mean that certain Second Lien Credit Agreement dated as of the Original Closing Date by and among the US Borrower, the Guarantors, the Prepetition Second Lien Lenders, the Prepetition Second Lien Agents and certain other agents party thereto.

"**Prepetition Second Lien Lenders**" shall mean the "Lenders" as such term is defined in the Prepetition Second Lien Credit Agreement.

"**Prepetition Second Lien Loan Documents**" shall mean the "Loan Documents" as such term is defined in the Prepetition Second Lien Credit Agreement.

"**Prepetition Second Lien Obligations**" shall mean the "Secured Obligations" as such term is defined in the Prepetition Second Lien Credit Agreement.

"**Primed Liens**" shall have the meaning assigned to such term in <u>Section 2.18(b)</u>.

"**Priority Payables**" shall mean, at any time, the full amount of the liabilities at such time which have a trust imposed to provide for payment thereof or are secured by a Lien which trust or Lien ranks or is capable of ranking senior to or *pari passu* with security interests, hypothecs, Liens or charges securing the Obligations, including, without limitation, the CCAA DIP Charge, on any of the Collateral under federal, provincial, territorial, state, county, municipal, or local law including, but not limited to, any such liabilities or claims for unremitted and accelerated rents, goods and services taxes, sales or other taxes, real property taxes, wages, workers' compensation obligations, vacation pay, government royalties, pension fund obligations and other statutory or other claims, together with the aggregate value, determined in accordance with GAAP, of all Eligible Inventory which the Collateral Agent considers may be or may become subject to a right of a supplier to recover possession thereof under any federal or provincial or territorial law, where such supplier's right may rank *pari passu* with or have priority over, the security interests, liens or charges securing the Obligations including, without limitation, Eligible Inventory subject to a right of a supplier to repossess goods pursuant to Section 81.1 of the BIA (generally known as the "30-day goods rule").

"**Pro Forma Basis**" shall mean on a basis in accordance with GAAP and otherwise reasonably satisfactory to the Administrative Agent.

"**Projections**" shall mean the Borrowers' 2009 monthly financial projections set forth on <u>Schedule 1.01(d)</u> or the updated monthly projections delivered to the Administrative Agent and the Lenders pursuant to <u>Section 5.01(h)</u>, as applicable.

"**property**" shall mean any right, title or interest in or to property or assets of any kind whatsoever, whether real, personal or mixed (or foreign equivalent thereof) and whether tangible or intangible and including Equity Interests or other ownership interests of any person and whether now in existence or owned or hereafter entered into or acquired, including all Real Property.

"**Property Material Adverse Effect**" shall have the meaning assigned thereto in the Mortgage.

"**Purchase Money Obligation**" shall mean, for any person, the obligations of such person in respect of Indebtedness (including Capital Lease Obligations) incurred for the purpose of financing all or any part of the purchase price of any property (including Equity Interests of any person) or the cost of installation, construction or improvement of any property and any refinancing thereof; *provided*, *however*, that (i) such Indebtedness is incurred within one year after such acquisition, installation, construction or improvement of such property by such person and (ii) the amount of such Indebtedness does not exceed 100% of the cost of such acquisition, installation, construction or improvement, as the case may be.

"**Qualified Capital Stock**" of any person shall mean any Equity Interests of such person that are not Disqualified Capital Stock.

"**Real Property**" shall mean, collectively, all right, title and interest (including any leasehold, mineral or other estate) in and to any and all parcels of or interests in real property owned, leased or operated by any person, whether by lease, license or other means, together with, in each case, all easements, servitudes, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures and equipment, all general intangibles and contract rights and other property and rights incidental to the ownership, lease or operation thereof.

"**Reduction Fee**" shall have the meaning assigned to such term in Section 2.05(d).

"**Reduction Fee Date**" shall have the meaning assigned to such term in Section 2.05(d).

"**Register**" shall have the meaning assigned to such term in Section 10.04(c).

"**Regulation D**" shall mean Regulation D of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Regulation S-X**" shall mean Regulation S-X promulgated under the Securities Act.

"**Regulation T**" shall mean Regulation T of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Regulation U**" shall mean Regulation U of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Regulation X**" shall mean Regulation X of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"**Related Parties**" shall mean, with respect to any person, such person's Affiliates and the partners, directors, officers, employees, agents and advisors of such person and of such person's Affiliates.

"**Release**" shall mean any spilling, leaking, seepage, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing, depositing, dispersing, emanating or migrating of any Hazardous Material in, into, onto or through the Environment.

"**Released Parties**" shall have the meaning assigned to such term in <u>Section 2.18(g)</u>.

"**Releasing Parties**" shall have the meaning assigned to such term in <u>Section 2.18(g)</u>.

"**Required Lenders**" shall mean Lenders having more than 50% of the sum of all Loans outstanding and unused Commitments or, after the Commitments have terminated, more than 50% of all Exposure.

"**Requirements of Law**" shall mean, collectively, any and all requirements of any Governmental Authority including any and all laws, judgments, orders, decrees, ordinances, rules, regulations, statutes or case law.

"**Reserves**" shall mean reserves established against the Borrowing Base that the Collateral Agent may, in accordance with this Agreement (including, without limitation, <u>Section 2.17</u> hereof), establish from time to time.

"**Response**" shall mean (a) "response" as such term is defined in CERCLA, 42 U.S.C. § 9601(24), and (b) all other actions required by any Governmental Authority or voluntarily undertaken to (i) clean up, remove, treat, abate or in any other way address any Hazardous Material in the Environment; (ii) prevent the Release or threat of Release, or minimize the further Release, of any Hazardous Material; or (iii) perform studies and investigations in connection with, or as a precondition to, or to determine the necessity of the activities described in, clause (i) or (ii) above.

"**Responsible Officer**" of any person shall mean any executive officer or Financial Officer of such person and any other officer or similar official thereof with responsibility for the administration of the obligations of such person in respect of this Agreement.

"**Sale and Leaseback Transaction**" has the meaning assigned to such term in <u>Section 6.03</u>.

"**Scheduled Termination Date**" shall mean December 1, 2009 as the same may be extended in accordance with <u>Section 2.19</u>.

"**Secured Obligations**" shall mean the Obligations.

"**Secured Parties**" shall mean, collectively, the Administrative Agent, the Collateral Agent, the Joint Lead Arrangers, each other Agent and the Lenders.

"**Securities Act**" shall mean the Securities Act of 1933.

"**Securities Collateral**" shall mean, collectively, (i) the US Securities Collateral and (ii) Foreign Securities Collateral.

"**Security Agreement Collateral**" shall mean all property pledged or granted as collateral pursuant to the Security Documents (a) on the Closing Date or (b) thereafter pursuant to <u>Section 5.11</u>.

"**Security Agreements**" shall mean, collectively, (a) the US Security Agreement substantially in the form of <u>Exhibit M</u> among certain of the Loan Parties and Collateral Agent for the

-35-

benefit of the Secured Parties and (b) the Canadian Security Agreements in each case, as the same may from time to time be modified, amended, extended or reaffirmed in accordance with the terms thereof.

"**Security Documents**" shall mean the Security Agreements, the Mortgages, the US Pledge Agreement, the Guarantees and each other security document or pledge agreement delivered in accordance with applicable local or foreign law to grant a valid, perfected security interest in any property, moveable or immovable, as collateral for all or part of the Secured Obligations and/or the Guaranteed Obligations, and all UCC, PPSA or other financing statements (or foreign equivalent thereof) or instruments of perfection required by this Agreement, the Security Agreements, any Mortgage or any other such security document or pledge agreement to be filed with respect to the security interests in property and fixtures created pursuant to the Security Agreements or any Mortgage and any other document or instrument utilized to pledge or grant or purport to pledge or grant a security interest or lien on any property as collateral for all or part of the Secured Obligations.

"**Sponsor**" shall mean Ontario Teachers' Pension Plan Board.

"**Spot Selling Rate**" shall mean the spot selling rate at which the Administrative Agent offers to sell Canadian dollars for US dollars in the Toronto foreign exchange market at approximately 11:00 a.m. Toronto time on such date for delivery two (2) Business Days later.

"**Statutory Reserves**" shall mean for any Interest Period for any Eurodollar Borrowing in US dollars, the average maximum rate at which reserves (including any marginal, supplemental or emergency reserves) are required to be maintained during such Interest Period under Regulation D by member banks of the United States Federal Reserve System in New York City with deposits exceeding one billion US dollars against "Eurocurrency liabilities" (as such term is used in Regulation D). Eurodollar Borrowings shall be deemed to constitute Eurodollar liabilities and to be subject to such reserve requirements without benefit of or credit for proration, exceptions or offsets which may be available from time to time to any Lender under Regulation D.

"**Subordinated Equity Holder Loan**" shall mean that certain intercompany indebtedness evidenced by intercompany notes made by Canadian Borrower to Holding LP2, as amended in accordance with the terms hereof.

"**Subsidiary**" shall mean, with respect to any person (the "**parent**") at any date, (i) any person the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, (ii) any other corporation, limited liability company, association or other business entity of which securities or other ownership interests representing more than 50% of the voting power of all Equity Interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Board of Directors thereof are, as of such date, owned, controlled or held by the parent and/or one or more subsidiaries of the parent, (iii) any partnership (a) the sole general partner or the managing general partner of which is the parent and/or one or more subsidiaries of the parent or (b) the only general partners of which are the parent and/or one or more subsidiaries of the parent and (iv) any other person that is otherwise Controlled by the parent and/or one or more subsidiaries of the parent. Unless the context requires otherwise, "Subsidiary" refers to a Subsidiary of Holding LP1.

"**Subsidiary Guarantor**" shall mean each Subsidiary listed on Schedule 1.01(b), and each other Subsidiary that is or becomes a party to this Agreement pursuant to Section 5.11.

"**Supermajority Lenders**" shall mean Lenders having more than 66 2/3% of the sum of all Loans outstanding and unused Commitments or, after the Commitments have terminated, more than 66 2/3% of all Exposure.

"**Syndication Agent**" shall have the meaning assigned to such term in the preamble hereto.

"**Tax Return**" shall mean all returns, statements, filings, attachments and other documents or certifications required by any Governmental Authority to be filed in respect of Taxes.

"**Taxes**" shall mean all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"**Test Period**" shall mean, at any time, the three months of Holding LP1 then last ended (in each case taken as one accounting period) for which financial statements have been or are required to be delivered pursuant to Section 5.01(b) or (c).

"**Transactions**" shall mean, collectively, the transactions to occur on or prior to the Closing Date, including (a) the execution, delivery and performance of the Loan Documents and the initial borrowings hereunder; and (b) the payment of all fees and expenses to be paid on or prior to the Closing Date and owing in connection with the foregoing.

"**Type**," when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to the Adjusted LIBOR Rate or the Alternate Base Rate.

"**UCC**" shall mean the Uniform Commercial Code as in effect from time to time (except as otherwise specified) in any applicable state or jurisdiction.

"**United States**" or "**US**" shall mean the United States of America.

"**Upfront Fee**" shall have the meaning assigned to such term in Section 2.05(c).

"**US Borrower**" shall have the meaning assigned to such term in the preamble hereto.

"**US dollars**" or "**$**" shall mean lawful money of the United States.

"**US Guarantors**" shall mean, collectively, the Guarantors organized under the laws of any state of the United States of America.

"**US Loan Parties**" shall mean, collectively, the US Borrower and the US Guarantors.

"**US Pledge Agreement**" shall mean the pledge agreement, dated as of the Closing Date, by Canadian Borrower, governed by New York law, in favor of the Collateral Agent, as the same may from time to time be modified, amended, extended or reaffirmed in accordance with the terms thereof.

"**US Securities Collateral**" shall have the meaning assigned to such term in the US Security Agreement.

"**US Security Agreement**" shall mean the Security Agreement substantially in the form of <u>Exhibit M</u> dated as of the Closing Date by US Borrower and each Domestic Subsidiary of US Borrower in favor of Collateral Agent, as the same may from time to time be modified, amended, extended or reaffirmed in accordance with the terms thereof.

"**US Security Agreement Collateral**" means the "Collateral" as defined in the US Security Agreement.

"**Voting Stock**" shall mean, with respect to any person, any class or classes of Equity Interests pursuant to which the holders thereof have the general voting power under ordinary circumstances to elect at least a majority of the Board of Directors of such person.

"**Wholly-Owned Subsidiary**" shall mean, as to any person, (a) any corporation 100% of whose capital stock (other than directors' qualifying shares) (or at least 98% of whose Economic Interests) is at the time owned by such first person and/or one or more Wholly-Owned Subsidiaries of such person and (b) any partnership, association, joint venture, limited liability company or other entity in which such first person and/or one or more Wholly-Owned Subsidiaries of such first person have a 100% equity interest (or at least a 98% Economic Interest) at such time.

"**Withdrawal Liability**" shall mean liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

**SECTION 1.02** <u>Classification of Loans and Borrowings</u>. For purposes of this Agreement, Loans may be classified and referred to by Type (*e.g.*, a "Eurodollar Loan").

**SECTION 1.03** <u>Terms Generally</u>. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise (a) any definition of or reference to any Loan Document, agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any person shall be construed to include such person's successors and assigns, (c) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement, (e) any reference to any law or regulation herein shall refer to such law or regulation as amended, modified or supplemented from time to time, (f) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights and (g) "on," when used with respect to the Mortgaged Property or any property adjacent to the Mortgaged Property, means "on, in, under, above or about."

**SECTION 1.04** <u>Accounting Terms; GAAP</u>. Except as otherwise expressly provided herein, all financial statements to be delivered pursuant to this Agreement shall be prepared in accordance with GAAP as in effect from time to time and all terms of an accounting or financial nature

shall be construed and interpreted in accordance with GAAP, as in effect on the date hereof unless otherwise agreed to by Borrowers and the Required Lenders.

**SECTION 1.05     Resolution of Drafting Ambiguities**. Each Loan Party acknowledges and agrees that it was represented by counsel in connection with the execution and delivery of the Loan Documents to which it is a party, that it and its counsel reviewed and participated in the preparation and negotiation hereof and thereof and that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be employed in the interpretation hereof or thereof.

## ARTICLE II

## THE CREDITS

**SECTION 2.01     Commitments**. Subject to the terms and conditions and relying upon the representations and warranties herein set forth, each Lender agrees, severally and not jointly, to make Loans in US dollars to the Borrowers, at any time and from time to time after the Closing Date until the earlier of the Final Maturity Date and the termination of the Commitment of such Lender in accordance with the terms hereof, in an aggregate principal amount at any time outstanding that will not (i) result in such Lender's Exposure exceeding such Lender's Commitment, (ii) cause the Aggregate Revolver Outstandings to be in excess of the Borrowing Availability, (iii) exceed the disbursements set forth in the Approved Budget for the applicable Measurement Period (subject to the proviso in the definition of Approved Budget regarding amounts carried forward and any variances permitted by Section 6.10(b) of this Agreement (for the avoidance of doubt, it being understood and agreed that the presence of any "basket" or "carve-out" set forth in any negative covenant contained in Article VI shall not be, and shall not be deemed to be, an approval or acceptance by the Administrative Agent or any Lender of any Line Item in any Approved Budget, or portion thereof, related to cash expenditures of the type described in such "basket" or "carve-out," which shall remain subject to the approval rights of Administrative Agent, the Joint Lead Arrangers and the Required Lenders with respect to each Approved Budget as set forth herein and in the Applicable Order)) or (iv) cause the aggregate amount of outstanding Loans, prior to the issuance and entry of the Final Order, to be in excess of $15,000,000. Borrowers may borrow, pay or prepay and reborrow Loans.

**SECTION 2.02     Loans**.

(a)     Each Loan shall be made as part of a Borrowing consisting of Loans made by the Lenders ratably in accordance with their applicable Commitments; *provided* that the failure of any Lender to make its Loan shall not in itself relieve any other Lender of its obligation to lend hereunder (it being understood, however, that no Lender shall be responsible for the failure of any other Lender to make any Loan required to be made by such other Lender). Loans comprising any Borrowing shall be in an aggregate principal amount that is (i) an integral multiple of $1.0 million and not less than $1.0 million or (ii) equal to the remaining available balance of the applicable Commitments.

(b)     Subject to Sections 2.11 and 2.12, each Borrowing shall be comprised entirely of ABR Loans or Eurodollar Loans, as the applicable Borrower may request pursuant to Section 2.03. Each Lender may at its option make any Eurodollar Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; *provided* that any exercise of such option shall not affect the obligation of Borrowers to repay such Loan in accordance with the terms of this Agreement. Borrowings of more than one Type may be outstanding at the same time; *provided* that Borrowers shall not be entitled

-39-

to request any Borrowing that, if made, would result in more than four Eurodollar Borrowings outstanding hereunder at any one time. For purposes of the foregoing, Borrowings having different Interest Periods, regardless of whether they commence on the same date, shall be considered separate Borrowings.

(c)     Each applicable Lender shall make each applicable Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds to such account in New York City as the Administrative Agent may designate not later than 11:00 a.m., New York City time, and the Administrative Agent shall promptly credit the amounts so received to an account as directed by Borrowers in the applicable Borrowing Request maintained with the Administrative Agent or, if a Borrowing shall not occur on such date because any condition precedent herein specified shall not have been met, return the amounts so received to the respective Lenders.

(d)     Unless the Administrative Agent shall have received notice from a Lender prior to the date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's portion of such Borrowing, the Administrative Agent may assume that such Lender has made such portion available to the Administrative Agent on the date of such Borrowing in accordance with paragraph (c) above, and the Administrative Agent may, in reliance upon such assumption, make available to the applicable Borrower on such date a corresponding amount. If the Administrative Agent shall have so made funds available, then, to the extent that such Lender shall not have made such portion available to the Administrative Agent, each of such Lender and Borrowers severally agrees to repay to the Administrative Agent forthwith on demand such corresponding amount together with interest thereon, for each day from the date such amount is made available to the applicable Borrower until the date such amount is repaid to the Administrative Agent at (i) in the case of such Borrower, the interest rate applicable at the time to the Loans comprising such Borrowing and (ii) in the case of such Lender, the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation. If such Lender shall repay to the Administrative Agent such corresponding amount, such amount shall constitute such Lender's Loan as part of such Borrowing for purposes of this Agreement, and Borrowers' obligation to repay the Administrative Agent such corresponding amount pursuant to this Section 2.02(d) shall cease.

(e)     Notwithstanding any other provision of this Agreement, a Borrower shall not be entitled to request, or to elect to convert or continue, any Borrowing if the Interest Period requested with respect thereto would end after the Final Maturity Date.

**SECTION 2.03     Borrowing Procedure**. (a) To request a Borrowing, the applicable Borrower shall deliver, by hand delivery or telecopier, a duly completed and executed Borrowing Request to the Administrative Agent (i) in the case of a Eurodollar Borrowing, not later than 12:00 p.m., New York City time, three Business Days before the date of the proposed Borrowing or (ii) in the case of an ABR Borrowing, not later than 12:00 p.m., New York City time, one Business Day before the date of the proposed Borrowing. Each Borrowing Request shall be irrevocable and shall specify the following information in compliance with Section 2.02:

(i)     the aggregate amount of such Borrowing;

(ii)     the date of such Borrowing, which shall be a Business Day;

(iii)     whether such Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing;

-40-

(iv)     in the case of a Eurodollar Borrowing, the initial Interest Period to be applicable thereto, which shall be a period contemplated by the definition of the term "Interest Period";

(v)     the location and number of the applicable Borrower's account to which funds are to be disbursed, which shall comply with the requirements of Section 2.02(c);

(vi)     that the conditions set forth in Sections 4.02(b)-(h) have been satisfied as of the date of the notice; and

(vii)     which Borrower shall be making such Borrowing.

(b)     If no election as to the Type of Borrowing is specified, then the requested Borrowing shall be an ABR Borrowing.  If no Interest Period is specified with respect to any requested Eurodollar Borrowing, then the applicable Borrower shall be deemed to have selected an Interest Period of one month's duration.  Promptly following receipt of a Borrowing Request in accordance with this Section, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Borrowing.

## SECTION 2.04     Evidence of Debt; Repayment of Loans.

(a)     Promise to Repay.  The Borrowers hereby, jointly and severally, unconditionally promise to pay to the Administrative Agent for the account of each Lender, the then unpaid principal amount of each Loan of such Lender on the Final Maturity Date.  All payments or repayments of Loans made pursuant to this Section 2.04(a) shall be made in US dollars.

(b)     Lender and Administrative Agent Records.  Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the Indebtedness of Borrowers to such Lender resulting from each Loan made by such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.  The Administrative Agent shall maintain accounts in which it will record (i) the amount of each Loan made hereunder, the Type thereof and the Interest Period applicable thereto; (ii) the amount of any principal or interest due and payable or to become due and payable from Borrowers to each Lender hereunder; and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.  The entries made in the accounts maintained pursuant to this paragraph shall be *prima facie* evidence of the existence and amounts of the obligations therein recorded; *provided* that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligations of Borrowers to repay the Loans in accordance with their terms.

(c)     Promissory Notes.  Any Lender by written notice to Borrowers (with a copy to the Administrative Agent) may request that Loans made by it be evidenced by a promissory note.  In such event, the applicable Borrower shall prepare, execute and deliver to such Lender a promissory note payable to the order of such Lender (or, if requested by such Lender, to such Lender and its registered assigns) in the form of Exhibit K.  Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 10.04) be represented by one or more promissory notes in such form payable to the order of the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

## SECTION 2.05     Fees.

| LA\1978870.15|{00001116. }

(a)     <u>Commitment Fee</u>. The Borrowers hereby agree, jointly and severally, to pay to the Administrative Agent for the account of each Lender a fee (a "**Commitment Fee**") equal to 1.50% per annum on the average daily unused and undrawn amount of each Commitment of such Lender during the period from and including the date hereof to but excluding the date on which such Commitment terminates. Accrued Commitment Fees shall be payable in arrears (A) on the last Business Day of each month, commencing on the first such date to occur after the date hereof, and (B) on the date on which such Commitment terminates. Commitment Fees shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(b)     <u>Administrative Agent Fees</u>. The Borrowers agree, jointly and severally, to pay to the Administrative Agent and its Affiliates, for their respective own account, the administrative and other fees payable in the amounts and at the times separately agreed upon between the Borrowers and the Administrative Agent (the "**Administrative Agent Fees**").

(c)     <u>Upfront Fee</u>. The Borrowers agree, jointly and severally, to pay to the Administrative Agent, for the account of each Lender, an upfront fee in the amount of 2.00% of the full amount of Commitments under this Agreement, which fee is due and payable in full in cash on the Closing Date (the "**Upfront Fee**").

(d)     <u>Reduction Fee</u>. The Borrowers agree, jointly and severally, to pay to the Administrative Agent for the account of each Lender a fee fully earned on the Closing Date and payable on the date on which the Commitments shall have been permanently reduced (each such date, a "**Reduction Fee Date**"), in whole or in part, in the amount of 2.00% of the Commitments so permanently reduced on such Reduction Fee Date, which fee is due and payable in cash on such Reduction Fee Date (the "**Reduction Fee**").

(e)     <u>Exit Fee</u>. The Borrowers agree, jointly and severally, to pay to the Administrative Agent for the account of each Lender a fee fully earned on the Closing Date and payable on the Final Maturity Date (such date, the "**Exit Fee Date**"), in whole or in part, in the amount of 2.00% of the Commitments in effect under this Agreement (after taking into account any reductions in Commitments in respect of which a Reduction Fee shall have been paid in accordance with <u>Section 2.05(d)</u>)on the Final Maturity Date (the "**Exit Fee**"), which fee is due and payable in cash on the Exit Fee Date.

(f)     All Fees shall be paid on the dates due, in immediately available funds in US dollars, to the Administrative Agent for distribution, if and as appropriate, among the Lenders. Once paid, none of the Fees shall be refundable under any circumstances.

**SECTION 2.06**     <u>**Interest on Loans**</u>.

(a)     <u>ABR Loans</u>. Subject to the provisions of <u>Section 2.06(e)</u>, the Loans comprising each ABR Borrowing shall bear interest at a rate per annum equal to the Alternate Base Rate <u>plus</u> the Applicable Margin.

(b)     [Intentionally Omitted].

(c)     Eurodollar Loans.  Subject to the provisions of Section 2.06(e), the Loans comprising each Eurodollar Borrowing shall bear interest at a rate per annum equal to the Adjusted LIBOR Rate for the Interest Period in effect for such Borrowing plus the Applicable Margin.

(d)     [Intentionally Omitted].

(e)     Default Rate.  Notwithstanding the foregoing, during an Event of Default, all Obligations shall, to the extent permitted by applicable law, bear interest, after as well as before judgment, at a per annum rate equal to (i) in the case of principal and premium, if any, of or interest on any Loan, 2% *plus* the rate otherwise applicable to such Loan as provided in the preceding paragraphs of this Section 2.06 or (ii) in the case of any other amount, 2.00% *plus* the rate applicable to ABR Loans as provided in Section 2.06(a) (in either case, the "**Default Rate**").

(f)     Interest Payment Dates.  Accrued interest on each Loan shall be payable in arrears on each Interest Payment Date for such Loan; *provided* that (i) interest accrued pursuant to Section 2.06(e) shall be payable on demand, (ii) in the event of any repayment or prepayment of any Loan (other than a prepayment of an ABR Loan without a permanent reduction in Commitments), accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment and (iii) in the event of any conversion of any Eurodollar Loan prior to the end of the current Interest Period therefor, accrued interest on such Loan shall be payable on the effective date of such conversion.

(g)     Interest Calculation.  All interest hereunder shall be computed on the basis of a year of 360 days, except that interest computed by reference to the Alternate Base Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day).  The applicable Alternate Base Rate or Adjusted LIBOR Rate shall be determined by the Administrative Agent in accordance with the provisions of this Agreement and such determination shall be conclusive absent manifest error.

(h)     Currency for Payment of Interest.  All interest paid or payable pursuant to this Section 2.06 shall be paid in US dollars.

(i)     Interest Act (Canada).  For the purposes of the Interest Act (Canada), in any case in which an interest or fee rate is stated in this Agreement to be calculated on the basis of a number of days that is other than the number in a calendar year, the yearly rate, to which such interest or fee rate is equivalent, is equal to such interest or fee rate multiplied by the actual number of days in the year in which the relevant interest or fee payment accrues and divided by the number of days used as the basis for such calculation.  The principle of deemed reinvestment of interest does not apply to any interest calculation under this Agreement.  The rates of interest stipulated in this Agreement are intended to be nominal rates and not effective rates or yields.

**SECTION 2.07     Termination and Reduction of Commitments.**

(a)     Termination of Commitments.  The Commitments shall automatically terminate on the Final Maturity Date, without further notice to or order of the Bankruptcy Court or the Canadian Court.

(b)     [Intentionally Omitted].

(c)     Optional Terminations and Reductions.  At their option, Borrowers may at any time terminate, or from time to time permanently reduce, the Commitments; *provided* that (i) each reduction of the Commitments shall be in an amount that is an integral multiple of $500,000 and not less than $1.0 million, (ii) the Commitments shall not be terminated or reduced if, after giving effect to any concurrent prepayment of the Loans in accordance with Section 2.10, the aggregate amount of Exposures would exceed the aggregate amount of Commitments and (iii) concurrently with any such reduction and the Final Maturity Date, the Borrowers shall pay the Reduction Fee or the Exit Fee, as applicable, in accordance with Section 2.05(d) and Section 2.05(e).

(d)     Borrower Notice.  Borrowers shall notify the Administrative Agent in writing of any election to terminate or reduce the Commitments under Section 2.07(c) at least three Business Days prior to the effective date of such termination or reduction, specifying such election and the effective date thereof.  Promptly following receipt of any notice, the Administrative Agent shall advise the Lenders of the contents thereof.  Each notice delivered by Borrowers pursuant to this Section 2.07 shall be irrevocable.  Any termination or reduction of the Commitments shall be permanent.  Each reduction of the Commitments shall be made ratably among the Lenders in accordance with their respective Commitments.

## SECTION 2.08     Interest Elections.

(a)     Generally.  Each Borrowing initially shall be of the Type specified in the applicable Borrowing Request, and, in the case of a Eurodollar Borrowing, shall have an initial Interest Period as specified in such Borrowing Request.  Thereafter, the applicable Borrower may elect to convert such Borrowing to a different Type or to continue such Borrowing and, in the case of a Eurodollar Borrowing, may elect Interest Periods therefor, all as provided in this Section.  The applicable Borrower may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing.  Notwithstanding anything to the contrary, the applicable Borrower shall not be entitled to request any conversion or continuation that, if made, would result in more than four Eurodollar Borrowings having more than four different Interest Periods being outstanding hereunder at any one time.

(b)     Interest Election Notice.  To make an election pursuant to this Section, the applicable Borrower shall deliver, by hand delivery or telecopier, a duly completed and executed Interest Election Request to the Administrative Agent not later than the time that a Borrowing Request would be required under Section 2.03 if such Borrower were requesting a Borrowing resulting from such election to be made on the effective date of such election.  Each Interest Election Request shall be irrevocable.  Each Interest Election Request shall specify the following information in compliance with Section 2.02:

(i)     the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, or if outstanding Borrowings are being combined, allocation to each resulting Borrowing (in which case the information to be specified pursuant to clauses (ii), (iii) and (iv) below shall be specified for each resulting Borrowing);

(ii)     the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

-44-

(iii)  whether the resulting Borrowing is to be an ABR Borrowing or a Eurodollar Borrowing; and

(iv)  if the resulting Borrowing is a Eurodollar Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period" or Section 2.03(c)(i), as the case may be.

If any such Interest Election Request requests a Eurodollar Borrowing but does not specify an Interest Period then such Borrower shall be deemed to have selected an Interest Period of one month's duration.

Promptly following receipt of an Interest Election Request, the Administrative Agent shall advise each Lender of the details thereof and of such Lender's portion of each resulting Borrowing.

(c)  Automatic Conversion to ABR Borrowing.  If an Interest Election Request with respect to a Eurodollar Borrowing is not timely delivered prior to the end of the Interest Period applicable thereto, then, unless such Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be converted to an ABR Borrowing.  Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing, the Administrative Agent or the Required Lenders may require, by notice to the applicable Borrower, that (i) no outstanding Borrowing may be converted to or continued as a Eurodollar Borrowing and (ii) unless repaid, each Eurodollar Borrowing shall be converted to an ABR Borrowing at the end of the Interest Period applicable thereto.

**SECTION 2.09    [Intentionally Omitted].**

**SECTION 2.10    Optional and Mandatory Prepayments of Loans.**

(a)  Optional Prepayments.  Borrowers shall have the right at any time and from time to time to prepay any Borrowing, in whole or in part, subject to the requirements of this Section 2.10; *provided* that each partial prepayment shall be in an amount that is an integral multiple of $500,000 and not less than $1.0 million or, if less, the outstanding principal amount of such Borrowing.

(b)  Loan Prepayments.

(i)  In the event of the termination of all the Commitments, each Borrower shall, on the date of such termination, repay or prepay all its outstanding Loans.

(ii)  In the event of any partial reduction of the Commitments, then (x) at or prior to the effective date of such reduction, the Administrative Agent shall notify the Borrowers and the Lenders of the sum of the Exposures after giving effect thereto and (y) if the sum of the Exposures would exceed the aggregate amount of Commitments after giving effect to such reduction, the Borrowers shall, on the date of such reduction, repay or prepay the Loans in an aggregate amount sufficient to eliminate such excess.

(iii)  [Intentionally Omitted].

(iv)  In the event that the sum of all Lenders' Exposures exceeds (x) the Commitments then in effect or (y) the Borrowing Base, in each case, then the Borrowers shall, without notice or demand, immediately repay or prepay Loans in an aggregate amount sufficient to eliminate such excess.

-45-

(c)     Asset Sales.  Not later than two Business Days following the receipt of any Net Cash Proceeds of any Asset Sale (other than in connection with the closing of a sale of all or substantially all of the Loan Parties' assets pursuant to Section 363 of the Bankruptcy Code (and a sale with similar effect pursuant to an order of the Canadian Court) in any Bankruptcy Case or the CCAA Case which, concurrent with such sale, results in the repayment in full in cash of the Secured Obligations) by Holding LP1, ManagementCo, GPCo1, GPCo2 or any of their respective Subsidiaries, Borrowers shall make prepayments in accordance with Sections 2.10(h) and (i) in an aggregate amount equal to 100% of such Net Cash Proceeds.

(d)     Debt Issuance or Equity Issuance.  Not later than one Business Day following the receipt of any Net Cash Proceeds of any Debt Issuance or Preferred Stock Issuance or other Equity Issuance by Holding LP1, ManagementCo, GPCo1, GPCo2 or any of their respective Subsidiaries, Borrowers shall make prepayments in accordance with Sections 2.10(h) and (i) in an aggregate amount equal to 100% of such Net Cash Proceeds.

(e)     [Intentionally Omitted].

(f)     Casualty Events.  Not later than two Business Days following the receipt of any Net Cash Proceeds from a Casualty Event by Holding LP1, ManagementCo, GPCo1, GPCo2 or any of their respective Subsidiaries, Borrowers shall make prepayments in accordance with Sections 2.10(h) and (i) in an aggregate amount equal to 100% of such Net Cash Proceeds.

(g)     [Intentionally Omitted].

(h)     Application of Prepayments.  Prior to any optional or mandatory prepayment hereunder, Borrowers shall select the Borrowing or Borrowings to be prepaid and shall specify such selection in the notice of such prepayment pursuant to Section 2.10(i), subject to the provisions of this Section 2.10(h).  Any prepayment of the Loans pursuant to Sections 2.10(a) and (b) shall be applied to repay then outstanding Loans, which payment shall not also result in the Commitments being reduced.  Any prepayment of the Loans pursuant to Section 2.10(c), (d) and (f) shall be applied *first*, to the payment of all fees of the Agents and all reasonable costs and expenses of the Agents and the Lenders, in each case, then due and payable under any Loan Document, until paid in full, *second*, to the indefeasible payment in full in cash, *pro rata*, of interest and other amounts constituting Obligations (other than principal), *third*, to the indefeasible payment in full in cash, *pro rata*, of the principal amount of the Obligations and *fourth*, the balance, if any, to all other outstanding Obligations under the Loan Documents until paid in full, in each case, which payments shall (other than with respect to Net Cash Proceeds of Asset Sales permitted by Section 6.06(a), (c) and (e)-(g)) also result in (x) the Commitments being reduced ratably among the Lenders in accordance with their applicable Commitments in an aggregate amount equal to the amount applied toward such prepayment and (y) the requirement to pay the Reduction Fee or the Exit Fee, as applicable, in accordance with Section 2.05(d) and Section 2.05(e).

Amounts to be applied pursuant to this Section 2.10 to the prepayment of Loans shall be applied first to reduce outstanding ABR Loans.  Any amounts remaining after each such application shall be applied to prepay Eurodollar Loans.  Notwithstanding the foregoing, if the amount of any prepayment of Loans required under this Section 2.10 shall be in excess of the amount of the ABR Loans at the time outstanding (an "**Excess Amount**"), only the portion of the amount of such prepayment as is equal to the amount of such outstanding ABR Loans shall be immediately prepaid and, at the election of the applicable Borrower, the Excess Amount shall be either (A) deposited in an escrow account on terms satisfactory to the Collateral Agent and applied to the prepayment of Eurodollar Loans on the last day of

-46-

the then next-expiring Interest Period for Eurodollar Loans; *provided* that (i) interest in respect of such Excess Amount shall continue to accrue thereon at the rate provided hereunder for the Loans which such Excess Amount is intended to repay until such Excess Amount shall have been used in full to repay such Loans and (ii) at any time while a Default has occurred and is continuing, the Administrative Agent may, and upon written direction from the Required Lenders shall, apply any or all proceeds then on deposit to the payment of such Loans in an amount equal to such Excess Amount or (B) prepaid immediately, together with any amounts owing to the Lenders under <u>Section 2.13</u>.

(i)  <u>Notice of Prepayment</u>.  The applicable Borrower shall notify the Administrative Agent by written notice of any prepayment hereunder (i) in the case of prepayment of a Eurodollar Borrowing, not later than 11:00 a.m., New York City time, three Business Days before the date of prepayment and (ii) in the case of prepayment of an ABR Borrowing, not later than 11:00 a.m., New York City time, one Business Day before the date of prepayment. Each such notice shall be irrevocable. Each such notice shall specify the prepayment date, the principal amount of each Borrowing or portion thereof to be prepaid and, in the case of a mandatory prepayment, a reasonably detailed calculation of the amount of such prepayment. Promptly following receipt of any such notice, the Administrative Agent shall advise the Lenders of the contents thereof. Each partial prepayment of any Borrowing shall be in an amount that would be permitted in the case of a Credit Extension of the same Type as provided in <u>Section 2.02</u>, except as necessary to apply fully the required amount of a mandatory prepayment, to repay the remaining outstanding principal amount of any Loan. Each prepayment of a Borrowing shall be applied ratably to the Loans included in the prepaid Borrowing and otherwise in accordance with this <u>Section 2.10</u>. Prepayments shall be accompanied by accrued interest to the extent required by <u>Section 2.06</u> and the Exit Fee to the extent required by <u>Section 2.05(e)</u>.

**SECTION 2.11** **Alternate Rate of Interest**. If prior to the commencement of any Interest Period for a Eurodollar Borrowing:

(a)  the Administrative Agent determines (which determination shall be final and conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted LIBOR Rate for such Interest Period; or

(b)  the Administrative Agent is advised in writing by the Required Lenders that the Adjusted LIBOR Rate for such Interest Period will not adequately and fairly reflect the cost to such Lenders of making or maintaining their Loans included in such Borrowing for such Interest Period;

then the Administrative Agent shall give written notice thereof to the applicable Borrower and the Lenders as promptly as practicable thereafter and, until the Administrative Agent notifies Borrowers and the Lenders that the circumstances giving rise to such notice no longer exist, (i) any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Borrowing shall be ineffective and (ii) if any Borrowing Request requests a Eurodollar Borrowing, such Borrowing shall be made as an ABR Borrowing.

**SECTION 2.12** **Yield Protection**.

(a)  <u>Increased Costs Generally</u>. Subject to the provisions of <u>Section 2.15</u> (which shall be controlling with respect to matters covered thereby), if any Change in Law shall:

-47-

(i)  impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in, by any Lender (except any reserve requirement reflected in the Adjusted LIBOR Rate);

(ii)  subject any Lender to any tax of any kind whatsoever with respect to this Agreement or any Eurodollar Loan made by it or change the basis of taxation of payments to such Lender in respect thereof (except for Indemnified Taxes or Other Taxes covered by Section 2.15 and the imposition of, or any change in the rate of, any Excluded Tax payable by such Lender); or

(iii)  impose on any Lender or the London interbank market any other condition, cost or expense affecting this Agreement or Eurodollar Loans made by such Lender;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Eurodollar Loan (or of maintaining its obligation to make any such Loan) or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount), then, upon request of such Lender, Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b)  Capital Requirements.  If any Lender determines (in good faith, but in its sole absolute discretion) that any Change in Law affecting such Lender or any lending office of such Lender or such Lender's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)  Certificates for Reimbursement.  A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section 2.12 and delivered to Borrowers shall be conclusive absent manifest error.  Borrowers shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)  Delay in Requests.  Failure or delay on the part of any Lender to demand compensation pursuant to this Section 2.12 shall not constitute a waiver of such Lender's right to demand such compensation; provided that Borrowers shall not be required to compensate a Lender pursuant to this Section 2.12 for any increased costs incurred or reductions suffered more than six months prior to the date that such Lender notifies Borrowers of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the six-month period referred to above shall be extended to include the period of retroactive effect thereof) .

**SECTION 2.13**   **Breakage Payments**.  In the event of (a) the payment or prepayment, whether optional or mandatory, of any principal of any Eurodollar Loan earlier than the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the

conversion of any Eurodollar Loan earlier than the last day of the Interest Period applicable thereto, (c) the failure to borrow, convert, continue or prepay any Loan on the date specified in any notice delivered pursuant hereto or (d) the assignment of any Eurodollar Loan earlier than the last day of the Interest Period applicable thereto as a result of a request by Borrowers pursuant to Section 2.16(b), then, in any such event, Borrowers shall compensate each Lender for the loss, cost and expense attributable to such event. In the case of a Eurodollar Loan, such loss, cost or expense to any Lender shall be deemed to include an amount determined by such Lender to be the excess, if any, of (i) the amount of interest which would have accrued on the principal amount of such Loan had such event not occurred, at the Adjusted LIBOR Rate that would have been applicable to such Loan, for the period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue, for the period that would have been the Interest Period for such Loan), over (ii) the amount of interest which would accrue on such principal amount for such period at the interest rate which such Lender would bid were it to bid, at the commencement of such period, for US dollar deposits of a comparable amount and period from other banks in the Eurodollar market. A certificate of any Lender setting forth in reasonable detail any amount or amounts that such Lender is entitled to receive pursuant to this Section 2.13 shall be delivered to Borrowers (with a copy to the Administrative Agent) and shall be conclusive and binding absent manifest error. Borrowers shall pay such Lender the amount shown as due on any such certificate within 5 days after receipt thereof.

### SECTION 2.14    Payments Generally; Pro Rata Treatment; Sharing of Setoffs.

(a)    Payments Generally. Borrowers shall make each payment required to be made by them hereunder or under any other Loan Document (whether of principal, interest or fees, or of amounts payable under Section 2.12, 2.13, 2.15 or 10.03, or otherwise) on or before the time expressly required hereunder or under such other Loan Document for such payment (or, if no such time is expressly required, prior to 2:00 p.m., New York City time), on the date when due, in immediately available funds, without setoff, deduction or counterclaim. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to the Administrative Agent at its offices at 677 Washington Boulevard, Stamford, Connecticut, except that payments pursuant to Sections 2.12, 2.13, 2.15 and 10.03 shall be made directly to the persons entitled thereto and payments pursuant to other Loan Documents shall be made to the persons specified therein. The Administrative Agent shall distribute any such payments received by it for the account of any other person to the appropriate recipient promptly following receipt thereof. If any payment under any Loan Document shall be due on a day that is not a Business Day, unless specified otherwise, the date for payment shall be extended to the next succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension. All payments under each Loan Document shall be made in US dollars, except as expressly specified otherwise.

(b)    Pro Rata Treatment.

(i)    Each payment by Borrowers of interest in respect of the Loans shall be applied to the amounts of such obligations owing to the Lenders *pro rata* according to the respective amounts then due and owing to the Lenders.

(ii)    Each payment by Borrowers on account of principal of the Loans shall be allocated among the Lenders *pro rata* based on the principal amount of Loans held by the Lenders.

-49-

(c)     Insufficient Funds.  If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied (i) *first*, toward payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) *second*, toward payment of principal then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

(d)     Sharing of Set-Off.  If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans or other Obligations resulting in such Lender's receiving payment of a proportion of the aggregate amount of its Loans and accrued interest thereon or other Obligations greater than its *pro rata* share thereof as provided herein, then the Lender receiving such greater proportion shall (a) notify the Administrative Agent of such fact, and (b) purchase (for cash at face value in US dollars) participations in the Loans and such other obligations of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and other amounts owing them, *provided* that:

(i)     if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(ii)     the provisions of this paragraph shall not be construed to apply to (x) any payment made by Borrowers pursuant to and in accordance with the express terms of this Agreement or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than to Holding LP1 or any Subsidiary thereof (as to which the provisions of this paragraph shall apply).

Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under applicable Requirements of Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Loan Party rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Loan Party in the amount of such participation.  If under applicable bankruptcy, insolvency or any similar law any Secured Party receives a secured claim in lieu of a setoff or counterclaim to which this Section 2.14(d) applies, such Secured Party shall to the extent practicable, exercise its rights in respect of such secured claim in a manner consistent with the rights to which the Secured Party is entitled under this Section 2.14(d) to share in the benefits of the recovery of such secured claim.

(e)     Borrowers Default.  Unless the Administrative Agent shall have received notice from any Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that such Borrower will not make such payment, the Administrative Agent may assume that such Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due.  In such event, if the applicable Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

-50-

(f)     Lender Default. If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.02(c), 2.14(e) or 10.03(c), then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

### SECTION 2.15     Taxes.

(a)     Payments Free of Taxes. Any and all payments by or on account of any obligation of the Loan Parties hereunder or under any other Loan Document shall be made free and clear of and without reduction or withholding for any Indemnified Taxes or Other Taxes; *provided* that if the Loan Parties shall be required by applicable Requirements of Law to deduct any Indemnified Taxes (including any Other Taxes) from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 2.15) the Administrative Agent or Lender, as the case may be, receives an amount equal to the sum it would have received had no such deductions been made, (ii) the applicable Loan Party shall make such deductions and (iii) the applicable Loan Party shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable Requirements of Law.

(b)     Payment of Other Taxes by Borrowers. Without limiting the provisions of paragraph (a) above and without limiting the provisions of paragraph (c) below, Borrowers shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with and subject to applicable Requirements of Law.

(c)     Indemnification by Borrowers. Borrowers shall indemnify the Administrative Agent and each Lender within 10 days after demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section 2.15) paid by the Administrative Agent or such Lender, as the case may be, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to Borrowers by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(d)     Evidence of Payments. As soon as practicable after any payment of Indemnified Taxes or Other Taxes by Borrowers to a Governmental Authority, Borrowers shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)     Status of Lenders. Any Foreign Lender that is entitled to an exemption from or reduction of withholding tax under the law of the jurisdiction in which a Borrower is resident for tax purposes, or any treaty to which such jurisdiction is a party, with respect to payments hereunder or under any other Loan Document shall, to the extent it may lawfully do so, deliver to the applicable Borrower (with a copy to the Administrative Agent), at the time or times prescribed by applicable Requirements of Law or reasonably requested by a Borrower or the Administrative Agent, such properly completed and executed documentation prescribed by applicable Requirements of Law as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if requested by either Borrower or the Administrative Agent, shall deliver such other documentation prescribed by

-51-

applicable Requirements of Law or reasonably requested by either Borrower or the Administrative Agent as will enable either Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the above two sentences, in the case of non-US withholding taxes the completion, execution and submission of non-US forms shall not be required if in the Lender's judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would be otherwise disadvantageous to such Lender in any material respect.

Without limiting the generality of the foregoing any Foreign Lender shall, to the extent it may lawfully do so, deliver to US Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the request of US Borrower or the Administrative Agent, but only if such Foreign Lender is legally entitled to do so), whichever of the following is applicable:

    (i) duly completed copies of Internal Revenue Service Form W-8BEN claiming eligibility for benefits of an income tax treaty to which the United States is a party,

    (ii) duly completed copies of Internal Revenue Service Form W-8ECI,

    (iii) in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate, in substantially the form of Exhibit Q, or any other form approved by the Administrative Agent, to the effect that such Foreign Lender is not (A) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of any Borrower within the meaning of Section 881(c)(3)(B) of the Code, or (C) a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code and (y) duly completed copies of Internal Revenue Service Form W-8BEN, or

    (iv) any other form prescribed by applicable Requirements of Law as a basis for claiming exemption from or a reduction in United States federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable Requirements of Law to permit Borrowers to determine the withholding or deduction required to be made.

    (f)    <u>Treatment of Certain Refunds</u>. If the Administrative Agent or a Lender determines, in its reasonable discretion, that it has received a refund of any Indemnified Taxes or Other Taxes as to which it has been indemnified by any Borrower or with respect to which such Borrower has paid additional amounts pursuant to this Section, it shall pay to such Borrower an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by such Borrower under this Section with respect to the Indemnified Taxes or Other Taxes giving rise to such refund), net of all reasonable out-of-pocket expenses of the Administrative Agent or such Lender, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); *provided* that such Borrower, upon the request of the Administrative Agent or such Lender, agrees to repay the amount paid over to such Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority. This paragraph shall not be construed to require the Administrative Agent or any Lender to make available its tax returns (or any other information relating to its taxes that it deems confidential) to any Borrower or any other person. Notwithstanding anything to the contrary, in no event will any Lender

-52-

be required to pay any amount to any Borrower the payment of which would place such Lender in a less favorable net after-tax position than such Lender would have been in if the additional amounts giving rise to such refund of any Indemnified Taxes or Other Taxes had never been paid.

### SECTION 2.16    Mitigation Obligations; Replacement of Lenders.

(a)    Designation of a Different Lending Office.  If any Lender requests compensation under Section 2.12, or requires Borrowers to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.15, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.12 or 2.15, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. Borrowers hereby agree to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.  A certificate setting forth such costs and expenses submitted by such Lender to Borrowers shall be conclusive absent manifest error.

(b)    Replacement of Lenders.  If any Lender requests compensation under Section 2.12, or if Borrowers are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.15, or if any Lender defaults in its obligation to fund Loans hereunder, or if Borrowers exercise its replacement rights under Section 10.02(d), then Borrowers may, at their sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 10.04), all of its interests, rights and obligations under this Agreement and the other Loan Documents to an Eligible Assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); *provided* that:

(i)    Borrowers shall have paid to the Administrative Agent the processing and recordation fee specified in Section 10.04(b);

(ii)    such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under Section 2.13), from the assignee (to the extent of such outstanding principal and accrued interest and fees) or Borrowers (in the case of all other amounts);

(iii)    in the case of any such assignment resulting from a claim for compensation under Section 2.12 or payments required to be made pursuant to Section 2.15, such assignment will result in a reduction in such compensation or payments thereafter; and

(iv)    such assignment does not conflict with applicable Requirements of Law.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling Borrowers to require such assignment and delegation cease to apply.

-53-

**SECTION 2.17** **Determination of Borrowing Base**.

(a) Eligible Accounts. On any date of determination of the Borrowing Base, all of the Accounts owned by Borrowing Base Parties and reflected in the most recent Borrowing Base Certificate delivered by Borrowers to the Collateral Agent and the Administrative Agent shall be "Eligible Accounts" for the purposes of this Agreement, except any Account to which any of the exclusionary criteria set forth below applies. Eligible Accounts shall not include any of the following Accounts:

(i) any Account in which the Collateral Agent, on behalf of the Secured Parties, does not have a valid, perfected first priority Lien;

(ii) any Account that is not owned by a Borrowing Base Party;

(iii) any Account due from an Account Debtor that is not domiciled in Canada or the United States and (if not a natural person) organized under the laws of Canada or the United States or any political subdivision thereof;

(iv) any Account that is payable in any currency other than US dollars or Canadian Dollars, or another currency which the Collateral Agent and Administrative Agent shall have approved in writing;

(v) any Account that does not arise from the sale of goods or the performance of services by a Borrowing Base Party in the ordinary course of its business;

(vi) any Account that does not comply with all material applicable legal requirements, including, without limitation, all laws, rules, regulations and orders of any Governmental Authority (including any Account due from an Account Debtor located in the States of Oregon, Wisconsin, North Carolina, Louisiana, North Carolina, Alabama, Ohio or Washington or Provinces of Alberta, British Columbia, Ontario or Quebec or any other State or Province, unless the applicable Borrowing Base Party (at the time the Account was created and at all times thereafter) (i) had filed and has maintained effective a current notice of business activities report with the appropriate office or agency of the States of Oregon, Wisconsin, North Carolina, Louisiana, North Carolina, Alabama, Ohio or Washington or any necessary filing to carry on business in the Provinces of Alberta, British Columbia, Ontario or Quebec or any other State or Province, as applicable, (ii) was and has continued to be exempt from filing such report and has provided the Collateral Agent and Administrative Agent with satisfactory evidence thereof or (iii) will be able to enforce its rights to payment of the Accounts in the applicable jurisdiction notwithstanding its failure to file or obtain an exemption from filing of such notice of business activities report);

(vii) any Account (a) upon which the right of a Borrowing Base Party to receive payment is not absolute or is contingent upon the fulfillment of any condition whatsoever unless such condition is satisfied or (b) as to which by a Borrowing Base Party is not able to bring suit or otherwise enforce its remedies against the Account Debtor through judicial or administrative process or (c) that represents a progress billing consisting of an invoice for goods sold or used or services rendered pursuant to a contract under which the Account Debtor's obligation to pay that invoice is subject to a Borrowing Base Party's completion of further performance under such contract or is subject to the equitable lien of a surety bond issuer;

-54-

(viii)      to the extent that any defense, counterclaim, setoff or dispute is asserted as to such Account, it being understood that the amount of any such defense, counterclaim, setoff or dispute shall be disclosed to the Collateral Agent and that the remaining balance of the Account shall be eligible;

(ix)  any Account that is not bona fide indebtedness incurred in the amount of the Account for goods sold to or services rendered and accepted by the applicable Account Debtor;

(x)  any Account with respect to which an invoice or other electronic transmission constituting a request for payment, reasonably acceptable to the Collateral Agent in form and substance, has not been sent on a timely basis to the applicable Account Debtor according to the normal invoicing and timing procedures a Borrowing Base Party;

(xi)  any Account that arises from a sale to any director, officer or other employee or Affiliate of a Borrowing Base Party, or to any entity that has any common officer or director with a Borrowing Base Party, *provided* that the Collateral Agent and Administrative Agent may, from time to time in the exercise of their Permitted Discretion, upon request of the Borrowers approve the inclusion of Accounts from Affiliates which are not Subsidiaries of Borrowers if Borrowers have provided sufficient current financial information to support a decision and demonstrated to their reasonable satisfaction that the sales to such Affiliates comply with the terms of <u>Section 6.09</u>;

(xii) to the extent a Borrowing Base Party or any Subsidiary is liable for goods sold or services rendered by the applicable Account Debtor to a Borrowing Base Party or any Subsidiary but only to the extent of the potential offset;

(xiii)      any Account that arises with respect to goods that are delivered on a bill-and-hold, cash-on-delivery basis or placed on consignment, guaranteed sale or other terms by reason of which the payment by the Account Debtor is or may be conditional (except sales made in the ordinary course of business which permit the return of defective goods or goods that do not otherwise conform to specifications);

(xiv) any Account that is in default; *provided*, that, without limiting the generality of the foregoing, an Account shall be deemed in default upon the occurrence of any of the following:

(A)    any Account not paid within ninety (90) days following its original invoice date or that is more than sixty (60) days past due according to its original terms of sale; or

(B)    the Account Debtor obligated upon such Account suspends business, makes a general assignment for the benefit of creditors or fails to pay its debts generally as they come due; or

(C)    a petition is filed by or against any Account Debtor obligated upon such Account under any bankruptcy law or any other federal, state or foreign (including any provincial) receivership, insolvency relief or other law or laws for the relief of debtors;

-55-

(xv) any Account that is the obligation of an Account Debtor (other than an individual) if 50% or more of the US dollar amount of all Accounts owing by that Account Debtor are ineligible under the other criteria set forth in this Section 2.17(a);

(xvi) any Account as to which any of the representations or warranties in the Loan Documents are untrue;

(xvii)      to the extent such Account is evidenced by a judgment, Instrument or Chattel Paper;

(xviii)      to the extent such Account exceeds any credit limit established by the Administrative Agent and the Collateral Agent, in their Permitted Discretion, following prior notice of such limit by the Collateral Agent to Borrower;

(xix) that portion of any Account (1) in respect of which there has been, or should have been, established by a Borrowing Base Party a contra account, whether in respect of contractual allowances with respect to such Account, audit adjustment, anticipated discounts or otherwise, or (2) which is due from an Account Debtor to whom a Borrowing Base Party owes a trade payable, but only to the extent of such trade payable or (3) which a Borrowing Base Party knows is subject to the exercise by an Account Debtor of any right of rescission, set-off, recoupment, counterclaim or defense;

(xx) any Account the assignment (whether absolutely or by way of security) of which is limited or restricted by the terms of the contract evidencing or relating to such Account unless, if so restricted, such limitation or restriction has been complied and the laws of the jurisdiction(s) governing the validity of such assignment do not provided that such limitation or restriction is ineffective as against the secured creditor with a security interest therein;

(xxi)      any Account on which the Account Debtor is a Governmental Authority, unless a Borrowing Base Party has assigned its rights to payment of such Account to the Administrative Agent pursuant to the Assignment of Claims Act of 1940, as amended, or the *Financial Administration Act* (Canada), as applicable, in the case of a federal Governmental Authority, or pursuant to Applicable Law, if any, in the case of any other Governmental Authority, and such assignment has been accepted and acknowledged by the appropriate government officers; or

(xxii)      any Account for which consents, licenses, approvals or authorizations of, or registrations or declarations with, any Governmental Authority are required to be obtained, effected or given in connection with the execution, delivery and performance of such Account by each party obligated thereunder or in connection with the enforcement and collection thereof by the Collateral Agent or Administrative Agent, unless such consents, licenses, approvals, authorizations, registrations or declarations have been duly obtained, effected or given and are in full force and effect.

(b)      Eligible Inventory.  On any date of determination of the Borrowing Base, all of the Inventory owned by Borrowing Base Parties and reflected in the most recent Borrowing Base Certificate delivered by Borrowers to the Collateral Agent and the Administrative Agent shall be "Eligible Inventory" for the purposes of this Agreement, except any Inventory to which any of the

exclusionary criteria set forth below applies.  Eligible Inventory shall not include any of the following Inventory:

       (i)   the Collateral Agent, on behalf of Secured Parties, does not have a valid, perfected first priority Lien on such Inventory;

       (ii)  (1) after the date that is thirty (30) days after the Closing Date, is stored at a location which is not owned by a Borrowing Base Party and where the aggregate value of Inventory exceeds $250,000 unless the Collateral Agent has given its prior consent thereto and unless either (x) a Landlord Access Agreement has been delivered to the Collateral Agent, or (y) Reserves reasonably satisfactory to the Collateral Agent have been established with respect thereto or (2) after the date that is thirty (30) days after the Closing Date, is stored with a bailee or warehouseman where the aggregate value of Inventory exceeds $500,000 unless either (x) an acknowledged Bailee Letter which is in form and substance satisfactory to the Collateral Agent and the Administrative Agent has been received by the Collateral Agent or (y) Reserves reasonably satisfactory to the Collateral Agent have been established with respect thereto, or (3) is located at an owned location subject to a mortgage in favor of a lender other than the Collateral Agent where the aggregate value of Inventory exceeds $250,000 unless either (x) a mortgagee waiver which is in form and substance satisfactory to the Collateral Agent and the Administrative Agent has been delivered to the Collateral Agent or (y) Reserves reasonably satisfactory to the Collateral Agent have been established with respect thereto;

       (iii)  is placed on consignment, unless a valid consignment agreement which is reasonably satisfactory to Collateral Agent is in place with respect to such Inventory;

       (iv)  is covered by a negotiable document of title, unless such document has been delivered to the Collateral Agent with all necessary endorsements, free and clear of all Liens except those in favor of the Collateral Agent and the Lenders and landlords, carriers, bailees and warehousemen if clause (ii) above has been complied with;

       (v)  is to be returned to suppliers;

       (vi)  is supplies and is obsolete, unsalable, shopworn, seconds, damaged or unfit for sale;

       (vii) is Inventory and is obsolete, unsalable, shopworn, seconds, damaged or unfit for sale;

       (viii)     consists of display items, samples or packing or shipping materials, or replacement parts;

       (ix)  is not of a type held for sale in the ordinary course of any Borrowing Base Party's business;

       (x)  breaches any of the representations or warranties pertaining to Inventory set forth in the Loan Documents;

       (xi)  consists of Hazardous Materials or goods that can be transported or sold only with licenses that are not readily available;

(xii) is not covered by casualty insurance maintained as required by <u>Section 5.04</u>; or

(xiii)       is subject to any licensing arrangement the effect of which would be to limit the ability of Collateral Agent, or any person selling the Inventory on behalf of Collateral Agent, to sell such Inventory in enforcement of the Collateral Agent's Liens, without further consent or payment to the licensor or other.

(c)       Notwithstanding any of the other provisions of this <u>Section 2.17</u>, the Collateral Agent and the Administrative Agent reserve the right, at any time and from time to time after the Closing Date, to adjust the criteria set forth above in this <u>Section 2.17</u>, to establish new criteria and to adjust the applicable advance rate with respect to Eligible Accounts, Eligible Intermediate Inventory, Eligible Raw Materials and Eligible Finished Goods in their collective Permitted Discretion subject to the approval of the Required Lenders in the case of adjustments, new criteria or changes in the applicable advance rates which, when compared to such criteria or such advance rates as provided herein on the Closing Date, have the effect of making more credit available.  In addition, the Collateral Agent and the Administrative Agent shall have the right to establish, modify or eliminate Reserves with respect to Eligible Accounts, Eligible Intermediate Inventory, Eligible Raw Materials and Eligible Finished Goods (including, without limitation, for estimates, chargeback or other accrued liabilities or offsets and amounts to adjust for material claims, offsets, defenses or counterclaims or other material disputes), from time to time in their collective Permitted Discretion.

**SECTION 2.18       <u>Super-Priority Nature of Obligations and Lenders' Liens</u>**.  Each Loan Party represents, warrants, covenants and agrees that:

(a)       The priority of the Agents' and Lenders' Liens on the Collateral owned by the Loan Parties shall be set forth in the Applicable Order.

(b)       All Obligations of the US Loan Parties under the Loan Documents:

(i)       pursuant to Section 364(c)(1) of the Bankruptcy Code, shall at all times constitute joint and several allowed administrative expense claims in the Chapter 11 Cases having priority over all administrative expenses of the kind specified in Sections 503(b) or 507(c) of the Bankruptcy Code;

(ii)       pursuant to Section 364(c)(2) of the Bankruptcy Code, shall at all times be secured by a perfected first priority Lien on all tangible and intangible property of each Loan Party that is not subject to a valid and perfected Lien in existence at the time of the commencement of the Chapter 11 Cases or to valid Liens in existence at the time of the commencement of the Chapter 11 Cases that are perfected after such commencement as permitted under Section 546(b) of the Bankruptcy Code (the "**364/546 Liens**");

(iii)       pursuant to Section 364(c)(3) of the Bankruptcy Code, shall be secured by a perfected Lien upon all tangible and intangible property of each Loan Party that is subject to Existing Liens (other than Primed Liens) and to post-petition Liens described in clauses (a), (b), (d), (e), (f) (but only subclause (x)), (h) or (r) of Section 6.02 hereunder that attach after the Petition Date (the "**Postpetition Senior Liens**," and, together with the 364/546 Liens, the "**Permitted Senior Liens**"), junior to the Permitted Senior Liens; and

-58-

(iv)  pursuant to Section 364(d)(1) of the Bankruptcy Code, shall be secured by a perfected first priority, senior priming Lien on all of the tangible and intangible property of each Loan Party that secures any Loan Party's Indebtedness and other obligations under the Prepetition Loan Documents and any Liens to which such Liens are senior (the "**Primed Liens**"), which senior Priming Liens shall have priority over any Liens granted on or after the Filing Date to provide adequate protection in respect of the Prepetition First Lien Obligations,

in each case, subject to the Carve-Out.

(c)  All Obligations are secured by the CCAA DIP Charge on all the property, assets and undertaking of the Canadian Loan Parties, subject in priority only to the Exceptions.

(d)  Agents' and Lenders' Liens on the Collateral provided by the US Loan Parties and Agents' and Lenders' respective administrative claims under Sections 364(c)(l) and 364(d) of the Bankruptcy Code shall also have priority over any claims, including, upon entry of the Final Order, those arising under Section 506(c) of the Bankruptcy Code subject and subordinate only to the sum of the following: (i) allowed, accrued, but unpaid professional fees and expenses of the US Loan Parties and the Committee (to the extent consistent with the Approved Budget, after giving effect to the proviso thereof which permits amounts that were budgeted for a prior Measurement Period but not spent in such Measurement Period may be added to the budgeted amounts for succeeding Measurement Periods) which have accrued and been incurred prior to the occurrence of an Event of Default which may and shall be paid after any such Event of Default to the extent allowed by the Bankruptcy Court (the "**Pre-Event of Default Carve-Out Expenses**"); (ii) allowed, accrued but unpaid professional fees and expenses incurred by the US Loan Parties and for the Committee incurred in the Chapter 11 Cases after an Event of Default (that is not cured or waived) in an aggregate amount not to exceed $750,000 (the "**Post-Event of Default Carve-Out Expenses**", and collectively with the Pre-Event of Default Carve-Out Expenses, the "**Carve-Out Expenses**"); and (iii) fees payable to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930 and to the clerk of the Bankruptcy Court (collectively, with the Carve-Out Expenses, the "**Carve-Out**"), provided, that the Carve-Out Expenses shall not include any other claims that are or may be senior to or *pari passu* with any of the Carve-Out Expenses or any professional fees and expenses of a Chapter 7 trustee and, provided, further, that Carve-Out Expenses shall not include any fees or disbursements (A) arising after the conversion of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code or (B) of the type described in the clause (iii) of <u>Section 3.12</u> hereof or otherwise related to the investigation of, preparation for, or commencement or prosecution of, any claims or proceedings against (i) the Agents or the Lenders or their claims or security interests in or Liens on, the Collateral whether under this Agreement or any other Loan Document and (ii) any agent or lender under the Prepetition Credit Agreements or their claims or security interests in connection with the Prepetition Credit Agreements or any of the Prepetition Loan Documents or instruments entered into in connection therewith.  Except as set forth herein or in the Applicable Order, no other claim or Lien having a priority superior or *pari passu* to that granted to Agents and Lenders by the Final Order shall be granted or approved while any Obligations under this Agreement remain outstanding without the prior written consent of the Collateral Agent (acting at the direction of the Required Lenders) and the Joint Lead Arrangers.  Except for the Carve-Out, the Administration Charge and the Directors' Charge, no costs or expenses of administration shall be imposed against Agents, Lenders or any of the Collateral or any of the Prepetition Agents and Prepetition Lenders under the Prepetition Credit Agreements or the Collateral (as defined in each Prepetition Credit Agreement) under Sections 105, 506(c) or 552 of the Bankruptcy Code, or otherwise, and the Loan Parties hereby waive for themselves and on behalf of each of their estates in bankruptcy, any and all rights under sections 105, 506(c) (upon entry of the Final Order) or 552, or otherwise, to assert or impose

-59-