or seek to assert or impose, any such costs or expenses of administration against Agents or the Lenders or the Prepetition Agents or the Prepetition Lenders under the Prepetition Credit Agreements.

(e) Upon the Final Maturity Date (whether by acceleration or otherwise) of any of the Obligations under this Agreement or any of the other Loan Documents, Lenders shall be entitled to immediate payment of such Obligations without further application to or order of the Bankruptcy Court or the Canadian Court.

(f) Each Loan Party agrees that (i) the Obligations hereunder shall not be discharged by the issuance and entry of an order confirming a plan of reorganization, arrangement or compromise in the CCAA Case or in any Chapter 11 Case (and each Loan Party pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (ii) the super priority administrative claim and the CCAA DIP Charge granted to the Agents and Lenders pursuant to the Financing Orders and described in Section 2.18 and the Liens granted to the Agents pursuant to the Financing Orders and described in Section 2.18 shall not be affected in any manner by the issuance and entry of an order confirming a plan of reorganization, arrangement or compromise in any Chapter 11 Case or the CCAA Case.

(g) The Loan Parties hereby acknowledge effective upon the issuance and entry of each Financing Order, that the Loan Parties have no defense, counterclaim, offset, recoupment, cross-complaint, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all or any part of the Loan Parties' liability to prepay or repay the Agents or any Lender as provided in this Agreement or other Loan Documents, Prepetition Agents or any Prepetition Lender as provided in the Prepetition Credit Agreements or other Prepetition Loan Documents or to seek affirmative relief or damages of any kind or nature from the Agents or any Lender or Prepetition Agents or any Prepetition Lender. The Loan Parties, in their own right, on behalf of each of their bankruptcy estates and on behalf of all their successors, assigns, Subsidiaries, Guarantors and any Affiliates and any Person acting for and on behalf of, or claiming through them, (collectively, the "**Releasing Parties**"), hereby, effective upon the issuance and entry of the Final Order, fully, finally and forever release and discharge the Agents, Lenders, Prepetition Agents and Prepetition Lenders and all of Agents', Lenders', Prepetition Agents' and Prepetition Lenders' past and present officers, directors, agents, attorneys, assigns, heirs, parents, subsidiaries, and each person acting for or on behalf of any of them (collectively, the "**Released Parties**") of and from any and all past and present actions, causes of action, demands, suits, claims, liabilities, Liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, whether in law, equity or otherwise (including, without limitation, those arising under Sections 541 through 550 of the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing, heretofore existing or which may heretofore accrue against any of the Released Parties, whether held in a personal or representative capacity, and which are based on any act, fact, event or omission or other matter, cause or thing occurring at or from any time prior to and including the date hereof in any way, directly or indirectly arising out of, connected with or relating to this Agreement, the other Loan Documents, the Prepetition Credit Agreements, the Prepetition Loan Documents, the Financing Orders and the transactions contemplated hereby, and all other agreements, certificates, instruments and other documents and statements (whether written or oral) related to any of the foregoing; provided, that nothing herein shall be deemed to be a release of any Secured Party from its obligations under the Loan Documents,

-60-

provided, further, that nothing contained herein shall be deemed to limit or modify the rights granted to third parties under the Financing Orders.

(h)     Upon the Closing Date, and on behalf of itself and its estate, and for so long as any Obligations shall be outstanding, each US Loan Party hereby irrevocably waives any right, pursuant to Sections 364(c) or 364(d) of the Bankruptcy Code or otherwise, to grant any Lien of equal or greater priority than the Liens securing the Obligations (or the adequate protection claims and Liens granted to the Prepetition First Lien Agents or the Prepetition First Lien Lenders in any Financing Order), or to approve a claim of equal or greater priority than the Obligations, unless effective upon the granting of any such Lien or claim, the Obligations and adequate protection obligations shall be paid in full in cash and the Commitments shall be terminated.

SECTION 2.19     Extension.  Each party hereto represents, warrants, covenants and agrees that, with the written consent of the Administrative Agent, the Joint Lead Arrangers and the Required Lenders and as further provided below, if Borrowers have obtained entry of an order approving a disclosure statement and are otherwise making progress towards confirmation of a plan of reorganization, arrangement or compromise that is acceptable to the Administrative Agent, the Joint Lead Arrangers and the Required Lenders, then Borrowers shall have the right to seek to extend the Scheduled Termination Date for up to two (2) additional distinct consecutive periods, each of three (3) months in duration (each an "**Extension Period**").  To request an extension of the Scheduled Termination Date, Borrowers shall deliver to Administrative Agent at least ten (10) days' prior written notice (an "**Extension Notice**"; such 10th day after delivery of the Extension Notice being hereinafter referred to as the "**Extension Effectiveness Date**") containing Borrowers' request to extend the Scheduled Termination Date.  On the applicable Extension Effectiveness Date, the Scheduled Termination Date shall be extended three (3) months from the then applicable Scheduled Termination Date, provided that the Borrowers shall have received the written consent to such extension from the Administrative Agent, the Joint Lead Arrangers and the Required Lenders.  Upon the receipt of such consents, the Scheduled Termination Date shall be deemed extended on the Extension Effectiveness Date without any further requisite action.  If the Scheduled Termination Date is extended, all the terms and conditions of the Loan Documents shall continue to apply, except that Borrowers shall have no further option to extend the Scheduled Termination Date beyond the expiration of the second occurring Extension Period.

# ARTICLE III

# REPRESENTATIONS AND WARRANTIES

Each Loan Party represents and warrants to the Administrative Agent, the Collateral Agent and the Lenders that:

SECTION 3.01     **Organization; Powers**.  Each Loan Party (a) is duly incorporated, continued, amalgamated, organized or formed and validly existing under the laws of the jurisdiction of its incorporation, continuation, amalgamation, organization or formation, (b) has all requisite corporate, limited liability company or partnership power and authority to carry on its business as now conducted and to own and lease its property and (c) is qualified and in good standing (to the extent such concept is applicable in the applicable jurisdiction and except by reason of the commencement of the Chapter 11 Cases and the CCAA Case) to do business in every jurisdiction where such qualification is required, except in such jurisdictions where the failure to so qualify or be in good standing, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.  There is no existing default under any Organizational Document of any Loan Party or any event which, with the giving of

-61-

notice or passage of time or both, would constitute a default by any party thereunder except in each case where such default, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

**SECTION 3.02    Authorization; Enforceability**. The Transactions to be entered into by each Loan Party are within such Loan Party's corporate, limited liability company or partnership powers and have been duly authorized by all necessary action on the part of such Loan Party. This Agreement has been duly executed and delivered by each Loan Party and, subject to the issuance and entry of the Interim Order and the CCAA Initial Order (or the Final Order, when applicable) by the Bankruptcy Court and the Canadian Court, as applicable, and subject to the terms of such orders, constitutes, and each other Loan Document to which any Loan Party is to be a party, when executed and delivered by such Loan Party, will constitute, a legal, valid and binding obligation of such Loan Party, enforceable in accordance with its terms.

**SECTION 3.03    No Conflicts**. Subject to the issuance and entry of the Interim Order and the CCAA Initial Order (or the Final Order, when applicable) by the Bankruptcy Court and the Canadian Court, as applicable, the Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except (i) such as have been obtained or made and are in full force and effect and (ii) consents, approvals, registrations, filings, permits or actions the failure to obtain or perform which could not reasonably be expected to result in a Material Adverse Effect, (b) will not violate the Organizational Documents of any Company, (c) will not violate any Requirement of Law except for violations (other than those caused by or otherwise related to any Loan Document) that could not reasonably be expected to result in a Material Adverse Effect, (d) will not violate or result in a default or require any consent or approval under any indenture, agreement or other instrument binding upon any Company or its property, or give rise to a right thereunder to require any payment to be made by any Company, except for violations, defaults or the creation of such rights that could not reasonably be expected to result in a Material Adverse Effect, and (e) will not result in the creation or imposition of any Lien on any property of any Company, except Liens created by the Loan Documents and Permitted Liens.

**SECTION 3.04    Financial Statements; Projections**.

(a)    Historical Financial Statements. Borrowers have heretofore delivered to the Lenders (i) the consolidated balance sheet of Holding LP1 and related consolidated statements of income, cash flows and stockholders' equity for fiscal years ended December 31, 2007 and 2008, in comparative form with such financial statements as of the end of, and for, the preceding fiscal year, and notes thereto (including a note with a consolidating balance sheet and statements of income and cash flows separating out Holding LP1, Borrowers and the Subsidiaries), and audited and accompanied by an opinion of PricewaterhouseCoopers LLP or other independent public accountants of recognized national standing satisfactory to the Administrative Agent (which shall not be qualified in any material respect (other than any "going concern" qualification and qualifications with respect to method of accounting as a result of the filing of the Chapter 11 Cases or the CCAA Case)), stating that such financial statements fairly presented, in all material respects, the consolidated financial condition, results of operations and cash flows of Holding LP1 as of the dates and for the periods specified, with respect to any period ended on or prior to December 31, 2007, prepared in accordance with International Financial Reporting Standards, with reconciliations to GAAP and, otherwise, prepared in accordance with GAAP, (ii) unaudited consolidated and consolidating balance sheets and related statements of income, stockholders' equity and cash flows of Holding LP1 for the fiscal quarter ending March 31, 2009 and for the comparable period of the preceding fiscal year and (iii) unaudited consolidated and consolidating balance sheets and related

-62-

statements of income of Holding LP1 and its consolidated subsidiaries for each fiscal month ending after the last fiscal quarter covered by the financial statements in clause (ii) of this Section 3.04(a)and more than 30 days prior to the Closing Date and for the comparable periods of the preceding fiscal year in each case, certified by the chief financial officer of Borrowers.  Such financial statements and all financial statements delivered pursuant to Sections 5.01(a) and (b) present fairly and accurately in all material respects  the financial condition and results of operations and cash flows of Holding LP1 and its consolidated subsidiaries as of the dates and for the periods to which they relate.  All financial statements delivered pursuant to Sections 5.01(a) and (b) with respect to any period ended on or prior to December 31, 2007 have been prepared in accordance with International Financial Reporting Standards, with reconciliations to GAAP and, otherwise, for all other periods, have been prepared in accordance with GAAP.

(b)     No Liabilities.  Except as set forth in the financial statements referred to in Section 3.04(a) and the events set forth in Schedule 3.17, there are no liabilities of any Company of any kind, whether accrued, contingent, absolute, determined, determinable or otherwise, which could reasonably be expected to result in a Material Adverse Effect, and there is no existing condition, situation or set of circumstances which could reasonably be expected to result in such a liability, other than liabilities under the Loan Documents.  Other than the commencement of the Chapter 11 Cases and the CCAA Case and the events set forth in Schedule 3.17, since December 31, 2008 there has been no event, change, circumstance or occurrence that, individually or in the aggregate, has had or could reasonably be expected to result in a Material Adverse Effect.

(c)     [Intentionally Omitted].

(d)     Forecasts.  Borrowers have heretofore delivered to the Lenders the Projections.  Such Projections have been prepared in good faith by Borrowers and based on assumptions believed by Borrowers to reasonable.

**SECTION 3.05     Properties.**

(a)     Generally.  Each Company has good title to, or valid leasehold interests in, all its property material to its business, free and clear of all Liens except for, in the case of Collateral, Permitted Collateral Liens and the Exceptions and, in the case of all other material property, Permitted Liens and the Exceptions and minor irregularities or deficiencies in title that, individually or in the aggregate, do not materially interfere with its ability to conduct its business as currently conducted on such property or to utilize such property for its intended purpose.  The property of the Companies, taken as a whole, (i) is in good operating order, condition and repair (ordinary wear and tear excepted) and (ii) constitutes all the property which is required for the business and operations of the Companies as presently conducted.

(b)     Real Property.  Schedules 7(a) and 7(b) to the Perfection Certificate dated the Closing Date contain a true and complete list as of the Closing Date of each interest in Real Property (i) owned by each Company and describes the type of interest therein held by such Company and whether all or any part of such owned Real Property is leased and if leased whether the underlying Lease contains any option or right of first offer to purchase all or any portion of such Real Property or any interest therein or contains any right of first refusal relating to any sale of such Real Property or any portion thereof or interest therein and (ii) leased, subleased or otherwise occupied or utilized by each Company, as lessee, sublessee, franchisee or licensee, and describes the type of interest therein held by such Company and, in each of the cases described in clauses (i) and (ii) of this Section 3.05(b), whether any Lease requires the consent of the landlord or tenant thereunder, or other party thereto, to the Transactions.

-63-

(c)     No Casualty Event.  No Company has received any notice of, nor has any knowledge of, the occurrence or pendency or contemplation of any Casualty Event affecting all or any portion of its property which could, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.  As of the Closing Date, no Mortgage encumbers improved Real Property that is located in an area that has been identified by the Secretary of Housing and Urban Development as an area having special flood hazards within the meaning of the National Flood Insurance Act of 1968 unless flood insurance available under such Act has been obtained in accordance with Section 5.04.

(d)     Collateral.  Each Company owns or has rights to use all of the Collateral and all rights with respect to any of the foregoing used in, necessary for or material to each Company's business as currently conducted.  The use by each Company of such Collateral and all such rights with respect to the foregoing do not infringe on the rights of any person other than such infringement which could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.  No claim has been made and remains outstanding that any Company's use of any Collateral does or may violate the rights of any third party that could, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

**SECTION 3.06     Intellectual Property.**

(a)     Ownership/No Claims.  Each Loan Party owns, or is licensed to use, the patents, patent applications, trademarks, trade names, service marks, copyrights, technology, trade secrets, proprietary information, domain names, know-how and processes used in the conduct of its business as currently conducted (the "**Intellectual Property**"), except for those the failure to own or license which, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.  No claim has been asserted and is pending by any person challenging or questioning the use of any such Intellectual Property or the validity or effectiveness of any such Intellectual Property, nor does any Loan Party know of any valid basis for any such claim, in each case in this sentence which could reasonably be expected to have a Material Adverse Effect.  The use of such Intellectual Property by such Loan Party in such Loan Party's business, does not infringe the intellectual property rights of any person, except for such claims and infringements that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(b)     Registrations.  Except pursuant to licenses and other user agreements entered into by each Loan Party in the ordinary course of business, which are listed in Schedule 11(a) or 11(b) to the Perfection Certificate, on and as of the date hereof (i) each Loan Party owns and possesses the right to use, and has not licensed or authorized any other person to use, any Copyright, Patent or Trademark (as such terms are defined in the Security Agreement) listed in Schedule 11(a) or 11(b) to the Perfection Certificate and (ii) all registrations listed in Schedule 11(a) or 11(b) to the Perfection Certificate are in full force and effect and, to the knowledge of the Loan Parties, valid.

(c)     No Violations or Proceedings.  To each Loan Party's knowledge, on and as of the date hereof, there is no material infringement by others of any right of such Loan Party with respect to any Copyright, Patent or Trademark listed in Schedule 11(a) or 11(b) to the Perfection Certificate, pledged by it under the name of such Loan Party except as may be set forth on Schedule 3.06(c).

**SECTION 3.07     Equity Interests and Subsidiaries.**

(a)     Equity Interests.  Schedules 1(a) and 9(a) to the Perfection Certificate dated the Closing Date set forth a list of (i) all the Subsidiaries of Holding LP1, ManagementCo, GPCo1 and

-64-

GPCo2 and their jurisdictions of incorporation, organization or formation, as appropriate, as of the Closing Date and (ii) the number of each class of its Equity Interests authorized, and the number outstanding, on the Closing Date and the number of shares covered by all outstanding options, warrants, rights of conversion or purchase and similar rights at the Closing Date. All Equity Interests consisting of capital stock of each of Holding LP1, ManagementCo, GPCo1, GPCo2 and their respective Subsidiaries are duly and validly issued and are fully paid and non-assessable, and, other than the Equity Interests of Holding LP1, ManagementCo, GPCo1, GPCo2 and up to 15% of the Equity Interests of Holdco3 are owned by Holding LP1, ManagementCo, GPCo1 and/or GPCo2, directly or indirectly through Wholly-Owned Subsidiaries. All Equity Interests of (v) Holding LP2, (w) Holdco3 (other than those owned by management or directors as of the Petition Date), (x) Holdco4, (y) Canadian Borrower and (z) US Borrower are, in each case, owned by the persons set forth on Schedule 3.07 hereto. Each Loan Party is the record and beneficial owner of, and has good and marketable title to, the Equity Interests pledged by it under the Security Documents, free of any and all Liens, rights or claims of other persons, except the security interest created by the Security Documents and except for the rights of Sponsor and its Subsidiaries under the ManagementCo Voting Agreement, and there are no outstanding warrants, options or other rights to purchase, or shareholder, voting trust or similar agreements outstanding with respect to, or property that is convertible into, or that requires the issuance or sale of, any such Equity Interests.

(b)     No Consent of Third Parties Required. Subject to the issuance and entry of the Interim Order and the CCAA Initial Order (or the Final Order, when applicable) by the Bankruptcy Court and the Canadian Court, as applicable, no consent of any person including any other general or limited partner, any other member of a limited liability company, any other shareholder or any other trust beneficiary is necessary or reasonably desirable (from the perspective of a secured party) in connection with the creation, perfection or priority status required pursuant to Section 2.18 of the security interest of the Collateral Agent in any Equity Interests pledged to the Collateral Agent for the benefit of the Secured Parties under the applicable Security Agreement or the exercise by the Collateral Agent of the voting or other rights provided for in the Security Agreement or the exercise of remedies in respect thereof.

(c)     Organizational Chart. An accurate organizational chart, showing the ownership structure of Holding LP1, Borrowers and each Subsidiary is set forth on Schedule 9(a) to the Perfection Certificate dated the Closing Date.

**SECTION 3.08     Litigation; Compliance with Laws**. Other than the Chapter 11 Cases and the CCAA Case and the events set forth in Schedule 3.17, there are no actions, suits or proceedings at law or in equity by or before any Governmental Authority now pending or, to the knowledge of any Company, threatened against or affecting any Company or any business, property or rights of any Company (i) that, as of the Closing Date, involve any Loan Document or any of the Transactions or (ii) as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect. Except for matters covered by Section 3.18, no Company or any of its property is in violation of, nor will the continued operation of its property as currently conducted violate, any Requirements of Law (including any zoning or building ordinance, code or approval or any building permits) or any restrictions of record or agreements affecting any Company's Real Property or is in default with respect to any Requirement of Law, where such violation or default, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.

**SECTION 3.09     Agreements**. No Company is a party to any agreement or instrument or subject to any corporate or other constitutional restriction that has resulted or could reasonably be expected to result in a Material Adverse Effect. No Company is in default in any manner

-65-

under any provision of any indenture or other agreement or instrument evidencing Indebtedness, or any other agreement or instrument to which it is a party or by which it or any of its property is or may be bound, where such default could reasonably be expected to result in a Material Adverse Effect, and no condition exists which, with the giving of notice or the lapse of time or both, would constitute such a default.

      **SECTION 3.10**     <u>**Federal Reserve Regulations**</u>. No Company is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of buying or carrying Margin Stock. No part of the proceeds of any Loan will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, for any purpose that entails a violation of, or that is inconsistent with, the provisions of the regulations of the Board, including Regulation T, U or X. The pledge of the Securities Collateral pursuant to the applicable Security Documents does not violate such regulations.

      **SECTION 3.11**     <u>**Investment Company Act**</u>. No Company is an "investment company" or a company "controlled" by an "investment company," as defined in, or subject to regulation under, the Investment Company Act of 1940, as amended.

      **SECTION 3.12**     <u>**Use of Proceeds**</u>. Borrowers will use the proceeds of the Loans solely to (i) pay fees in connection with the senior secured, super-priority revolving credit facility set forth in this Agreement, (ii) fund the ongoing post-petition working capital needs and other general corporate purposes of the Borrowers, (iii) pay expenses constituting the Carve-Out, the Administration Charge Expenses and the Directors' Charge Expenses and (iv) fund the payment of such Prepetition and other out of the ordinary course of business expenses of the Borrowers as may be approved by the Bankruptcy Court and the Canadian Court, including permitted capital expenditures, priority employee wage claims, critical vendor claims, and expenses associated with the assumption of executory contracts and unexpired leases, in each case in amounts not to exceed in any Measurement Period the amounts in the Approved Budget subject to the proviso in the definition of Approved Budget regarding amounts carried forward and any variances permitted by <u>Section 6.10(b)</u> of this Agreement (for the avoidance of doubt, it being understood and agreed that the presence of any "basket" or "carve-out" set forth in any negative covenant contained in <u>Article VI</u> shall not be, and shall not be deemed to be, an approval or acceptance by the Administrative Agent, the Joint Lead Arrangers or any Lender of any Line Item in any Approved Budget, or portion thereof, related to cash expenditures of the type described in such "basket" or "carve-out," which shall remain subject to the approval rights of Administrative Agent, the Joint Lead Arrangers and the Required Lenders with respect to each Approved Budget as set forth herein and in the Applicable Order). The proceeds of the Loans will not be used for: (a) the payment of interest and principal with respect to any Indebtedness (other than Indebtedness incurred under this Agreement), including, without limitation, Indebtedness under the Prepetition Loan Documents, (b) to finance in any way any adversary action, suit, arbitration, proceeding, application, motion or other litigation of any type relating to or in connection with the Prepetition First Lien Credit Agreement or any of the Prepetition First Lien Loan Documents or in instruments entered into in connection therewith, including, without limitation, any challenges to the Obligations (as defined in the Prepetition First Lien Credit Agreement) under the Prepetition First Lien Credit Agreement, or the validity, perfection, priority, or enforceability of any Lien securing such claims or any payment made thereunder, (c) to finance in any way any action, suit, arbitration, proceeding, application, motion or other litigation of any type adverse to the interests of the Administrative Agent and the Lenders or their rights and remedies under this Agreement, the other Loan Documents, the Interim Order, the CCAA Initial Order or the Final Order, (d) to make any distribution under a plan of reorganization, arrangement or compromise in any of the Chapter 11 Cases or the CCAA Case without the prior written consent of the Administrative Agent and the Required Lenders

-66-

or otherwise permitted herein and (e) to make any payment (in the aggregate, together with all other such payments) in excess of $100,000 in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior written consent of the Administrative Agent and the Required Lenders; provided that nothing in this subclause (e) shall prevent the Borrowers from assuming or curing executory contracts and unexpired leases subject to an order of the Bankruptcy Court or the Canadian Court if otherwise permitted hereunder.

**SECTION 3.13** **Taxes**. Each Company has (a) timely filed or caused to be timely filed all federal Tax Returns and all material state, provincial, local and foreign Tax Returns or materials required to have been filed by it and all such Tax Returns are true and correct in all material respects and (b) duly and timely paid, collected or remitted or caused to be duly and timely paid, collected or remitted all Taxes (whether or not shown on any Tax Return) due and payable, collectible or remittable by it and all assessments received by it, except Taxes (i) that are being contested in good faith by appropriate proceedings and for which such Company has set aside on its books adequate reserves in accordance with GAAP or (ii) which could not reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect. Each Company has made adequate provision in accordance with GAAP for all Taxes not yet due and payable. Each Company is unaware of any proposed or pending tax assessments, deficiencies or audits that could be reasonably expected to, individually or in the aggregate, result in a Material Adverse Effect. No Company has ever been a party to any understanding or arrangement constituting a "tax shelter" within the meaning of Section 6662(d)(2)(C)(ii) of the Code, or has ever "participated" in a "listed transaction" within the meaning of Treasury Regulation Section 1.6011-4, except as could not be reasonably expected to, individually or in the aggregate, result in a Material Adverse Effect.

**SECTION 3.14** **No Material Misstatements**. No information, report, financial statement, certificate, Borrowing Request, exhibit or schedule furnished by or on behalf of any Company to the Administrative Agent or any Lender in connection with the negotiation of any Loan Document or included therein or delivered pursuant thereto, taken as a whole, contained or contains any material misstatement of fact or omitted or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were or are made, not misleading as of the date such information is dated or certified; *provided* that to the extent any such information, report, financial statement, exhibit or schedule was based upon or constitutes a forecast or projection, each Company represents only that it acted in good faith and utilized reasonable assumptions and due care in the preparation of such information, report, financial statement, exhibit or schedule.

**SECTION 3.15** **Labor Matters**. As of the Closing Date, there are no strikes, lockouts or slowdowns against any Company pending or, to the knowledge of any Company, threatened. The hours worked by and payments made to employees of any Company have not been in violation of the Fair Labor Standards Act of 1938, as amended, or any other applicable federal, state, local or foreign law dealing with such matters in any manner which could reasonably be expected to result in a Material Adverse Effect. All payments due from any Company, or for which any claim may be made against any Company, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of such Company except where the failure to do so could not reasonably be expected to result in a Material Adverse Effect. The consummation of the Transactions will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which any Company is bound.

**SECTION 3.16** [Intentionally Omitted].

**SECTION 3.17** **Employee Benefit Plans**.

(a)     Except as could not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect: (i) each Company which is subject to ERISA and its ERISA Affiliates is in compliance in all material respects with the applicable provisions of ERISA and the Code and the regulations thereunder; (ii) except as set forth in Schedule 3.17 (solely to the extent the liability resulting therefrom does not exceed the Dollar Equivalent of the "projected liability" set forth with respect thereto on Schedule 3.17), no ERISA Event has occurred or is reasonably expected to occur; and (iii) except as set forth in Schedule 3.17(a), the present value of all accumulated benefit obligations of all underfunded Plans (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) did not, as of the date of the most recent financial statements reflecting such amounts, exceed the fair market value of the property of all such underfunded Plans.  Except as set forth in Schedule 3.17 (solely to the extent the liability resulting therefrom does not exceed the Dollar Equivalent of the "projected liability" set forth with respect thereto on Schedule 3.17), using actuarial assumptions and computation methods consistent with subpart I of subtitle E of Title IV of ERISA, the aggregate liabilities of each Company which is subject to ERISA or its ERISA Affiliates to all Multiemployer Plans in the event of a complete withdrawal therefrom, as of the close of the most recent fiscal year of each such Multiemployer Plan, could not reasonably be expected to result in a Material Adverse Effect.

(b)     Except as could not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect: (i) to the extent applicable, each Foreign Plan has been maintained in substantial compliance with its terms and with any and all applicable Requirements of Law and has been maintained, where required, in good standing with applicable regulatory authorities; (ii) no Company has incurred any material obligation in connection with the termination of or withdrawal from any Foreign Plan; and (iii) the present value of the accrued benefit liabilities (whether or not vested) under each Foreign Plan which is funded, determined as of the end of the most recently ended fiscal year of the respective Company on the basis of actuarial assumptions, each of which is reasonable, did not exceed the current value of the property of such Foreign Plan, and for each Foreign Plan which is not funded, the obligations of such Foreign Plan are properly accrued.

(c)     Except as could not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect: (i) the Canadian Pension Plans are duly registered under all applicable provincial pension benefits legislation; (ii) all material obligations of Canadian Borrower and its Subsidiaries (including fiduciary, funding, investment and administration obligations) required to be performed in connection with the Canadian Pension Plans, the Canadian Benefit Plans and the funding agreements therefor have been performed in a timely fashion; (iii) there are no outstanding disputes concerning the assets held pursuant to any such Canadian Pension Plan or the Canadian Benefit Plan funding agreement; (iv) all contributions or premiums required to be made by Canadian Borrower or any of its Subsidiaries to the Canadian Pension Plans and the Canadian Benefit Plans have been made in a timely fashion in accordance with the terms of such plans and applicable laws and regulations; (v) all employee contributions to the Canadian Pension Plans and the Canadian Benefit Plans required to be made by way of authorized payroll deduction have been properly withheld and fully paid into such plans in a timely fashion; (vi) all reports and disclosures relating to the Canadian Pension Plans and Canadian Benefit Plans required by any applicable laws or regulations have been filed or distributed in a timely fashion; (vii) to the knowledge of the Borrowers, there have been no improper withdrawals, or applications of, the assets of any of the Canadian Pension Plans; (viii) except as set forth on Schedule 3.17, there have been no partial terminations of any Canadian Pension Plan and, to the knowledge of the Borrowers, no circumstances exist or have existed that would result, or be reasonably anticipated to result, in the declaration of a partial termination of any Canadian Pension Plan under applicable Requirements of Law; (ix) no material tax, interest or penalty is owing by or in respect of any of the Canadian Pension Plans under the ITA or any provincial taxation statute; (x) set out in Schedule 3.17(c) is the funded status

-68-

of each of the Canadian Pension Plans which is a defined benefit registered pension plan, as of the effective date of the last valuation report filed for such plan with the appropriate Governmental Authority, both on an ongoing basis and on a solvency basis pursuant to actuarial assumptions and methods which are utilized in such report and which are consistent with generally accepted actuarial principles and (xi) the Borrowers, after diligent enquiry, have neither any knowledge, nor any grounds for believing, that any of the Canadian Pension Plans is the subject of an investigation, any other proceeding, an action or a claim.

### SECTION 3.18    Environmental Matters.

(a)      Except as set forth in Schedule 3.18 and except as, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect:

    (i)    The Companies and their businesses, operations and Real Property are in compliance with, and the Companies have no liability under, any applicable Environmental Law; and, to the knowledge of the Companies, under the currently effective business plan of the Companies, no expenditures or operational adjustments will be required in order to comply with applicable Environmental Laws (as in effect on the date hereof) during the next five years;

    (ii)    The Companies have obtained all Environmental Permits required for the conduct of their businesses and operations, and the ownership, operation and use of their property, under Environmental Law, all such Environmental Permits are valid and in good standing and, to the knowledge of the Companies, under the currently effective business plan of the Companies, no expenditures or operational adjustments will be required in order to renew or modify such Environmental Permits during the next five years;

    (iii)    There has been no Release or threatened Release of Hazardous Material by the Companies or, to the knowledge of the Companies, by any other person on, at, under or from any Real Property or facility presently or formerly owned, leased or operated by the Companies or their predecessors in interest (during the time of such ownership, lease or operation) that could reasonably be expected to result in liability by the Companies under any applicable Environmental Law as such Environmental Laws are in effect as of the date hereof;

    (iv)    There is no Environmental Claim pending or, to the knowledge of the Companies, threatened against the Companies, or relating to the Real Property currently or to the knowledge of the Companies formerly owned, leased or operated by the Companies or their predecessors in interest or relating to the operations of the Companies, and to the knowledge of the Companies, there are no actions, activities, circumstances, conditions, events or incidents that could reasonably be expected to form the basis of such an Environmental Claim; and

    (v)    To the knowledge of the Companies, no person with an indemnity or contribution obligation to the Companies relating to compliance with or liability under Environmental Law is in default with respect to such obligation.

(b)      Except as set forth in Schedule 3.18:

    (i)    No Company is obligated to perform any action or otherwise incur any expense under Environmental Law pursuant to any order, decree, judgment or agreement by which it is bound or has assumed by contract or agreement or, to the knowledge of the Companies, by

operation of law, and no Company is conducting or financing any Response pursuant to any Environmental Law with respect to any Real Property or any other location except in each case as could not reasonably be expected to result in a Material Adverse Effect;

(ii)  No Real Property or facility owned, operated or leased by the Companies and, to the knowledge of the Companies, no Real Property or facility formerly owned, operated or leased by the Companies or any of their predecessors in interest is (x) listed or proposed for listing on the National Priorities List promulgated pursuant to CERCLA or (y) listed on the Comprehensive Environmental Response, Compensation and Liability Information System promulgated pursuant to CERCLA or (z) included on any similar list maintained by any Governmental Authority including any such list relating to petroleum;

(iii)  No Lien has been recorded or, to the knowledge of any Company, threatened under any Environmental Law with respect to any Real Property or other assets of the Companies the result of which could reasonably be expected to result in a material loss to the business, property, operations or prospect of any Loan Party;

(iv)  The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby will not require any notification, registration, filing, reporting, disclosure, investigation, remediation or cleanup pursuant to any Governmental Real Property Disclosure Requirements or any other applicable Environmental Law, except for notifications, registrations, filings, reporting, disclosure, investigation, remediation or cleanup, the consequences of which could not reasonably be expected to result in material obligations of the Companies pursuant to Governmental Real Property Disclosure Requirements or any other applicable Environmental Law; and

(v)  The Companies have made available to the Lenders all material records and files in the possession, custody or control of, or otherwise reasonably available to, the Companies concerning compliance with or liability under Environmental Law, including those concerning the actual or suspected existence of Hazardous Material at Real Property or facilities currently or formerly owned, operated, leased or used by the Companies.

**SECTION 3.19**      <u>Insurance</u>.  <u>Schedule 3.19</u> sets forth a true, complete and correct description of all insurance maintained by each Company as of the Closing Date.  All insurance maintained by the Companies is in full force and effect, all premiums have been duly paid, no Company has received notice of violation or cancellation thereof, the Premises, and the use, occupancy and operation thereof, comply in all material respects with all Insurance Requirements, and there exists no default under any Insurance Requirement.  Each Company has insurance in such amounts and covering such risks and liabilities as are customary for companies of a similar size engaged in similar businesses in similar locations.

**SECTION 3.20**      <u>Security Documents</u>.

(a)      <u>Security Documents</u>.  Upon the issuance and entry of the Interim Order and the CCAA Initial Order by the Bankruptcy Court and the Canadian Court, as applicable, the Interim Order, the CCAA Initial Order and the Security Agreements are effective to create in favor of the Collateral Agent for the benefit of the Secured Parties, legal, valid and enforceable Liens on, and security interests in, the Security Agreement Collateral, the Liens on the Security Agreement Collateral shall constitute fully perfected Liens with the priority set forth in <u>Section 2.18</u> on, and security interests in, all right, title

-70-

and interest of the grantors in the Security Agreement Collateral, as described thereon in each case subject to no Liens other than the Exceptions and the Permitted Collateral Liens.

(b)     PTO Filing; Copyright Office Filing.  Upon the issuance and entry of the Interim Order and the CCAA Initial Order by the Bankruptcy Court and Canadian Court, as applicable, the Liens created by the Interim Order, the CCAA Initial Order and the Security Agreements shall constitute fully perfected Liens with the priority set forth in Section 2.18 on, and security interests in, all right, title and interest of the grantors thereunder in Patents (as defined in such Security Agreement) registered or applied for with the United States Patent and Trademark Office or Copyrights (as defined in such Security Agreement) registered or applied for with the United States Copyright Office, as the case may be, in each case constituting Security Agreement Collateral and subject to no Liens other than the Exceptions and the Permitted Collateral Liens.

(c)     US Real Property.  Upon the entry of the Interim Order by the Bankruptcy Court, the Collateral Agent, for the benefit of the Secured Parties, shall have legal, valid and enforceable Liens with the priority set forth in Section 2.18 on, and security interests in, all of the US Loan Parties' right, title and interest in and to all Real Property owned by such US Loan Parties, subject to no Liens other than the Exceptions and the Permitted Collateral Liens.

(d)     Canadian Real Property.  Upon the issuance and entry of the CCAA Initial Order by the Canadian Court, the Collateral Agent or UBS AG Canada Branch (in accordance with Section 9.01), for the benefit of the Secured Parties, shall have legal, valid and enforceable Liens with the priority set forth in Section 2.18 on, and security interests in, all of the Canadian Loan Parties' right, title and interest in and to all Real Property owned by such Canadian Loan Parties, subject in priority to no Liens other than the Exceptions and subject to no Liens other than the Exceptions and the Permitted Collateral Liens.

(e)     Valid Liens.  Upon the issuance and entry of the Interim Order and the CCAA Initial Order by the Bankruptcy Court and the Canadian Court, as applicable, such orders shall be effective to create in favor of the Collateral Agent or UBS AG Canada Branch (in accordance with Section 9.01), for the benefit of the Secured Parties, legal, valid and enforceable Liens on, and security interests in, all of the Loan Parties' right, title and interest in and to the Collateral thereunder.  Upon the issuance and entry of the Interim Order and the CCAA Initial Order by the Bankruptcy Court and the Canadian Court, as applicable, such orders and the Liens created by such orders will constitute fully perfected Liens on, and security interests in, all right, title and interest of the Loan Parties in such Collateral, in each case with the priority set forth in Section 2.18 and subject to no Liens other than the Exceptions and the Permitted Collateral Liens.

SECTION 3.21     Bank Accounts.  Schedule 13 to the Perfection Certificate contains a complete and accurate list of all bank accounts maintained by any Loan Party with any bank or other financial institution.

SECTION 3.22     Anti-Terrorism Law.

(a)     No Loan Party and, to the knowledge of the Loan Parties, none of its Affiliates is in violation of any Requirement of Law relating to terrorism or money laundering ("**Anti-Terrorism Laws**"), including Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001 (the "**Executive Order**"), and the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56.

| LA\1978870.15||{00001116. }

(b)      No Loan Party and to the knowledge of the Loan Parties, no Affiliate or broker or other agent of any Loan Party acting or benefiting in any capacity in connection with the Loans is any of the following:

(i)     a person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order;

(ii)    a person owned or controlled by, or acting for or on behalf of, any person that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order;

(iii)   a person with which any Lender is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law;

(iv)    a person that commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order; or

(v)     a person that is named as a "specially designated national and blocked person" on the most current list published by the US Treasury Department Office of Foreign Assets Control ("**OFAC**") at its official website or any replacement website or other replacement official publication of such list.

(c)      No Loan Party and, to the knowledge of the Loan Parties, no broker or other agent of any Loan Party acting in any capacity in connection with the Loans (i) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any person described in paragraph (b) above, (ii) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order, or (iii) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

**SECTION 3.23**      **Reorganization Matters**.

(a)      The Chapter 11 Cases were commenced on the Petition Date and the CCAA Case was commenced on the CCAA Filing Date in accordance with applicable law and proper notice thereof and proper notice for (x) the motion seeking approval of the Loan Documents and the Applicable Order, (y) the hearing for the approval of the Interim Order and the CCAA Initial Order and (z) the hearing for the approval of the Final Order has been given or dispensed with by the terms of the Applicable Order. The Borrowers shall give, on a timely basis as specified in the Applicable Order, all notices required to be given to all parties specified in the Applicable Order.

(b)      After the issuance and entry of the Interim Order and the CCAA Initial Order, and pursuant to and to the extent permitted in the Interim Order, the CCAA Initial Order and the Final Order, the Obligations will (i) in the case of the US Loan Parties, constitute allowed administrative expense claims in the Chapter 11 Cases having priority over all administrative expense claims and unsecured claims against each Loan Party now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 326, 330, 331, 503(b), 507(a), 507(b), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under Section 364(c)(l) of the Bankruptcy Code, subject to the Carve-Out and (ii) in the case of the Canadian Loan Parties, be secured by the CCAA DIP Charge, subject only to the Exceptions.

| LA\1978870.15||{00001116. }

(c)     After the issuance and entry of the Interim Order and the CCAA Initial Order and pursuant to and to the extent provided in the Interim Order, the CCAA Initial Order and the Final Order, the Obligations will be secured by a valid and perfected Lien with the priority set forth in <u>Section 2.18</u> on all of the Collateral, subject to the Exceptions.

(d)     The Interim Order and the CCAA Initial Order (with respect to the period prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order), as the case may be, is in full force and effect and has not been reversed, stayed, modified or amended.

Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Interim Order, the CCAA Initial Order or Final Order, as the case may be, upon the Final Maturity Date (whether by acceleration or otherwise) of any of the Obligations, Agents and Lenders shall be entitled to immediate payment of such Obligations in cash and to enforce the remedies provided for hereunder or under applicable law, without further application to or order by the Bankruptcy Court or the Canadian Court, subject to the terms of the Loan Documents and the Applicable Order.

**SECTION 3.24     Location of Material Inventory**.  Schedules <u>2(a)</u>, <u>2(b)</u>, <u>2(c)</u>, <u>2(d)</u> and <u>2(e)</u> to the Perfection Certificate set forth all locations in Canada or the United States where the aggregate value of Inventory (including, without limitation, Eligible Intermediate Inventory, Eligible Raw Materials and Eligible Finished Goods) owned by the Loan Parties exceeds $250,000 as of the date hereof.

**SECTION 3.25     Accuracy of Borrowing Base**.  At the time any Borrowing Base Certificate is delivered pursuant to this Agreement, each Account and each item of Inventory (including, without limitation, Eligible Intermediate Inventory, Eligible Raw Materials and Eligible Finished Goods) included in the calculation of the Borrowing Base satisfies all of the criteria stated herein to be an Eligible Account and an item of Eligible Intermediate Inventory, Eligible Raw Materials and Eligible Finished Goods, respectively.

**SECTION 3.26     Post-Appraisal Asset Dispositions**.  As of the Closing Date, Borrowers and the other Loan Parties have not disposed of assets (other than Inventory sold in the ordinary course of their business) which are set forth in the Appraisal and/or Field Exam and which have an aggregate fair market value of more than $250,000.

# ARTICLE IV

# CONDITIONS TO CREDIT EXTENSIONS

**SECTION 4.01     Conditions to Initial Credit Extension**.  The obligation of each Lender to fund the initial Credit Extension requested to be made by it shall be subject to the prior or concurrent satisfaction (except to the extent that such conditions are permitted to be satisfied on a post-closing basis pursuant to <u>Section 5.14</u> hereof) of each of the conditions precedent set forth in this <u>Section 4.01</u>.

(a)     <u>Loan Documents</u>.  All legal matters incident to this Agreement, the Credit Extensions hereunder and the other Loan Documents shall be satisfactory to the Lenders and to the Administrative Agent and the Joint Lead Arrangers and there shall have been delivered to the

Administrative Agent and the Joint Lead Arrangers an executed counterpart of each of the Loan Documents and the Perfection Certificate.

(b)  Corporate Documents.  The Administrative Agent shall have received:

(i)  a certificate of the secretary or assistant secretary of each Loan Party dated the Closing Date, certifying (A) that attached thereto is a true and complete copy of each Organizational Document of such Loan Party certified (to the extent applicable) as of a recent date by the Secretary of State of the state of its organization (or other applicable Governmental Authority), (B) that attached thereto is a true and complete copy of resolutions duly adopted by the Board of Directors and/or partners meetings of such Loan Party authorizing the execution, delivery and performance of the Loan Documents to which such person is a party and, in the case of Borrowers, the borrowings hereunder, and that such resolutions have not been modified, rescinded or amended and are in full force and effect and (C) as to the incumbency and specimen signature of each officer executing any Loan Document or any other document delivered in connection herewith on behalf of such Loan Party (together with a certificate of another officer as to the incumbency and specimen signature of the secretary or assistant secretary executing the certificate in this clause (i));

(ii)  a certificate as to the good standing or status (or other foreign equivalent thereof if a certificate of good standing or status is a relevant concept) of each Loan Party (in so-called "long-form" if available) as of a recent date, from such Secretary of State (or other applicable Governmental Authority); and

(iii)  such other documents as the Lenders, the Administrative Agent may reasonably request.

(c)  Officers' Certificate.  The Administrative Agent shall have received a certificate, dated the Closing Date and signed by the chief executive officer and the chief financial officer of Borrowers, confirming compliance with the conditions precedent set forth in this Section 4.01 and Sections 4.02(b)-(h).

(d)  [Intentionally Omitted].

(e)  Financial Statements; Pro Forma Balance Sheet; Projections.  The Lenders shall have received and shall be reasonably satisfied with the financial statements described in Section 3.04 and with the forecasts of the financial performance of Borrowers and their respective Subsidiaries.

(f)  Indebtedness and Minority Interests.  Immediately prior to and after giving effect to the Transactions and the other transactions contemplated hereby, no Company shall have outstanding any Indebtedness or preferred stock other than the Loans and Credit Extensions hereunder, Indebtedness owed to Borrowers or any Guarantor, Indebtedness permitted under Section 6.01 and preferred stock issued by Holdco3.

(g)  Opinions of Counsel.  The Administrative Agent shall have received, on behalf of itself, the other Agents and the Lenders, a favorable written opinion of (i) Dechert LLP, special counsel for the Loan Parties, covering the matters set forth in Exhibit N and (ii) each local and foreign counsel of the Loan Parties listed on Schedule 4.01(g) in form and substance satisfactory to the Administrative Agent, in each case (A) dated the Closing Date, (B) addressed to the Agents and the Lenders and (C)

-74-

covering such matters relating to the Loan Documents and the Transactions as the Administrative Agents shall reasonably request.

        (h)     [Intentionally Ommitted].

        (i)     <u>Sources and Uses</u>. The sources and uses of the Loans shall be as set forth in <u>Section 3.12</u>.

        (j)     <u>Fees</u>. The Joint Lead Arrangers and Administrative Agent shall have received all Fees and other amounts due and payable on or prior to the Closing Date, including, to the extent invoiced, reimbursement or payment of all out-of-pocket expenses (including the legal fees and expenses of Latham & Watkins LLP and Osler, Hoskin & Harcourt LLP, special counsel to the Agents, and Skadden Arps Slate Meagher & Flom LLP, special counsel to Black Diamond Commercial Finance, L.L.C., and the fees and expenses of any local counsel, foreign counsel, appraisers, consultants (including, without limitation, Imperial Capital) and other advisors) required to be reimbursed or paid by Borrowers hereunder or under any other Loan Document.

        (k)     <u>Personal Property Requirements</u>. The Collateral Agent shall have received:

        (i)     to the extent not otherwise in the possession of the Prepetition Agents, all certificates, agreements or instruments representing or evidencing the Securities Collateral accompanied by instruments of transfer and stock powers (or stock transfer forms, as appropriate) undated and endorsed in blank;

        (ii)     to the extent not otherwise in the possession of the Prepetition Agents, the Intercompany Loan Documents executed by and among Holding LP1 and each of its Subsidiaries, as applicable, accompanied by instruments of transfer undated and endorsed in blank;

        (iii)     to the extent not otherwise in the possession of the Prepetition Agents, all other certificates, agreements, including Control Agreements, or instruments necessary to perfect the Collateral Agent's security interest in all Chattel Paper, all Instruments, all Deposit Accounts and all Investment Property of each Loan Party (as each such term is defined in the Security Agreement and to the extent required by the Security Agreement);

        (iv)     UCC and PPSA financing statements in appropriate form for filing under the UCC and the PPSA, as applicable, filings with the United States Patent and Trademark Office, United States Copyright Office, Canadian Intellectual Property Offices and such other documents under applicable Requirements of Law in each jurisdiction as may be necessary or appropriate or, in the opinion of the Collateral Agent, desirable to perfect the Liens created, or purported to be created, by the Security Documents and, with respect to all UCC financing statements required to be filed pursuant to the Loan Documents, evidence satisfactory to the Administrative Agent that Borrowers have retained, at its sole cost and expense, a service provider acceptable to the Administrative Agent for the tracking of all such financing statements and notification to the Administrative Agent, of, among other things, the upcoming lapse or expiration thereof;

        (v)     certified copies of (A) UCC, PPSA, United States Patent and Trademark Office, United States Copyright Office, Canadian Intellectual Property Offices, tax and judgment lien searches, bankruptcy and pending lawsuit searches or equivalent reports or searches, each of a recent date listing all effective financing statements, lien notices or comparable documents that

name any Loan Party as debtor and that are filed in those state, provincial and county jurisdictions in which any property of any Loan Party is located and the state and county jurisdictions in which any Loan Party is organized or maintains its principal place of business and such other searches that the Collateral Agent deems necessary or appropriate, none of which encumber the Collateral covered or intended to be covered by the Security Documents (other than the Exceptions and the Permitted Collateral Liens);

(vi)     with respect to each location set forth on Schedule 4.01(k)(vi), a Landlord Access Agreement or Bailee Letter, as applicable; *provided* that no such Landlord Access Agreement or Bailee Letter shall be required with respect to any Real Property that could not be obtained after the Loan Party that is the lessee of such Real Property or owner of the inventory or other personal property Collateral stored with the bailee thereof, as applicable, shall have used all commercially reasonable efforts to do so; and

(vii)    evidence acceptable to the Collateral Agent of payment or arrangements for payment by the Loan Parties of all applicable recording taxes, fees, charges, costs and expenses required for the recording of the Security Documents.

(l)      Real Property Requirements. The Collateral Agent shall have received:

(i)     a Mortgage encumbering each Mortgaged Property owned by the Canadian Loan Parties in favor of the Collateral Agent or UBS AG Canada Branch (in accordance with Section 9.01), for the benefit of the Secured Parties, duly executed and acknowledged by each Loan Party that is the owner of or holder of any interest in such Mortgaged Property, and otherwise in form for recording in the recording office of each applicable political subdivision where each such Mortgaged Property is situated, together with such certificates, affidavits, questionnaires or returns as shall be required in connection with the recording or filing thereof to create a lien under applicable Requirements of Law, and such financing statements and any other instruments necessary to grant a mortgage lien under the laws of any applicable jurisdiction, all of which shall be in form and substance reasonably satisfactory to Collateral Agent;

(ii)    with respect to each Mortgaged Property, such consents, approvals, amendments, supplements, estoppels, tenant subordination agreements or other instruments as shall reasonably be deemed necessary by the Collateral Agent in order for the owner or holder of the fee or leasehold interest constituting such Mortgaged Property to grant the Lien contemplated by the Mortgage with respect to such Mortgaged Property;

(iii)   with respect to each Real Property or Mortgaged Property, copies of all Leases in which any Borrower or any Subsidiary holds the lessor's interest or other agreements relating to possessory interests, if any. To the extent any of the foregoing affect any Mortgaged Property, such agreement shall be subordinate to the Lien of the Mortgage to be recorded against such Mortgaged Property, either expressly by its terms or pursuant to a subordination, non-disturbance and attornment agreement, and shall otherwise be reasonably acceptable to the Collateral Agent;

(iv)    with respect to each Mortgaged Property, each Company shall have made all notifications, registrations and filings, to the extent required by, and in accordance with, all Governmental Real Property Disclosure Requirements applicable to such Mortgaged Property; and

(v)  a completed Federal Emergency Management Agency Standard Flood Hazard Determination with respect to each Mortgaged Property located in the United States.

Notwithstanding the foregoing, the Loan Parties shall not be required to obtain or deliver a Mortgage or any of the other items described in this clause (l) with respect to any leasehold interest except to the extent that the Borrowers, using their commercially reasonable efforts for the period set forth on Schedule 5.14, are able to obtain the landlord's consent for such Mortgage and to obtain such items.

(m)  Insurance.  The Administrative Agent shall have received a copy of, or a certificate as to coverage under, the insurance policies required by Section 5.04 and the applicable provisions of the Security Documents, each of which shall be endorsed or otherwise amended to include a "standard" or "New York" lender's loss payable or mortgagee endorsement (as applicable) and shall name the Collateral Agent, on behalf of the Secured Parties, as additional insured, in form and substance satisfactory to the Administrative Agent.

(n)  USA Patriot Act.  The Lenders shall have received, sufficiently in advance of the Closing Date, all documentation and other information that may be required by the Lenders in order to enable compliance with applicable "know your customer" and anti-money laundering rules and regulations, including the United States PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) including the information described in Section 10.13.

(o)  [Intentionally Omitted].

(p)  [Intentionally Omitted].

(q)  No Default; Representations and Warranties.  After giving effect to each Credit Extension occurring on the Closing Date and the other Transactions contemplated hereby to occur on or prior to the Closing Date (a) no Default or Event of Default shall have occurred and be continuing and (b) all representations and warranties made on the Closing Date by any Loan Party contained herein or in the other Loan Documents shall be true and correct.

(r)  Budgets and Projections.  The Administrative Agent, the Joint Lead Arrangers and the Required Lenders shall have received a copy of the Approved Budget and the Projections, in each case, in form and substance acceptable to the Administrative Agent, the Joint Lead Arrangers and the Required Lenders.

(s)  Chapter 11 Case Administration.  Entry by the Bankruptcy Court of the Interim Order, by no later than five (5) days after the Petition Date.

(t)  CCAA Case Administration.  Entry by the Canadian Court of the CCAA Initial Order on the CCAA Filing Date in form and substance reasonably satisfactory to the Administrative Agent and its counsel, the Joint Lead Arrangers (solely to the extent reasonably available and in attendance in person (or through counsel) at the hearing seeking issuance of the CCAA Initial Order) and the Required Lenders authorizing the Loans, granting the CCAA DIP Charge and providing that the filing, registration or perfection of the CCAA DIP Charge shall not be required and the CCAA DIP Charge shall be valid and enforceable for all purposes.

(u)  First Day Orders.  The First Day Orders shall be in form and substance reasonably satisfactory to the Administrative Agent and its counsel and the Required Lenders.

| LA\1978870.15||{00001116. }

(v)     Litigation.  Other than the commencement and effect of the Chapter 11 Cases and the CCAA Case and except as set forth in Schedule 3.17, there shall not exist any action, suit, investigation, litigation or proceeding pending or threatened in any court or before any arbitrator or Governmental Authority that, in the Permitted Discretion of the Administrative Agent and the reasonable (from the perspective of a secured asset based lender) business judgment of the Required Lenders affects any of the transactions contemplated hereby or that has or could reasonably be expected to have a Material Adverse Effect on any of the transactions contemplated hereby, or that has resulted in or would reasonably be expected to have a Material Adverse Effect on the business, assets, operations or condition (financial or otherwise) of the Borrowers and their Subsidiaries, taken as a whole.

(w)     No Excess Cash.  The Administrative Agent and the Required Lenders shall have received evidence that to the extent the Loan Parties have any cash on hand, such cash shall have been (i) utilized prior to the initial Credit Extension in accordance with the Interim Order and the CCAA Initial Order or (ii) shall be utilized within three (3) Business Days after the initial Credit Extension to pay payroll, professional fees and expenses and other fees and expenses incurred in the ordinary course of business, in each case in accordance with the Interim Order and the CCAA Initial Order.

(x)     Appraisals and Reports.  The Administrative Agent and the Collateral Agent shall have received all field examinations, audits, reports and opinions of appraisers, consultants or other Advisors retained by them to review the Collateral, business, operation or condition of the Loan Parties and shall be reasonably satisfied in form and substance with all such field examinations, audits, reports and opinions.

**SECTION 4.02     Conditions to All Credit Extensions**.  The obligation of each Lender to make any Credit Extension (including the initial Credit Extension) shall be subject to, and to the satisfaction of, each of the conditions precedent set forth below.

(a)     Notice.  The Administrative Agent shall have received a Borrowing Request as required by Section 2.03 (or such notice shall have been deemed given in accordance with Section 2.03).

(b)     No Default.  At the time of and immediately after giving effect to such Credit Extension and the application of the proceeds thereof, no Default shall have occurred and be continuing on such date.

(c)     Representations and Warranties.  Each of the representations and warranties made by any Loan Party set forth in Article III hereof or in any other Loan Document shall be true and correct in all material respects (except that any representation and warranty that is qualified as to "materiality" or "Material Adverse Effect" shall be true and correct in all respects) on and as of the date of such Credit Extension with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date.

(d)     No Legal Bar.  No order, judgment or decree of any Governmental Authority shall purport to restrain any Lender from making any Loans to be made by it.  No injunction or other restraining order shall have been issued, shall be pending or noticed with respect to any action, suit or proceeding seeking to enjoin or otherwise prevent the consummation of, or to recover any damages or obtain relief as a result of, the transactions contemplated by this Agreement or the making of Loans hereunder.

-78-

(e)    Approved Budget.  The extensions of credit so requested shall (i) not cause the aggregate outstanding amount of the Loans to exceed the amount then authorized by the Applicable Order and (ii) shall be consistent with the most recently delivered Approved Budget in effect at such time.

(f)    Bankruptcy Matters.  At the time of such Credit Extension, (i) if such Credit Extension is prior to the issuance and entry and effectiveness of the Final Order, the Interim Order and the CCAA Initial Order shall not have terminated or expired, and the date of such Credit Extension shall not be more than 30 days from the issuance and entry and effectiveness of the Interim Order or more than 35 days from the Petition Date, (ii) if such Credit Extension is after the issuance and entry and effectiveness of the Final Order, the Final Order shall be effective, and shall not have terminated or expired, (iii) no Financing Order shall have been vacated, reversed, stayed, amended, supplemented or otherwise modified (without the consent of the Administrative Agent, the Joint Lead Arrangers (solely to the extent reasonably available and in attendance in person (or through counsel) at the hearing with respect to any such modifications) and the Required Lenders), (iv) no motion for reconsideration of any Financing Order shall be pending, and (v) no appeal of any Financing Order shall be pending and no Financing Order shall be subject of a stay pending appeal or a motion for a stay pending appeal.

(g)    Borrowing Availability.  After giving effect to each Credit Extension, the Aggregate Revolver Outstandings shall not exceed Borrowing Availability at such time.

Each of the delivery of a Borrowing Request and the acceptance by the applicable Borrower of the proceeds of such Credit Extension shall constitute a representation and warranty by such Borrower and each other Loan Party that on the date of such Credit Extension (both immediately before and after giving effect to such Credit Extension and the application of the proceeds thereof), in the case of the initial Credit Extension, the conditions contained in Section 4.01 and Section 4.02 have been satisfied and, in the case of all other Credit Extensions, the conditions contained in Sections 4.02 have been satisfied.  The applicable Borrower shall provide such information as the Administrative Agent may reasonably request to confirm that the conditions in Sections 4.01 and 4.02 have been satisfied.

## ARTICLE V

## AFFIRMATIVE COVENANTS

Each Loan Party warrants, covenants and agrees with each Lender that so long as this Agreement shall remain in effect and until the Commitments have been terminated and the principal of and interest on each Loan, all Fees and all other expenses or amounts payable under any Loan Document shall have been paid in full, each Loan Party will, and will cause each of its Subsidiaries to:

**SECTION 5.01**    **Financial Statements, Reports, etc.**  Furnish to the Administrative Agent and each Lender:

(a)    Annual Reports.  As soon as available and in any event within 90 days after the end of each fiscal year, (i) the consolidated balance sheet of Holding LP1 as of the end of such fiscal year and related consolidated statements of income, cash flows and stockholders' equity for such fiscal year, in comparative form with such financial statements as of the end of, and for, the preceding fiscal year, and notes thereto (including a note with a consolidating balance sheet and statements of income and cash flows separating out Holding LP1, Borrowers and the Subsidiaries), and audited and accompanied by an opinion of PricewaterhouseCoopers LLP or other independent public accountants of recognized national standing satisfactory to the Administrative Agent (which shall not be qualified in any material respect

-79-

(other than any "going concern" qualification and qualifications with respect to method of accounting as a result of the filing of the Chapter 11 Cases and the CCAA Case)), stating that such financial statements fairly present, in all material respects, the consolidated financial condition, results of operations and cash flows of Holding LP1 as of the dates and for the periods specified in accordance with GAAP (the "**Audited Financial Statements**"), (ii) a management report in a form reasonably satisfactory to the Administrative Agent setting forth (A) statement of income items and Consolidated EBITDA of Holding LP1 for such fiscal year, showing variance, by US dollar amount and percentage, from amounts for the previous fiscal year and budgeted amounts and (B) data regarding quarterly volume and price, broken out for the Resins and Overlays segments for such fiscal year consistent with the form of such information provided to the Administrative Agent prior to the Closing Date, and (iii) a narrative report and management's discussion and analysis, in a form reasonably satisfactory to the Administrative Agent, of the financial condition and results of operations of Holding LP1 for such fiscal year, as compared to amounts for the previous fiscal year and the Projections (it being understood that the information required by clause (i) may be furnished in the form of a Form 10-K);

(b)    Quarterly Reports.  As soon as available and in any event within 45 days after the end of each of the first three fiscal quarters of each fiscal year, beginning with the fiscal quarter ending June 30, 2009, (i) the consolidated balance sheet of Holding LP1 as of the end of such fiscal quarter and related consolidated statements of income and cash flows for such fiscal quarter and for the then elapsed portion of the fiscal year, in comparative form with the consolidated statements of income and cash flows for the comparable periods in the previous fiscal year, and notes thereto (including a note with a consolidating balance sheet and statements of income and cash flows separating out Holding LP1, Borrowers and the Subsidiaries), and accompanied by a certificate of a Financial Officer stating that such financial statements fairly present, in all material respects, the consolidated financial condition, results of operations and cash flows of Holding LP1 as of the date and for the periods specified in accordance with GAAP consistently applied, and on a basis consistent with the Audited Financial Statements, subject to normal year-end audit adjustments and the absence of footnotes, (ii) a management report in a form reasonably satisfactory to the Administrative Agent setting forth (A) statement of income items and Consolidated EBITDA of Holding LP1 for such fiscal quarter and for the then elapsed portion of the fiscal year, showing variance, by US dollar amount and percentage, from amounts for the comparable periods in the previous fiscal year and budgeted amounts and (B) data regarding quarterly volume and price, broken out for the Resins and Overlays segments, for such fiscal quarter and for the then elapsed portion of the fiscal year consistent with the form of such information provided to the Administrative Agent prior to the Closing Date, and (iii) a narrative report, substantially in the form of the current quarterly management reports for the Acquired Business, of the financial condition and results of operations for such fiscal quarter and the then elapsed portion of the fiscal year, as compared to the comparable periods in the previous fiscal year and the Projections (it being understood that the information required by clause (i) may be furnished in the form of a Form 10-Q);

(c)    Monthly Reports.  Within 30 days after the end of each of the first two months of each fiscal quarter, beginning with the fiscal month ending July 31, 2009, (i) the consolidated balance sheet of Holding LP1 as of the end of each such month and the related consolidated statements of income and cash flows of Holding LP1 for such month and for the then elapsed portion of the fiscal year, in comparative form with the consolidated statements of income and cash flows for the comparable periods in the previous fiscal year, accompanied by a certificate of a Financial Officer stating that such financial statements fairly present, in all material respects, the consolidated results of operations and cash flows of Holding LP1 as of the date and for the periods specified in accordance with GAAP consistently applied, subject to normal year-end audit adjustments and the absence of footnotes, and (ii) a management report in a form reasonably satisfactory to the Administrative Agent setting forth (A) statement of income items

-80-

and Consolidated EBITDA of Holding LP1 for such month and for the then elapsed portion of the fiscal year, showing variance, by US dollar amount and percentage, from amounts for the comparable periods in the previous fiscal year and the Projections and (B) data regarding monthly volume and price, broken out for the Resins and Overlays segments, for such month and for the then elapsed portion of the fiscal year consistent with the form of such information provided to the Administrative Agent prior to the Closing Date;

    (d) <u>Financial Officer's Certificate</u>.  (i)  Concurrently with any delivery of financial statements under <u>Section 5.01(a)</u>, <u>(b)</u> or <u>(c)</u>, a Compliance Certificate (A) certifying that no Default has occurred or, if such a Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto, (B) beginning with the fiscal quarter ending June 30, 2009, setting forth computations in reasonable detail satisfactory to the Administrative Agent demonstrating compliance with the covenants contained in <u>Section 6.10</u> and (C) showing a reconciliation of Consolidated EBITDA to the net income set forth on the statement of income; and (ii) concurrently with any delivery of financial statements under <u>Section 5.01(a)</u> above, beginning with the fiscal year ending December 31, 2009, a report of the accounting firm opining on or certifying such financial statements stating that in the course of its regular audit of the financial statements of Holding LP1 and its Subsidiaries, which audit was conducted in accordance with generally accepted auditing standards, such accounting firm obtained no knowledge that any Default insofar as it relates to financial or accounting matters has occurred or, if in the opinion of such accounting firm such a Default has occurred, specifying the nature and extent thereof;

    (e) <u>Financial Officer's Certificate Regarding Collateral</u>.  Concurrently with any delivery of financial statements under <u>Section 5.01(a)</u> or <u>(b)</u>, a certificate of a Financial Officer setting forth the information required pursuant to the Perfection Certificate Supplement or confirming that there has been no change in such information since the date of the Perfection Certificate or latest Perfection Certificate Supplement;

    (f) <u>Public Reports</u>.  Promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and other materials filed by any Company with the Securities and Exchange Commission, or any Governmental Authority succeeding to any or all of the functions of said Commission, or with any national securities exchange, or distributed to holders of its Indebtedness pursuant to the terms of the documentation governing such Indebtedness (or any trustee, agent or other representative therefor), as the case may be;

    (g) <u>Management Letters</u>.  Promptly after the receipt thereof by any Company, a copy of any "management letter" received by any such person from its certified public accountants and the management's responses thereto;

    (h) <u>Budgets</u>.  Within 45 days after the beginning of each fiscal year, a budget for Holding LP1 in form and substance reasonably satisfactory to the Administrative Agent, but to include balance sheets, statements of income and sources and uses of cash, for each month of such fiscal year prepared in detail and summary form and including projected Consolidated EBITDA in a form substantially similar to the Projections, in each case, with appropriate presentation and discussion of the principal assumptions upon which such budgets and forecasts are based, accompanied by the statement of a Financial Officer of Borrowers to the effect that the budget of Holding LP1 is a reasonable estimate for the periods covered thereby and, promptly when available, any significant revisions of such budget;

(i)     Organization.  Concurrently with any delivery of financial statements under Section 5.01(a), an accurate organizational chart as required by Section 3.07(c), or confirmation that there are no changes to Schedule 9(a) to the Perfection Certificate;

(j)     Organizational Documents.  Promptly provide copies of any Organizational Documents that have been amended or modified in accordance with the terms hereof and deliver a copy of any notice of default given or received by any Company under any Organizational Document within 15 days after such Company gives or receives such notice;

(k)     Miscellaneous Reports and Bankruptcy Court Filings.  Promptly following delivery or service thereof, copies of all monthly reports, projections, or other information respecting the Borrowers' or any Subsidiary of any Borrower's business or financial condition or prospects as well as all pleadings, motions, applications and judicial information filed by or on behalf of the Borrowers with the Bankruptcy Court or the Canadian Court or provided by or to the U.S. Trustee or the Monitor (or any monitor appointed in any Chapter 11 Case) or the Committee, at the time such document is filed with the Bankruptcy Court or the Canadian Court, or provided by or, to the U.S. Trustee or the Monitor (or any monitor appointed in any Chapter 11 Case) or the Committee;

(l)     Approved Budget Updates.  On the dates specified herein, or more frequently as reasonably requested by the Administrative Agent upon the occurrence or during the continuance of an Event of Default, on Thursday of each week, on or about 5:00 P.M. (New York City time), an update of the Approved Budget for the current week and rolling forward for the next twelve (12) week period and an updated comparison to the previously delivered Approved Budget, in form and substance acceptable to the Administrative Agent, the Joint Lead Arrangers and the Required Lenders.  It is hereby understood and agreed by the parties hereto that the Administrative Agent, the Joint Lead Arrangers and the Required Lenders shall be deemed to have approved the submitted update for the Approved Budget if they fail to submit to the Borrowers a written objection within two (2) Business Days of receipt thereof.  The foregoing sentence is only applicable to the extent that the Borrowers submitted an update for the Approved Budget in a timely manner in accordance with the first sentence of this paragraph hereof;

(m)     Variance Report.  On or about 5:00 P.M. (New York City time) on the Thursday following the last day of each Measurement Period, a report stating whether the Borrowers are in compliance with the covenants set forth in Sections 6.10(b) and (c) together with supporting detail reasonably acceptable to the Administrative Agent and the Joint Lead Arrangers, which supporting detail shall include, without limitation, statements of weekly and cumulative variances;

(n)     Borrowing Base Certificate.  The Borrowers shall deliver or cause to be delivered (at the expense of the Borrowers) to the Collateral Agent and the Administrative Agent the following:

(i)     in no event less frequently than twenty days after the end of each month for the month most recently ended, a Borrowing Base Certificate from Borrowers accompanied by such supporting detail and documentation as shall be requested by the Collateral Agent in its reasonable credit judgment, reflecting all information through the end of the appropriate period for the Borrowing Base Parties;

(ii)     in no event less frequently than on or about 5:00 P.M. (New York City time) on the Thursday after the end of (x) each Measurement Period (from and after the Measurement Period ended as of August 8, 2009), an updated Borrowing Base Certificate with respect to Accounts (updated either by way of aging or roll-forward in a manner acceptable to the

-82-

Administrative Agent) and (y) on the date any Borrowing Base Certificate is delivered pursuant to Section 5.1(n)(i) or at such more frequent intervals as the Collateral Agent may request from time to time, a summary of Inventory by location and type accompanied by such supporting detail and documentation as shall be requested by the Collateral Agent in its reasonable credit judgment (in each case, together with a copy of all or any part of such delivery requested by any Lender in writing after the Closing Date);

(iii)  on the date any Borrowing Base Certificate is delivered pursuant to Section 5.1(n)(i) or at such more frequent intervals as the Collateral Agent may request from time to time (together with a copy of all or any part of such delivery requested by any Lender in writing after the Closing Date), (i) a collateral report with respect to the Loan Parties, including all additions and reductions (cash and non-cash) with respect to intercompany loan accounts of the Borrowing Base Parties, accompanied by such supporting detail and documentation as shall be requested by the Collateral Agent in its reasonable credit judgment;

(iv)  at the time of delivery of each of the financial statements delivered pursuant to Section 5.01(a), (b) and (c), a reconciliation of the Accounts trial balance and quarter-end Inventory reports of the Borrowing Base Parties to the general ledger of such Loan Party, in each case, accompanied by such supporting detail and documentation as shall be requested by the Collateral Agent in its reasonable credit judgment;

(v)  when available, a list of any applications for the registration of any patent, trademark or copyright with the United States Patent and Trademark Office, the United States Copyright Office, the Canadian Intellectual Property Office or any similar office or agency which any Loan Party has filed in the prior fiscal year;

(vi)  on the date of delivery of each of the financial statements delivered pursuant to Section 5.01(a), (b) and (c), an aging of Accounts and a reconciliation of accounts payable aging to such Borrowing Base Party's general ledger and the monthly financial statements delivered pursuant to Section 5.01(c); and

(vii) on the date any Borrowing Base Certificate is delivered pursuant to Section 5.1(n)(ii), a schedule of each account maintained by the Canadian Borrower not subject to the "automatic" sweep required pursuant to Section 5.18(d) in accordance with Section 5.18(e)(C), together with the closing balance of such account as of the Business Date immediately prior to the date such Borrowing Base Certificate is delivered.

(viii)  such other reports, statements and reconciliations with respect to the Borrowing Base or Collateral of any or all Loan Parties as the Collateral Agent shall from time to time request in the exercise of its Permitted Discretion;

(o)  Management Letters.  Promptly after the receipt thereof by any Loan Party, a copy of any "management letter" received by any such Loan Party from its certified public accountants and the management's responses thereto;

(p)  Flash Reports.  On Thursday of each week, no later than 5:00 P.M. (New York City time), "flash" reports setting forth in reasonable detail material information related to the Borrowers' revenues and profitability for the preceding week;

(q)     Marketing and Sales Information.  On Thursday of each week, no later than 5:00 P.M. (New York City time), an oral report setting forth in reasonable detail, material information related to the Borrowers' and Guarantor's marketing and sales process in connection with any sale of substantially all of the Borrowers' and Guarantors' assets for the preceding week; and

(r)     Other Information.  Promptly, from time to time, such other information regarding the operations, business affairs and financial condition of any Company, or compliance with the terms of any Loan Document, as the Administrative Agent or any Lender may reasonably request and summaries of all letters of intent, written offers and purchase agreements received by the Loan Parties or their advisors with respect to, in connection with, or in response to any asset purchase agreement or pleadings seeking approval of the same.

**SECTION 5.02     Litigation and Other Notices**.  Furnish to the Administrative Agent and each Lender written notice of the following promptly (and, in any event, within five Business Days of the occurrence thereof):

(a)     any Default, specifying the nature and extent thereof and the corrective action (if any) taken or proposed to be taken with respect thereto;

(b)     the filing or commencement of, or any threat or notice of intention of any person to file or commence, any action, suit, litigation or proceeding, whether at law or in equity by or before any Governmental Authority, other than in connection with the Chapter 11 Cases and the CCAA Case, (i) against any Company or any Affiliate thereof that could reasonably be expected to result in a Material Adverse Effect or (ii) with respect to any Loan Document;

(c)     any development that has resulted in, or could reasonably be expected to result in a Material Adverse Effect;

(d)     the occurrence of a Casualty Event that is subject to Section 2.10; and

(e)     (i) the incurrence of any material Lien (other than the Exceptions and Permitted Collateral Liens) on, or claim asserted against any of the Collateral or (ii) the occurrence of any other event which could materially affect the value of the Collateral.

**SECTION 5.03     Existence; Businesses and Properties**.

(a)     Do or cause to be done all things necessary to preserve, renew and maintain in full force and effect its legal existence, except as otherwise expressly permitted under Section 6.05 or Section 6.06 or, in the case of any Subsidiary, where the failure to perform such obligations, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(b)     Except as prohibited or excused by the Interim Order and the CCAA Initial Order with respect to the period prior to the issuance and entry of the Final Order and the Final Order with respect to the period on and after issuance and entry of the Final Order, the Bankruptcy Code, similar Canadian legislation or by reason of commencement of the Chapter 11 Cases or the CCAA Case, do or cause to be done all things necessary to obtain, preserve, renew, extend and keep in full force and effect the rights, licenses, permits, privileges, franchises, authorizations, patents, copyrights, trademarks and trade names material to the conduct of its business; maintain and operate such business in substantially the manner in which it is presently conducted and operated; comply with all applicable Requirements of Law (including any and all zoning, building, Environmental Law, ordinance, code or approval or any

-84-

building permits or any restrictions of record or agreements affecting the Real Property) and decrees and orders of any Governmental Authority, whether now in effect or hereafter enacted, except where the failure to comply, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect; pay and perform its obligations under all Leases and Transaction Documents except to the extent the same are being contested in good faith; and at all times maintain, preserve and protect all property material to the conduct of such business and keep such property in good repair, working order and condition (other than wear and tear occurring in the ordinary course of business) and from time to time make, or cause to be made, all needful and proper repairs, renewals, additions, improvements and replacements thereto necessary in order that the business carried on in connection therewith may be properly conducted at all times; *provided* that nothing in this <u>Section 5.03(b)</u> shall prevent (i) sales of property or transactions, by or involving any Company permitted by <u>Section 6.05</u> or <u>Section 6.06</u>; (ii) the withdrawal by any Company of its qualification as a foreign or extra-provincial corporation in any jurisdiction where such withdrawal, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect; or (iii) the abandonment by any Company of any rights, franchises, licenses, trademarks, trade names, copyrights or patents that such person reasonably determines are not useful to its business or no longer commercially desirable.

## SECTION 5.04    <u>Insurance</u>.

(a)    <u>Generally</u>.  Keep its insurable property adequately insured at all times by financially sound and reputable insurers; maintain such other insurance, to such extent and against such risks as is customary with companies in the same or similar businesses operating in the same or similar locations, including insurance with respect to Mortgaged Properties and other properties material to the business of the Companies against such casualties and contingencies and of such types and in such amounts with such deductibles as is customary in the case of similar businesses operating in the same or similar locations, including (i) physical hazard insurance on an "all risk" basis, (ii) commercial general liability against claims for bodily injury, death or property damage covering any and all insurable claims, (iii) explosion insurance in respect of any boilers, machinery or similar apparatus constituting Collateral, (iv) business interruption insurance, (v) worker's compensation insurance and such other insurance as may be required by any Requirement of Law and (vi) such other insurance against risks as the Administrative Agent may from time to time reasonably require (such policies to be in such form and amounts and having such coverage as may be reasonably satisfactory to the Administrative Agent and the Collateral Agent); *provided* that with respect to physical hazard insurance, neither the Collateral Agent nor the applicable Company shall agree to the adjustment of any claim thereunder without the consent of the other (such consent not to be unreasonably withheld or delayed); *provided, further*, that no consent of any Company shall be required during an Event of Default and no consent of the Collateral Agent shall be required for any claim that does not exceed $2,000,000.

(b)    <u>Requirements of Insurance</u>.  All such insurance shall (i) provide that no cancellation, material reduction in amount or material change in coverage thereof shall be effective until at least 30 days after receipt by the Collateral Agent of written notice thereof, (ii) name the Collateral Agent on behalf of the Secured Parties as mortgagee (in the case of property insurance) or additional insured (in the case of liability insurance) or loss payee (in the case of property insurance), as applicable, (iii) if reasonably requested by the Collateral Agent, include a breach of warranty clause and (iv) be reasonably satisfactory in all other respects to the Collateral Agent.

(c)    <u>Notice to Agents</u>.  Notify the Administrative Agent and the Collateral Agent immediately whenever any separate insurance concurrent in form or contributing in the event of loss with

-85-