that required to be maintained under this Section 5.04 is taken out by any Company; and promptly deliver to the Administrative Agent and the Collateral Agent a duplicate original copy of such policy or policies.

(d) Flood Insurance. With respect to each Mortgaged Property, obtain flood insurance in such total amount as the Administrative Agent or the Required Lenders may from time to time require, if at any time the area in which any improvements located on any Mortgaged Property is designated a "flood hazard area" in any Flood Insurance Rate Map published by the Federal Emergency Management Agency (or any successor agency), and otherwise comply with the National Flood Insurance Program as set forth in the Flood Disaster Protection Act of 1973, as amended from time to time.

(e) Broker's Report. Deliver to the Administrative Agent and the Collateral Agent and the Lenders a report of a reputable insurance broker with respect to such insurance and such supplemental reports with respect thereto as the Administrative Agent or the Collateral Agent may from time to time reasonably request.

(f) Mortgaged Properties. No Loan Party that is an owner of Mortgaged Property shall take any action that is reasonably likely to be the basis for termination, revocation or denial of any insurance coverage required to be maintained under such Loan Party's respective Mortgage or that could be the basis for a defense to any claim under any Insurance Policy maintained in respect of the Premises, and each Loan Party shall otherwise comply in all material respects with all Insurance Requirements in respect of the Premises; *provided, however*, that each Loan Party may, at its own expense and after written notice to the Administrative Agent, (i) contest the applicability or enforceability of any such Insurance Requirements by appropriate legal proceedings, the prosecution of which does not constitute a basis for cancellation or revocation of any insurance coverage required under this Section 5.04 or (ii) cause the Insurance Policy containing any such Insurance Requirement to be replaced by a new policy complying with the provisions of this Section 5.04.

## SECTION 5.05    Obligations and Taxes.

(a) Payment of Obligations. Except as prohibited or excused by the CCAA Initial Order, the Interim Order with respect to the period prior to the issuance and entry of the Final Order and the Final Order with respect to the period on and after issuance and entry of the Final Order, the Bankruptcy Code, the CCAA or by reason of commencement of the Chapter 11 Cases and the CCAA Case, pay its Indebtedness and other obligations promptly and in accordance with their terms and pay and discharge promptly when due all material Taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or in respect of its property, before the same shall become delinquent or in default, as well as all lawful claims for labor, services, materials and supplies or otherwise that, if unpaid, might give rise to a Lien other than a Permitted Lien upon such properties or any part thereof; *provided* that such payment and discharge shall not be required with respect to any such Tax, assessment, charge, levy or claim so long as (x)(i) the validity or amount thereof shall be contested in good faith by appropriate proceedings timely instituted and diligently conducted and the applicable Company shall have set aside on its books adequate reserves or other appropriate provisions with respect thereto in accordance with GAAP, (ii) such contest operates to suspend collection of the contested obligation, Tax, assessment or charge and enforcement of a Lien other than a Permitted Lien and (iii) in the case of Collateral, the applicable Company shall have otherwise complied with the Contested Collateral Lien Conditions and (y) the failure to pay could not reasonably be expected to result in a Material Adverse Effect.

-86-

(b)    Filing of Returns.  Except as prohibited or excused by the CCAA Initial Order, the Interim Order with respect to the period prior to the issuance and entry of the Final Order and the Final Order with respect to the period on and after issuance and entry of the Final Order, the Bankruptcy Code, the CCAA or by reason of commencement of the Chapter 11 Cases and the CCAA Case, timely and correctly file all material Tax Returns required to be filed by it, withhold, collect and remit all Taxes that it is required to collect, withhold or remit, except to the extent the same are being contested in good faith and adequate reserves have been established therefor.

(c)    Tax Shelter Reporting.  Borrowers do not intend to treat the Loans as being a "reportable transaction" within the meaning of Treasury Regulation Section 1.6011-4.  In the event any Borrower determines to take any action inconsistent with such intention, it will promptly notify the Administrative Agent thereof.

**SECTION 5.06    Employee Benefits**.  (a) Comply in all material respects with the applicable provisions of ERISA and the Code and (b) furnish to the Administrative Agent (x) as soon as possible after, and in any event within 5 days after any Responsible Officer of any Company or any ERISA Affiliates of any Company knows or has reason to know that, except as set forth in Schedule 3.17 (solely to the extent the liability resulting therefrom does not exceed the Dollar Equivalent of the "projected liability" set forth with respect thereto on Schedule 3.17), any ERISA Event has occurred that, alone or together with any other ERISA Event could reasonably be expected to result in liability of the Companies or any of their ERISA Affiliates in an aggregate amount exceeding $2,500,000 or the imposition of a Lien, a statement of a Financial Officer of Borrowers setting forth details as to such ERISA Event and the action, if any, that the Companies propose to take with respect thereto, and (y) upon request by the Administrative Agent, copies of (i) each Schedule B (Actuarial Information) to the annual report (Form 5500 Series) filed by any Company or any ERISA Affiliate with the Internal Revenue Service with respect to each Plan; (ii) the most recent actuarial valuation report for each Plan; (iii) all notices received by any Company or any ERISA Affiliate from a Multiemployer Plan sponsor or any governmental agency concerning an ERISA Event; and (iv) such other documents or governmental reports or filings relating to any Plan (or employee benefit plan sponsored or contributed to by any Company) as the Administrative Agent shall reasonably request.  Except as set forth in Schedule 3.17(c), with respect to any Loan Party organized outside the United States, such Loan Party shall ensure that all Foreign Plans, to the extent required by applicable Requirements of Law, are fully funded based on reasonable actuarial assumptions and recommendations and otherwise are operated or maintained in all material respects as required by applicable Requirements of Law.  With respect to any Canadian Pension Plan or Canadian Benefit Plan (i) promptly notify the Administrative Agent on becoming aware of: (A) any circumstances that would result, or be reasonably anticipated to result, in the declaration of a partial or full termination of any Canadian Pension Plan under applicable Requirements of Law; (B) the failure to make a required contribution to or payment under any Canadian Pension Plan when due; (C) the occurrence of any event which is reasonably likely to result in any Loan Party incurring any liability, fine or penalty with respect to any Canadian Benefit Plan or Canadian Pension Plan; (D) the existence of any report required to be filed with any Governmental Authority which discloses an unfunded liability on a solvency or going concern basis, prior to the filing of such report with such Governmental Authority; and (E) the establishment of any new Canadian Pension Plans or any change to any existing Canadian Pension Plan; (ii) in a timely fashion perform in all material respects all funding and portability obligations required to be performed in connection with such Canadian Pension Plan; (iii) pay all required contributions, premiums and payments when due to any Canadian Pension Plan in accordance with its terms and applicable Requirements of Law; and (iii) if requested by the Administrative Agent, promptly deliver to the Administrative Agent copies of: (A) annual information returns, actuarial valuations and any other material reports which have been filed with a Governmental Authority with respect to each

-87-

Canadian Pension Plan; and (B) any direction, order, notice, ruling or opinion that any Loan Party may receive from a Governmental Authority with respect to any Canadian Benefit Plan or Canadian Pension Plan.

## SECTION 5.07    Maintaining Records; Access to Properties and Inspections; Annual Meetings.

(a)    Keep proper books of record and account in which full, true and correct entries in conformity with GAAP and all Requirements of Law are made of all dealings and transactions in relation to its business and activities. Each Company will permit any representatives designated by the Administrative Agent or any Lender to visit and inspect the financial records and the property of such Company at reasonable times and as often as reasonably requested upon reasonable prior notice and during normal business hours and to make extracts from and copies of such financial records, and permit any representatives designated by the Administrative Agent or any Lender to discuss the affairs, finances, accounts and condition of any Company with the officers and employees thereof and advisors therefor (including independent accountants) if prior reasonable notice is given with respect to the officers, employees and advisors whose participation is requested.

(b)    With respect to Inventory (including, without limitation, Eligible Intermediate Inventory, Eligible Raw Materials and Eligible Finished Goods) and Accounts: (i) Borrowing Base Parties shall at all times maintain records of Inventory (including, without limitation, Eligible Intermediate Inventory, Eligible Raw Materials and Eligible Finished Goods) and Accounts reasonably satisfactory to Collateral Agent, keeping correct and accurate records itemizing and describing the kind, type, quality and quantity of Inventory (including, without limitation, Eligible Intermediate Inventory, Eligible Raw Materials and Eligible Finished Goods) and Accounts, the cost therefor and recent withdrawals therefrom and additions thereto (with such records being reconciled at least monthly); (ii) any of the Administrative Agent's and Collateral Agent's officers, employees or agents shall have the right, at any time or times, in the name of the Administrative Agent or Collateral Agent, as applicable, any designee of the Administrative Agent, Collateral Agent or Borrower, to engage in any reasonable procedure to verify the validity, amount or any other matter relating to Inventory (including, without limitation, Eligible Intermediate Inventory, Eligible Raw Materials and Eligible Finished Goods) and Accounts by mail, telephone, electronic communication, personal inspection or otherwise and to conduct field audits of the financial affairs and Collateral of the Loan Parties, and Borrowers shall cooperate fully with the Administrative Agent and Collateral Agent in an effort to facilitate and promptly conclude any such verification process; (iii) the Loan Parties shall cooperate fully with the Collateral Agent, any Lender and its and/or their agents during all Collateral field audits, Field Exams and Appraisals which shall be, in the case of the Collateral Agent, at the expense of the Borrowers and shall be conducted quarterly or more frequently at Collateral Agent's or such Lender's (acting in coordination with the Collateral Agent) reasonable request; (iv) no Borrowing Base Party shall sell Inventory (including, without limitation, Eligible Intermediate Inventory, Eligible Raw Materials and Eligible Finished Goods) and Accounts to any customer on approval, or any other basis which entitles the customer to return (except for the right of customers for Inventory which is defective or non-conforming) or may obligate any Loan Party to repurchase such Inventory (including, without limitation, Eligible Intermediate Inventory, Eligible Raw Materials and Eligible Finished Goods) and Accounts; and (v) Borrowing Base Parties shall keep the Inventory (including, without limitation, Eligible Intermediate Inventory, Eligible Raw Materials and Eligible Finished Goods) in good and marketable condition (except for damaged or defective goods arising in the ordinary course of business).

| LA\1978870.15||{00001116. }

(c)     Permit any of the Administrative Agent's officers, employees or agents, at any time or times set forth in the last sentence of this paragraph (c), in the name of the Administrative Agent or any designee of the Administrative Agent to conduct field audits of the financial affairs and Collateral of the Loan Parties.  Borrowers shall cooperate fully with the Administrative Agent in an effort to facilitate and promptly conclude any such verification process.  The Loan Parties shall cooperate fully with the Administrative Agent and its agents during all Collateral field audits done on reasonable notice during normal business hours, including by providing the data files, reports, and various other information as more fully set forth in such appraisals, all of which shall be at the reasonable expense of the Borrowers and shall be conducted, in the case of field audits, quarterly, or more frequently at the Administrative Agent's reasonable request.

(d)     At the request of the Administrative Agent or Required Lenders, hold meetings (at a mutually agreeable locations, venues and times or, at the option of the Administrative Agent, by conference call, the costs of such venue or call to be paid by Borrowers) with all Lenders who choose to attend such meeting, at which meeting shall be reviewed the financial results the financial condition of the Companies and the budgets presented for the current fiscal year of the Companies.

**SECTION 5.08**     **Use of Proceeds**.  Use the proceeds of the Loans only for the purposes set forth in Section 3.12 in a manner consistent in all respects with the Approved Budget (subject to the proviso in the definition of Approved Budget regarding amounts carried forward and any variances permitted by Section 6.10(b) of this Agreement (for the avoidance of doubt, it being understood and agreed that the presence of any "basket" or "carve-out" set forth in any negative covenant contained in Article VI shall not be, and shall not be deemed to be, an approval or acceptance by the Administrative Agent, the Joint Lead Arrangers or any Lender of any Line Item in any Approved Budget, or portion thereof, related to cash expenditures of the type described in such "basket" or "carve-out," which shall remain subject to the approval rights of Administrative Agent, the Joint Lead Arrangers and the Required Lenders with respect to each Approved Budget as set forth herein and in the Applicable Order)).

**SECTION 5.09**     **Compliance with Environmental Laws; Environmental Reports**.

(a)     Comply, and take reasonable steps to cause all lessees and other persons occupying Real Property owned, operated or leased by any Company to comply, in all material respects with all Environmental Laws and Environmental Permits applicable to its operations and Real Property; obtain and renew, and take reasonable steps to cause all lessees and other persons occupying Real Property owned, operated or leased by any Company to obtain and renew, all material Environmental Permits applicable to the Companies or any of their lessees with respect to its operations and Real Property; and conduct all Responses required by, and in accordance with, Environmental Laws; *provided* that no Company shall be required to undertake any Response to the extent that its obligation to do so is being contested in good faith and by proper proceedings and appropriate reserves are being maintained with respect to such circumstances in accordance with GAAP.

(b)     If a Default caused by reason of a breach of Section 3.18 or Section 5.09(a) shall have occurred and be continuing for more than 20 days without the Companies commencing activities reasonably likely to cure such Default in accordance with Environmental Laws, at the written request of the Administrative Agent or the Required Lenders through the Administrative Agent, provide to the Lenders within 45 days after such request, at the expense of Borrowers, an environmental assessment report regarding the matters which are the subject of such Default, including, where appropriate, soil and/or groundwater sampling (provided however, if soil and/or groundwater sampling is appropriate, within 75 days), prepared by an environmental consulting firm and, in the form and substance, reasonably

-89-

acceptable to the Administrative Agent and indicating the presence or absence of Hazardous Materials and the estimated cost of any compliance or Response to address them.

<b>SECTION 5.10     <u>Location of Material Inventory</u></b>

SECTION 5.10    <u>Location of Material Inventory</u>.  Borrowers will promptly notify the Collateral Agent and the Administrative Agent of any locations which, after the date hereof, become locations in Canada or the United States, where the aggregate value of Inventory (including, without limitation, Eligible Intermediate Inventory, Eligible Raw Materials and Eligible Finished Goods) owned by the Loan Parties at any such location exceeds $250,000.

<b>SECTION 5.11     <u>Additional Collateral; Additional Guarantors</u></b>.

(a)    Subject to this <u>Section 5.11</u>, with respect to any property acquired after the Closing Date by any Loan Party that is intended to be subject to the Lien created by the Applicable Orders or any of the Security Documents but is not so subject, promptly (and in any event within 30 days after the acquisition thereof) (i) execute and deliver to the Administrative Agent and the Collateral Agent such amendments or supplements to the relevant Security Documents or such other documents as the Administrative Agent or the Collateral Agent shall deem necessary or advisable to grant to the Collateral Agent, for its benefit and for the benefit of the other Secured Parties, a Lien on such property subject to no Liens other than the Exceptions and Permitted Collateral Liens, and (ii) take all actions necessary to cause such Lien to be duly perfected to the extent required by such Security Document and with the priority set forth in <u>Section 2.18</u> hereof in accordance with all applicable Requirements of Law, including the filing of financing statements in such jurisdictions as may be reasonably requested by the Administrative Agent.  Borrowers shall otherwise take such actions and execute and/or deliver to the Collateral Agent such documents as the Administrative Agent or the Collateral Agent shall require to confirm the validity, perfection and priority of the Lien of the Security Documents on such after-acquired properties.

(b)    With respect to any person that is or becomes a Subsidiary (or ceases to be an Immaterial Foreign Subsidiary) after the Closing Date, promptly (and in any event within 30 days after such person becomes a Subsidiary or ceases to be any Immaterial Foreign Subsidiary) (i) deliver to the Collateral Agent the certificates, if any, representing all of the Equity Interests of such Subsidiary, together with undated stock powers or other appropriate instruments of transfer executed and delivered in blank by a duly authorized officer of the holder(s) of such Equity Interests, and all intercompany notes owing from such Subsidiary to any Loan Party together with instruments of transfer executed and delivered in blank by a duly authorized officer of such Loan Party and (ii) cause such new Subsidiary (A) to execute a Joinder Agreement or such comparable documentation to become a Subsidiary Guarantor and a joinder agreement to the applicable Security Agreement, substantially in the form annexed thereto or, in the case of a Foreign Subsidiary (or a Canadian Subsidiary), execute a security agreement compatible with the laws of such Foreign Subsidiary's (or a Canadian Subsidiary's) jurisdiction in form and substance reasonably satisfactory to the Administrative Agent, and (B) to take all actions necessary or advisable in the reasonable opinion of the Administrative Agent or the Collateral Agent to cause the Lien created by the applicable Security Agreement to be duly perfected to the extent required by such agreement in accordance with all applicable Requirements of Law, including the filing of financing statements (or the foreign equivalent thereof) in such jurisdictions as may be reasonably requested by the Administrative Agent or the Collateral Agent.  Notwithstanding the foregoing, (1) the Equity Interests required to be delivered to the Collateral Agent pursuant to clause (i) of this <u>Section 5.11(b)</u> shall not include any Equity Interests of a Foreign Subsidiary created or acquired after the Closing Date and (2) no Foreign Subsidiary shall be required to take the actions specified in clause (ii) of this <u>Section 5.11(b)</u>, if, either (x) in the case of either clause (1) or (2), doing so could constitute an investment of earnings in

-90-

United States property under Section 956 (or a successor provision) of the Code; *provided* that this exception shall not apply to (A) Voting Stock of any Subsidiary which is a first-tier controlled foreign corporation (as defined in Section 957(a) of the Code) representing 66% of the total voting power of all outstanding Voting Stock of such Subsidiary and (B) 100% of the Equity Interests not constituting Voting Stock of any such Subsidiary, except that any such Equity Interests constituting "stock entitled to vote" within the meaning of Treasury Regulation Section 1.956-2(c)(2) shall be treated as Voting Stock for purposes of this Section 5.11(b) or (y) in the case of either clauses (1) or (2), such Foreign Subsidiary is an Immaterial Foreign Subsidiary.

(c)     Promptly (i) grant to the Collateral Agent, within 30 days of the acquisition thereof, a security interest in and Mortgage on each Real Property owned in fee by such Loan Party as is acquired by such Loan Party after the Closing Date and that, together with any improvements thereon, individually has a fair market value of at least $2,000,000, and (ii) unless the Collateral Agent otherwise consents, use commercially reasonable efforts to grant to the Collateral Agent, within 30 days of entering into the applicable lease on or after the Closing Date, a security interest in and Mortgage on each leased Real Property of such Loan Party which lease individually has a fair market value of at least $2,000,000, in each case, as additional security for the Secured Obligations (unless the subject property is already mortgaged to a third party to the extent permitted by Section 6.02). Such Mortgages shall be granted pursuant to documentation reasonably satisfactory in form and substance to the Administrative Agent and the Collateral Agent and shall constitute valid and enforceable perfected Liens with the priority set forth in Section 2.18 hereof and subject only to the Exceptions and Permitted Collateral Liens. The Mortgages or instruments related thereto shall be duly recorded or filed in such manner and in such places as are required by law to establish, perfect, preserve and protect the Liens in favor of the Collateral Agent required to be granted pursuant to the Mortgages and all taxes, fees and other charges payable in connection therewith shall be paid in full. Such Loan Party shall otherwise take such actions and execute and/or deliver to the Collateral Agent such documents as the Administrative Agent or the Collateral Agent shall require to confirm the validity, perfection and priority of the Lien of any existing Mortgage or new Mortgage against such after-acquired Real Property (including a local counsel opinion (in form and substance reasonably satisfactory to the Administrative Agent and the Collateral Agent) in respect of such Mortgage).

Nothing in this Section 5.11 (or the failure of any party to comply or enforce this Section 5.11) shall amend, modify, affect or limit the terms and conditions of the Applicable Order or the granting, attachment and perfection of the Liens granted therein to the Collateral Agent, Lenders, Prepetition First Lien Agents or Prepetition First Lien Lenders.

**SECTION 5.12     Security Interests; Further Assurances**. Promptly, upon the reasonable request of the Administrative Agent, the Collateral Agent or any Lender, at Borrowers' expense, execute, acknowledge and deliver, or cause the execution, acknowledgment and delivery of, and thereafter register, file or record, or cause to be registered, filed or recorded, in an appropriate governmental office, any document or instrument supplemental to or confirmatory of the Security Documents or otherwise deemed by the Administrative Agent or the Collateral Agent reasonably necessary for the continued validity, perfection and priority of the Liens on the Collateral covered thereby or by any Applicable Order subject to no other Liens except Permitted Senior Liens, or obtain any consents or waivers as may be necessary or appropriate in connection therewith. Deliver or cause to be delivered to the Administrative Agent and the Collateral Agent from time to time such other documentation, consents, authorizations, approvals and orders in form and substance reasonably satisfactory to the Administrative Agent and the Collateral Agent as the Administrative Agent and the Collateral Agent shall reasonably deem necessary to perfect or maintain the Liens on the Collateral

pursuant to the Security Documents. Upon the exercise by the Administrative Agent, the Collateral Agent or any Lender of any power, right, privilege or remedy pursuant to any Loan Document which requires any consent, approval, registration, qualification or authorization of any Governmental Authority execute and deliver all applications, certifications, instruments and other documents and papers that the Administrative Agent, the Collateral Agent or such Lender may require. If the Administrative Agent, the Collateral Agent or the Required Lenders determine that they are required by a Requirement of Law to have appraisals prepared in respect of the Real Property of any Loan Party constituting Collateral, Borrowers shall provide to the Administrative Agent appraisals that satisfy the applicable requirements of the Real Estate Appraisal Reform Amendments of FIRREA and are otherwise in form and substance satisfactory to the Administrative Agent and the Collateral Agent.

Nothing in this Section 5.12 (or the failure of any party to comply or enforce this Section 5.12) shall amend, modify, affect or limit the terms and conditions of the Applicable Order or the granting, attachment and perfection of the Liens granted therein to the Administrative Agent, Lenders, Prepetition First Lien Agents or Prepetition First Lien Lenders.

**SECTION 5.13    Information Regarding Collateral.**

(a)     Not effect any change (i) in any Loan Party's legal name, (ii) in the location of any Loan Party's chief executive office or registered office, as appropriate, (iii) in any Loan Party's identity or organizational structure, (iv) in any Loan Party's Federal Taxpayer Identification Number or organizational identification number or registered office, as appropriate, or (v) in any Loan Party's jurisdiction of organization (in each case, including by merging with or into any other entity, reorganizing, dissolving, liquidating, reorganizing or organizing in any other jurisdiction), until (A) it shall have given the Collateral Agent and the Administrative Agent not less than 30 days' prior written notice (in the form of an Officers' Certificate), or such lesser notice period agreed to by the Collateral Agent, of its intention so to do, clearly describing such change and providing such other information in connection therewith as the Collateral Agent or the Administrative Agent may reasonably request and (B) it shall have taken all action reasonably satisfactory to the Collateral Agent to maintain the perfection and priority of the security interest of the Collateral Agent for the benefit of the Secured Parties in the Collateral, if applicable. Each Loan Party agrees to promptly provide the Collateral Agent with certified Organizational Documents reflecting any of the changes described in the preceding sentence. Each Loan Party also agrees to promptly notify the Collateral Agent of any change in the location of any office in which it maintains books or records relating to Collateral owned by it or any office or facility at which Collateral is located (including the establishment of any such new office or facility), other than changes in location to a Mortgaged Property or a leased property subject to a Landlord Access Agreement.

(b)     Concurrently with the delivery of financial statements pursuant to Section 5.01(a), deliver to the Administrative Agent and the Collateral Agent a Perfection Certificate Supplement and a certificate of a Financial Officer of Borrowers certifying that all UCC and PPSA financing statements (including fixture filings, as applicable) or other appropriate filings, recordings or registrations, including all refilings, rerecordings and reregistrations, containing a description of the Collateral have been filed of record in each governmental, municipal or other appropriate office in each jurisdiction necessary to protect and perfect the security interests and Liens under the Security Documents for a period of not less than 18 months after the date of such certificate (except as noted therein with respect to any continuation statements to be filed within such period).

**SECTION 5.14    Post-Closing Collateral Matters**. Execute and deliver the documents and complete the tasks set forth on Schedule 5.14, in each case within the time limits specified on such schedule, subject to such extensions as may be agreed to by the Collateral Agent.

**SECTION 5.15    Affirmative Covenants With Respect to Leases**. With respect to each Lease, the respective Loan Party shall perform all the obligations imposed upon the landlord under such Lease and enforce all of the tenant's obligations thereunder, except where the failure to so perform or enforce could not reasonably be expected to result in a Property Material Adverse Effect.

**SECTION 5.16    Post Closing Mortgaged Property**. To the extent requested by the Collateral Agent in its sole discretion, the Loan Parties shall deliver within 30 days of Collateral Agent's request therefore, a Mortgage encumbering each Real Property owned by the US Loan Parties in favor of the Collateral Agent, for the benefit of the Secured Parties, duly executed and acknowledged by each Loan Party that is the owner of or holder of any interest in such Real Property (each, a "**Post Closing Mortgaged Property**"), and otherwise in form for recording in the recording office of each applicable political subdivision where each such Post Closing Mortgaged Property is situated, together with such certificates, affidavits, questionnaires or returns as shall be required in connection with the recording or filing thereof to create a lien under applicable Requirements of Law, and such financing statements and any other instruments necessary to grant a mortgage lien under the laws of any applicable jurisdiction, all of which shall be in form and substance reasonably satisfactory to Collateral Agent.

**SECTION 5.17    Cooperation with Advisors**. Each of the Loan Parties will use commercially reasonably efforts to provide full cooperation and assistance to Advisors hired by or at the discretion of the Administrative Agent and the Required Lenders (or their counsel) to enable such Advisors to perform the services for which they were engaged.

**SECTION 5.18    Cash Management System**. The Borrowers and each other Loan Party shall maintain a cash management system which shall be established within forty five (45) days (or such extended period as the Collateral Agent may permit) of the Closing Date (such date the "**Cash Management Implementation Date**") and which shall be acceptable to the Administrative Agent and the Collateral Agent (the "**Cash Management System**"), and which shall operate as follows:

(a)    All funds held by Borrowers or any other Loan Party (other than funds being collected pursuant to the provisions stated below) shall be deposited in one or more bank accounts or securities investment accounts, in form and substance reasonably satisfactory to Collateral Agent subject to the terms of the Security Agreements and applicable Control Agreements.

(b)    Each Borrower shall establish and maintain, at its sole expense, and shall cause each Guarantor to establish and maintain, at its sole expense, blocked accounts or lockboxes and related deposit accounts (in each case, "**Blocked Accounts**") into which Borrowers and such Guarantors shall promptly deposit and direct their respective Account Debtors to directly remit all payments on Accounts and all payments constituting proceeds of Inventory or other Collateral in the identical form in which such payments are made, whether by cash, check or other manner and shall be identified and segregated from all other funds of Borrowers and the Guarantors. Borrowers and such Guarantors shall deliver, or cause to be delivered, to Collateral Agent a Control Agreement (or, in the case of the Blocked Accounts located in Canada, a blocked account agreement (in each case, a "**Blocked Account Agreement**")) duly authorized, executed and delivered by each bank where a Blocked Account for the benefit of any Borrower or any such Guarantor is maintained, and by each bank where any other deposit account is from time to time maintained. Borrowers shall further execute and deliver, and shall cause each such

-93-

Guarantor to execute and deliver, such agreements and documents as Collateral Agent may reasonably require in order to implement the provisions of this Section 5.18 in connection with such Blocked Accounts and such Control Agreements and Blocked Account Agreements. Borrowers and such Guarantors shall not establish any deposit accounts after the Closing Date, unless such Borrower or such Guarantor (as applicable) have complied in full with the provisions of this Section 5.18(b) with respect to such deposit accounts. Borrowers agree that from and after the Closing Date, all payments made to such Blocked Accounts or other funds received and collected by Collateral Agent or any Lender, whether in respect of the Accounts, as proceeds of Inventory or other Collateral or otherwise shall be treated as payments to Collateral Agent and Lenders in respect of the Obligations and therefore shall constitute the property of Collateral Agent and Lenders to the extent of the then outstanding Secured Obligations.

(c)      With respect to all Blocked Accounts of Borrowers and such Guarantors, the applicable bank maintaining such Blocked Accounts shall agree to forward daily all amounts in each Blocked Account to one Blocked Account designated as no more than two concentration accounts (one for each currency) in the name of the applicable Borrower (collectively, the "**Concentration Account**") at the bank that shall be designated as the Concentration Account bank for such Borrower (the "**Concentration Account Bank**"), which shall be established within forty five (45) days (or such extended period as the Collateral Agent may permit) of the Closing Date, and maintained at a financial institution acceptable to the Collateral Agent. The Concentration Account Bank shall agree, from and after the Cash Management Implementation Date pursuant to the applicable Control Agreement or Blocked Account Agreement, to forward daily all amounts in the Concentration Account to the account designated as collection account  (the "**Collection Account**") which shall be under the exclusive dominion and control of the Collateral Agent (it being understood that the respective Loan Parties shall not have access to funds in the Concentration Account).

(d)      With respect to all Blocked Accounts of such Guarantors, the applicable bank maintaining such Blocked Accounts shall agree, from and after the Cash Management Implementation Date to forward all amounts in each Blocked Account to the applicable Collection Account and to commence the process of daily sweeps from such Blocked Account into the Collection Account.

(e)      Notwithstanding any provision of this Section 5.18 to the contrary, (A) Borrowers and the Guarantors may maintain zero-balance-disbursement accounts, payroll accounts and trust accounts that are not a part of the Cash Management System, *provided* that Borrowers and the Guarantors shall not accumulate or maintain cash in such accounts as of any date of determination in excess of checks outstanding against such accounts as of that date and amounts necessary to meet minimum balance requirements, (B) Arclin Surfaces may maintain account number 15350348154 with U.S. Bank, N.A. that is not a part of the Cash Management System provided that such account does not at any time contain funds in excess of $30,000 and (C) the Canadian Borrower may maintain an account or accounts that (i) is not a part of the Cash Management System and (ii) is not subject the "automatic" daily sweep required pursuant to clause (d) above; provided, in the case of clauses (C)(i) and (C)(ii) that (x) such account or accounts does not (or do not) at any time contain funds in excess of the Dollar Equivalent of $500,000 in the aggregate; (y) with respect to funds in excess of such $500,000 aggregate amount, the Canadian Borrower shall "manually" cause the transfer of such finds to the Concentration Account on a daily basis; and (z) with respect to funds in excess of such $500,000 aggregate amount, the Administrative Agent, in its Permitted Discretion, may require compliance with the "automatic" daily sweep required pursuant to clause (d) above within 5 Business Days of notice of its request for such requirement.

-94-

(f)      Unless Administrative Agent or Collateral Agent determines to release such funds to Borrowers in accordance with the following sentence, the Collateral Agent shall apply all such funds in a Collection Account on a daily basis to the repayment of  (i) first, Fees and reimbursable expenses of the Administrative Agent, the Collateral Agent and the Joint Lead Arrangers then due and payable; (ii) second, to interest then due and payable on all Loans, and (iii) third pro rata to all Loans. Notwithstanding the foregoing sentence, after payment in full has been made of the amounts required under subsections (i)-(iii) above, upon Borrowers' request and as long as (x) no Default has occurred and is continuing, (y) the Aggregate Revolver Outstandings is $0.000 and (z) all other conditions precedent to a Borrowing have been satisfied (including, without limitation, that Agents' release of such funds to the Borrowers shall (I) not cause the aggregate outstanding amount of the Loans to exceed the amount then authorized by the Applicable Order and (II) be consistent with the most recently delivered Approved Budget in effect at such time), any additional funds deposited in the Collection Account or Cash Collateral Account shall be released to Borrowers.  In addition, if consented to by the Administrative Agent, the Collateral Agent and the Required Lenders, such funds in the Cash Collateral Account may be released to Borrowers.  Notwithstanding the above, if the Administrative Agent has declared the Loans then outstanding to be forthwith due and payable in whole or in part pursuant to Section 8.01, the Collateral Agent shall, or shall direct the Administrative Agent to apply all funds received in the Collection Account in accordance with Section 8.03.

(g)      Each Borrowing Base Party and its directors, employees, agents and other Affiliates shall, acting as trustee for Collateral Agent, receive, as the property of Collateral Agent, any monies, checks, notes, drafts or any other payment relating to and/or proceeds of Accounts, Inventory or other Collateral which come into their possession or under their control and immediately upon receipt thereof, shall deposit or cause the same to be deposited in the Blocked Accounts, or remit the same or cause the same to be remitted, in kind, to Collateral Agent.  In no event shall the same be commingled with Borrowers' own funds.  Borrowers agree, jointly and severally, to reimburse Collateral Agent on demand for any amounts owed or paid to any bank at which a Blocked Account is established or any other bank or person involved in the transfer of funds to or from the Blocked Accounts arising out of Collateral Agent's payments to or indemnification of such bank or person.

**SECTION 5.19      Milestones**.  Unless otherwise waived by the Required Lenders, the Administrative Agent and the Joint Lead Arrangers in their sole and absolute discretion, each Loan Party shall take all actions necessary to achieve the Milestones set forth on Schedule 5.19 by the dates specified therein (or such later date as may be agreed to by the Required Lenders, the Administrative Agent and the Joint Lead Arranger in their sole discretion).

**SECTION 5.20      Conversion of Intercompany Indebtedness**.  At the direction of the Administrative Agent and the Joint Lead Arrangers, Holdings LP2 shall exercise its rights to convert each of the Subordinated Equity Holder Loan and the Holdco Intercompany Loan into Class B shares of the Canadian Borrower or Holdco3, as applicable, in each case in accordance with the terms thereof.

# ARTICLE VI

# NEGATIVE COVENANTS

Each Loan Party warrants, covenants and agrees with each Lender that, so long as this Agreement shall remain in effect and until the Commitments have been terminated and the principal of and interest on each Loan, all Fees and all other expenses or amounts payable under any Loan Document have been paid in full, no Loan Party will, nor will they cause or permit any Subsidiaries to:

**SECTION 6.01**     **Indebtedness.**  Incur, create, assume or permit to exist, directly or indirectly, any Indebtedness, except

        (a)     Indebtedness incurred under this Agreement and the other Loan Documents;

        (b)     Indebtedness outstanding on the Petition Date and listed on <u>Schedule 6.01(b)</u>;

        (c)     [Intentionally Omitted];

        (d)     Indebtedness permitted by <u>Section 6.04(f)</u>;

        (e)     Indebtedness in respect of Purchase Money Obligations and Capital Lease Obligations, and refinancings or renewals thereof, in an aggregate amount (excluding, for purposes of calculating this amount, the items set forth on <u>Schedule 6.01(b)</u>) not to exceed $1,000,000 in the aggregate at any time outstanding;

        (f)     [Intentionally Omitted];

        (g)     Indebtedness in respect of bid, performance or surety bonds, workers' compensation claims, self-insurance obligations and bankers acceptances issued for the account of any Company in the ordinary course of business, including guarantees or obligations of any Company with respect to letters of credit supporting such bid, performance or surety bonds, workers' compensation claims, self-insurance obligations and bankers acceptances (in each case other than for an obligation for money borrowed) not to exceed $200,000 in the aggregate at any time outstanding;

        (h)     Contingent Obligations of any Loan Party in respect of Indebtedness otherwise permitted under this <u>Section 6.01</u>;

        (i)     Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently (except in the case of daylight overdrafts) drawn against insufficient funds in the ordinary course of business; *provided*, *however*, that such Indebtedness is extinguished within five Business Days of incurrence;

        (j)     Indebtedness arising in connection with endorsement of instruments for deposit in the ordinary course of business;

        (k)     [Intentionally Omitted];

        (l)     [Intentionally Omitted]; and

        (m)     the Indebtedness incurred under the Prepetition Credit Agreements as of the Petition Date plus accrued but unpaid interest, fees and other expenses.

Notwithstanding the foregoing, and except for the Exceptions or as otherwise provided in <u>Section 2.18</u>, no Indebtedness under <u>Sections 6.01(b)</u> through <u>(m)</u> shall be permitted to have an administrative expense claim or super priority status under the Bankruptcy Code, a super priority charge under the CCAA senior to or pari passu with the super priority charge or administrative expense claims or super priority charge of the Agents and Lenders (or, in respect of the US Loan Parties, the adequate protection claims of the Prepetition First Lien Agents and Prepetition First Lien Lenders) as set forth herein and in the Applicable Order.

| LA\1978870.15||{00001116. }

**SECTION 6.02** **Liens**. Create, incur, assume or permit to exist, directly or indirectly, any unsecured claim, court ordered charge or other super-priority claim or Lien, or apply to the Bankruptcy Court or Canadian Court to do so, on any property now owned or hereafter acquired by it or on any income or revenues or rights in respect of any thereof, except the following (collectively, the "**Permitted Liens**"):

(a)     inchoate Liens for taxes, assessments or governmental charges or levies not yet due and payable or delinquent and Liens for taxes, assessments or governmental charges or levies, which (i) are being contested in good faith by appropriate proceedings for which adequate reserves have been established in accordance with GAAP, which proceedings (or orders entered in connection with such proceedings) have the effect of preventing the forfeiture or sale of the property subject to any such Lien, and (ii) in the case of any such charge or claim which has or may become a Lien against any of the Collateral, such Lien and the contest thereof shall satisfy the Contested Collateral Lien Conditions;

(b)     Liens in respect of property of any Company imposed by Requirements of Law, which were incurred in the ordinary course of business and do not secure Indebtedness for borrowed money, such as carriers', warehousemen's, materialmen's, landlords', workmen's, suppliers', repairmen's and mechanics' Liens and other similar Liens arising in the ordinary course of business, and (i) which do not in the aggregate materially detract from the value of the property of the Companies, taken as a whole, and do not materially impair the use thereof in the operation of the business of the Companies, taken as a whole, (ii) which, if they secure obligations that are then due and unpaid, are being contested in good faith by appropriate proceedings for which adequate reserves have been established in accordance with GAAP, which proceedings (or orders entered in connection with such proceedings) have the effect of preventing the forfeiture or sale of the property subject to any such Lien, and (iii) in the case of any such Lien which has or may become a Lien against any of the Collateral, such Lien and the contest thereof shall satisfy the Contested Collateral Lien Conditions;

(c)     any Lien in existence on the Closing Date and set forth on <u>Schedule 6.02(c)</u> (any such Lien, an "**Existing Lien**");

(d)     easements, servitudes, rights-of-way, restrictions (including zoning restrictions), covenants, licenses, encroachments, protrusions and other similar charges or encumbrances, and minor title deficiencies on or with respect to any Real Property, in each case whether now or hereafter in existence, not (i) securing Indebtedness, (ii) individually or in the aggregate materially impairing the value or marketability of such Real Property or (iii) individually or in the aggregate materially interfering with the ordinary conduct of the business of the Companies at such Real Property;

(e)     Liens arising out of judgments, attachments or awards not resulting in a Default and in respect of which such Company shall in good faith be prosecuting an appeal or proceedings for review in respect of which there shall be secured a subsisting stay of execution pending such appeal or proceedings and, in the case of any such Lien which has or may become a Lien against any of the Collateral, such Lien and the contest thereof shall satisfy the Contested Collateral Lien Conditions;

(f)     Liens (other than any Lien imposed by ERISA) (x) imposed by Requirements of Law or deposits made in connection therewith in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security legislation, (y) incurred in the ordinary course of business to secure the performance of tenders, statutory obligations (other than excise taxes), surety, stay, customs and appeal bonds, statutory bonds, bids, leases, government contracts, trade contracts, performance and return of money bonds and other similar

obligations (exclusive of obligations for the payment of borrowed money) or (z) arising by virtue of deposits made in the ordinary course of business to secure liability for premiums to insurance carriers; *provided* that (i) with respect to clauses (x), (y) and (z) of this paragraph (f), such Liens are for amounts not yet due and payable or delinquent or, to the extent such amounts are so due and payable, such amounts are being contested in good faith by appropriate proceedings for which adequate reserves have been established in accordance with GAAP, which proceedings for orders entered in connection with such proceedings have the effect of preventing the forfeiture or sale of the property subject to any such Lien, (ii) to the extent such Liens are not imposed by Requirements of Law, such Liens shall in no event encumber any property other than cash and Cash Equivalents and (iii) in the case of any such Lien against any of the Collateral, such Lien and the contest thereof shall satisfy the Contested Collateral Lien Conditions;

(g)     Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into by any Company in the ordinary course of business in accordance with the past practices of such Company;

(h)     Liens securing Indebtedness incurred pursuant to <u>Section 6.01(e)</u>; *provided* that any such Liens attach only to the property being financed pursuant to such Indebtedness and do not encumber any other property of any Company;

(i)     banker's Liens, rights of setoff and other similar Liens existing solely with respect to cash and Cash Equivalents on deposit in one or more accounts maintained by any Company, in each case granted in the ordinary course of business in favor of the bank or banks with which such accounts are maintained, securing amounts owing to such bank with respect to cash management and operating account arrangements, including those involving pooled accounts and netting arrangements; *provided* that, unless such Liens are non-consensual and arise by operation of law, in no case shall any such Liens secure (either directly or indirectly) the repayment of any Indebtedness;

(j)     [Intentionally Omitted];

(k)     Liens granted pursuant to the Security Documents to secure the Secured Obligations;

(l)     licenses of Intellectual Property granted by any Company in the ordinary course of business and not interfering in any material respect with the ordinary conduct of business of the Companies;

(m)     the filing of UCC or PPSA financing statements solely as a precautionary measure in connection with operating leases or consignment of goods;

(n)     [Intentionally Omitted];

(o)     the Carve-Out;

(p)     Liens granted pursuant to the Prepetition Loan Documents to secure the obligations under the Prepetition Loan Documents that are junior to the Liens securing the Secured Obligations; and

(q)     the Administration Charge;

(r)     with respect to Real Property located in Canada, (i) registered agreements with any Governmental Authority and any public utilities or private suppliers of services, including subdivision agreements, development agreements, engineering, grading or landscaping agreements, site plan control agreements, servicing agreements and other similar agreements, provided such agreements have been complied with in all material respects, (ii) facility cost sharing, servicing, parking, reciprocal and other similar agreements with neighboring landowners and/or Governmental Authorities, provided such agreements have been complied with in all material respects, (iii) restrictive covenants, private deed restrictions and other similar land use control agreements, provided such instruments have been complied with in all material respects, (iv) any subsisting reservations, limitations, provisos, conditions or exceptions in favor of the Crown in right of any Province of Canada or in right of Canada, and (v) any rights of expropriation, access, use or any other right conferred or reserved by or in any statute of Canada or a Province of Canada where any of the Real Property is situate, in each case with respect to the foregoing clauses (i) through (v), not (A) securing Indebtedness, (B) individually or in the aggregate materially impairing the value or marketability of such Real Property or (C) individually or in the aggregate materially interfering with the ordinary conduct of the business of the Companies at such Real Property; and

(s)     the Directors' Charge;

*provided, however*, that no consensual Liens shall be permitted to exist, directly or indirectly, on any Securities Collateral, other than Liens granted pursuant to the Security Documents or the Security Documents (as such term is defined in the Prepetition Credit Agreements) or the Exceptions.

Notwithstanding the foregoing or any other provision of any Loan Document, except as otherwise allowed pursuant to the Applicable Order or pursuant to Section 2.18(h), no Loan Party may incur, create, assume, suffer to exist or permit any Lien or other administrative claim or security interest which is pari passu with or senior to the Liens or claims of the Agents and Lenders against the Loan Parties, or the adequate protection Liens or claims of the Prepetition First Lien Agents and Prepetition First Lien Lenders against the Loan Parties, in each case, subject to the Exceptions, except as set forth herein.

**SECTION 6.03     Sale and Leaseback Transactions**.  Enter into any arrangement, directly or indirectly, with any person whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property which it intends to use for substantially the same purpose or purposes as the property being sold or transferred (a "**Sale and Leaseback Transaction**").

**SECTION 6.04     Investment, Loan and Advances**.  Directly or indirectly, lend money or credit (by way of guarantee or otherwise) or make advances to any person, or purchase or acquire any stock, bonds, notes, debentures or other obligations or securities of, or any other interest in, or make any capital contribution to, any other person, or purchase or own a futures contract or otherwise become liable for the purchase or sale of currency or other commodities at a future date in the nature of a futures contract (all of the foregoing, collectively, "**Investments**"), except that the following shall be permitted:

(a)     [Intentionally Omitted];

(b)     Investments outstanding on the Closing Date and identified on Schedule 6.04(b);

(c)    the Companies may (i) acquire and hold accounts receivables owing to any of them if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary terms, (ii) invest in, acquire and hold cash and Cash Equivalents, (iii) endorse negotiable instruments held for collection in the ordinary course of business or (iv) make lease, utility and other similar deposits in the ordinary course of business;

(d)    Hedging Obligations incurred pursuant to <u>Section 6.01(b)</u>;

(e)    advances, consistent with past practice, to directors, employees and officers of ManagementCo, Holding LP1 and their respective Subsidiaries for travel and entertainment for *bona fide* business purposes not to exceed $100,000 in the aggregate at any one time outstanding and made in accordance with the Approved Budget;

(f)    (i) Investments by (A) any Company in Borrowers or any Subsidiary Guarantor (or person becoming a Subsidiary Guarantor in accordance with <u>Section 5.11</u>) and (B) any Company in any direct Subsidiary thereof that is a Guarantor, so long as, in the case of this clause (i)(B), substantially concurrently therewith the proceeds of such Investment are invested in accordance with the foregoing clause (i)(A), and (ii) Investments by a Subsidiary that is not a Subsidiary Guarantor in any other Subsidiary that is not a Subsidiary Guarantor; *provided* that any Investment in the form of a loan or advance shall be evidenced by the Intercompany Note (or, in the case, of any such loan or advance involving any persons not party to the Intercompany Note, by a note substantially similar thereto in a form reasonably approved by the Administrative Agent) and, in the case of a loan or advance by a Loan Party, pledged by such Loan Party as Collateral pursuant to the Security Documents; and

(g)    Investments in securities of trade creditors or customers or suppliers in the ordinary course of business received upon foreclosure or pursuant to any plan of reorganization or liquidation or similar arrangement upon the bankruptcy or insolvency of such trade creditors or customers or suppliers or in connection with the settlement of a delinquent account or dispute with any trade creditors or customers or suppliers.

An Investment shall be deemed to be outstanding to the extent not returned in the same form as the original Investment to Borrowers or any Subsidiary Guarantor.

SECTION 6.05    <u>Mergers and Consolidations</u>.  Wind up, liquidate or dissolve its affairs or enter into any transaction of merger, amalgamation or consolidation (or agree to do any of the foregoing at any future time), except that Asset Sales in compliance with <u>Section 6.06</u> shall be permitted.

To the extent the Required Lenders or all the Lenders, as applicable, waive the provisions of this <u>Section 6.05</u> with respect to the sale of any Collateral, or any Collateral is sold as permitted by this <u>Section 6.05</u>, such Collateral (unless sold to a Company) shall be sold free and clear of the Liens created by the Security Documents, and, so long as Borrowers shall have provided the Agents such certifications or documents as any Agent shall reasonably request in order to demonstrate compliance with this <u>Section 6.05</u>, the Agents shall take all actions reasonably requested in order to effect the foregoing.

SECTION 6.06    <u>Asset Sales</u>.  Effect any Asset Sale, or agree to effect any Asset Sale, except that the following shall be permitted:

(a)    disposition of used, worn out, obsolete or surplus property by any Company in the ordinary course of business and the abandonment or other disposition of Intellectual Property that is,

in the reasonable judgment of a Borrower, no longer economically practicable to maintain or useful in the conduct of the business of the Companies taken as a whole;

(b)     [Intentionally Omitted];

(c)     leases of real or personal property in the ordinary course of business and in accordance with the applicable Security Documents;

(d)     [Intentionally Omitted];

(e)     any conveyance, sale, lease, sublease, assignment, transfer or other disposition by a Borrower or Subsidiary Guarantor to a Borrower or any other Subsidiary Guarantor; *provided* that the Lien on and security interest in such property granted or to be granted in favor of the Collateral Agent under the Applicable Orders and the Security Documents shall be maintained or created in accordance with the Applicable Orders and the provisions of Section 5.11 or Section 5.12, as applicable;

(f)     transactions in compliance with Section 6.08; and

(g)     Investments in compliance with Section 6.04.

To the extent the Required Lenders or all the Lenders, as applicable, waive the provisions of this Section 6.06 with respect to the sale of any Collateral, or any Collateral is sold as permitted by this Section 6.06, such Collateral (unless sold to a Company) shall be sold free and clear of the Liens created by the Security Documents, and, so long as Borrowers shall have provided the Agents such certifications or documents as any Agent shall reasonably request in order to demonstrate compliance with this Section 6.06, the Agents shall take all actions reasonably requested in order to effect the foregoing.

**SECTION 6.07     Acquisitions**.  Purchase or otherwise acquire (in one or a series of related transactions) any part of the property (whether tangible or intangible) of any person (or agree to do any of the foregoing at any future time), except that the following shall be permitted:

(a)     Capital Expenditures by Borrowers and the Subsidiaries shall be permitted to the extent permitted by Section 6.10(c);

(b)     purchases and other acquisitions of inventory, materials, equipment and intangible property in the ordinary course of business;

(c)     Investments in compliance with Section 6.04;

(d)     leases of real or personal property in the ordinary course of business and in accordance with the applicable Security Documents;

(e)     [Intentionally Omitted];

(f)     [Intentionally Omitted]; and

(g)     transactions in compliance with Section 6.08;

*provided* that the Lien on and security interest in such property granted or to be granted in favor of the Collateral Agent under the Applicable Orders and the applicable Security Documents shall be maintained

-101-

or created in accordance with the Applicable Orders and the provisions of <u>Section 5.11</u> or <u>Section 5.12</u>, as applicable.

**SECTION 6.08**   <u>Dividends</u>. Authorize, declare or pay, directly or indirectly, any Dividends with respect to any Company except that the following shall be permitted:

(a)     Dividends by any Company to any Borrower or any Guarantor that is a Wholly-Owned Subsidiary of any Borrower;

(b)     [Intentionally Omitted]; and

(c)     (A) to the extent actually used by Can SPV Co or any of its Subsidiaries or ManagementCo to pay such taxes, costs and expenses, payments by any Borrower to or on behalf of Can SPV Co or any of its Subsidiaries or ManagementCo in an amount sufficient to pay Board of Director expenses and franchise taxes and other fees required to maintain the legal existence of Can SPV Co or any of its Subsidiaries or ManagementCo and (B) payments by any Borrower to or on behalf of Can SPV Co or any of its Subsidiaries or ManagementCo in an amount sufficient to pay out-of-pocket legal, accounting and filing costs and other expenses in the nature of overhead in the ordinary course of business of Can SPV Co or any of its Subsidiaries or ManagementCo, in the case of clauses (A) and (B) in an aggregate amount not to exceed the Dollar Equivalent of $25,000 in any fiscal year (to the extent consistent with prior practice and in accordance with the Approved Budget).

**SECTION 6.09**   <u>Transactions with Affiliates</u>. Enter into, directly or indirectly, any transaction or series of related transactions, whether or not in the ordinary course of business, with any Affiliate of any Company (other than between or among Borrowers and one or more Subsidiary Guarantors or between or among one or more Subsidiary Guarantors), other than on terms and conditions at least as favorable to such Company as could reasonably be obtained by such Company at that time in a comparable arm's-length transaction with a person other than an Affiliate, except that the following shall be permitted:

(a)     Dividends permitted by <u>Section 6.08</u>;

(b)     Investments permitted by <u>Section 6.04(c)(i)</u> and <u>Section 6.04(f)</u>;

(c)     reasonable and customary director, officer and employee compensation (including bonuses) and other benefits (including retirement, health, stock option and other benefit plans) and indemnification arrangements, in each case approved by the Board of Directors of Borrowers (to the extent consistent with prior practice and in accordance with the Approved Budget);

(d)     transactions with customers, clients, suppliers, joint venture partners or purchasers or sellers of goods and services, in each case in the ordinary course of business and otherwise not prohibited by the Loan Documents; and

(e)     only to the extent that the provisions set forth therein are required to remain enforceable under applicable Requirements of Law after commencement of the Chapter 11 Cases and the CCAA Case, the existence of, and the performance by any Loan Party of its obligations under the terms of, any limited liability company, limited partnership or other Organizational Document or securityholders voting agreement (including any registration rights agreement or purchase agreement related thereto) to which it is a party on the Closing Date and which has been attached to (or otherwise

-102-

specifically incorporated by reference therein) the secretary certificates delivered on the Closing Date delivered in accordance with Section 4.01(b)(i) hereof.

### SECTION 6.10     Financial Covenants.

(a)     Minimum EBITDA. Permit Consolidated EBITDA for the consecutive six fiscal month period then ended to be less than the amount set forth opposite the end date of such period below:

| Test Period Ending | Amount |
|---|---|
| July 31, 2009 | $10,398,000 |
| August 31, 2009 | $11,596,000 |
| September 30, 2009 | $12,656,000 |
| October 31, 2009 | $12,814,000 |
| November 30, 2009 | $12,499,000 |
| December 31, 2009 and each fiscal month ending thereafter | $10,828,000 |

(b)     Budget Covenants. Permit actual ending cash, tested as of the last Business Day of any Measurement Period, to be less than the amount set forth for such date in the Approved Budget, with a permitted variance of $4,000,000.

(c)     Limitation on Capital Expenditures. Permit the aggregate amount of Capital Expenditures made during (i) the period commencing on the Petition Date and ending on the last date of the thirteenth (13th) consecutive Measurement Period after the Petition Date to exceed $5,000,000 in the aggregate and (ii) each successive "rolling" period thereafter commencing on the first day of each Measurement Period and consisting of thirteen (13) Measurement Periods in aggregate to exceed the amount set forth in the Approved Budget for such period plus 15% of the amount set forth in the Approved Budget for such period.

(d)     Minimum Excess Availability. As of any date of determination, permit Excess Availability to be less than $2,000,000.

### SECTION 6.11     Prepayments of Other Indebtedness; Modifications of Organizational Documents and Other Documents, etc. Directly or indirectly:

(a)     make (or give any notice in respect thereof) any voluntary or optional payment or prepayment on or redemption or acquisition for value of, or any prepayment or redemption as a result of any asset sale, change of control or similar event of, any outstanding Indebtedness other than the Obligations;

(b)     [Intentionally Omitted];

-103-

amend, modify or permit the amendment or modification of, any provision of the ManagementCo Voting Agreement, the Holdco3 Management Agreements and documents evidencing the Subordinated Equity Holder Loan or the Holdco Intercompany Loan (other than the conversion of the Subordinated Equity Holder Loan or the Holdco Intercompany Loan into Class B shares of the Canadian Borrower or Holdco3, as applicable, solely to the extent such conversion is made in accordance with <u>Section 5.20</u>) in any manner that is adverse to the interests of the Lenders;

(c)  terminate, amend or modify any of its Organizational Documents or permit the termination, amendment or modification of the Organizational Documents of Can SPV Co (including (x) by the filing or modification of any certificate of designation and (y) any election to treat any Pledged Securities (as defined in the Security Agreement) as a "security" under Section 8-103 of the UCC (or the applicable provision under the PPSA) other than concurrently with the delivery of certificates representing such Pledged Securities to the Collateral Agent) or any agreement to which it is a party with respect to its Equity Interests (including the ManagementCo Voting Agreement, the Holdco3 Management Agreements and any other stockholders' agreement), or enter into any new agreement with respect to its Equity Interests;

(d)  amend or modify, or permit the amendment or modification of, any provision of the Prepetition Loan Documents;

(e)  make any payments or transfer, or agree to any setoff or recoupment with respect to any Prepetition claim, Prepetition Lien or Prepetition Indebtedness except (i) as approved by order of the Bankruptcy Court and Canadian Court and (ii) as expressly permitted by the terms of the Loan Documents and any Approved Budget; or

(f)  (i) amend or modify, or permit the amendment or modification of the Interim Order, the CCAA Initial Order, the Final Order or any other financing order or order with respect to the confirmation of any plan or the disclosure schedules related thereto, without the consent of the Administrative Agent and the Joint Lead Arrangers (solely to the extent reasonably available and in attendance in person (or through counsel) at the hearing with respect to such amendment or modification of the Interim Order, CCAA Initial Order or the Final Order, as applicable); or (ii) amend or modify, or permit the amendment or modification of any First Day Orders (excluding the Interim Order, the CCAA Interim Order and the Final Order), except for amendments or modifications which are not in any way adverse in any respect to the interests of the Agents or the Lender in such capacities, without the consent of the Administrative Agent.

**SECTION 6.12  Limitation on Certain Restrictions on Subsidiaries**. Directly or indirectly, create or otherwise cause or suffer to exist or become effective any encumbrance or restriction on the ability of any Subsidiary to (a) pay dividends or make any other distributions on its capital stock or any other interest or participation in its profits owned by any Borrower or any Subsidiary, or pay any Indebtedness owed to a Borrower or a Subsidiary, (b) make loans or advances to any Borrower or any Subsidiary or (c) transfer any of its properties to any Borrower or any Subsidiary, except for such encumbrances or restrictions existing under or by reason of (i) applicable Requirements of Law; (ii) this Agreement, the other Loan Documents and the Prepetition Loan Documents; (iii) customary provisions restricting subletting or assignment of any lease governing a leasehold interest of a Subsidiary; (iv) customary provisions restricting assignment of any agreement entered into by a Subsidiary in the ordinary course of business; (v) any holder of a Lien permitted by <u>Section 6.02</u> restricting the transfer of the property subject thereto; (vi) customary restrictions and conditions contained in any agreement relating to the sale of any property permitted under <u>Section 6.06</u> pending the consummation of such sale;

-104-

(vii) without affecting the Loan Parties' obligations under Section 5.11, customary provisions in partnership agreements, limited liability company organizational governance documents, asset sale and stock sale agreements and other similar agreements entered into in the ordinary course of business that restrict the transfer of ownership interests in such partnership, limited liability company or similar person; (viii) restrictions on cash or other deposits or net worth imposed by suppliers or landlords under contracts entered into in the ordinary course of business; or (ix) any encumbrances or restrictions imposed by any amendments or refinancings that are otherwise permitted by the Loan Documents and the Prepetition Loan Documents of the contracts, instruments or obligations referred to in clause (ii) above; *provided* that such amendments or refinancings are no more materially restrictive with respect to such encumbrances and restrictions than those prior to such amendment or refinancing.

SECTION 6.13 **Limitation on Issuance of Capital Stock**. With respect to any Loan Party, issue or permit any Subsidiary to issue any Equity Interest (including by way of sales of treasury stock) or any options or warrants to purchase, or securities convertible into, any Equity Interest other than the conversion of the Subordinated Equity Holder Loan or the Holdco Intercompany Loan into Class B shares of the Canadian Borrower or Holdco3, as applicable, solely to the extent such conversion is made with the consent and at the direction of the Administrative Agent and the Joint Lead Arrangers in accordance with Section 5.20 hereof.

SECTION 6.14 **Limitation on Creation of Subsidiaries**. Establish, create or acquire any additional Subsidiaries.

SECTION 6.15 **Business**.

(a) With respect to Can SPV Co, (i) incur any Indebtedness or any other obligation or liability other than those that are incidental to its activities permitted under clause (iii) below; (ii) create or suffer to exist any Lien upon any property or assets now owned or hereafter acquired by it other than the Liens created under the Applicable Orders and the Security Documents to which it is a party and other than Involuntary Liens; (iii) engage in any business or activity or own any assets or have any liabilities, other than (x) holding Equity Interests of ManagementCo ,GPCo1, GPCo2, Holding LP1 or any of the other parent companies of a Borrower, to the extent no Change in Control shall have occurred, (y) performing its obligations and activities incidental thereto and under the Loan Documents and (z) making Dividends and Investments to the extent permitted by this Agreement; (iv) consolidate with or merge with or into, or convey, transfer or lease all or substantially all its assets to, any person; (v) sell or otherwise dispose of any Equity Interests of any of its Subsidiaries; (vi) create or acquire any Subsidiary or make or own any Investment in any person other than GPCo1, GPCo2 and Holding LP1 as described above; or (vii) fail to hold itself out to the public as a legal entity separate and distinct from all other persons.

(b) With respect to ManagementCo, (i) incur any Indebtedness or any other obligation or liability other than under the Transaction Documents to which it is a party and other than those that are incidental to its activities permitted under clause (iii) below; (ii) create or suffer to exist any Lien upon any property or assets now owned or hereafter acquired by it other than the Liens created under the Applicable Orders and the Security Documents to which it is a party and other than Involuntary Liens; (iii) engage in any business or activity or own any assets or have any liabilities, other than (x) holding up to 1% of the Economic Interests and up to 70% of the Voting Stock of each of GPCo1, GPCo2, Holdco3, Holdco4, Canadian Borrower, US Borrower, Mexico AcquisitionCo, Arclin Mexico and any of the other Subsidiaries of Can SPV Co, other than any other Subsidiary of any Borrower (excluding for this purpose of the US Borrower in its capacity as a Subsidiary of Canadian Borrower), (y) performing its obligations

and activities incidental thereto and under the Transaction Documents and the ManagementCo Voting Agreement and (z) making Dividends and Investments to the extent permitted by this Agreement; (iv) consolidate with or merge with or into, or convey, transfer or lease all or substantially all its assets to, any person; (v) sell or otherwise dispose of any Equity Interests of any of its Subsidiaries; (vi) create or acquire any Subsidiary or make or own any Investment in any person other than GPCo1, GPCo2, Holdco3, Holdco4, Canadian Borrower, US Borrower, Mexico AcquisitionCo, Arclin Mexico; or (vii) fail to hold itself out to the public as a legal entity separate and distinct from all other persons.

(c)  With respect to GPCo1, (i) incur any Indebtedness or any other obligation or liability other than under the Loan Documents to which it is a party other than those that are incidental to its activities permitted under clause (iii) below; (ii) create or suffer to exist any Lien upon any property or assets now owned or hereafter acquired by it other than the Liens created under the Applicable Orders and the Security Documents to which it is a party other than Involuntary Liens; (iii) engage in any business or activity or own any assets or have any liabilities, other than (x) holding Equity Interests in Holding LP1, (y) performing its obligations and activities incidental thereto and under the Loan Documents and (z) making Dividends and Investments to the extent permitted by this Agreement; (iv) consolidate with or merge with or into, or convey, transfer or lease all or substantially all its assets to, any person; (v) sell or otherwise dispose of any Equity Interests of any of its Subsidiaries; (vi) create or acquire any Subsidiary or make or own any Investment in any person other than Holding LP1; or (vii) fail to hold itself out to the public as a legal entity separate and distinct from all other persons.

(d)  With respect to GPCo2, (i) incur any Indebtedness or any other obligation or liability other than under the Loan Documents to which it is a party other than those that are incidental to its activities permitted under clause (iii) below; (ii) create or suffer to exist any Lien upon any property or assets now owned or hereafter acquired by it other than the Liens created under the Applicable Orders and the Security Documents to which it is a party and other than Involuntary Liens; (iii) engage in any business or activity or own any assets or have any liabilities, other than (x) holding Equity Interests in Holding LP2, (y) performing its obligations and activities incidental thereto and under the Loan Documents and (z) making Dividends and Investments to the extent permitted by this Agreement; (iv) consolidate with or merge with or into, or convey, transfer or lease all or substantially all its assets to, any person; (v) sell or otherwise dispose of any Equity Interests of any of its Subsidiaries; (vi) create or acquire any Subsidiary or make or own any Investment in any person other than Holding LP2; or (vii) fail to hold itself out to the public as a legal entity separate and distinct from all other persons.

(e)  With respect to Holding LP1, (i) incur any Indebtedness or any other obligation or liability other than under the Loan Documents to which it is a party and other than those that are incidental to its activities permitted under clause (iii) below; (ii) create or suffer to exist any Lien upon any property or assets now owned or hereafter acquired by it other than the Liens created under the Applicable Orders and the Security Documents to which it is a party and other than Involuntary Liens; (iii) engage in any business or activity or own any assets or have any liabilities, other than (x) holding Equity Interests of Holding LP2, (y) performing its obligations and activities incidental thereto and under the Loan Documents and (z) making Dividends and Investments to the extent permitted by this Agreement; (iv) consolidate with or merge with or into, or convey, transfer or lease all or substantially all its assets to, any person; (v) sell or otherwise dispose of any Equity Interests of any of its Subsidiaries; (vi) create or acquire any Subsidiary or make or own any Investment in any person other than Holding LP2, as described above; or (vii) fail to hold itself out to the public as a legal entity separate and distinct from all other persons.

| LA\1978870.15||{00001116. }

(f)    With respect to Holding LP2, (i) incur any Indebtedness or any other obligation or liability other than under the Loan Documents to which it is a party and other than those that are incidental to its activities permitted under clause (iii) below; (ii) create or suffer to exist any Lien upon any property or assets now owned or hereafter acquired by it other than the Liens created under the Applicable Orders and the Security Documents to which it is a party and other than Involuntary Liens; (iii) engage in any business or activity or own any assets or have any liabilities, other than (x) holding Equity Interests of Holdco3 and, until such time as the Administrative Agent shall have delivered a notice directing the conversion of the same into Equity Interests of the Canadian Borrower or Holdco 3, as applicable, in accordance with <u>Section 5.20</u>, the Subordinated Equity Holder Loan and the Holdco Intercompany Loan, (y) performing its obligations and activities incidental thereto and under the Loan Documents and (z) making Dividends and Investments to the extent permitted by this Agreement; (iv) consolidate with or merge with or into, or convey, transfer or lease all or substantially all its assets to, any person; (v) sell or otherwise dispose of any Equity Interests of any of its Subsidiaries; (vi) create or acquire any Subsidiary or make or own any Investment in any person other than Holdco3, as described above; or (vii) fail to hold itself out to the public as a legal entity separate and distinct from all other persons.

(g)    With respect to Holdco3, (i) incur any Indebtedness or any other obligation or liability other than under the Loan Documents to which it is a party other than those that are incidental to its activities permitted under clause (iii) below; (ii) create or suffer to exist any Lien upon any property or assets now owned or hereafter acquired by it other than the Liens created under the Applicable Orders and the Security Documents to which it is a party and other than Involuntary Liens; (iii) engage in any business or activity or own any assets or have any liabilities, other than (x) holding Equity Interests of Holdco4, (y) performing its obligations and activities incidental thereto and under the Loan Documents and any Holdco3 Management Agreements and (z) making Dividends and Investments to the extent permitted by this Agreement; (iv) consolidate with or merge with or into, or convey, transfer or lease all or substantially all its assets to, any person; (v) sell or otherwise dispose of any Equity Interests of any of its Subsidiaries; (vi) create or acquire any Subsidiary or make or own any Investment in any person other than Holdco4, as described above; or (vii) fail to hold itself out to the public as a legal entity separate and distinct from all other persons.

(h)    With respect to Holdco4, (i) incur any Indebtedness or any other obligation or liability other than under the Loan Documents to which it is a party other than those that are incidental to its activities permitted under clause (iii) below; (ii) create or suffer to exist any Lien upon any property or assets now owned or hereafter acquired by it other than the Liens created under the Applicable Orders and the Security Documents to which it is a party and other than Involuntary Liens; (iii) engage in any business or activity or own any assets or have any liabilities, other than (x) holding Equity Interests of Canadian Borrower, (y) performing its obligations and activities incidental thereto and under the Loan Documents and (z) making Dividends and Investments to the extent permitted by this Agreement; (iv) consolidate with or merge with or into, or convey, transfer or lease all or substantially all its assets to, any person; (v) sell or otherwise dispose of any Equity Interests of any of its Subsidiaries; (vi) create or acquire any Subsidiary or make or own any Investment in any person other than Canadian Borrower, as described above; or (vii) fail to hold itself out to the public as a legal entity separate and distinct from all other persons.

(i)    With respect to Subsidiaries of Holdco4, engage (directly or indirectly) in any business other than those businesses in which such Subsidiaries are engaged on the Closing Date and any businesses reasonably related thereto.

| LA\1978870.15||{00001116. }

**SECTION 6.16    Limitation on Accounting Changes**. Make or permit any change in accounting policies or reporting practices, without the consent of the Required Lenders, which consent shall not be unreasonably withheld, except changes that are required by GAAP.

**SECTION 6.17    Fiscal Year**. Change its fiscal year-end to a date other than December 31.

**SECTION 6.18    No Further Negative Pledge**. Enter into any agreement, instrument, deed or lease which prohibits or limits the ability of any Loan Party to create, incur, assume or suffer to exist any Lien upon any of their respective properties or revenues, whether now owned or hereafter acquired, or which requires the grant of any security for an obligation if security is granted for another obligation, except the following: (1) this Agreement, the other Loan Documents and the Organizational Documents of any Loan Party (to the extent the same are no more restrictive than the restrictions contained herein); (2) covenants in documents creating Liens permitted by Section 6.02 prohibiting further Liens on the properties encumbered thereby; (3) any other agreement that does not restrict in any manner (directly or indirectly) Liens created pursuant to the Loan Documents on any Collateral securing the Secured Obligations and does not require the direct or indirect granting of any Lien securing any Indebtedness or other obligation by virtue of the granting of Liens on or pledge of property of any Loan Party to secure the Secured Obligations; and (5) any prohibition or limitation that (a) exists pursuant to applicable Requirements of Law, (b) consists of customary restrictions and conditions contained in any agreement relating to the sale of any property permitted under Section 6.06 pending the consummation of such sale, (c) restricts subletting or assignment of any lease governing a leasehold interest of Borrowers or a Subsidiary, (d) exists in any agreement in effect at the time such Subsidiary becomes a Subsidiary of a Borrower, so long as such agreement was not entered into in contemplation of such person becoming a Subsidiary or (e) is imposed by any amendments or refinancings that are otherwise permitted by the Loan Documents of the contracts, instruments or obligations referred to in clause (3) or (5)(d); *provided* that such amendments and refinancings are no more materially restrictive with respect to such prohibitions and limitations than those prior to such amendment or refinancing.

**SECTION 6.19    Anti-Terrorism Law; Anti-Money Laundering**.

(a)    Directly or indirectly, (i) knowingly conduct any business or engage in making or receiving any contribution of funds, goods or services to or for the benefit of any person described in Section 3.22, (ii) knowingly deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order or any other Anti-Terrorism Law, or (iii) knowingly engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law (and the Loan Parties shall deliver to the Lenders any certification or other evidence requested from time to time by any Lender in its reasonable discretion, confirming the Loan Parties' compliance with this Section 6.19).

(b)    Cause or permit any of the funds of such Loan Party that are used to repay the Loans to be derived from any unlawful activity with the result that the making of the Loans would be in violation of any Requirement of Law.

**SECTION 6.20    Embargoed Person**. Cause or permit (a) any of the funds or properties of the Loan Parties that are used to repay the Loans to constitute property of, or be beneficially owned directly or indirectly by, any person subject to sanctions or trade restrictions under United States

-108-

law ("**Embargoed Person**" or "**Embargoed Persons**") that is identified on (1) the "List of Specially Designated Nationals and Blocked Persons" maintained by OFAC and/or on any other similar list maintained by OFAC pursuant to any authorizing statute including, but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 *et seq.*, The Trading with the Enemy Act, 50 U.S.C. App. 1 *et seq.*, and any Executive Order or Requirement of Law promulgated thereunder, with the result that the investment in the Loan Parties (whether directly or indirectly) is prohibited by a Requirement of Law, or the Loans made by the Lenders would be in violation of a Requirement of Law, or (2) the Executive Order, any related enabling legislation or any other similar Executive Orders or (b) any Embargoed Person to have any direct or indirect interest, of any nature whatsoever in the Loan Parties, with the result that the investment in the Loan Parties (whether directly or indirectly) is prohibited by a Requirement of Law or the Loans are in violation of a Requirement of Law.

               **SECTION 6.21**     **Critical Vendor and Other Payments**. The Loan Parties shall not make (i) any Prepetition "critical vendor" payments or other payments on account of any creditor's Prepetition unsecured claims, (ii) payments on account of claims or expenses arising under section 503(b)(9) of the Bankruptcy Code, or (iii) payments under any management incentive plan or on account of claims or expenses arising under Section 503(c) of the Bankruptcy Code, except in each case in amounts and on terms and conditions that (a) are approved by order of the Bankruptcy Court or the Canadian Court and (b) are expressly permitted by the terms of the Loan Documents and the Approved Budget; provided that the aggregate amount of "critical vendor" payments permitted under this <u>Section 6.21</u> from and after the Closing Date shall not exceed $13,000,000.

               **SECTION 6.22**     **Prepetition Indebtedness**. The Loan Parties shall not make any adequate protection or other payments or transfers on account of any Prepetition Indebtedness or other obligations or any Prepetition Liens, except to the extent provided in the Applicable Orders in respect of the Prepetition First Lien Obligation, in the First Day Orders or in any other order of the Bankruptcy Court and the Canadian Court, which order is consented to by the Administrative Agent, the Joint Lead Arrangers (solely to the extent reasonably available and in attendance in person (or through counsel) at the hearing with respect to the entry of such order) and the Required Lenders.

## ARTICLE VII

## GUARANTEE

               **SECTION 7.01**     **The Guarantee**. The Guarantors hereby jointly and severally guarantee (and, in respect of the Guarantors formed under the laws of Canada or any province thereof, severally each as to 100%), as a primary obligor and not as a surety to each Secured Party and their respective successors and assigns, the prompt payment in full when due (whether at stated maturity, by required prepayment, declaration, demand, by acceleration or otherwise) of the principal of and interest (including any interest, fees, costs or charges that would accrue but for the provisions of the Title 11 of the United States Code or any equivalent law in any applicable jurisdiction after any bankruptcy or insolvency petition under Title 11 of the United States Code) on the Loans made by the Lenders to, and the Notes held by each Lender of, Borrowers, and all other Secured Obligations from time to time owing to the Secured Parties by any Loan Party under any Loan Document, in each case strictly in accordance with the terms thereof (such obligations being herein collectively called the "**Guaranteed Obligations**"). The Guarantors hereby jointly and severally agree that if any Borrower or other Guarantors shall fail to pay in full when due (whether at stated maturity, by acceleration or otherwise) any of the Guaranteed Obligations, the Guarantors will promptly pay the same in cash, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Guaranteed

-109-