Obligations, the same will be promptly paid in full when due (whether at extended maturity, by acceleration or otherwise) in accordance with the terms of such extension or renewal.

**SECTION 7.02**    **Obligations Unconditional**. The obligations of the Guarantors under <u>Section 7.01</u> shall constitute a guaranty of payment and to the fullest extent permitted by applicable Requirements of Law, are absolute, irrevocable and unconditional, joint and several, irrespective of the value, genuineness, validity, regularity or enforceability of the Guaranteed Obligations of Borrowers under this Agreement, the Notes, if any, or any other agreement or instrument referred to herein or therein, or any substitution, release or exchange of any other guarantee of or security for any of the Guaranteed Obligations, and, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of a surety or Guarantor (except for payment in full). Without limiting the generality of the foregoing, it is agreed that the occurrence of any one or more of the following shall not alter or impair the liability of the Guarantors hereunder which shall remain absolute, irrevocable and unconditional under any and all circumstances as described above:

(i)    at any time or from time to time, without notice to the Guarantors, the time for any performance of or compliance with any of the Guaranteed Obligations shall be extended, or such performance or compliance shall be waived;

(ii)    any of the acts mentioned in any of the provisions of this Agreement or the Notes, if any, or any other agreement or instrument referred to herein or therein shall be done or omitted;

(iii)    the maturity of any of the Guaranteed Obligations shall be accelerated, or any of the Guaranteed Obligations shall be amended in any respect, or any right under the Loan Documents or any other agreement or instrument referred to herein or therein shall be amended or waived in any respect or any other guarantee of any of the Guaranteed Obligations or any security therefor shall be released or exchanged in whole or in part or otherwise dealt with; or

(iv)    any Lien or security interest granted to, or in favor of, any Lender or Agent as security for any of the Guaranteed Obligations shall fail to be perfected.

The Guarantors hereby expressly waive diligence, presentment, demand of payment, protest and all notices whatsoever, and any requirement that any Secured Party exhaust any right, power or remedy or proceed against any Borrower under this Agreement or the Notes, if any, or any other agreement or instrument referred to herein or therein, or against any other person under any other guarantee of, or security for, any of the Guaranteed Obligations. The Guarantors waive any and all notice of the creation, renewal, extension, waiver, termination or accrual of any of the Guaranteed Obligations and notice of or proof of reliance by any Secured Party upon this Guarantee or acceptance of this Guarantee, and the Guaranteed Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred in reliance upon this Guarantee, and all dealings among Borrowers and the Secured Parties shall likewise be conclusively presumed to have been had or consummated in reliance upon this Guarantee. This Guarantee shall be construed as a continuing, absolute, irrevocable and unconditional guarantee of payment without regard to any right of offset with respect to the Guaranteed Obligations at any time or from time to time held by Secured Parties, and the obligations and liabilities of the Guarantors hereunder shall not be conditioned or contingent upon the pursuit by the Secured Parties or any other person at any time of any right or remedy against Borrowers or against any other person which may be or become liable in respect of all or any part of the Guaranteed Obligations or against any collateral security or guarantee therefor or right of offset with respect thereto. This Guarantee shall

remain in full force and effect and be binding in accordance with and to the extent of its terms upon the Guarantors and the successors and assigns thereof, and shall inure to the benefit of the Lenders, and their respective successors and assigns, notwithstanding that from time to time during the term of this Agreement there may be no Guaranteed Obligations outstanding.

        **SECTION 7.03**     **Reinstatement**. The obligations of the Guarantors under this Article VII shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of any Borrower or other Loan Party in respect of the Guaranteed Obligations is rescinded or must be otherwise restored by any holder of any of the Guaranteed Obligations, whether as a result of any proceedings in bankruptcy or reorganization or otherwise.

        **SECTION 7.04**     **Subrogation; Subordination**. Each Guarantor hereby agrees that until the indefeasible payment and satisfaction in full in cash of all Guaranteed Obligations and the expiration and termination of the Commitments of the Lenders under this Agreement it shall waive any claim and shall not exercise any right or remedy, direct or indirect, arising by reason of any performance by it of its guarantee in Section 7.01, whether by subrogation or otherwise, against Borrowers or any other Guarantor of any of the Guaranteed Obligations or any security for any of the Guaranteed Obligations. Any Indebtedness of any Loan Party permitted pursuant to Section 6.01(d) shall be subordinated to such Loan Party's Secured Obligations in the manner set forth in the Intercompany Note evidencing such Indebtedness.

        **SECTION 7.05**     **Remedies**. The Guarantors jointly and severally agree that, as between the Guarantors and the Lenders, the obligations of Borrowers under this Agreement and the Notes, if any, may be declared to be forthwith due and payable as provided in Section 8.01 (and shall be deemed to have become automatically due and payable in the circumstances provided in Section 8.01) for purposes of Section 7.01, notwithstanding any stay, injunction or other prohibition preventing such declaration (or such obligations from becoming automatically due and payable) as against any Borrower and that, in the event of such declaration (or such obligations being deemed to have become automatically due and payable), such obligations (whether or not due and payable by Borrowers) shall forthwith become due and payable by the Guarantors for purposes of Section 7.01.

        **SECTION 7.06**     **Instrument for the Payment of Money**. Each Guarantor hereby acknowledges that the guarantee in this Article VII constitutes an instrument for the payment of money, and consents and agrees that any Lender or Agent, at its sole option, in the event of a dispute by such Guarantor in the payment of any moneys due hereunder, shall have the right to bring a motion-action under New York CPLR Section 3213.

        **SECTION 7.07**     **Continuing Guarantee**. The guarantee in this Article VII is a continuing guarantee of payment, and shall apply to all Guaranteed Obligations whenever arising.

        **SECTION 7.08**     **General Limitation on Guarantee Obligations**. In any action or proceeding involving any state corporate limited partnership or limited liability company law, or any applicable state, provincial, federal or foreign bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of any Guarantor under Section 7.01 would otherwise be held or determined to be void, voidable, invalid or unenforceable, or subordinated to the claims of any other creditors, on account of the amount of its liability under Section 7.01, then, notwithstanding any other provision to the contrary, the amount of such liability shall, without any further action by such Guarantor, any Loan Party or any other person, be automatically limited and reduced to the highest amount (after giving effect to the right of contribution established in Section 7.10) that is valid

| LA\1978870.15||{00001116. }

and enforceable and not subordinated to the claims of other creditors as determined in such action or proceeding.

SECTION 7.09     [Intentionally Omitted].

SECTION 7.10     **Right of Contribution**.  Each Subsidiary Guarantor hereby agrees that to the extent that a Subsidiary Guarantor shall have paid more than its proportionate share of any payment made hereunder, such Subsidiary Guarantor shall be entitled to seek and receive contribution from and against any other Subsidiary Guarantor hereunder which has not paid its proportionate share of such payment.  Each Subsidiary Guarantor's right of contribution shall be subject to the terms and conditions of <u>Section 7.04</u>.  The provisions of this <u>Section 7.10</u> shall in no respect limit the obligations and liabilities of any Subsidiary Guarantor to the Administrative Agent the Lenders, and each Subsidiary Guarantor shall remain liable to the Administrative Agent and the Lenders for the full amount guaranteed by such Subsidiary Guarantor hereunder.

## EVENTS OF DEFAULT

SECTION 8.01     **Events of Default**.  Notwithstanding the provisions of Section 362 of the Bankruptcy Code and without notice, application or motion to, hearing before, or order of the Bankruptcy Court or the Canadian Court or any notice to any Loan Party, the occurrence of any one or more of the following events (regardless of the reason therefor) shall constitute an "**Event of Default**" hereunder:

(a)     default shall be made in the payment of any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment (whether voluntary or mandatory) thereof or by acceleration thereof or otherwise;

(b)     default shall be made in the payment of any interest on any Loan or any Fee or any other amount (other than an amount referred to in paragraph (a) above) due under any Loan Document, when and as the same shall become due and payable;

(c)     any representation or warranty made or deemed made in or in connection with any Loan Document or the borrowings hereunder, or any representation, warranty, statement or information contained in any report, certificate, financial statement or other instrument furnished in connection with or pursuant to any Loan Document, shall prove to have been false or misleading in any material respect when so made, deemed made or furnished;

(d)     default shall be made in the due observance or performance by any Company of any covenant, condition or agreement contained in <u>Section 5.01</u>, <u>5.02</u>, <u>5.03(a)</u>, <u>5.07(b)</u>, <u>5.07(c)</u>, <u>5.08</u>, <u>5.17</u>, or <u>5.18</u>, or in <u>Article VI</u>;

(e)     default shall be made in the due observance or performance by any Company of any covenant, condition or agreement contained in any Loan Document (other than those specified in paragraphs (a), (b) or (d) immediately above) and such default shall continue unremedied or shall not be waived for a period of 30 days after written notice thereof from the Administrative Agent or any Lender to Borrowers;

(f)     except for defaults occasioned by the filing of the Chapter 11 Cases and the CCAA Case and defaults resulting from obligations with respect to which the Bankruptcy Code and

similar Canadian legislation and the CCAA Initial Order prohibit any Loan Party from complying or permit any Loan Party not to comply, any Company shall (i) fail to pay any principal or interest, regardless of amount, due in respect of any Indebtedness (other than the Obligations), when and as the same shall become due and payable beyond any applicable grace period, or (ii) fail to observe or perform any other term, covenant, condition or agreement contained in any agreement or instrument evidencing or governing any such Indebtedness if the effect of any failure referred to in this clause (ii) is to cause, or to permit the holder or holders of such Indebtedness or a trustee or other representative on its or their behalf (with or without the giving of notice, the lapse of time or both) to cause, such Indebtedness to become due prior to its stated maturity or become subject to a mandatory offer purchase by the obligor; *provided* that it shall not constitute an Event of Default pursuant to this paragraph (f) unless the aggregate amount of all such Indebtedness referred to in clauses (i) and (ii) exceeds the Dollar Equivalent of $500,000 at any one time (*provided* that, in the case of Hedging Obligations, the amount counted for this purpose shall be the amount payable by all Companies if such Hedging Obligations were terminated at such time);

(g)    [Intentionally Omitted];

(h)    in respect of any Canadian Pension Plan, the existence of any circumstances that would result, or be reasonably anticipated to result, in the declaration of a partial or full termination of and Canadian Pension Plan under applicable Requirements of Law which could result in any Loan Party being required to make a contribution to or in respect of a Canadian Pension Plan that has, or that may have, a Material Adverse Effect, or any Loan Party fails to make a required contribution to or payment under any Canadian Pension Plan when due;

(i)    one or more judgments, orders or decrees for the payment of money in an aggregate amount in excess of the Dollar Equivalent of $500,000 shall be rendered against any Company or any combination thereof and the same shall remain undischarged, unvacated or unbonded for a period of 30 consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to levy upon properties of any Company to enforce any such judgment;

(j)    except as set forth in <u>Schedule 3.17</u> (solely to the extent the liability resulting therefrom does not exceed the Dollar Equivalent of the "projected liability" set forth with respect thereto on <u>Schedule 3.17</u>), one or more ERISA Events or noncompliance with respect to Foreign Plans shall have occurred that, in the opinion of the Required Lenders, when taken together with all other such ERISA Events (other than those ERISA Events set forth in <u>Schedule 3.17</u> solely to the extent the liability resulting therefrom does not exceed the Dollar Equivalent of the "projected liability" set forth with respect thereto on <u>Schedule 3.17</u>) and noncompliance with respect to Foreign Plans that have occurred, could reasonably be expected to result in liability of any Company and its ERISA Affiliates in an aggregate amount exceeding $500,000 or in the imposition of a Lien exceeding $500,000 in the aggregate on any properties of a Company;

(k)    any security interest and Lien purported to be created by any Security Document or pursuant to an Applicable Order shall cease to be in full force and effect, or shall cease to give the Collateral Agent, for the benefit of the Secured Parties, the Liens, rights, powers and privileges purported to be created and granted under such Security Document or the Applicable Order (including a perfected security interest in and Lien with the priority set forth in <u>Section 2.18</u> on all of the Collateral thereunder (except as otherwise expressly provided in such Security Document or the Applicable Order)) in favor of the Collateral Agent, or shall be asserted by any Borrower or any other Loan Party not to be a valid, perfected, and with the priority set forth in <u>Section 2.18</u> (except as otherwise expressly provided in this

Agreement, such Security Document or the Applicable Order) security interest in or Lien on the Collateral covered thereby;

(l)      (A) the Liens securing the Prepetition Obligations cease to be subordinated to the Liens securing the Secured Obligations in the manner contemplated by the Applicable Order or (B) the Liens securing the Prepetition Second Lien Obligations cease to be subordinated to the Liens securing the Prepetition First Lien Obligations in the manner contemplated by the Intercreditor Agreement;

(m)      any Loan Document or any material provisions thereof shall at any time and for any reason be declared by a court of competent jurisdiction to be null and void, or a proceeding shall be commenced by any Loan Party or any other person, or by any Governmental Authority, seeking to establish the invalidity or unenforceability thereof (exclusive of questions of interpretation of any provision thereof), or any Loan Party shall repudiate or deny any portion of its liability or obligation for the Obligations;

(n)      there shall have occurred a Change in Control;

(o)      [Intentionally Omitted]; or

(p)      the occurrence of any of the following in any Chapter 11 Case or the CCAA Case:

(i)      the bringing of a motion by any Loan Party, the issuance and entry of an order or ruling or any other action or actions (which has not been withdrawn, dismissed or reversed): (w) to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code or similar legislation in Canada not otherwise permitted pursuant to this Agreement (unless such financing is proposed to refinance and pay in cash in full the Obligations due under this Agreement and the Prepetition First Lien Obligations (or, in the case of the Prepetition First Lien Obligations, otherwise convert all such First Lien Obligations into either Indebtedness or Equity Interests, in either case, pursuant to a plan of reorganization, arrangement or compromise consented to by the Administrative Agent, the Joint Lead Arrangers and the Required Lenders); (x) to grant any Lien other than Permitted Liens, the Carve-Out and the Administration Charge upon or affecting any Collateral without the prior written consent of the Administrative Agent and the Required Lenders (unless the granting of such a Lien is simultaneous with a refinancing to pay in full in cash all Obligations due under this Agreement and the Prepetition First Lien Obligations (or, in the case of the Prepetition First Lien Obligations, otherwise to convert all such First Lien Obligations into either Indebtedness or Equity Interests, in either case, pursuant to a plan of reorganization, arrangement or compromise consented to by the Administrative Agent, the Joint Lead Arrangers and the Required Lenders); (y) except as provided in the Applicable Order, to use cash collateral of Agents or Prepetition First Lien Agents under Section 363(c) of the Bankruptcy Code or provision of similar effect pursuant to an order of the Canadian Court without the prior written consent of the Administrative Agent and the Required Lenders; or (z) adverse to Agents, Lenders, Prepetition First Lien Agents, Prepetition First Lien Lenders or their rights and remedies hereunder or under the First Lien Loan Documents or their interest in the Collateral or the Prepetition First Lien Collateral commenced or supported by the Loan Parties;

(ii)      the filing of any plan of reorganization, arrangement or compromise or disclosure statement attendant thereto, or any direct or indirect amendment to such plan or disclosure statement, by any Loan Party (a) which plan does not propose to provide for the payment in full

| LA\1978870.15||{00001116. }

in cash of all Obligations under this Agreement and the Prepetition First Lien Obligations (or, in the case of the Prepetition First Lien Obligations, the conversion all such First Lien Obligations into either Indebtedness or Equity Interests, in either case, consented to by the Administrative Agent, the Joint Lead Arrangers and the Required Lenders) on the effective date thereof, or (b) if such plan does not propose payment in full in cash of all Obligations under this Agreement the Prepetition First Lien Obligations (or, in the case of the Prepetition First Lien Obligations, the conversion all such First Lien Obligations into either Indebtedness or Equity Interests, in either case, consented to by the Administrative Agent, the Joint Lead Arrangers and the Required Lenders) on the effective date thereof, to which the Administrative Agent and the Required Lenders do not consent or otherwise agree to the treatment of their claims;

(iii) the issuance and entry of an order in any Chapter 11 Case or the CCAA Case confirming a plan or plans of reorganization, arrangements or compromises that does not contain a provision for termination of the Commitment and repayment in full in cash of all of the Obligations under this Agreement and the Prepetition First Lien Obligations (or, in the case of the Prepetition First Lien Obligations, otherwise convert all such First Lien Obligations into either Indebtedness or Equity Interests, in either case, pursuant to a plan of reorganization, arrangement or compromise acceptable to the Administrative Agent, the Joint Lead Arrangers and the Required Lenders) on or before the effective date of such plan or plans or such plan;

(iv) the issuance and entry of an order amending, supplementing, staying, vacating or otherwise modifying the Loan Documents, the Interim Order, the CCAA Initial Order or the Final Order without the written consent of the Administrative Agent, the Joint Lead Arrangers (solely to the extent reasonably available and in attendance in person (or through counsel) at the hearing with respect to any such modifications) and the Required Lenders;

(v) the Interim Order is not issued and entered on or before the date that is 5 days after the Petition Date or the Final Order is not issued and entered on or before the date that is 30 days after the date the Interim Order is entered, or prior to or immediately following the expiration of the Interim Order and the CCAA Initial Order;

(vi) the payment by a Loan Party of, or application by any Loan Party for authority to pay by a Loan Party, any Prepetition claim without the Administrative Agent's and the Required Lenders' prior written consent unless such payment is otherwise permitted under this Agreement or provided pursuant to the "first day" orders and specifically provided for in the Approved Budget;

(vii) the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against any Agent any Lender or any of the Collateral or against any Prepetition First Lien Agents, any Prepetition First Lien Lender or any Collateral (as defined in the Prepetition Credit Agreement);

(viii) the appointment of an interim or permanent trustee in any Chapter 11 Case or the appointment of a receiver or an examiner in any Chapter 11 Case with expanded powers to operate or manage the financial affairs, the business, or reorganization of such Loan Party (or any Loan Party seeks or acquiesces in such relief);

(ix) the Canadian Loan Parties are declared bankrupt or a proceeding is taken to have a receiver, interim receiver, receiver and manager, agent, liquidator or other like Person appointed

-115-

over all or any material portion of their property and assets or, except for the Monitor in the CCAA Case, any such appointment is made or any creditor takes possession of all or a material portion of such property and assets or otherwise enforces any of its rights against the Canadian Loan Parties;

(x)   the sale without the Administrative Agent's and the Required Lenders' consent, of all or substantially all of the assets of the Loan Parties through a sale under Section 363 of the Bankruptcy Code or a similar sale pursuant to an order of the Canadian Court , through a confirmed plan of reorganization, arrangement or compromise in the Chapter 11 Case or the CCAA Case, or otherwise that does not provide for payment in full in cash of the Obligations and termination of Lenders' Commitment (or any Loan Party seeks or acquiesces in such relief);

(xi)  the dismissal of any Chapter 11 Case, or the conversion of any Chapter 11 Case from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code (except as consented to by the Administrative Agent and the Required Lenders) or any Loan Party shall file a motion or other pleading seeking the dismissal of any Chapter 11 Case under Section 1112 of the Bankruptcy Code conversion of any Chapter 11 Case or otherwise;

(xii) the dismissal of the CCAA Case or a conversion of the CCAA Case to a liquidation proceeding or receivership under the BIA, the WURA or otherwise (except as consented to by the Administrative Agent, the Joint Lead Arrangers and the Required Lenders);

(xiii)      the issuance and entry of an order by the Bankruptcy Court or the Canadian Court granting relief from or modifying any stay, including the automatic stay of Section 362 of the Bankruptcy Code, (x) to allow any creditor to execute upon or enforce a Lien on any Collateral having a value in excess of $500,000 in the aggregate, or (y) with respect to any Lien of or the granting of any Lien on any Collateral to any state or local environmental or regulatory agency or authority, which in either case would have a Material Adverse Effect;

(xiv) the commencement of a suit or action against any Agent or any Lender and, as to any suit or action brought by any Person other than a Loan Party or a Subsidiary, officer or employee of a Loan Party, the continuation thereof without being dismissed, enjoined or stayed for 35 days after service thereof on such Agent or such Lender, that asserts or seeks by or on behalf of the Borrowers, the Environmental Protection Agency, any state environmental protection or health and safety Governmental Authority, any official committee in the Chapter 11 Cases or any other party in interest in the Chapter 11 Cases or the CCAA Case, (a) unless waived by the Administrative Agent and the Required Lenders in their sole discretion, a claim against any Agent and/or any Lender, in their capacity as such, (b) unless waived by the applicable Joint Lead Arranger (solely to the extent reasonably available and in attendance in person (or through counsel) at the hearing with respect to any such waiver) in its sole discretion, a claim against any Joint Lead Arranger in its capacity as such, (c) unless waived by the Administrative Agent, the Joint Lead Arrangers (solely to the extent reasonably available and in attendance in person (or through counsel) at the hearing with respect to any such waiver) and the Required Lenders in their sole discretion, any legal or equitable remedy that would have the effect of subordinating any or all of the Obligations or Liens of the Administrative Agent or any Lender under the Loan Documents or the Prepetition First Lien Obligations to any other claim, (d) unless waived by the Administrative Agent and the Required Lenders in their sole discretion, a claim that would otherwise have a Material Adverse Effect on the business, assets, operations or condition (financial or otherwise) of Holding LP1 and its Subsidiaries, taken as a whole, or (e) unless

| LA\1978870.15||{00001116. }

waived by the Administrative Agent and the Required Lenders in their sole discretion, a claim that would have a Material Adverse Effect on the rights and remedies of any Agent or any Lender under any Loan Document, the Prepetition First Lien Loan Documents, or the collectability of all or any portion of the Obligations;

(xv) the issuance and entry of an order in any Chapter 11 Case or the CCAA Case avoiding or requiring repayment of any portion of the payments made on account of the Obligations owing under this Agreement, the other Loan Documents or the Prepetition First Lien Loan Documents;

(xvi) the failure of any Loan Party to perform any of its obligations under the Interim Order, the CCAA Initial Order or the Final Order;

(xvii) except as otherwise provided by the Applicable Order, the issuance and entry of an order in any Chapter 11 Case or the CCAA Case granting any other super priority administrative claim or Lien equal or superior to that granted to Administrative Agent, on behalf of itself and/or the Secured Parties;

(xviii) any motion or application is filed by, on behalf of, or supported by any Loan Party seeking the issuance and entry of an order, or an order is issued and entered in any of the Chapter 11 Cases or the CCAA Case, approving any subsequent debtor-in-possession facility for borrowed money or other extensions of credit unless such subsequent facility and such order expressly provide for the indefeasible payment and complete satisfaction in full in cash to the Administrative Agent of all Secured Obligations (and termination of all Commitments) hereunder and all Prepetition First Lien Obligations (or, in the case of the Prepetition First Lien Obligations, otherwise provides for conversion of all such First Lien Obligations into either Indebtedness or Equity Interests, in either case, pursuant to a plan of reorganization, arrangement or compromise consented to by the Administrative Agent, the Joint Lead Arrangers and the Required Lenders) prior to, or concurrently with, any initial borrowings or other extensions of credit under such subsequent facility;

(xix) any motion or pleading is filed by any of the Loan Parties seeking to grant, or the issuance and entry of any order granting, to any party, (x) any Lien senior or equal to the Liens described in the Applicable Order, the Loan Documents or the Prepetition First Lien Loan Documents that are held by any of the Agents, Lenders, Prepetition First Lien Agents or Prepetition First Lien Lenders in the Collateral (subject to the Exceptions), or (y) any claim or expense senior or equal to the claims and expenses described in the Applicable Order, the Loan Documents or the Prepetition First Lien Loan Documents that are held by any of the Agents, Lenders, Prepetition First Lien Agents or Prepetition First Lien Lenders (subject to the Exceptions) against any of the Loan Parties (in each case, except to the extent such motion or pleading contemplates the satisfaction in full in cash of all Secured Obligations (and termination of all Commitments) hereunder and all Prepetition First Lien Obligations (or, in the case of the Prepetition First Lien Obligations, otherwise provides for conversion of all such First Lien Obligations into either Indebtedness or Equity Interests, in either case, pursuant to a plan of reorganization, arrangement or compromise consented to by the Administrative Agent, the Joint Lead Arrangers and the Required Lenders));

(xx) termination of the exclusive period for Loan Parties to file a plan of reorganization in the Chapter 11 Case;

(xxi) any of the Loan Parties' return of goods constituting Collateral pursuant to Section 546(g) of the Bankruptcy Code other than in accordance with any such program (a) approved pursuant to a First Day Order, or (b) otherwise approved by the Bankruptcy Court and consented to by the Administrative Agent and the Required Lenders in writing; or

(xxii) any holder of any security interest, mortgage, charge, claim or Lien of any kind enforces against or becomes entitled to enforce against or otherwise takes possession, management or control of all or any party of a Loan Parties' property, assets or undertaking.

then, and in any such event, so long as any such Event of Default shall be continuing, (subject, in the case of <u>clauses (iv)</u> – <u>(vi)</u> below, solely to any requirement for the giving of notice by the terms of the Applicable Order (provided that no such notice shall be required for the purpose of freezing or blocking any deposit or securities accounts which are Collateral)), the CCAA Initial Order shall provide that the stay of proceedings granted by the Canadian Court in the CCAA Initial Order shall be lifted without further action or order of the Canadian Court and the Administrative Agent, the Collateral Agent, and the Lenders shall be entitled to exercise all of their respective rights and remedies under the Loan Documents and the Administrative Agent may, or upon the request of the Required Lenders, the Administrative Agent shall, notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from the Bankruptcy Court or the Canadian Court:

(i) declare the Commitment to be forthwith terminated, in whole or in part, whereupon the Commitments shall immediately terminate;

(ii) increase the rate of interest applicable to the Loans then outstanding to the interest rate specified in <u>Section 2.06(e)</u>;

(iii) declare all or a portion of the Loans hereunder (with accrued interest thereon) and all other amounts owing under this Agreement and the Notes (if any) to be due and payable forthwith, whereupon the same shall immediately become due and payable and the interest thereon shall be increased to the interest rate specified in <u>Section 2.06(e)</u>;

(iv) direct any or all of the Loan Parties to sell or otherwise dispose of any or all of the Collateral on terms and conditions reasonably acceptable to the Administrative Agent and the Required Lenders pursuant to Sections 363, 365 and other applicable provisions of the Bankruptcy Code and a sale with similar effect in Canada (and, without limiting the foregoing, direct any Loan Party to assume and assign any lease or executory contract included in the Collateral to Administrative Agent's designees in accordance with and subject to Section 365 of the Bankruptcy Code);

(v) enter onto the premises of any Loan Party in connection with an orderly liquidation of the Collateral; or

(vi) exercise any rights and remedies provided to such Agent under the Loan Documents or at law or equity, including all remedies provided under the Bankruptcy Code and similar Canadian legislation and, pursuant to the Interim Order, the CCAA Initial Order and the Final Order, the stay, including the automatic stay of Section 362 of the Bankruptcy Code, shall be modified and vacated to permit Agents and Lenders to exercise their remedies under this

-118-

Agreement and the Loan Documents, without further notice, application or motion to, hearing before, or order from, the Bankruptcy Court and the Canadian Court.

Upon the occurrence and during the continuance of an Event of Default and the exercise by Agents, on behalf of the Lenders, of their rights and remedies under this Agreement and the other Loan Documents, the Borrowers shall assist the Agents and Lenders in effecting a sale or other disposition of the Collateral upon such terms as are acceptable to the Administrative Agent and the Required Lenders.

      **SECTION 8.02**    <u>**Rescission**</u>.  If at any time after termination of the Commitments or acceleration of the maturity of the Loans, Borrowers shall pay all arrears of interest and all payments on account of principal of the Loans owing by them that shall have become due otherwise than by acceleration (with interest on principal and, to the extent permitted by law, on overdue interest, at the rates specified herein) and all Defaults (other than non-payment of principal of and accrued interest on the Loans due and payable solely by virtue of acceleration) shall be remedied or waived pursuant to <u>Section 10.02</u>, then upon the written consent of the Required Lenders and written notice to Borrowers, the termination of the Commitments or the acceleration and their consequences may be rescinded and annulled; but such action shall not affect any subsequent Default or impair any right or remedy consequent thereon.  The provisions of the preceding sentence are intended merely to bind the Lenders to a decision that may be made at the election of the Required Lenders, and such provisions are not intended to benefit Borrowers and do not give Borrowers the right to require the Lenders to rescind or annul any acceleration hereunder, even if the conditions set forth herein are met.

      **SECTION 8.03**    <u>**Application of Proceeds**</u>.  The proceeds received by the Collateral Agent in respect of any sale of, collection from or other realization upon all or any part of the Collateral pursuant to the exercise by the Collateral Agent of its remedies shall be applied, in full or in part, together with any other sums then held by the Collateral Agent pursuant to this Agreement, promptly by the Collateral Agent as follows:

      (a)    As to Collateral of the US Loan Parties:

      (i)  *First*, to the payment of all reasonable costs and expenses, fees, commissions and taxes of such sale, collection or other realization including compensation to the Collateral Agent and its agents and counsel, and all expenses, liabilities and advances made or incurred by the Collateral Agent in connection therewith and all amounts for which the Collateral Agent is entitled to indemnification pursuant to the provisions of any Loan Document, together with interest on each such amount at the highest rate then in effect under this Agreement from and after the date such amount is due, owing or unpaid until paid in full;

      (ii)  *Second*, to the payment of all other reasonable costs and expenses of such sale, collection or other realization including compensation to the other Secured Parties and their agents and counsel and all costs, liabilities and advances made or incurred by the other Secured Parties in connection therewith, together with interest on each such amount at the highest rate then in effect under this Agreement from and after the date such amount is due, owing or unpaid until paid in full;

      (iii)  *Third*, without duplication of amounts applied pursuant to clauses (i) and (ii) above, to the indefeasible payment in full in cash, *pro rata*, of interest and other amounts constituting Obligations (other than principal);

(iv) *Fourth*, to the indefeasible payment in full in cash, *pro rata*, of principal amount of the Obligations and any premium thereon; and

(v) *Fifth*, the balance, if any, to the person lawfully entitled thereto (including the applicable Loan Party or its successors or assigns) or as a court of competent jurisdiction may direct.

(b)     As to Collateral of the Canadian Loan Parties:

(i) *First*, to the payment of amounts secured by the Administration Charge;

(ii) *Second*, to the payment of all reasonable costs and expenses, fees, commissions and taxes of such sale, collection or other realization including compensation to the Collateral Agent and its agents and counsel, and all expenses, liabilities and advances made or incurred by the Collateral Agent in connection therewith and all amounts for which the Collateral Agent is entitled to indemnification pursuant to the provisions of any Loan Document, together with interest on each such amount at the highest rate then in effect under this Agreement from and after the date such amount is due, owing or unpaid until paid in full;

(iii) *Third*, to the payment of all other reasonable costs and expenses of such sale, collection or other realization including compensation to the other Secured Parties and their agents and counsel and all costs, liabilities and advances made or incurred by the other Secured Parties in connection therewith, together with interest on each such amount at the highest rate then in effect under this Agreement from and after the date such amount is due, owing or unpaid until paid in full;

(iv) *Fourth*, without duplication of amounts applied pursuant to clauses (ii) and (iii) above, to the indefeasible payment in full in cash, pro rata, of interest and other amounts constituting Obligations (other than principal);

(v) *Fifth*, to the indefeasible payment in full in cash, pro rata, of principal amount of the Obligations and any premium thereon;

(vi) *Sixth*, to the payment of amounts secured by the Directors' Charge; and

(vii) *Seventh*, the balance, if any, to the person lawfully entitled thereto (including the applicable Loan Party or its successors or assigns) or as a court of competent jurisdiction may direct.

In the event that any such proceeds are insufficient to pay in full the items described in this Section 8.03, the Loan Parties shall remain liable, jointly and severally, for any deficiency.

## ARTICLE IX

## THE ADMINISTRATIVE AGENT AND THE COLLATERAL AGENT

**SECTION 9.01     Appointment and Authority**. Each of the Lenders hereby irrevocably appoints UBS AG, Stamford Branch, to act on its behalf as the Administrative Agent and the Collateral Agent hereunder and under the other Loan Documents and authorizes such Agents to take such actions on its behalf and to exercise such powers as are delegated to such Agents by the terms hereof or

-120-

thereof, together with such actions and powers as are reasonably incidental thereto. Without limiting the foregoing, each Lender hereby (i) authorizes the Agent to consent, on behalf of each Lender in such capacity, to an Interim Order substantially in the form attached as <u>Exhibit C</u> hereto and a Final Order to be negotiated between the Loan Parties, the Administrative Agent and the Committee and (ii) acknowledges that certain Canadian Mortgages may be held by UBS AG, Stamford Branch in the name of UBS AG Canada Branch. The Loan Parties acknowledge that certain Canadian Mortgages may be held by UBS AG, Stamford Branch in the name of UBS AG Canada Branch. The provisions of this Article are solely for the benefit of the Administrative Agent, the Collateral Agent, the Lenders, and neither Borrowers nor any other Loan Party shall have rights as a third party beneficiary of any of such provisions. Notwithstanding anything else contained herein, Administrative Agent or Collateral Agent may assign any of its rights and obligations as an Agent hereunder to any of its Affiliates without the consent of any other party to any Loan Document. In addition to the foregoing, the Collateral Agent (including its successors and permitted assigns) is hereby irrevocably appointed as the person holding the power of attorney (*fondè de pouvoir*) of the holder(s) of the Debenture (as hereinafter defined) as contemplated under Article 2692 of the Civil Code of Quebec in connection with any deed of hypothec (**"Deed of Hypothec"**) to which the Canadian Borrower is or may become a party under the laws of the Province of Quebec for the purposes of providing for the issuance of debentures (collectively, the **"Debenture"**) secured by a hypothec Canadian Borrower's Collateral with the authority to exercise such powers and duties which are conferred upon Collateral Agent, as *fondè de pouvoir* under such Deed of Hypothec. The appointment of the Collateral Agent as *fondè de pouvoir* under any Deed of Hypothec executed by the Canadian Borrower prior to the date of this Agreement is hereby ratified and approved. The Collateral Agent (including its successors and permitted assigns) is further irrevocably appointed as agent, mandatary, custodian and depositary for and on behalf of each of the Secured Parties (i) to hold and to be the sole registered holder of any Debenture that may be issued under any such Deed of Hypothec, the whole notwithstanding Section 32 of the *Act respecting the special powers of legal persons* (Quebec) or any other applicable law, and (ii) to enter into on behalf of the Secured Parties, and for their benefit, a Debenture Pledge Agreement (**"Pledge"**) to which Canadian Borrower is or may become a party under the laws of the Province of Quebec evidencing the pledge of the Debenture as security for the payment and performance of the Canadian Obligations. In this respect, (a) Collateral Agent, as agent, mandatary, custodian and depositary of the Secured Parties, shall keep a record indicating the names and addresses of, and the pro rata portion of the obligations and indebtedness secured by any such Pledge, owing to the persons for and on behalf of whom the Debenture is so held from time to time, and (b) each of the Secured Parties will be entitled to the benefits of any Collateral of Canadian Borrower charged under any such Deed of Hypothec and any such Pledge and will participate in the proceeds of realization of any such Collateral, the whole in accordance with the terms hereof. Collateral Agent, in such aforesaid capacities shall (x) have the sole and exclusive right and authority to exercise, except as may be otherwise specifically restricted by the terms hereof, all rights and remedies given to Collateral Agent with respect to the Collateral under any such Deed of Hypothec and Pledge, applicable law or otherwise, and (y) benefit from and be subject to all provisions hereof with respect to Collateral Agent *mutatis mutandis*, including, without limitation, all such provisions with respect to the liability or responsibility to and indemnification by the Secured Parties. Any person who is or becomes a Secured Party shall be deemed to have consented to and confirmed Collateral Agent as the person holding the power of attorney (*fondè de pouvoir*) and as the agent, mandatary, custodian and depositary as aforesaid and to have ratified, as of the date it becomes a Secured Party, all actions taken by Collateral Agent in such capacities. Collateral Agent shall be entitled to delegate from time to time any of its powers or duties under any such Deed of Hypothec and any such Pledge to any person and on such terms and conditions as Collateral Agent may determine from time to time. Neither of the Joint Lead Arrangers shall have any duties hereunder.

**SECTION 9.02     Rights as a Lender**.  Each person serving as an Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include each person serving as an Agent hereunder in its individual capacity.  Such person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with Holding LP1 or any Subsidiary or other Affiliate thereof as if such person were not an Agent hereunder and without any duty to account therefor to the Lenders.

**SECTION 9.03     Exculpatory Provisions**.  No Agent shall have any duties or obligations except those expressly set forth herein and in the other Loan Documents.  Without limiting the generality of the foregoing, no Agent:

> (i)     shall be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

> (ii)     shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that such Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); *provided* that such Agent shall not be required to take any action that, in its judgment or the judgment of its counsel, may expose such Agent to liability or that is contrary to any Loan Document, applicable Requirements of Law or the Applicable Order; and

> (iii)     shall, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to any Borrower or any of its Affiliates that is communicated to or obtained by the person serving as such Agent or any of its Affiliates in any capacity.

No Agent shall be liable for any action taken or not taken by it (x) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as such Agent shall believe in good faith shall be necessary, under the circumstances as provided in Section 10.02) or (y) in the absence of its own gross negligence or willful misconduct.  No Agent shall be deemed to have knowledge of any Default unless and until notice describing such Default is given to such Agent by Borrowers, a Lender.

No Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document or (v) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to such Agent.  Without limiting the generality of the foregoing, the use of the term "agent" in this Agreement with reference to the Administrative Agent or the Collateral Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any

applicable law.  Instead, such term us used merely as a matter of market custom and is intended to create or reflect only an administrative relationship between independent contracting parties.

**SECTION 9.04    Reliance by Agent**.  Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper person.  Each Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan.  Each Agent may consult with legal counsel (who may be counsel for Borrowers), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

**SECTION 9.05    Delegation of Duties**.  Each Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through, or delegate any and all such rights and powers to, any one or more sub-agents appointed by such Agent, including a sub-agent which is a non-US affiliate of such Agent.  Each Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.  The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of each Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Agent.

**SECTION 9.06    Resignation of Agent**.  Each Agent may at any time give notice of its resignation to the Lenders and Borrowers.  Upon receipt of any such notice of resignation, the Required Lenders shall have the right, in consultation with Borrowers, to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation, then the retiring Agent may on behalf of the Lenders, appoint a successor Agent meeting the qualifications set forth above provided that if the Agent shall notify Borrowers and the Lenders that no qualifying person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (1) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Collateral Agent on behalf of the Lenders under any of the Loan Documents, the retiring Collateral Agent shall continue to hold such collateral security as nominee until such time as a successor Collateral Agent is appointed) and (2) all payments, communications and determinations provided to be made by, to or through an Agent shall instead be made by or to each Lender directly, until such time as the Required Lenders appoint a successor Agent as provided for above in this paragraph.  Upon the acceptance of a successor's appointment as Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this paragraph).  The fees payable by any Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between such Borrower and such successor.  After the retiring Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article IX and Section 10.03 shall continue in effect for the

-123-

benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as Agent.

SECTION 9.07     Non-Reliance on Agent and Other Lenders.  Each Lender acknowledges that it has, independently and without reliance upon any Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender further represents and warrants that it has reviewed each document made available to it on the Platform in connection with this Agreement and has acknowledged and accepted the terms and conditions applicable to the recipients thereof.  Each Lender also acknowledges that it will, independently and without reliance upon any Agent or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

SECTION 9.08     No Other Duties, etc.  Anything herein to the contrary notwithstanding, none of the Joint Lead Arrangers, Syndication Agent or any other entity listed on the cover page hereof shall have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity, as applicable, as the Administrative Agent, the Collateral Agent or a Lender hereunder.

SECTION 9.09     Actions in Concert.  Anything in this Agreement to the contrary notwithstanding (but subject to Section 9.10), each Lender hereby agrees with each other Lender that no Lender shall take any action to protect or enforce its rights arising out of this Agreement or the Notes (including exercising any rights of setoff) without first obtaining the prior written consent of Agents and the Required Lenders, it being the intent of Lenders that any such action to protect or enforce rights under this Agreement and the Notes shall be taken in concert and at the direction or with the consent of Agents or the Required Lenders and as provided in Section 8.01.

SECTION 9.10     Enforcement.  Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent (or the Collateral Agent upon the instruction of the Administrative Agent), or as the Required Lenders may require or otherwise direct the Administrative Agent, for the benefit of all the Lenders; provided, however, that the foregoing shall not prohibit (a) the Administrative Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Administrative Agent) hereunder and under the other Loan Documents, (b) any Lender from exercising setoff rights in accordance with, and subject to, the terms of this Agreement, or (c) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party under any bankruptcy or insolvency law.

SECTION 9.11     Borrowing Base Certificates.  All calculations of Borrowing Availability in any Borrowing Base Certificate shall originally be made by Borrowers and certified by a Responsible Officer, provided that Administrative Agent may from time to time review and adjust any such calculation (a) to reflect its reasonable estimate of declines in value of any Collateral, due to collections received in the Collection Accounts or otherwise; (b) to adjust advance rates to reflect changes in dilution, quality, mix and other factors affecting Collateral (a determination to be made by Administrative Agent in its Permitted Discretion); and/or (c) to the extent the calculation is not made in accordance with this Agreement or does not accurately reflect any Reserve.

-124-

## ARTICLE X

## MISCELLANEOUS

**SECTION 10.01    Notices**.

(a)    Generally.  Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in paragraph (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier as follows:

(i)    if to any Loan Party, to Canadian Borrower at:

Arclin Canada Ltd.
5865 McLaughlin Road, Unit 3
Mississauga, ON, L5R 1B8
Canada
Attention:  Chief Financial Officer
Telecopier No.:  905.712.0900
Email: scott.maynard@arclin.com

with a copy to:

Dechert LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
USA
Attention:  Sarah B. Gelb, Esq.
             Geraldine A. Sinatra, Esq
Telecopier No.:  215.994.2222
Email: sarah.gelb@dechert.com
             geraldine.sinatra@dechert.com

(ii)    if to the Administrative Agent or the Collateral Agent, to it at:

UBS AG, Stamford Branch
677 Washington Boulevard
Stamford, Connecticut  06901
Attention:  Marouan Grissa
Telecopier No.:  (203) 719-3180
Email:  Marouan.Grissa@ubs.com

(iii)    if to the Joint Lead Arrangers, to:

UBS Securities LLC

c/o UBS AG, Stamford Branch
677 Washington Boulevard
Stamford, Connecticut 06901
Attention: Marouan Grissa
Telecopier No.: (203) 719-3180
Email: Marouan.Grissa@ubs.com

and

Black Diamond Commercial Finance, L.L.C.
100 Field Drive
Lake Forest, IL 60045-2580
Attention: Hugo H. Gravenhorst
Telecopier No.: (847) 615-9064
Email: hgravenhorst@bdcf.com

(iv) if to a Lender, to it at its address (or telecopier number) set forth in its Administrative Questionnaire;

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient). Notices delivered through electronic communications to the extent provided in paragraph (b) below, shall be effective as provided in said paragraph (b).

(b) Electronic Communications. Notices and other communications to the Lenders hereunder may (subject to Section 10.01(d)) be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent; *provided* that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication. The Administrative Agent, the Collateral Agent or any Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it (including as set forth in Section 10.01(d)); *provided* that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement); *provided* that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)      <u>Change of Address, etc.</u> Any party hereto may change its address or telecopier number for notices and other communications hereunder by notice to the other parties hereto.

(d)      <u>Posting.</u> Each Loan Party hereby agrees that it will provide to the Administrative Agent all information, documents and other materials that it is obligated to furnish to the Administrative Agent pursuant to this Agreement and any other Loan Document, including all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding any such communication that (i) relates to a request for a new, or a conversion of an existing, Borrowing or other extension of credit (including any election of an interest rate or interest period relating thereto), (ii) relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefor, (iii) provides notice of any Default under this Agreement or (iv) is required to be delivered to satisfy any condition precedent to the effectiveness of this Agreement and/or any Borrowing or other extension of credit hereunder (all such non-excluded communications, collectively, the "**Communications**"), by transmitting the Communications in an electronic/soft medium in a format reasonably acceptable to the Administrative Agent at Syndtrak or at such other e-mail address(es) provided to Borrowers from time to time or in such other form, including hard copy delivery thereof, as the Administrative Agent shall require. In addition, each Loan Party agrees to continue to provide the Communications to the Administrative Agent in the manner specified in this Agreement or any other Loan Document or in such other form, including hard copy delivery thereof, as the Administrative Agent shall require. Nothing in this <u>Section 10.01</u> shall prejudice the right of the Agents, any Lender or any Loan Party to give any notice or other communication pursuant to this Agreement or any other Loan Document in any other manner specified in this Agreement or any other Loan Document or as any such Agent shall require.

To the extent consented to by the Administrative Agent in writing from time to time, Administrative Agent agrees that receipt of the Communications by the Administrative Agent at its e-mail address(es) set forth above shall constitute effective delivery of the Communications to the Administrative Agent for purposes of the Loan Documents; *provided* that Borrowers shall also deliver to the Administrative Agent an executed original of each Compliance Certificate required to be delivered hereunder.

Each Loan Party further agrees that Administrative Agent may make the Communications available to the Lenders by posting the Communications on Intralinks or a substantially similar electronic transmission system (the "**Platform**"). The Platform is provided "as is" and "as available." The Agents do not warrant the accuracy or completeness of the Communications, or the adequacy of the Platform and expressly disclaim liability for errors or omissions in the communications. No warranty of any kind, express, implied or statutory, including, without limitation, any warranty of merchantability, fitness for a particular purpose, non-infringement of third party rights or freedom from viruses or other code defects, is made by any Agent in connection with the Communications or the Platform. In no event shall the Administrative Agent or any of its Related Parties have any liability to the Loan Parties, any Lender or any other person for damages of any kind, including direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of any Loan Party's or the Administrative Agent's transmission of communications through the Internet, except to the extent the liability of such person is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted from such person's gross negligence or willful misconduct.

| LA\1978870.15||{00001116. }

### SECTION 10.02    Waivers; Amendment.

(a)    Generally.  No failure or delay by any Agent or any Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of each Agent and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of any Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by this Section 10.02, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether any Agent, any Lender may have had notice or knowledge of such Default at the time.  No notice or demand on any Borrower in any case shall entitle such Borrower to any other or further notice or demand in similar or other circumstances.

(b)    Required Consents.  Subject to Section 10.02(c) and (d), neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended, supplemented or modified except, in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by Borrowers and the Required Lenders or, in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Administrative Agent, the Collateral Agent (in the case of any Security Document) and the Loan Party or Loan Parties that are party thereto, in each case with the written consent of the Required Lenders; *provided* that no such agreement shall be effective if the effect thereof would:

(i)    increase the Commitment of any Lender without the written consent of such Lender (it being understood that no amendment, modification, termination, waiver or consent with respect to any condition precedent, covenant or Default shall constitute an increase in the Commitment of any Lender);

(ii)    reduce the principal amount of any Loan or reduce the rate of interest thereon (other than interest pursuant to Section 2.06(e)), or reduce any Fees payable hereunder, or change the form or currency of payment of any Obligation, without the written consent of each Lender directly affected thereby (it being understood that any amendment or modification to the financial definitions in this Agreement shall not constitute a reduction in the rate of interest for purposes of this clause (ii));

(iii)    (A) change the scheduled final maturity of any Loan (other than, for the avoidance of doubt, extensions made in accordance with Section 2.19 hereof), (B) change the amount of, waive or excuse any such payment (other than waiver of any increase in the interest rate pursuant to Section 2.06(e)), or (C) postpone the scheduled date of expiration of any Commitment beyond the Final Maturity Date, in any case, without the written consent of each Lender directly affected thereby;

(iv)    [Intentionally Omitted];

(v)    permit the assignment or delegation by any Borrower of any of its rights or obligations under any Loan Document, without the written consent of each Lender;

-128-

(vi)  release any Guarantor from its Guarantee (except as permitted hereunder or permitted pursuant to a waiver or consent to a transaction otherwise prohibited by this Agreement), or limit their liability in respect of such Guarantee, without the written consent of each Lender;

(vii) release all or a substantial portion of the Collateral from the Liens of the Security Documents or alter the relative priorities of the Secured Obligations entitled to the Liens of the Security Documents, in each case without the written consent of each Lender;

(viii)      change Section 2.14(b), (c) or (d) in a manner that would alter the *pro rata* sharing of payments or setoffs required thereby or any other provision in a manner that would alter the *pro rata* allocation among the Lenders of Loan disbursements, including the requirements of Section 2.02(a), without the written consent of each Lender directly affected thereby;

(ix)  change any provision of this Section 10.02, without the written consent of each Lender directly affected thereby;

(x)  change the percentage set forth in the definition of "Required Lenders", "Supermajority Lenders" or any other provision of any Loan Document (including this Section) specifying the number or percentage of Lenders required to waive, amend or modify any rights thereunder or make any determination or grant any consent thereunder, without the written consent of each Lender, other than to increase such percentage or number or to give any additional Lender or group of Lenders such right to waive, amend or modify or make any such determination or grant any such consent;

(xi)  [Intentionally Omitted];

(xii) [Intentionally Omitted];

(xiii)      change or waive any provision of Article X as the same applies to any Agent, or any other provision hereof as the same applies to the rights or obligations of any Agent, in each case without the written consent of such Agent;

(xiv)change or waive any provision of the Loan Documents as the same applies to any Joint Lead Arranger, or any other provision hereof as the same applies to the rights or obligations of any Joint Lead Arranger, in each case without the written consent of any Joint Lead Arranger so affected;

(xv) change the criteria set forth in Section 2.17 or increase the applicable advance rates which, in either case, has the effect of making more credit available without the written consent of the Administrative Agent, the Collateral Agent, the Joint Lead Arrangers and the Supermajority Lenders; or

(xvi)expressly change or waive any condition precedent in Section 4.02 to any Borrowing without the written consent of the Required Lenders;

*provided, further*, that

| LA\1978870.15|\|{00001116. }

(xvii)    any waiver, amendment or modification prior to the completion of the primary syndication of the Commitments and Loans (as determined by the Joint Lead Arrangers) may not be effected without the written consent of the Joint Lead Arrangers.

(c)    Collateral.  Subject to the Applicable Order, without the consent of any other person, the applicable Loan Party or Loan Parties and the Administrative Agent and/or Collateral Agent may (in its or their respective sole discretion, or shall, to the extent required by any Loan Document), enter into any amendment or waiver of any Loan Document, or enter into any new agreement or instrument, to effect the granting, perfection, protection, expansion or enhancement of any security interest in any Collateral or additional property to become Collateral for the benefit of the Secured Parties, or as required by local law to give effect to, or protect any security interest for the benefit of the Secured Parties, in any property or so that the security interests therein comply with applicable Requirements of Law.

(d)    Dissenting Lenders.  If, in connection with any proposed change, waiver, discharge or termination of the provisions of this Agreement as contemplated by Section 10.02(b), the consent of the Required Lenders is obtained but the consent of one or more of such other Lenders whose consent is required is not obtained, then Borrowers shall have the right to replace all, but not less than all, of such non-consenting Lender or Lenders (so long as all non-consenting Lenders are so replaced) with one or more persons pursuant to Section 2.16 so long as at the time of such replacement each such new Lender consents to the proposed change, waiver, discharge or termination. Each Lender agrees that, if any Borrower elects to replace such Lender in accordance with this Section, it shall promptly execute and deliver to the Administrative Agent an Assignment and Assumption to evidence such sale and purchase and shall deliver to the Administrative Agent any Note (if Notes have been issued in respect of such Lender's Loans) subject to such Assignment and Assumption; *provided* that the failure of any such non-consenting Lender to execute an Assignment and Assumption shall not render such sale and purchase (and the corresponding assignment) invalid and such assignment shall be recorded in the Register.

### SECTION 10.03    Expenses; Indemnity; Damage Waiver.

(a)    Costs and Expenses.  Borrowers shall pay (i) all reasonable out-of-pocket expenses incurred by the Administrative Agent, the Collateral Agent, the Joint Lead Arrangers and their respective Affiliates (including the reasonable fees, charges and disbursements of counsel and other Advisors for the Administrative Agent, the Collateral Agent and/or the Joint Lead Arrangers) in connection with (A) the syndication of the credit facilities provided for herein (including the obtaining and maintaining of CUSIP numbers for the Loans), (B) the preparation, negotiation, execution, delivery and administration of this Agreement and the other Loan Documents or any amendment, amendment and restatement, modification or waiver of the provisions hereof or thereof or any workouts or restructurings in respect hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), including in connection with post-closing searches to confirm that security filings and recordations have been properly made, (C) the obtaining of approval of the Loan Documents by the Bankruptcy Court and the Canadian Court and (D) the preparation and review of pleadings, documents and reports related to the Chapter 11 Cases and the CCAA Case and any subsequent case under Chapter 7 of the Bankruptcy Code or similar proceeding in Canada, attendance at meetings, court hearings or conferences related to the Chapter 11 Cases and CCAA Case and any subsequent case under Chapter 7 of the Bankruptcy Code or similar proceeding in Canada, and general monitoring of the Chapter 11 Cases and the CCAA Case and any subsequent case under Chapter 7 of the Bankruptcy Code or similar proceeding in Canada, (ii) all out-of-pocket expenses incurred by the Administrative Agent, the Collateral Agent, and the Joint Lead Arrangers (including the fees, charges and disbursements of any counsel and

-130-

other Advisors for the Administrative Agent, the Collateral Agent, or any Joint Lead Arranger), in connection with the enforcement or protection of its rights (A) in connection with this Agreement and the other Loan Documents, including its rights under this Section 10.03, or (B) in connection with the Loans made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans and (iii) all documentary and similar taxes and charges in respect of the Loan Documents.

      (b)    <u>Indemnification by Borrowers</u>. Borrowers shall, jointly and severally, indemnify the Administrative Agent (and any sub-agent thereof), the Collateral Agent (and any sub-agent thereof), each Joint Lead Arranger (and any sub-agent thereof) and each Lender, and each Related Party of any of the foregoing persons (each such person being called an "**Indemnitee**") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including the fees, charges and disbursements of any counsel for any Indemnitee) incurred by any Indemnitee or asserted against any Indemnitee by any third party or by any Borrower or any other Loan Party arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document, or any amendment, amendment and restatement, modification or waiver of the provisions hereof or thereof, or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, (ii) any Loan or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or Release or threatened Release of Hazardous Materials on, at, under or from any property owned, leased or operated by any Company at any time, or any Environmental Claim related in any way to any Company, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by any Borrower or any other Loan Party, and regardless of whether any Indemnitee is a party thereto; *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee or (y) result from a claim brought by such Borrower or any other Loan Party against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document, if any Borrower or such Loan Party has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction.

      (c)    <u>Reimbursement by Lenders</u>. To the extent that any Borrower for any reason fails to indefeasibly pay any amount required under paragraph (a) or (b) of this Section 10.03 to be paid by it to the Administrative Agent (or any sub-agent thereof), the Collateral Agent (or any sub-agent thereof), any Joint Lead Arranger (or any sub-agent thereof) or any Related Party of any of the foregoing, each Lender severally agrees to pay to the Administrative Agent (or any such sub-agent), the Collateral Agent (or any sub-agent thereof), such Joint Lead Arranger (or any sub-agent thereof) or such Related Party, as the case may be, such Lender's *pro rata* share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; *provided* that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such sub-agent), the Collateral Agent (or any sub-agent thereof), such Joint Lead Arranger (or any sub-agent thereof) or against any Related Party of any of the foregoing acting for the Administrative Agent (or any such sub-agent), the Collateral Agent (or any sub-agent thereof) or such Joint Lead Arranger (or any sub-agent thereof) in connection with such capacity. The obligations of the Lenders under this paragraph (c) are subject to the provisions of Section 2.14. For purposes hereof, a Lender's "*pro rata* share" shall be determined based upon its share of the sum of the total Exposure and unused Commitments at the time.

(d)     Waiver of Consequential Damages, Etc.  To the fullest extent permitted by applicable Requirements of Law, no Loan Party shall assert, and each Loan Party hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof.  No Indemnitee referred to in paragraph (b) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby.

(e)     Payments.  All amounts due under this Section shall be payable not later than 3 Business Days after demand therefor.

### SECTION 10.04     Successors and Assigns.

(a)     Successors and Assigns Generally.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Loan Party may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent, the Collateral Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Eligible Assignee in accordance with the provisions of paragraph (b) of this Section 10.04, (ii) by way of participation in accordance with the provisions of paragraph (d) of this Section 10.04 or (iii) by way of pledge or assignment of a security interest subject to the restrictions of paragraph (f) of this Section (and any other attempted assignment or transfer by any Borrower or any Lender shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in paragraph (d) of this Section and, to the extent expressly contemplated hereby, the other Indemnitees) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     Assignments by Lenders.  Any Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it); *provided* that

(i)     except in the case of any assignment made in connection with the primary syndication of the Commitment and Loans by the Joint Lead Arrangers or an assignment of the entire remaining amount of the assigning Lender's Commitment and the Loans at the time owing to it or in the case of an assignment to a Lender or an Affiliate of a Lender or an Approved Fund with respect to a Lender, the aggregate amount of the Commitment (which for this purpose includes Loans outstanding thereunder) or, if the applicable Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date) shall not be less than $2,500,000, in the case of any assignment in respect of Loans and/or Commitments, unless the Administrative Agent otherwise consents (each such consent not to be unreasonably withheld or delayed);

(ii)     each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loan or

-132-

the Commitment assigned, except that this clause (ii) shall not prohibit any Lender from assigning all or a portion of its rights and obligations among separate tranches on a non-*pro rata* basis; and

(iii) the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500, and the Eligible Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to paragraph (c) of this Section 10.04, from and after the effective date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 2.12, 2.13, 2.15 and 10.03 with respect to facts and circumstances occurring prior to the effective date of such assignment. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this paragraph shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (d) of this Section 10.04.

(c)     Register. The Administrative Agent, acting solely for this purpose as an agent of Borrowers, shall maintain at one of its offices in Stamford, Connecticut a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**"). The entries in the Register shall be conclusive, and Borrowers, the Administrative Agent and the Lenders may treat each person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by any Borrower, the Collateral Agent and any Lender (with respect to its own interest only), at any reasonable time and from time to time upon reasonable prior notice.

(d)     Participations. Any Lender may at any time, without the consent of, or notice to, Borrowers or the Administrative Agent, sell participations to any person (other than a natural person or any Borrower or any of a Borrower's Affiliates or Subsidiaries) (each, a "**Participant**") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); *provided* that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) such Borrower, the Administrative Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce the Loan Documents and to approve any amendment, modification or waiver of any  provision of the Loan Documents; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification, waiver described in clause (i), (ii) or (iii) of the first proviso to

-133-

Section 10.02(b) that affects such Participant. Subject to paragraph (e) of this Section, each Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.12, 2.13 and 2.15 (subject to the requirements of those Sections) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 10.08 as though it were a Lender, provided such Participant agrees to be subject to Section 2.14 as though it were a Lender.

(e)     Limitations on Participant Rights. A Participant shall not be entitled to receive any greater payment under Sections 2.12, 2.13 and 2.15 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with each Borrower's prior written consent.

(f)     Certain Pledges. Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; *provided* that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto. In the case of any Lender that is a fund that invests in bank loans, such Lender may, without the consent of Borrowers or the Administrative Agent, collaterally assign or pledge all or any portion of its rights under this Agreement, including the Loans and Notes or any other instrument evidencing its rights as a Lender under this Agreement, to any holder of, trustee for, or any other representative of holders of, obligations owed or securities issued, by such fund, as security for such obligations or securities.

(g)     Electronic Execution of Assignments. The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable Requirement of Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

**SECTION 10.05     Survival of Agreement**. All covenants, agreements, representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Agents or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and so long as the Commitments have not expired or terminated. The provisions of Sections 2.12, 2.14, 2.15 and Article X (other than Section 10.12) shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Commitments or the termination of this Agreement or any provision hereof, provided that the provisions of Section 10.12 shall also survive and remain in full force and effect for a period of one year after the repayment of the Loans, the expiration or termination of the Commitments or the termination of this Agreement or any provision hereof.

| LA\1978870.15||{00001116. }

**SECTION 10.06    Counterparts; Integration; Effectiveness**.  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and the other Loan Documents, and any separate letter agreements with respect to fees payable to the Administrative Agent, constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto.  Delivery of an executed counterpart of a signature page of this Agreement by telecopier shall be effective as delivery of a manually executed counterpart of this Agreement.

**SECTION 10.07    Severability**.  Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

**SECTION 10.08    Right of Setoff**.  Notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from, the Bankruptcy Court or the Canadian Court but subject in all cases to the Applicable Order, if an Event of Default shall have occurred and be continuing, each Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable Requirements of Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of any Borrower or any other Loan Party against any and all of the obligations of such Borrower or such Loan Party now or hereafter existing under this Agreement or any other Loan Document to such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document and although such obligations of such Borrower or such Loan Party may be contingent or unmatured or are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness.  The rights of each Lender and their respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender or its Affiliates may have.  Each Lender agrees to notify Borrowers and the Administrative Agent promptly after any such setoff and application; *provided* that the failure to give such notice shall not affect the validity of such setoff and application.

**SECTION 10.09    Governing Law; Jurisdiction; Consent to Service of Process**.  EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN ANY OF THE LOAN DOCUMENTS, IN ALL RESPECTS, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THE LOAN DOCUMENTS AND THE OBLIGATIONS SHALL BE GOVERNED BY, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN THAT STATE AND ANY APPLICABLE LAWS OF THE UNITED STATES OF AMERICA (INCLUDING THE BANKRUPTCY CODE) AND THE CCAA.  EACH LOAN PARTY HEREBY CONSENTS AND AGREES THAT THE BANKRUPTCY COURT (AND, IN THE CASE OF THE CANADIAN LOAN PARTIES, THE CANADIAN COURT) SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN THE LOAN PARTIES, AGENTS, THE JOINT LEAD ARRANGERS AND LENDERS PERTAINING TO

THE FACILITY OR ANY OF THE OTHER LOAN DOCUMENTS RELATED TO THE FACILITY OR TO ANY MATTER ARISING OUT OF OR RELATING TO THE FACILITY OR ANY OF THE OTHER LOAN DOCUMENTS RELATED TO THE FACILITY ; PROVIDED, THAT AGENTS, JOINT LEAD ARRANGERS, LENDERS AND THE LOAN PARTIES ACKNOWLEDGE THAT ANY APPEALS FROM THE BANKRUPTCY COURT (OR THE CANADIAN COURT) MAY HAVE TO BE HEARD BY A COURT OTHER THAN THE BANKRUPTCY COURT (OR CANADIAN COURT); PROVIDED, FURTHER, THAT NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR OPERATE TO PRECLUDE AGENTS AND THE JOINT LEAD ARRANGERS FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION TO REALIZE ON THE COLLATERAL OR ANY OTHER SECURITY FOR THE OBLIGATIONS, OR TO ENFORCE A JUDGMENT OR OTHER COURT ORDER IN FAVOR OF AGENTS AND THE JOINT LEAD ARRANGERS. EACH LOAN PARTY EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT, AND EACH LOAN PARTY HEREBY WAIVES ANY OBJECTION THAT SUCH LOAN PARTY MAY HAVE BASED UPON LACK OF PERSONAL JURISDICTION, IMPROPER VENUE OR FORUM NON CONVENIENS AND HEREBY CONSENTS TO THE GRANTING OF SUCH LEGAL OR EQUITABLE RELIEF AS IS DEEMED APPROPRIATE BY SUCH COURT. EACH LOAN PARTY HEREBY WAIVES PERSONAL SERVICE OF THE SUMMONS, COMPLAINT AND OTHER PROCESS ISSUED IN ANY SUCH ACTION OR SUIT AND AGREES THAT SERVICE OF SUCH SUMMONS, COMPLAINTS AND OTHER PROCESS MAY BE MADE BY REGISTERED OR CERTIFIED MAIL ADDRESSED TO SUCH LOAN PARTY AT THE ADDRESS SET FORTH IN SECTION 10.01 OF THIS AGREEMENT AND THAT SERVICE SO MADE SHALL BE DEEMED COMPLETED UPON THE EARLIER OF SUCH LOAN PARTY'S ACTUAL RECEIPT THEREOF OR THREE (3) DAYS AFTER DEPOSIT IN THE UNITED STATES OR CANADIAN MAILS, PROPER POSTAGE PREPAID.

SECTION 10.10    **Waiver of Jury Trial**.  Each Loan Party hereby waives, to the fullest extent permitted by applicable Requirements of Law, any right it may have to a trial by jury in any legal proceeding directly or indirectly arising out of or relating to this Agreement, any other Loan Document or the transactions contemplated hereby (whether based on contract, tort or any other theory). Each party hereto (a) certifies that no representative, agent or attorney of any other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver and (b) acknowledges that it and the other parties hereto have been induced to enter into this Agreement by, among other things, the mutual waivers and certifications in this Section.

SECTION 10.11    **Headings**.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

SECTION 10.12    **Treatment of Certain Information; Confidentiality**.  Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, agents, advisors and other representatives (it being understood that the persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any Governmental Authority or regulatory authority (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable Requirements of Law or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding

-136-

relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section 10.12, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement, (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to any Borrower and its obligations or (iii) any rating agency for the purpose of obtaining a credit rating applicable to any Lender, (g) with the consent of Borrowers or (h) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section or (y) becomes available to the Administrative Agent, any Lender or any of their respective Affiliates on a nonconfidential basis from a source other than any Borrower. For purposes of this Section, "**Information**" means all information received from any Borrower or any of its Subsidiaries relating to any Borrower or any of its Subsidiaries or any of their respective businesses, other than any such information that is available to the Administrative Agent or any Lender on a nonconfidential basis prior to disclosure by any Borrower or any of its Subsidiaries. Any person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such person has exercised the same degree of care to maintain the confidentiality of such Information as such person would accord to its own confidential information.

**SECTION 10.13**     **USA PATRIOT Act Notice**.  Each Lender that is subject to the Act (as hereinafter defined) and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies Borrowers that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "**Act**"), it is required to obtain, verify and record information that identifies Borrowers, which information includes the name, address and tax identification number of Borrowers and other information regarding Borrowers that will allow such Lender or the Administrative Agent, as applicable, to identify Borrowers in accordance with the Act.  This notice is given in accordance with the requirements of the Act and is effective as to the Lenders and the Administrative Agent.

**SECTION 10.14**     **Interest Rate Limitation**.  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable Requirements of Law (collectively, the "**Charges**"), shall exceed the maximum lawful rate (the "**Maximum Rate**") which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with applicable Requirements of Law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

**SECTION 10.15**     **Lender Addendum**.  Each Lender to become a party to this Agreement on the date hereof shall do so by delivering to the Administrative Agent a Lender Addendum duly executed by such Lender, Borrowers and the Administrative Agent.

**SECTION 10.16**     **Obligations Absolute**.  To the fullest extent permitted by applicable Requirements of Law, all obligations of the Loan Parties hereunder shall be absolute and unconditional irrespective of:

(a)     any bankruptcy, insolvency, reorganization, arrangement, readjustment, composition, liquidation or the like of any Loan Party;

(b)     any lack of validity or enforceability of any Loan Document or any other agreement or instrument relating thereto against any Loan Party;

(c)     any change in the time, manner or place of payment of, or in any other term of, all or any of the Obligations, or any other amendment or waiver of or any consent to any departure from any Loan Document or any other agreement or instrument relating thereto;

(d)     any exchange, release or non-perfection of any other Collateral, or any release or amendment or waiver of or consent to any departure from any guarantee, for all or any of the Obligations;

(e)     any exercise or non-exercise, or any waiver of any right, remedy, power or privilege under or in respect hereof or any Loan Document; or

(f)     any other circumstances which might otherwise constitute a defense available to, or a discharge of, the Loan Parties.

**SECTION 10.17     Conflicts with Other Loan Documents**.  Unless otherwise expressly provided in this Agreement (or in another Loan Document by specific reference to the applicable provision contained in this Agreement), if any provision contained in this Agreement conflicts with any provision of any other Loan Document, the provision contained in this Agreement shall govern and control.  Notwithstanding the foregoing, if any provision in this Agreement or any other Loan Document conflicts with any provision in the Applicable Order, the provision in the Applicable Order shall govern and control.

**SECTION 10.18     Judgment Currency**.

(a)     Each Borrower's obligation hereunder and under the other Loan Documents to make payments in US dollars (pursuant to such obligation, the "**Obligation Currency**") shall not be discharged or satisfied by any tender or recovery pursuant to any judgment expressed in or converted into any currency other than the Obligation Currency, except to the extent that such tender or recovery results in the effective receipt by the Administrative Agent or the respective Lender of the full amount of the Obligation Currency expressed to be payable to the Administrative Agent or such Lender under this Agreement or the other Loan Documents.  If, for the purpose of obtaining or enforcing judgment against a Borrower in any court or in any jurisdiction, it becomes necessary to convert into or from any currency other than the Obligation Currency (such other currency being hereinafter referred to as the "**Judgment Currency**") an amount due in the Obligation Currency, the conversion shall be made at the Dollar Equivalent, and in the case of other currencies, the rate of exchange (as quoted by the Administrative Agent or if the Administrative Agent does not quote a rate of exchange on such currency, by a known dealer in such currency designated by the Administrative Agent) determined, in each case, as of the Business Day immediately preceding the day on which the judgment is given (such Business Day being hereinafter referred to as the "**Judgment Currency Conversion Date**").

(b)     If there is a change in the rate of exchange prevailing between the Judgment Currency Conversion Date and the date of actual payment of the amount due, each Borrower covenants and agrees to pay, or cause to be paid, such additional amounts, if any (but in any event not a lesser amount) as may be necessary to ensure that the amount paid in the Judgment Currency, when converted at the rate of exchange prevailing on the date of payment, will produce the amount of the Obligation Currency which could have been purchased with the amount of Judgment Currency stipulated in the judgment or judicial award at the rate of exchange prevailing on the Judgment Currency Conversion Date.

-138-

(c)     For purposes of determining the Dollar Equivalent or any other rate of exchange for this Section 10.18, such amounts shall include any premium and costs payable in connection with the purchase of the Obligation Currency.

**SECTION 10.19     Parties Including Trustees; Bankruptcy Court Proceedings.**
This Agreement, the other Loan Documents, and all Liens and other rights and privileges created hereby or pursuant hereto or to any other Loan Document shall be binding upon each Loan Party, the bankruptcy estate of each Loan Party, and any trustee, other bankruptcy estate representative or any successor in interest of any Loan Party in the Chapter 11 Cases, the CCAA Case or any subsequent case commenced under Chapter 7 of the Bankruptcy Code or similar proceeding in Canada, and shall not be subject to Section 365 of the Bankruptcy Code. This Agreement and the other Loan Documents shall be binding upon, and inure to the benefit of, the successors of Agents and Lenders and their respective assigns, transferees and endorsees. The Liens created by this Agreement and the other Loan Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of any Chapter 11 Case, the CCAA Case or any other bankruptcy case of any Loan Party to a case under Chapter 7 of the Bankruptcy Code or a similar proceeding in Canada or in the event of dismissal of any Chapter 11 Case, the CCAA Case or the release of any Collateral from the jurisdiction of the Bankruptcy Court or the Canadian Court for any reason, without the necessity that the Administrative Agent files financing statements or otherwise perfect its Liens under applicable law. No Loan Party may assign, transfer, hypothecate or otherwise convey its rights, benefits, obligations or duties hereunder or under any of the other Loan Documents without the prior express written consent of each Agent and each Lender. Any such purported assignment, transfer, hypothecation or other conveyance by any Loan Party without the prior express written consent of the Agents and Lenders shall be void. The terms and provisions of this Agreement are for the purpose of defining the relative rights and obligations of each Loan Party, Agents, the Joint Lead Arrangers and Lenders with respect to the transactions contemplated hereby and no person shall be a third party beneficiary of any of the terms and provisions of this Agreement or any of the other Loan Documents.

[Signature Pages Follow]

-139-

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

ARCLIN US HOLDINGS INC.


By: _____
    Name:
    Title:


ARCLIN HOLDINGS I L.P.


By: Arclin Holdings GP I Inc., its general partner


    By: _____
        Name:
        Title:


ARCLIN HOLDINGS II L.P.


By: Arclin Holdings GP II Inc., its general partner


    By: _____
        Name:
        Title:


ARCLIN HOLDINGS III INC.


By: _____
    Name:
    Title:


ARCLIN HOLDINGS IV INC.


By: _____
    Name:
    Title:

ARCLIN MANAGEMENT HOLDINGS INC.


By: _____
     Name:
     Title:


ARCLIN CHEMICALS HOLDING INC.


By: _____
     Name:
     Title:


ARCLIN HOLDINGS GP I INC.


By: _____
     Name:
     Title:


ARCLIN HOLDINGS GP II INC.


By: _____
     Name:
     Title:


MARMORANDUM LLC


By: _____
     Name:
     Title:


ARCLIN CANADA LTD.


By: _____
     Name:
     Title:

ARCLIN SURFACES INC.


By: _____
       Name:
       Title:


ARCLIN INDUSTRIES U.S.A. INC.


By: _____
       Name:
       Title:


ARCLIN U.S.A. INC.


By: _____
       Name:
       Title:


ARCLIN FORT SMITH INC.


By: _____
       Name:
       Title:

UBS SECURITIES LLC, as Joint Lead Arranger and
Syndication Agent


By: _____
    Name:
    Title:


By: _____
    Name:
    Title:


UBS AG, STAMFORD BRANCH, as Administrative
Agent and Collateral Agent


By: _____
    Name:
    Title:


By: _____
    Name:
    Title:

BLACK DIAMOND COMMERCIAL FINANCE,
L.L.C., as Joint Lead Arranger


By: _____
     Name:
     Title: