IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>ARCLIN US HOLDINGS INC., et al.,<br><br>Debtors.[1] | Chapter 11<br><br>Bankr. Case No. 09 - _____ ( )<br><br>Jointly Administered |

## DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING DEBTORS TO PAY THE PREPETITION CLAIMS OF CERTAIN CRITICAL VENDORS AND ADMINISTRATIVE CLAIM HOLDERS AND GRANTING RELATED RELIEF

The above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by and through their undersigned attorneys, hereby file this motion (the "Motion"), for the entry of an order authorizing the Debtors to pay, in the ordinary course of business, the prepetition claims of certain critical vendors and administrative claim holders. In support thereof, the Debtors respectfully represent as follows:

## JURISDICTION

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue of these cases and this Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The predicates for the relief requested in this Motion are sections 363(b), 503(b)(9), 549(a), and 105(a) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 6003(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

---

[1] The Debtors are Arclin US Holdings Inc., Marmorandum LLC, Arclin Chemicals Holding Inc., Arclin Industries U.S.A. Inc., Arclin Fort Smith Inc., Arclin U.S.A. Inc., and Arclin Surfaces Inc.

## INTRODUCTION

2. On July 27, 2009 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 (the "Chapter 11 Cases") of the Bankruptcy Code. Certain of the Debtors' non-debtor Canadian affiliates (the "CCAA Debtors" and, collectively with the Debtors, the "Arclin Group" or the "Company")[2] contemporaneously herewith filed for protection from their creditors in Canada (the "Canadian Proceeding") pursuant to Canada's Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended (the "CCAA"), before the Ontario (Commercial List) Superior Court of Justice (the "Canadian Court").[3]

3. The Debtors continue to manage their properties and affairs as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code and the CCAA Debtors continue to manage their properties in accordance with the relevant provisions of the CCAA. No trustee, examiner, or official committee has been appointed in these Chapter 11 Cases.

### The Company's Business

4. The Arclin Group is an integrated enterprise sharing logistical, operational, technical, and financial resources. The Arclin Group develops, produces, and markets bonding and surfacing products and technology for the engineered materials markets. The resin bonding products are used predominantly in the manufacture of residential and industrial construction materials such as particleboard, medium density fiberboard, plywood and

---

[2] The CCAA Debtors are: Arclin Canada Ltd., Arclin Holdings I L.P., Arclin Holdings II L.P., Arclin Holdings III Inc., Arclin Holdings IV Inc., Arclin Management Holdings Inc., Arclin Holdings GP I Inc., and Arclin Holdings GP II Inc. It should be noted that the CCAA does not apply to partnerships; however, because the CCAA Debtors have requested that the Canadian Court extend the protections afforded under the CCAA to Arclin Holdings I L.P. and Arclin Holdings II L.P., those entities have been included in the definition of Canadian Debtors herein for ease of reference.

[3] The Debtors' Mexican affiliates, Arclin Mexican Holdings S.A. de C.V., Arclin Mexico S.A. de C.V., and Arclin Operadora S.A. de C.V., are not subject to any insolvency proceedings.

2

oriented strandboard. It has approximately 25% of the resins market in the United States and Canada. The Company also produces paper overlays technologies and provides surfacing solutions for decorative panels, building products, and industrial specialty applications for North American and export markets.

5. The Company, through its operating entities Arclin Canada, an Ontario Corporation, Arclin USA Inc., an Oregon corporation ("Arclin USA"), and Arclin Surfaces Inc., a Wisconsin corporation ("Arclin Surfaces" and collectively with Arclin Canada and Arclin USA, the "Operating Entities"), operates two business units – Building & Construction and Engineered Materials. Arclin Canada maintains six facilities located in Canada[4] and Arclin USA and Arclin Surfaces maintain eight facilities located in the United States. Each of the Operating Entities independently manages its own day-to-day operations. However, the Company is headquartered and performs most administrative, purchasing, and accounting functions through Arclin Canada's offices in Mississauga, Ontario, Canada.

6. The Arclin Group's prepetition capital structure and the events leading up to the commencement of these cases are set forth in Declaration of D. Scott Maynard in Support of the First Day Motions (the "Maynard Declaration"), which was filed with the Court on the Petition Date.

Negotiations with Prepetition Lenders

7. In or about April 2009, the Company began discussions with the its existing secured lenders to negotiate a de-leveraging of the Company's balance sheet. After several months of good faith, arm's length negotiations, the Company received an expression of

---

[4] Four of the six facilities are active plants, one of the six facilities (Sexsmith) is dormant and one of the six facilities (Mississauga) is the head office location that does not conduct any manufacturing.

interest in a financial restructuring of the Company (the "Expression of Interest") from certain of those lenders. In accordance with the Expression of Interest, it is anticipated that the restructuring of the Company will provide, among other things, for the following key terms:

- Each holder of a claim under the Company's first lien credit facility (a "First Lien Claim") will receive, in full satisfaction of its secured claim, its pro rata share of, directly or indirectly (i) 97% of the equity (the "Reorganized Company Equity") in the restructured Company, subject to dilution on account of the Reorganized Company Equity to be reserved for a management incentive plan (the "MIP") to be developed by the Company's board of directors and warrants to be issued to holders of the claims under the Company's second lien credit facility (the "Second Lien Claims") and (ii) a new, second lien term loan in the amount of $60 million.

- Each holder of a Second Lien Claim will receive, in full satisfaction of its secured claim, its pro rata share of (i) 3% of the Reorganized Company Equity, and (ii)(A) warrants for 4% of the Reorganized Company Equity, with a term of four years and a strike price equal to an equity value of $145 million; plus (B) warrants for 4% of the Reorganized Company Equity, with a term of five years and a strike price equal to an equity value of $145 million; plus (C) warrants for 4% of the Reorganized Company Equity, with a term of four years and a strike price equal to an equity value of $175 million; plus (D) warrants for 4% of the Reorganized Company Equity, with a term of five years and a strike price equal to an equity value of $175 million (the "Warrant Package"), subject to dilution in each of clauses (i) and (ii) of this sentence on account of the MIP.

- Management will receive 10% of the Reorganized Company Equity in accordance with the MIP.

## RELIEF REQUESTED

8. The Debtors seek entry of an order authorizing the Debtors, in their discretion, to pay the Critical Vendor Claims (defined below)[5] in an amount of up to $10.2 million in the aggregate. The Debtors also request that all applicable banks and other financial institutions be authorized and directed to receive, process, honor, and pay any and all checks

---

[5] Nothing in this Motion should be construed as an assumption of any executory contract or unexpired lease between the Debtors and any other party, nor should it be construed as a rejection of any executory contract or unexpired lease with any creditor. The Debtors reserve the right to contest the amount claimed to be due by any person or entity.

4

drawn on the Debtors' accounts to honor the Critical Vendor Claims, without regard to whether such checks were presented before or after the Petition Date, unless otherwise directed by the Debtors.

9. The Debtors propose to condition the payment of the Critical Vendor Claims on the written acknowledgment of an individual Critical Vendor (as defined below) to continue supplying goods and services to the Debtors on terms at least as favorable as those that such Critical Vendor provided to the Debtors before the Petition Date. The Debtors reserve the right to negotiate new trade terms with any Critical Vendor as a condition to payment of its claim.

10. If a Critical Vendor subsequently refuses to provide goods or services on the terms set forth above, any payment made to such Critical Vendor on account of its prepetition claim shall be deemed to have been in payment of any then-outstanding postpetition obligations owed to such Critical Vendor. If the paid prepetition amount exceeds the amount of the Debtor's outstanding postpetition obligations (the "Excess Amount") to such Critical Vendor, the Excess Amount shall be deemed to be an avoidable postpetition transfer under Bankruptcy Code section 549. Upon any such recovery, the claim for which such payment was made shall be reinstated, subject to objection by the Debtors and other parties-in-interest.

A. <u>The Debtor's Critical Suppliers</u>

11. The Debtors utilize various suppliers (the "Critical Suppliers") on a regular basis for four primary raw materials in their resins business: urea, methanol, phenol and melamine (the "Raw Materials"). The uninterrupted supply of these raw materials is critical to the Debtors' business for the following reasons:

- The Debtors generally operate their business with minimal inventory levels for their Raw Materials, in most cases with less than one week of inventory on hand.

Any impediment to the Debtors' ability to source Raw Materials on a competitive basis may result in higher Raw Material costs, which would impact the Debtors' profit margins.

- A significant portion of the Debtors' Raw Materials arrive via railway from all over North America, resulting in lead times for new Raw Materials of up to 40 days. If the Debtors Raw Materials suppliers suspend delivery to the Debtors, one or more of Debtors' plants may be required to shutdown.

- Because the Debtors supply their customers on a just-in-time basis, if one of the Debtors plants is required to shutdown, a customer plant also may be forced to shutdown. Should this occur, the relationship with the customer would be damaged permanently and the customer would likely take its business to a competitor of the Debtors.

- Critical Suppliers willing to continue providing Raw Materials to the Debtors will likely require the Debtors to accept less favorable terms than those previously made available to the Debtors. By paying the prepetition claims of the Critical Suppliers, the Debtors will be able to maintain the same or more favorable terms for the Raw Materials.

12. The Debtors estimate that, as of the Petition Date, they owed the Critical Suppliers $9.3 million in the aggregate on account of goods delivered to the Debtors (the "Critical Supplier Claims"). Approximately $7.7 million of the Critical Supplier Claims relates to goods received by the Debtors within 20 days of the Petition Date, and which is entitled to administrative expense status under Bankruptcy Code section 503(b)(9) (the "503(b)(9) Claims"). Approximately $1.6 million of the Critical Supplier Claims are not secured by a lien under state law or entitled to administrative expense priority.

13. The Debtors submit that the payment of undisputed Critical Supplier Claims will enable the Debtors to maintain their relationships with the Critical Suppliers and their customers and that such relief is in the best interests of the Debtors, their estates, their creditors, and other parties-in-interest.

B. The Debtor's Shippers

14. The Debtors' industry is shipping intensive. In the ordinary course of business, the Debtors use various shippers, including dedicated carriers, common carriers, rail carries, and truckers (the "Critical Shippers" and, together with the Critical Suppliers, the "Critical Vendors") to ensure the timely shipping and delivery of raw materials purchased and goods sold. In 2008, the Debtors paid approximately $22.9 million to the Critical Shippers.

15. The Debtors obtain significant raw materials through the Critical Shippers. Some of the costs of these raw materials are priced on a delivered basis so the transportation cost is included in the Debtors' purchase price, but in some cases the Debtors pay the direct freight cost of obtaining the raw materials.[6]

16. The Debtors also use the Critical Shippers to transport their finished products (e.g., resin and coatings) to their customers and dealers.[7] At any given time, the Debtors have finished goods in transit with their Critical Shippers. Therefore, certain Critical Shippers are in possession of goods that are vital to the Debtors' operations.

17. The Debtors cannot maintain the reliable supply and distribution system that is essential for the continuation of their business without the services of the Critical Shippers for the following reasons:

- The Critical Shippers operate along established and carefully scheduled routes, providing the Debtors with an integrated mechanism for receiving incoming raw materials and delivering outgoing finished products.

---

[6] With respect to the cost of freight that is built into the purchase price of raw materials that the Debtors buy, the Debtors submit the related prepetition claim should be considered a 503(b)(9) Claim, to the extent the materials were received within 20 days of the Petition Date.

[7] The Debtors typically sell their products FOB (customer locations), and the cost of shipping is included in a customer's invoice as part of the sales price.

7

- The Critical Shippers must utilize dedicated, specialized tanker trucks and rail cars to deliver the Debtors' raw materials. Those tankers and rail cars cannot be used for other materials without being specially cleaned at the Debtors' expense.

- The Critical Shippers that operate rail lines have exclusive control over the railroad tracks that run adjacent to the Debtors' facilities. Thus, those Critical Shippers cannot be readily replaced with a convenient or cost-effective alternative.

- The Critical Shippers may have state law liens with respect to goods in transit as of the Petition Date.

- Replacing the Critical Shippers would take at least three months, during which time the Debtors' operations would be effectively shut down.

18. The Debtors estimate that the claims of Critical Shippers will not exceed $900,000 in the aggregate (the "Critical Shipper Claims" and, together with the Critical Supplier Claims, the "Critical Vendor Claims") and will enable the Debtors to maintain their relationships with the Critical Shippers and their customers and that such relief is in the best interests of the Debtors, their estates, their creditors, and other parties-in-interest.

## BASIS FOR RELIEF REQUESTED

A. Payment of the Claims Described Herein Is Essential to Preserve the Value of the Debtors' Businesses through Continued Operations

19. Bankruptcy Code section 105(a) empowers a court to issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code. The purpose of Bankruptcy Code section 105(a) is to ensure a bankruptcy court's power to take whatever action "is appropriate or necessary in aid of the exercise of [its] jurisdiction." 2 Collier on Bankruptcy, ¶ 105.01 (15th rev. ed. 1997); see also Management Technology Corp. v. Pardo, 56 B.R. 337, 339 (Bankr. D.N.J. 1985) (court's equitable power derived from Bankruptcy Code section 105).

8

20. Under the "necessity of payment rule" or the "doctrine of necessity,"[8] courts often allow the immediate payment of prepetition claims where the payments are essential to the debtor's continued operations, even though the Bankruptcy Code may not explicitly authorize payment. See, e.g., In re Just for Feet, Inc., 242 B.R. 821, 824 (Bankr. D. Del. 1999); In re Columbia Gas System, Inc., 171 B.R. 189, 191-92 (Bankr. D. Del. 1994) (noting that a debtor may pay a class of prepetition creditors in advance of a confirmed plan if essential to the continued operation of the business).

21. The doctrine of necessity recognizes that paying prepetition obligations outside of a plan of reorganization is often necessary to realize the paramount purpose of chapter 11 reorganization – i.e., preventing the liquidation of the debtor-in-possession and preserving its potential for rehabilitation. See, e.g., In re Lehigh & New England Ry. Co., 657 F.2d 570, 581 (3d Cir. 1981) (holding that the doctrine of necessity permits "immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of the business until their pre-reorganization claims shall have been paid").

22. This Court, as well as courts in other districts, has granted similar relief in other chapter 11 cases. See, e.g., In re AbitibiBowater Inc., Case No. 09-11296 (KJC) (Bankr. D. Del. Apr. 17, 2009); In re The Fairchild Corp., Case No. 09-10899 (CSS) (Bankr. D. Del. Apr. 15, 2009); In re Smurfit-Stone Container Corp., Case No. 09-10235 (KG) (Bankr. D. Del. Feb. 23, 2009); In re Midway Games Inc., Case No. 09-10465 (KG) (Bankr. D. Del. Feb. 13, 2009); In re Pliant Corp., Case No. 09-10443 (BLS) (Bankr. D. Del. Feb. 12, 2009).

---

[8] This doctrine, first articulated by the United States Supreme Court in Miltenberger v. Logansport, C&S W. R. Co., 106 U.S. 286, 311-312 (1882), recognizes the existence of judicial power to authorize a debtor in a reorganization case to pay prepetition claims where such payment is essential to the continued operation of the debtor.

23. The Debtors submit that paying the Critical Vendors would benefit the Debtors' estates and their creditors.

(1) 503(b)(9) Claims

24. As discussed above, the 503(b)(9) Claims are claims of the Critical Suppliers for goods received by the Debtors within 20 days of the Petition Date. Bankruptcy Code section 503(b)(9) provides in relevant part that "the value of any goods received by the debtor within twenty (20) days before the date of commencement of a [bankruptcy case. . . .] in which the goods have been sold to the debtor in the ordinary course of such debtor's business" shall be, allowed, administrative expenses. The Debtors believe that all administrative claims will be paid in full upon the approval of a plan of reorganization. As such, no harm would be caused to the Debtors' estates by paying the 503(b)(9) Claims in the ordinary course of business during these Chapter 11 Cases.

(2) Critical Shipper Claims and Other Critical Supplier Claims

25. Although the Critical Shipper Claims and certain Critical Supplier Claims may not be entitled to administrative expense status, the Debtors believe it is essential that the Debtors be authorized to pay such claim. For the reasons set forth above, the Debtors submit that the Debtors' creditors would not be harmed (and indeed would be benefited) by the immediate payment of the claims of Critical Shipper Claims and Critical Supplier Claims.

B. There are Sound Business Reasons for the Relief Requested Herein.

26. Bankruptcy Code section 363(b) provides this Court with additional authority to grant the relief requested herein. Under this section, the Debtors may use property of their estates outside of the ordinary course of business if it is within its sound business judgment. See Ionosphere, 98 B.R. at 175. In fact, some courts have employed this section to allow a debtor to pay a prepetition claim as an outside of the ordinary course transaction. See,

14996114 {00001098. }

e.g., In re Conseco, Inc., Case No. 02-49672 (CAD) (Bankr. N.D. Ill. Jan. 14, 2003); In re UAL Corp., Case No. 02-48191 (ERW) (Bankr. N.D. Ill. Dec. 9, 2002). The Debtors submit that, for the reasons discussed herein, it would be sound and prudent exercise of their business judgment to pay the Critical Vendor Claims.

C. Failure to Authorize Payment in the First 20 Days Would Cause Immediate and Irreparable Harm

27. Bankruptcy Rule 6003(b) allows the use of property of the estate, or the payment of prepetition claims, within 20 days of the Petition Date if the relief would prevent "immediate and irreparable harm." Accordingly, for the reasons set forth above and in the Maynard Declaration, the Debtors submit that the payment of the Critical Vendor Claims is necessary to prevent immediate and irreparable harm to the Debtors and their estates.

D. The Debtors have Sufficient Funds to Make the Payments Sought Herein

28. The Debtors represent that they have sufficient availability of funds to pay the amounts described herein in the ordinary course of business by virtue of cash reserves, expected cash flows from ongoing business operations and anticipated access to debtor-in-possession financing. Under the Debtors' existing cash management system, the Debtors represent that checks or wire transfer requests can be readily identified as relating to an authorized payment in respect of the Critical Vendor Claims. Accordingly, the Debtors believe there is little risk that checks or wire transfer requests unrelated to authorized payments would be honored inadvertently, and that all applicable banks, other financial institutions and third party payroll processing agents should be authorized and directed, when requested by the Debtors, to receive, process, honor and pay any and all checks or wire transfer requests in respect of the Critical Vendor Claims.

11

## WAIVER OF RULE 6004 STAY

29. Because the payment of the Critical Vendor Claims is essential to prevent irreparable harm to the Debtors' reorganization efforts, the Debtors submit that cause exists for a waiver of the 10-day stay imposed by Bankruptcy Rule 6004(h), to the extent applicable.

## NOTICE

30. Notice of this Motion has been provided via e-mail, facsimile, telephone, and/or hand delivery to the Office of the United States Trustee for Region 3, serving the District of Delaware; counsel to the administrative agents under the Debtors' secured credit facilities; the creditors (excluding insiders) holding the 30 largest unsecured claims against the Debtors on a consolidated basis; the Internal Revenue Service; the United States Securities and Exchange Commission; the United States Attorney's Office; and the United States Attorney General. As this Motion is seeking first-day relief, notice of this Motion and any order entered hereon will be served on all parties required by Rule 9013-1(m) of the Local Rules for the United States Bankruptcy Court for the District of Delaware. Due to the urgency of the circumstances surrounding this Motion and the nature of the relief requested herein, the Debtors respectfully submit that no further notice of this Motion is required.

## NO PRIOR RELIEF

31. No previous motion for the relief sought herein has been made to this or any other Court.

14996114 {00001098. }

## **CONCLUSION**

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto as Exhibit A granting the Debtors the relief requested herein and such other and further relief as may be just and proper.

Dated: July 27, 2009
Wilmington, Delaware

/s/ Frederick B. Rosner
Frederick B. Rosner (DE 3995)
MESSANA ROSNER & STERN LLP
1000 N. West Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 777-1111
Email: frosner@mrs-law.com

-and-

Glenn E. Siegel
Brian E. Greer
Andrew L. Buck
DECHERT LLP
1095 Avenue of the Americas
New York, New York 10112
Telephone: (212) 698-3500
Facsimile: (212) 698-3599
Email: brian.greer@dechert.com

Proposed Co-Counsel for the Debtors
and Debtors-in-Possession