THIS PROPOSED DISCLOSURE STATEMENT IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS PROPOSED DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | **Chapter 11** |
| | : | **Jointly Administered** |
| | : | |
| **ARCLIN US HOLDINGS INC.,** | : | **Bankr. Case No. 09 – 12628 (KJC)** |
| **ARCLIN U.S.A. INC.** | : | **Bankr. Case No. 09 – 12629 (KJC)** |
| **ARCLIN SURFACES INC.** | : | **Bankr. Case No. 09 – 12630 (KJC)** |
| **ARCLIN CHEMICALS HOLDING INC.,** | : | **Bankr. Case No. 09 – 12631 (KJC)** |
| **ARCLIN INDUSTRIES U.S.A. INC.,** | : | **Bankr. Case No. 09 – 12632 (KJC)** |
| **ARCLIN FORT SMITH INC., and** | : | **Bankr. Case No. 09 – 12633 (KJC)** |
| **MARMORANDUM LLC,** | : | **Bankr. Case No. 09 – 12634 (KJC)** |
| **Debtors.** | : | |

## DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE FOR THE DEBTORS' JOINT PLAN OF <u>REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE</u>

September 21, 2009

Frederick B. Rosner (DE 3995)
MESSANA ROSSNER & STERN LLP
1000 N. West Street
Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 777-1111
frosner@mrs-law.com
      -and-
Glenn E. Siegel
Brian E. Greer
Andrew L. Buck
DECHERT LLP
1095 Avenue of the Americas
New York, NY 10112
Telephone: (212) 698-3500
Fax: (212) 698-3599
glenn.siegel@dechert.com
ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION

DISCLOSURE STATEMENT, DATED SEPTEMBER 21, 2009

## SOLICITATION OF VOTES WITH RESPECT TO THE JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE PROPOSED BY ARCLIN US HOLDINGS INC. AND ITS DEBTOR AFFILIATES

———————————

THE BOARDS OF DIRECTORS AND MEMBERS OF ARCLIN US HOLDINGS INC., ARCLIN USA, INC., ARCLIN SURFACES INC., ARCLIN CHEMICALS HOLDING INC., ARCLIN INDUSTRIES USA INC., ARCLIN FORT SMITH INC. AND MARMORANDUM LLC (COLLECTIVELY, THE "DEBTORS") HAVE APPROVED THE JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE, DATED SEPTEMBER 21, 2009 AND ATTACHED HERETO AS EXHIBIT I (THE "PLAN"), AS IN THE BEST INTERESTS OF CREDITORS. ALL CREDITORS ENTITLED TO VOTE THEREON ARE URGED TO VOTE IN FAVOR OF THE PLAN. A SUMMARY OF THE VOTING INSTRUCTIONS ARE SET FORTH BEGINNING ON PAGE 45 OF THIS DISCLOSURE STATEMENT. MORE DETAILED INSTRUCTIONS ARE CONTAINED ON THE BALLOTS DISTRIBUTED TO CREDITORS ENTITLED TO VOTE ON THE PLAN. TO BE COUNTED, YOUR BALLOT MUST BE DULY COMPLETED, EXECUTED AND RECEIVED BY 5:00 P.M., EASTERN TIME, ON DECEMBER 1, 2009 OR SUCH OTHER DATE IDENTIFIED ON YOUR BALLOT (THE "VOTING DEADLINE"), UNLESS EXTENDED.

———————————

THE CONFIRMATION AND EFFECTIVENESS OF THE PROPOSED PLAN ARE SUBJECT TO MATERIAL CONDITIONS PRECEDENT, SOME OF WHICH MAY NOT BE SATISFIED. SEE "OVERVIEW OF THE PLAN – CONDITIONS TO CONFIRMATION AND THE EFFECTIVE DATE OF THE PLAN" AND "VOTING AND CONFIRMATION OF THE PLAN – ACCEPTANCE OR CRAMDOWN." THERE IS NO ASSURANCE THAT THESE CONDITIONS WILL BE SATISFIED OR WAIVED.

———————————

No person is authorized by any of the Debtors in connection with the Plan or the solicitation of acceptances of the Plan to give any information or to make any representation other than as contained in this Disclosure Statement and the exhibits and schedules attached hereto or incorporated by reference or referred to herein, and, if given or made, such information or representation may not be relied upon as having been authorized by any of the Debtors. Although the Debtors will make available to creditors entitled to vote on acceptance of the Plan such additional information as may be required by applicable law before December 1, 2009 at 5:00 p.m., Eastern Time, or such other date identified on your Ballot, the delivery of this Disclosure Statement will not under any circumstances imply that the information herein is correct as of any time subsequent to the date hereof.

---

**ALL CREDITORS ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING THE PLAN ATTACHED HERETO AS <u>EXHIBIT I</u>, THE PLAN SUPPLEMENT WHICH WILL BE FILED WITH THE BANKRUPTCY COURT BEFORE THE VOTING DEADLINE AND THE MATTERS DESCRIBED UNDER "RISK FACTORS," BEFORE SUBMITTING BALLOTS PURSUANT TO THIS SOLICITATION.**

---

The summaries of the Plan and the other documents contained in this Disclosure Statement are qualified by reference to the Plan itself, the exhibits thereto, the Plan Supplement and documents described therein as being Filed before approval of the Disclosure Statement.

The information contained in this Disclosure Statement, including the information regarding the history, businesses and operations of the Debtors and their affiliates, the historical and projected financial information regarding the Debtors, the Reorganized Debtors and New Arclin and the liquidation analysis relating to the Debtors, is included for purposes of soliciting acceptances of the Plan, but, as to contested matters and adversary proceedings, is not to be construed as admissions or stipulations, but rather as statements made in settlement negotiations.

---

**THIS DISCLOSURE STATEMENT CONTAINS FORWARD-LOOKING STATEMENTS BASED PRIMARILY ON THE CURRENT EXPECTATIONS OF THE DEBTORS AND PROJECTIONS ABOUT FUTURE EVENTS AND FINANCIAL TRENDS AFFECTING THE FINANCIAL CONDITION OF THE DEBTORS' OR THE REORGANIZED DEBTORS' BUSINESSES. THE WORDS "BELIEVE," "MAY," "ESTIMATE," "CONTINUE," "ANTICIPATE," "INTEND," "EXPECT" AND SIMILAR EXPRESSIONS IDENTIFY THESE FORWARD-LOOKING STATEMENTS. THESE FORWARD-LOOKING STATEMENTS ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES AND ASSUMPTIONS, INCLUDING THOSE DESCRIBED BELOW UNDER THE CAPTION "RISK FACTORS." IN LIGHT OF THESE RISKS AND UNCERTAINTIES, THE FORWARD-LOOKING EVENTS AND CIRCUMSTANCES DISCUSSED IN THIS DISCLOSURE STATEMENT MAY NOT OCCUR, AND ACTUAL RESULTS COULD DIFFER MATERIALLY FROM THOSE ANTICIPATED IN THE FORWARD-LOOKING STATEMENTS. NEITHER THE DEBTORS, ANY OF THE REORGANIZED DEBTORS NOR NEW ARCLIN UNDERTAKE ANY OBLIGATION TO UPDATE OR REVISE PUBLICLY ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS OR OTHERWISE FOLLOWING THE APPROVAL OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT.**

---

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY STOCK EXCHANGE, NOR HAS THE SEC OR ANY STOCK EXCHANGE PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

---

All capitalized terms in this Disclosure Statement not otherwise defined herein have the meanings given to them in the Plan.

THIS IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.

{00001442. }

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND DISCLAIMER ................................................................................................. 1

OVERVIEW OF THE COMPANY .................................................................................................. 2

    Business Overview of the Company ................................................................................. 3

    Existing Capital Structure of the Company ................................................................... 4

        First Lien Credit Agreement ...................................................................................... 4

        Second Lien Credit Agreement ................................................................................. 5

        The Intercreditor Agreement .................................................................................... 5

    Circumstances Leading to Filing ..................................................................................... 6

    Negotiations with the Lenders and the Expression of Interest ........................................ 6

    Commencement of Reorganization Cases and Related Case Administration Activities .. 6

        First Day Relief ......................................................................................................... 6

        Cash Management Order ............................................................................................ 7

        Appointment of Committee ....................................................................................... 8

        Retention of Professionals ......................................................................................... 8

    CCAA Case ...................................................................................................................... 9

    Postpetition Operations and Liquidity ............................................................................ 9

OVERVIEW OF THE PLAN ............................................................................................................. 9

    The Plan ........................................................................................................................... 9

    General Information Concerning Treatment of Claims and Equity Interests .................. 10

    Summary of Classes and Treatment of Claims and Equity Interests .............................. 10

    Additional Information Regarding Assertion and Treatment of Administrative Expense
        Claims, Professional Fee Claims, DIP Claims and Priority Tax Claims ............. 14

        Administrative Expense Claims ................................................................................ 14

        Professional Fee Claims ............................................................................................ 14

        DIP Claims ................................................................................................................ 15

        Priority Tax Claims .................................................................................................... 15

        Reclamation Claims .................................................................................................. 15

    Summary of Terms of Certain Securities to Be Issued Pursuant to the Plan .................. 15

        New Equity Interests ................................................................................................. 15

        New Warrants ............................................................................................................ 16

        New Management Incentive Plan .............................................................................. 16

Stockholders Agreement ................................................................... 16

Distributions ................................................................................... 16

Securities Issuance in Accordance with Section 1145 ....................... 16

Exit Facility .................................................................................... 17

New Term Debt ............................................................................... 17

Means for Implementing the Plan ........................................................... 18

Continued Corporate Existence ........................................................ 18

Continuation of Certain Retiree and Workers' Compensation Benefits .............. 18

Critical Vendors .............................................................................. 18

Restructuring Transactions ................................................................... 18

Releases ............................................................................................... 19

Debtors' Releases ............................................................................ 19

Other Releases ................................................................................ 20

Knowledge of Claims ...................................................................... 21

The Cadillac Fairview Corporation Limited Indemnity ...................... 21

Conditions to Confirmation and the Effective Date of the Plan .................... 22

Conditions to Confirmation ............................................................. 22

Conditions to the Effective Date ...................................................... 22

Waiver of Conditions to the Confirmation or Effective Date ............... 22

Effect of Nonoccurrence of Conditions to the Effective Date ............. 23

Limited Consolidation ........................................................................... 23

Modification or Revocation of the Plan .................................................. 24

Preservation of Rights of Action ............................................................ 24

NEW ARCLIN ........................................................................................... 24

New Arclin Corporate Structure ............................................................ 24

Business Plan and Strategy for New Arclin ....................................... 24

Liquidity and Capital Resources ...................................................... 25

Selected Unaudited Historical Combined Financial Statements ................. 25

Projected Financial Statements .............................................................. 26

The Projections ............................................................................... 26

Valuations ............................................................................................... 27

Valuation Methodology ......................................................................... 30

ENVIRONMENTAL DISCLOSURES ................................................................. 32

The Portland Facility .............................................................................. 33

The Andalusia Facility ........................................................................... 33

The Moncure Facility ............................................................................. 33

The Springfield Facility ......................................................................... 33

The Winnfield Facility ........................................................................... 34

RISK FACTORS ................................................................................................. 34

The Arclin Group's Business Plan May Not Be Successfully Implemented, and the Projections or Enterprise Value May Not Be Achieved. ..................................... 35

Risk of Revenue Decline – Price and Volume ...................................... 35

Risk of Customer Failure ....................................................................... 35

Costs of Raw Material Supply – Pricing and Pricing Volatility ........... 36

Key Management and Employee Retention .......................................... 36

Potential for Labor Force Disruption ..................................................... 36

The Arclin Group Will Continue to Be Leveraged ............................... 36

The Arclin Group's Assets Will Be Subject to Various Liens and Security Interests ..... 37

The Arclin Group's Financial Results Will Not Be Comparable with the Historical Financial Results of the Debtors ........................................................... 37

The Arclin Group Will Rely Heavily on Certain Customers and Industries .................. 38

Competitive Industry Conditions May Negatively Affect the Arclin Group ................. 38

Resale of the New Equity Interests May Be Restricted ......................... 38

Depressed Pricing Trends May Negatively Affect the Arclin Group .............................. 38

The Arclin Group May Fail to Achieve the Operating Efficiencies and Cost Savings Goals ............................................................................................. 38

The Arclin Group Will Be Subject to Stringent Health, Safety and Environmental Requirements .......................................................................... 39

Legislative Restrictions on Formaldehyde May Adversely Impact the Arclin Group's Results of Operations and Financial Position ...................................... 39

Unplanned Operating Problems May Negatively Affect the Arclin Group ................... 39

Severe Weather Conditions Can Cause Downtime in the Arclin Group's Manufacturing Operations ........................................................................................................... 40

Litigation Claims May Negatively Affect the Arclin Group ........................................... 40

The Arclin Group May Be Restricted From Paying Distributions ................................. 40

LEGAL EFFECTS OF THE PLAN ............................................................................... 40

Directors and Executive Officers ................................................................................ 41

Satisfaction of Claims and Termination of Equity Interests ........................................ 41

Injunctions ................................................................................................................ 42

Termination of Subordination Rights and Settlement of Related Claims and Controversies ........................................................................................................ 42

Limitations on Amounts to Be Distributed to Holders of Allowed Insured Claims ....... 42

Cancellation of Securities .......................................................................................... 43

Executory Contracts and Unexpired Leases .............................................................. 43

Real Property ........................................................................................................ 43

Insurance Policies ................................................................................................. 44

Approval of Assumption, Assumption and Assignment or Rejection of Executory Contracts and Unexpired Leases ..................................................................... 44

Cure of Defaults .................................................................................................... 44

Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan ........................................... 44

Release of Liens ........................................................................................................ 45

Revesting of Assets ................................................................................................... 45

PROCEDURES FOR RESOLVING DISPUTED CLAIMS ............................................. 45

Disputed Claims ........................................................................................................ 45

Objections to and Resolution of Claims ..................................................................... 45

VOTING AND CONFIRMATION OF THE PLAN ......................................................... 46

General ...................................................................................................................... 46

Voting Procedures and Requirements ....................................................................... 47

Confirmation Hearing ................................................................................................ 48

Confirmation .............................................................................................................. 48

Acceptance or Cramdown .......................................................................................... 48

**TABLE OF CONTENTS**
**(Continued)**

Modification or Revocation of the Plan..........................................................................49

Best Interests Test............................................................................................................49

Liquidation Analysis........................................................................................................51

Feasibility ........................................................................................................................52

Compliance with Applicable Provisions of the Bankruptcy Code ..................................52

Alternatives to Confirmation and Consummation of the Plan.........................................52

CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF CONSUMMATION OF
THE PLAN .......................................................................................................................52

APPLICABILITY OF CERTAIN FEDERAL AND STATE SECURITIES LAWS .................52

ADDITIONAL INFORMATION ...............................................................................................54

RECOMMENDATION AND CONCLUSION ..........................................................................55

**TABLE OF EXHIBITS**

Exhibit I        –        Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code

Exhibit II        –        Unaudited Historical Combined Financials and Projections

Exhibit III        –        Liquidation Analysis

# INTRODUCTION AND DISCLAIMER

The Debtors are seeking approval of the Plan, a copy of which is attached hereto as Exhibit I. This Disclosure Statement is submitted by the Debtors in connection with the solicitation of acceptances of the Plan.

The confirmation of a plan of reorganization, which is the vehicle for satisfying the rights of holders of claims against and equity interests in a debtor, is the overriding purpose of a chapter 11 case.

On July 27, 2009 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").[1] Simultaneously with the filing of the Chapter 11 Cases, the CCAA Debtors[2] commenced insolvency proceedings (the "CCAA Case") in Canada in the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") under the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, as amended (the "CCAA").

The primary objectives of the Plan are to:

- implement the Restructuring Transactions;

- maximize the value of the ultimate recoveries to creditor groups on a fair and equitable basis; and

- settle, compromise or otherwise dispose of certain Claims and Equity Interests on terms that the Debtors believe to be fair and reasonable under the circumstances and in the best interests of their respective Estates, creditors and equity holders.

**PLEASE REFER TO THE CHART BEGINNING ON PAGE 11 OF THIS DISCLOSURE STATEMENT FOR A SUMMARY OF THE PROPOSED TREATMENT OF EACH CLASS OF CLAIMS AND INTERESTS.**

If the Plan is confirmed and consummated in accordance with its terms, only Classes of Other Priority Claims, First Lien Claims and Other Secured Claims (Classes 1, 2 and 4) will receive or retain any property on account of such Allowed Claims. Holders of Second Lien Claims will receive their distribution from the holders of First Lien Claims. See "Overview of the Plan – Summary of Classes and Treatment of Claims and Equity Interests." On the Effective Date, subject to the Restructuring Transactions, the Reorganized Debtors will continue to exist after the Effective Date as separate corporate entities in accordance with the applicable law in the jurisdiction in which they are formed under their respective Organizational Documents in effect

---

[1] The Debtors' Mexican affiliates, Arclin Mexican Holdings S.A. de C.V., Arclin Mexico S.A. de C.V., and Arclin Operadora S.A. de C.V., are not subject to any insolvency proceedings.

[2] The CCAA Debtors are: Arclin Canada Ltd., Arclin Holdings I L.P., Arclin Holdings II L.P., Arclin Holdings III Inc., Arclin Holdings IV Inc., Arclin Management Holdings Inc., Arclin Holdings GP I Inc., and Arclin Holdings GP II Inc. The protections of the initial order in the CCAA Case have also been extended to two partnerships that are not CCAA Debtors: Arclin Holdings I L.P. and Arclin Holdings II L.P (the "Canadian Partnerships"). The general partners of the Canadian Partnerships are CCAA Debtors.

before the Effective Date except as the Organizational Documents may be amended pursuant to the Plan.

In accordance with the Bankruptcy Code, Confirmation of the Plan and the occurrence of the Effective Date will result in the discharge of certain Claims against or Equity Interests in the Debtors. See "Legal Effects of the Plan – Satisfaction of Claims and Termination of Equity Interests; Injunctions."

**EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THE PLAN, ON AND AFTER THE EFFECTIVE DATE, THE DEBTORS, OTPP, THE LENDERS AND THE DIP LENDERS ARE RELEASED FROM ALL CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION AND LIABILITIES, RELATED TO THE DEBTORS, WHETHER LIQUIDATED OR CONTINGENT, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, IN LAW OR IN EQUITY, THROUGH THE EFFECTIVE DATE. SEE "OVERVIEW OF THE PLAN – RELEASES" FOR ADDITIONAL INFORMATION.**

**THE DEBTORS' BOARDS OF DIRECTORS AND MEMBERS BELIEVE THAT THE PLAN IS IN THE BEST INTERESTS OF CREDITORS UNDER THE CIRCUMSTANCES. ALL CREDITORS ENTITLED TO VOTE ARE URGED TO VOTE IN FAVOR OF THE PLAN BY NO LATER THAN 5:00 P.M., EASTERN TIME, ON DECEMBER 1, 2009. CERTAIN OF THE FIRST LIEN LENDERS AND THE SECOND LIEN LENDERS AND THEIR RESPECTIVE PROFESSIONALS HAVE NEGOTIATED THE TERMS OF THE PLAN, AND SUCH FIRST LIEN LENDERS AND SECOND LIEN LENDERS SUPPORT THE PLAN, SUBJECT TO SATISFACTION OR WAIVER OF ALL CONDITIONS TO CONFIRMATION AND THE EFFECTIVE DATE OF THE PLAN.**

The requirements for Confirmation, including the vote of creditors to accept the Plan and certain of the statutory findings that must be made by the Bankruptcy Court, are set forth in "Voting and Confirmation of the Plan." Confirmation of the Plan and the occurrence of the Effective Date are subject to a number of significant conditions, which are summarized in "Overview of the Plan – Conditions to Confirmation and the Effective Date of the Plan." There is no assurance that these conditions will be satisfied or waived.

## OVERVIEW OF THE COMPANY

This Disclosure Statement sets forth certain detailed information regarding the Company's history, its projections for future operations and significant events that have occurred during the Reorganization Cases. This Disclosure Statement also describes the Plan, alternatives to the Plan, effects of Confirmation of the Plan and the manner in which distributions will be made under the Plan. In addition, this Disclosure Statement discusses the Confirmation process and the voting procedures that holders of Claims entitled to vote must follow for their votes to be counted.

## Business Overview of the Company

The Debtors, together with the CCAA Debtors and the Canadian Partnerships (collectively, the "Arclin Group" or the "Company"), are an integrated enterprise sharing logistical, operational, technical and financial resources. The corporate structure of the Arclin Group is set forth below.



**Arclin Corporate Organizational Chart**

The Debtors develop, produce and market bonding and surfacing products and technology for the engineered materials markets. The resin bonding products are used predominantly in the manufacture of residential and industrial construction materials such as particleboard, medium density fiberboard, plywood and oriented strandboard. The Arclin Group holds approximately 25% of the resins market in the United States and Canada. The Company also produces paper overlays technologies and provides surfacing solutions for decorative panels, building products and industrial specialty applications for North American and export markets.

The Arclin Group sells its products primarily to other manufacturers for use in the production of end products sold for use in construction, furniture, automotive and specialty industries. The Company has in excess of 150 customers mostly in North America, including a number of key national, regional and local accounts with large building materials manufacturers.

The Arclin Group, through its operating entities Arclin Canada Ltd., an Ontario Corporation ("Arclin Canada"), Arclin USA and Arclin Surfaces (collectively, the "Operating Entities"), operates two business units – Building & Construction and Engineered Materials.[3]

Arclin Canada maintains six facilities located in Canada, and Arclin USA and Arclin Surfaces maintain eight facilities located in the United States. Each of the Operating Entities independently manages its own day-to-day operations. The Company is headquartered and performs most administrative, purchasing and accounting functions through Arclin Canada's offices in Mississauga, Ontario, Canada. In addition, Arclin USA, Arclin Canada and Arclin Surfaces are jointly parties to supply agreements with certain customers. This integration increases the efficiency and dependability of the Arclin Group as a whole.

In 2008, the Company's U.S. operations accounted for approximately 70% of the Arclin Group's sales to third parties. The U.S. operations had approximately $451.6 million in total net revenue in 2008 and approximately $128.8 million in total net revenue through the first calendar half of 2009. As of June 30, 2009, the Debtors had assets of approximately $277.2 million and liabilities of approximately $312.0 million on a consolidated basis.[4]

As of the Petition Date, the Debtors had approximately 346 US-based employees, of which 108 were salaried and 238 were hourly. As of the Petition Date, the CCAA Debtors had 192 Canada-based employees, of which 176 were active and 16 were inactive. Of the active employees, 84 were hourly and 92 were salaried.

**Existing Capital Structure of the Company**

*First Lien Credit Agreement*

Arclin Canada (formerly known as Bond Acquisition Company Inc.) and Arclin US Holdings (formerly known as Bond US Holdings Inc.) are borrowers, and the remaining Debtors and CCAA Debtors are guarantors, under the First Lien Credit Agreement, which provides for (a) a term loan commitment of up to $200 million, (b) a revolving commitment of up to $20 million (the "Revolver"), (c) a swingline commitment of up to $2 million and (d) a letter of credit sublimit of up to $5 million, secured by a first-priority lien on substantially all assets of the Debtors and CCAA Debtors (the "Prepetition Collateral").[5]

---

[3]   The remaining Debtors and the CCAA Debtors do not conduct any business operations.

[4]   As of June 30, 2009, the Arclin Group had assets of approximately $359.3 million and liabilities of approximately $347.3 million on a consolidated basis.

[5]   Borrowings under the First Lien Credit Agreement are denominated in U.S. Dollars.

Pursuant to the First Lien Credit Agreement, the Debtors were, as of the Petition Date, jointly and severally indebted to the First Lien Agent, the First Lien Lenders and the other First Lien secured parties exclusive of accrued but unpaid interest, costs, fees and expenses, in the principal amount of approximately $204,132,994 (which consists of approximately $183,532,994 in principal amount of prepetition term loans and $17,000,000 in principal amount of prepetition revolving loans and a $3.6 million interest hedge).

On or about January 16, 2009, upon learning that the Debtors' fourth quarter 2008 results would not meet certain financial covenants under the First Lien Credit Agreement, the First Lien Agent froze the availability under the Revolver. On or about March 26, 2009, the First Lien Agent declared an event of default with respect to certain financial covenants under the First Lien Credit Agreement. On May 11 and 12, 2009, the Debtors failed to make scheduled interest payments of approximately $2.83 million in the aggregate under the First Lien Credit Agreement.[6] Such non-payments of interest constituted events of default under the First Lien Credit Agreement.

As of the Petition Date, the principal amount of approximately $204,132,994 was drawn and outstanding under the First Lien Credit Agreement. As of the Petition Date, the Debtors had no availability under the First Lien Credit Agreement.

### Second Lien Credit Agreement

Arclin US Holdings is the borrower, and the remaining Debtors and CCAA Debtors are guarantors, under the Second Lien Credit Agrement, which provides for a term loan of up to $30 million,[7] secured by a second priority lien on the Prepetition Collateral.

On or about March 26, 2009, the Second Lien Agent declared an event of default with respect to certain financial covenants under the Second Lien Credit Agreement. In May, 2009, the Company failed to make scheduled interest payments of approximately $573,308 in the aggregate under the Second Lien Credit Agreement. Such non-payments of interest constituted events of default under the Second Lien Credit Agreement.

As of the Petition Date, the principal amount of approximately $30,000,000 was drawn and outstanding under the Second Lien Credit Agreement. As of the Petition Date, the Debtors had no availability under the Second Lien Credit Agreement.

### The Intercreditor Agreement

Pursuant to that certain agreement, dated as of July 10, 2007 (the "Intercreditor Agreement"), the Debtors and the Prepetition Agents are parties to an intercreditor arrangement that governs the respective rights, obligations and priorities of the Lenders with respect to their relative interests in the Prepetition Collateral and certain other matters, including, without limitation, the $25 million senior secured, superpriority debtor-in-possession credit agreement

---

[6] The Company failed to make the following interest payments related to the First Lien Credit Agreement: $1,805,863 on the term debt; $174,333 on the Revolver; and $848,304 on the interest hedge.

[7] Borrowings under the Second Lien Credit Agreement are denominated in U.S. Dollars.

(the "DIP Facility") with certain of the First Lien Lenders. Pursuant to the Intercreditor Agreement, the First Lien Lenders' interests are senior in priority to the Second Lien Lenders' interests on all Prepetition Collateral.

**Circumstances Leading to Filing**

The Debtors' profitability, along with that of the entire Arclin Group, depends in large part on the varying economic and other conditions of the markets they serve. The core end-user markets served by the Arclin Group are subject to volatility.

Beginning in 2008, the demand for the Company's products has declined significantly, principally as a result of the deterioration of the new construction residential housing market, the weakening of consumer confidence and decline in purchasing, leading to "de-stocking" by customers who now carry smaller inventories of the Company's products, and, more recently, a delay in the customary spring construction surge.

**Negotiations with the Lenders and the Expression of Interest**

In or about April 2009, the Company began discussions with the Lenders to negotiate a de-leveraging of the Company's balance sheet. After several months of good faith, arm's length negotiations, the Company received an expression of interest (the "Expression of Interest") in a financial restructuring of the Company from certain of the Lenders. The Expression of Interest provided the underpinning for the reorganization proposed within the Plan.

**Commencement of Reorganization Cases and Related Case Administration Activities**

The following discussion of case administration activities includes descriptions of actions taken by the Debtors as a group because the Reorganization Cases are being jointly administered.

*First Day Relief*

On the Petition Date, the Debtors filed a number of motions and other pleadings (the "First Day Motions"), certain of the more significant of which are described briefly below. The First Day Motions were designed to meet the Debtors' goals of:

- continuing their operations in chapter 11 with as little disruption and loss of productivity as possible;

- maintaining the confidence and support of the Debtors', the CCAA Debtors' and their nondebtor affiliates' customers, employees, vendors, suppliers, service providers, contractors and other key groups;

- maintaining good relations in the communities served by the Debtors', the CCAA Debtors' and their nondebtor affiliates' businesses; and

- obtaining necessary postpetition financing.

The First Day Motions included:

- motions relating to case administration;

- a motion relating to payment of prepetition wages and other benefits to the Debtors' employees;

- a motion relating to the retention and payment of Kurtzman Carson Consultants LLC as claims, noticing and balloting agent;

- a motion relating to continuation and renewal of the Debtors' liability, property, workers compensation and other insurance policies, agreements and programs;

- a motion relating to payment of prepetition claims of certain critical vendors and service providers;

- a motion relating to the payment of prepetition trust fund and franchise taxes;

- a motion relating to the approval of the Debtors' Cash Management System, intercompany transactions and the use of existing bank accounts, business forms and investment and deposit guidelines; as discussed below under "— Cash Management Order;"

- a motion relating to payment for future utility services;

- a motion relating to the confirmation of administrative expense priority status of undisputed obligations to vendors for the postpetition delivery of goods and services; and

- a motion relating to the approval of postpetition financing, authorization of the use of cash collateral, grant of liens and provision of superpriority expense status, grant of adequate protection, modification of the automatic stay and scheduling of a final hearing (the "DIP Financing Motion").

*Cash Management Order*

Before the Petition Date, the Debtors maintained a Cash Management System in connection with the day-to-day operation of their business for approximately 8 months (the "Cash Management System"). The Cash Management System constituted a customary and essential business practice and is similar to systems currently utilized by comparable corporate enterprises. The bank accounts through which the Cash Management System was operated are part of a self-funding system used by the Debtors. In accordance with the DIP Facility, the Cash Management System was modified to comply with the requirements of section 5.18 of the DIP Facility.

In particular, the Debtors were required to establish no more than two new concentration accounts within 45 days of the Petition Date or such later date as agreed by the Administrative Agent under the DIP Facility (the "DIP Agent"). Upon the agreement of the DIP Agent, the date by which the Debtors were required to establish the concentration accounts was extended to September 30, 2009. Once a concentration account is established, all cash receipts received by

the Debtors will be received in the concentration account, and the Debtors will no longer deposit funds into the disbursement accounts. Funds in the concentration account will be swept daily to the DIP Agent to repay borrowings under the DIP Facility. The DIP Agent will relend the necessary funds to maintain operations.

Pursuant to the Cash Management Order, the Bankruptcy Court approved the Debtors' right to maintain their prepetition Cash Management System. In addition, the Cash Management Order authorized the Debtors to continue their ordinary course transactions with, and transfers of cash to, their nondebtor affiliates. Lastly, the Cash Management Order ensured that each individual Debtor would not, at the expense of its creditors, fund the operations of another entity through "extensions of intercompany credit" by according administrative expense status to postpetition Intercompany Claims against a Debtor by another Debtor or nondebtor affiliate arising after the Petition Date as a result of intercompany transactions through Debtors' Cash Management Systems.

*Appointment of Committee*

On August 11, 2009, the Office of the United States Trustee appointed the official committee of unsecured creditors (the "Committee"). The current membership of the Committee and its professional advisors are as follows:

Committee Members:

> Georgia Gulf Chemicals & Vinyls, LLC
> Quality Carriers, Inc.
> Univar USA Inc.
> Kapstone Charleston Kraft LLC
> Ineos Phenol

Co-Counsel:

> Otterbourg, Steindler, Houston & Rosen, P.C.
> Richards, Layton & Finger, P.A.

Financial Advisor:

> Morris Anderson & Associates, Ltd.

*Retention of Professionals*

In connection with the commencement of the Reorganization Cases, the Debtors sought and obtained Bankruptcy Court approval of the retention of Alvarez & Marsal Securities, LLC ("A&M") as their investment banker, Dechert LLP as their global restructuring counsel and Messana Rossner & Stern LLP as their local restructuring counsel.

**CCAA Case**

The initial order the CCAA Debtors obtained in the CCAA Case, among other things: (a) imposes an immediate stay of all proceedings against the CCAA Debtors, the Canadian Partnerships and their property in Canada; (b) appoints Ernst & Young Inc. as the monitor (the "Monitor") in the CCAA Case; (c) authorizes the CCAA Debtors to continue to operate their business in the ordinary course while they seek to implement a restructuring; (d) authorizes the CCAA Debtors to maintain their Cash Management System through the restructuring process, including the ordinary course intercompany fund transfers and Arclin Canada's transferring of funds from its U.S. accounts to its Canadian accounts; (e) authorizes the CCAA Debtors to incur postpetition indebtedness in an amount up to $25 million on terms described under the DIP Financing Motion; and (f) allows for the coordination of the CCAA Case with the Chapter 11 Cases to the greatest extent possible.

Since the Petition Date, the CCAA Debtors and the Canadian Partnerships have been operating their businesses in the ordinary course. On September 16, 2009, however, Arclin Canada announced that due to deteriorating market conditions it would suspend manufacturing operations at its Thunder Bay, Ontario resin plant (the "Thunder Bay Facility"). The Thunder Bay Facility produces resins commonly used in the production of wood based panels and other engineered materials. A number of regional mill closures coupled with record low housing and construction activity in North America severely limited opportunities for business in the region supplied from the Thunder Bay Facility. Production is scheduled to cease by the end of September 2009. Arrangements have been made to transfer supply of the remaining customers to other of the Arclin Group's facilities. The Thunder Bay Facility will be environmentally secured and taken to a safe state.

The CCAA Debtors currently intend to file the CCAA Plan in the CCAA Case before the Voting Deadline occurs with respect to the Debtors. The combined recovery of the First Lien Lenders and the Second Lien Lenders under both the Plan and the CCAA Plan will constitute one recovery in full satisfaction of the First Lien Claims and the Second Lien Claims. There is no assurance that the Canadian Court will approve the CCAA Plan or that the CCAA Debtors will receive the requisite acceptances to support the sanction of the CCAA Plan by the Canadian Court.

**Postpetition Operations and Liquidity**

The Debtors and the First Lien Lenders engaged in good faith and extensive arm's-length negotiations that culminated in an agreement by the First Lien Lenders to provide the Debtors up to $25 million of postpetition financing, on the terms and subject to the conditions set forth in the DIP Facility and the related fee letters. The DIP Facility has provided the Debtors with sufficient liquidity to meet their ongoing business operations.

## OVERVIEW OF THE PLAN

**The Plan**

The following is a brief overview of certain material provisions of the Plan. This overview is qualified in its entirety by reference to the provisions of the Plan, which is attached

{00001442. }

hereto as <u>Exhibit I</u>, and the exhibits thereto, including the Plan Supplement, as amended from time to time, which will be available for inspection in the office of the Bankruptcy Court during normal court hours or online at http://www.kccllc.net/arclin. See "Additional Information." For a description of certain other significant terms and provisions of the Plan, see "Legal Effects of the Plan."

**General Information Concerning Treatment of Claims and Equity Interests**

For purposes of computations of Claim amounts, administrative and other expenses and similar computational purposes, the Distribution Record Date is the close of business on the Confirmation Date. There is no assurance, however, as to if or when the Distribution Record Date will actually occur.

The determination of the relative distributions to be received under the Plan by the holders of Claims in certain Classes was based upon, among other factors, estimates of the amounts of Allowed Claims in each of the Classes, the unclassified Allowed Claims and the relative priorities of such Allowed Claims. The estimates of the amounts of Allowed Claims in each Class are set forth in " – Summary of Classes and Treatment of Claims and Equity Interests." The distributions to be received by creditors in certain Classes could differ from these estimates if the estimates, despite the Debtors' best efforts, prove to be inaccurate.

THE PLAN CONSOLIDATES THE DEBTORS' ESTATES. THE COMBINED ASSETS OF ALL OF THE DEBTORS WILL SATISFY THE ALLOWED CLAIMS AGAINST EACH OF THE DEBTORS AND THEIR ESTATES AS PROVIDED IN THE PLAN.

The "cramdown" provisions of section 1129(b) of the Bankruptcy Code permit confirmation of a chapter 11 plan of reorganization in certain circumstances even if the plan is not accepted by all impaired classes of claims and interests. See "Voting and Confirmation of the Plan – Acceptance or Cramdown." The Debtors have reserved the right to request Confirmation pursuant to the cramdown provisions of the Bankruptcy Code and to amend the Plan because holders of Claims in Classes 5 and 6 and Equity Interests in Class 7 will be deemed to have rejected the Plan and if any other Class of Claims fails to accept the Plan. For purposes of this Disclosure Statement, it has been assumed that the Debtors will be required to seek Confirmation under the cramdown provisions of the Bankruptcy Code. Although the Debtors believe that the Plan could be confirmed under the cramdown provisions of the Bankruptcy Code, there is no assurance that the requirements of such provisions would be satisfied.

**Summary of Classes and Treatment of Claims and Equity Interests**

The classification of Claims and Equity Interests, the estimated aggregate amount of Claims in each Class and the amount and nature of distributions to holders of Claims or Equity Interests in each Class are summarized in the table below. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Professional Fee Claims, DIP Claims and Priority Tax Claims have not been classified. For a discussion of certain additional matters related to Administrative Expense Claims, Priority Tax Claims and DIP Claims, see " – Additional Information Regarding Assertion and Treatment of Administrative Expense Claims, Professional Fee Claims, DIP Claims and Priority Tax Claims."

Because the Plan contemplates the consolidation of all of the Debtors (see "Overview of the Plan – Limited Consolidation"), the information set forth in the table below with respect to each Class of Claims is presented on a combined basis for all the Debtors to which such information is applicable.  The estimated aggregate amounts of Claims are based on the Debtors' estimates of the aggregate amounts of such Claims that the Debtors believe will be asserted upon resolution of all such Claims that the Debtors believe will be Disputed Claims.  Certain of these Disputed Claims are likely to be material, and the total amount of all such Claims, including Disputed Claims, may be materially in excess of the total amount of Allowed Claims assumed in the development of the Plan.

The holders of First Lien Claims in Class 2 are entitled to receive 100% of the New Equity Interests.  However, the holders of First Lien Claims in Class 2 have consented to (i) if Class 3 votes to accept the Plan, the distribution of New Equity Interests and New Warrants by the holders of First Lien Claims to the holders of Second Lien Claims as set forth in Section 4.2.3 of the Plan and (ii) the distribution of New Equity Interests pursuant to the New Management Incentive Plan.  In accordance with the Restructruing Transactions, on the Effective Date, each holder of an Allowed First Lien Claim in Class 2 will receive, in full satisfaction of its Claims against the Debtors, the CCAA Debtors and the Canadian Partnerships, its Pro-Rata Share of (i) 97% of the New Equity Interests and (ii) the New Term Debt.

Holders of Second Lien Claims in Class 3 will not be entitled to, and will not receive or retain, any property or interest in property from the Debtors or the Debtors' estates on account of the Second Lien Claims under the Plan.  However, if Class 3 votes to accept the Plan, the holders of First Lien Claims have consented to the following distribution by the holders of First Lien Claims to holders of Second Lien Claims under the Plan: in accordance with the Restructruing Transactions, on the Effective Date, each holder of an Allowed Second Lien Claim in Class 3 will receive, in full satisfaction of its respective share of $12,664,365 of the Second Lien Claims against the Debtors, the CCAA Debtors and the Canadian Partnerships, its Pro-Rata Share of (i) 3% of the New Equity Interests and (ii) the New Warrants.

The holders of Second Lien Claims will have deficiency claims in the aggregate amount of $18,655,143, which will be treated as General Unsecured Claims under the Plan.

*Each "Estimated Aggregate Claims Amount" shown in the table below is based upon the Debtors' preliminary review of its books and records and may be substantially revised following the completion of a detailed analysis of Claims Filed by the bar dates to be by the Bankruptcy Court.  Further, the amount of any Disputed Claim that ultimately is allowed by the Bankruptcy Court may be significantly more or less than the estimated amount of such Claim.*

*Each amount designated in the table below as "Estimated Percentage Recovery" for each class is the quotient of Cash to be distributed to all holders of Allowed Claims in such Class, divided by the estimated aggregate amount of Allowed Claims in such Class.*

{00001442. }

| **Description and Amount of Claims or Equity Interests** | **Treatment** |
|---|---|
| • Class 1 (Other Priority Claims): This Class consists of the Other Priority Claims against the Debtors.<br><br>Estimated Aggregate Claims Amount: $0[8] | Unimpaired. Unless the holder of an Allowed Other Priority Claim has been paid before the Effective Date or agrees to a different treatment, on the Effective Date, each holder of an Allowed Other Priority Claim in Class 1 will have its Claim Reinstated.<br><br>Estimated Percentage Recovery: 100% |
| • Class 2 (First Lien Claims): This Class consists of the First Lien Claims against the Debtors.<br><br>Estimated Aggregate Claims Amount: no less than $210,025,174[9] | Impaired. In accordance with the Restructruing Transactions, on the Effective Date, each holder of an Allowed Claim First Lien Claim in Class 2 will receive its Pro-Rata Share of (i) 97% of the New Equity Interests and (ii) the New Term Debt.<br><br>Estimated Percentage Recovery: 88.4% |
| • Class 3 (Second Lien Claims): This Class consists of the Second Lien Claims against the Debtors.<br><br>Estimated Aggregate Claims Amount: no less than $31,319,508 | Impaired. In accordance with the Restructuring Transactions, on the Effective Date, each holder of an Allowed Second Lien Secured Claim in Class 3 will receive, in full satisfaction of its respective share of $12,664,365 of the Second Lien Claims against the Debtors, the CCAA Debtors and the Canadian Partnerships, its Pro-Rata Share of (i) 3% of the New Equity Interests outstanding as of the Effective Date and (ii) the New Warrants.<br><br>Estimated Percentage Recovery: 40.4% |
| • Class 4 (Other Secured Claims): This Class consists of the Other Secured Claims against the Debtors.<br><br>Estimated Aggregate Claims Amount: | Unimpaired. Unless the holder of an Allowed Other Secured Claim agrees to a different treatment, on the Effective Date, each holder of an Allowed Other Secured Claim in Class 4 will have its Claim Reinstated. |

---

[8] The claims estimate does not include amounts paid or to be paid in connection with any Order obtained from the Bankruptcy Court authorizing such payments, and does not include any claims under section 503(a)(5) of the Bankruptcy Code.

[9] The claims estimate does not include accrued interest on the interest hedge entered into by the Debtors and CCAA Debtors in connection with the First Lien Credit Agreement.

| Description and Amount of Claims or Equity Interests | Treatment |
|---|---|
| $[TBD] | Estimated Percentage Recovery: 100% |
| • Class 5 (General Unsecured Claims): This Class consists of the General Unsecured Claims against the Debtors.<br><br>Estimated Aggregate Claims Amount: $9,629,531[10] | Impaired. The holders of Allowed General Unsecured Claims in Class 5 will not be entitled to, and will not receive or retain, any property or interest in property on account of such General Unsecured Claims under the Plan.<br><br>Estimated Percentage Recovery: 0% |
| • Class 6 (Intercompany Claims): This Class consists of the prepetition Intercompany Claims against the Debtors. | Impaired. Allowed prepetition Intercompany Claims in Class 6 will not be entitled to, and will not receive or retain, any property or interest in property on account of such prepetition Intercompany Claims under the Plan, and such Claims will be extinguished or cancelled by setoff, contribution or other method as appropriate in the judgment of the Debtors and the Required First Lien Lenders to effectuate the Restructuring Transactions contemplated by the Plan.<br><br>Estimated Percentage Recovery: 0% |
| • Class 7 (Equity Interests): This Class consists of the Equity Interests of the Debtors. | Impaired. On the Effective Date, all Equity Interests of the Debtors (which will include any and all Claims subordinated pursuant to section 510(b) of the Bankruptcy Code that are in any way arising from, related to, or in connection with the Equity Interests) will not receive or retain any property under the Plan on account of such Equity Interests. In accordance with and subject to the Restructuring Transactions, however, the Equity Interests of the Debtors will be reissued as appropriate to preserve the corporate structure of the Reorganized Debtors. |

---

[10] The claims estimate does not include amounts to be paid to critical vendors authorized to be paid under the Critical Vendor Order, holders of Claims entitled to priority under section 503(b)(9) of the Bankruptcy Code, Claims that will be paid in connection with the assumption of Executory Contracts and Unexpired Leases, any deficiency claims of the holders of First Lien Claims and Second Lien Claims and claims related to the OTPP Indemnity.

| Description and Amount of Claims or Equity Interests | Treatment |
|---|---|

Estimated Percentage Recovery: 0%

**Additional Information Regarding Assertion and Treatment of Administrative Expense Claims, Professional Fee Claims, DIP Claims and Priority Tax Claims**

*Administrative Expense Claims*

Except to the extent a holder of an Allowed Administrative Expense Claim has been paid by the Debtors before the Effective Date or agrees to a less favorable or equal, but different treatment, each holder of an Allowed Administrative Expense Claim (other than a Professional Fee Claim or DIP Claim) will receive Cash in an amount equal to such Allowed Administrative Expense Claim on the later of the Effective Date, or the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is practicable; provided, however, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by any Debtor or liabilities arising under loans or advances to or other obligations incurred by any Debtor will be paid in full and performed by such New Arclin in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions.

*Professional Fee Claims*

The holders of Professional Fee Claims will file their respective final fee applications for the allowance of compensation for services rendered and reimbursement of expenses incurred after the Petition Date through the Confirmation Date by no later than the date that is sixty (60) days after the Effective Date, or such other date that may be fixed by the Bankruptcy Court. If granted by the Bankruptcy Court, such award will be paid in full in Cash in such amount as is Allowed by the Bankruptcy Court either (a) on the date such Professional Fee Claim becomes an Allowed Professional Fee Claim, or as soon as practicable thereafter, or (b) upon such other terms as may be mutually agreed upon between such holder of an Allowed Professional Fee Claim and the Debtors. Professionals will not be required to seek Court approval of any fees and expenses incurred after the Confirmation Date in connection with the Debtors or the Reorganization Cases. Requests for compensation under section 503(b) of the Bankruptcy Code must be filed with the Bankruptcy Court and served on the Debtors, the Committee and other parties in interest by no later than the date that is sixty (60) days after the Effective Date. If the Debtors, the Reorganized Debtors or New Arclin and any such professional cannot agree on the amount of fees and expenses to be paid to such party, the amount of fees and expenses will be determined by the Bankruptcy Court.

*DIP Claims*

Except to the extent the holders of DIP Claims agree to a different treatment, the holders of the Allowed DIP Claims will receive Cash in an amount equal to such Allowed DIP Claims from the proceeds of the Exit Facility on the Effective Date.

*Priority Tax Claims*

Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by the holder of a Priority Tax Claim and the applicable Debtor, each holder of an Allowed Priority Tax Claim will have its Claim Reinstated.

Notwithstanding the provisions of Section 3.4(a) of the Plan, the holder of an Allowed Priority Tax Claim will not be entitled to receive any payment on account of any penalty arising with respect to or in connection with the Allowed Priority Tax Claim. Any such Claim or demand for any such penalty will be subject to treatment in Class 5 (General Unsecured Claims) if not subordinated to Class 5 Claims pursuant to an order of the Bankruptcy Court. The holder of an Allowed Priority Tax Claim will not assess or attempt to collect such penalty from the Debtors, the Reorganized Debtors, New Arclin or their property.

*Reclamation Claims*

To the extent holders of Reclamation Claims seek to assert their Reclamation Claims as Secured Claims under the Bankruptcy Code, the Debtors assert that the Reclamation Claims are not entitled to such treatment because the holders' reclamation rights were subject at all times to the Liens of the First Lien Lenders and the Second Lien Lenders, and the goods sought to be reclaimed were worth less than the value of such Liens. Accordingly, each holder of a Reclamation Claim will be considered to be a holder of a Class 5 General Unsecured Claim with respect to the value of the goods sold and delivered to the Debtors by such holder, except to the extent that such holder holds an Allowed Claim under section 503(b)(9) of the Bankruptcy Code.

## Summary of Terms of Certain Securities to Be Issued Pursuant to the Plan

### New Equity Interests

As of the Effective Date, New Arclin will have ten million (10,000,000) shares of issued and outstanding New Equity Interests, held as follows: (i) holders of the Allowed First Lien Claims will hold 97%, or nine million seven-hundred thousand (9,700,000) shares, of such issued and outstanding New Equity Interests and (ii) holders of the Allowed Second Lien Claims will hold 3%, or three-hundred thousand (300,000) shares, of New Equity Interests, subject in each case to dilution by (a) a reserve of an amount of New Equity Interests equal to 10% of the New Equity Interests issued and outstanding as of the Effective Date, to be issued in the amounts set forth in and pursuant to the terms of the New Management Incentive Plan and (b) New Equity Interests to be issued in connection with the New Warrants. New Arclin will be authorized to issue twenty million (20,000,000) New Equity Interests as of the Effective Date.

*New Warrants*

On the Effective Date, New Arclin will issue to holders of the Allowed Second Lien Claims the New Warrants in accordance with the terms and conditions of the New Warrant Agreement.

*New Management Incentive Plan*

In connection with the Plan, the board of directors of New Arclin, in consultation with the chief executive officer of New Arclin, will adopt within 90 days after the Effective Date the New Management Incentive Plan, , which will provide for, among other things, a reserve of 10% of the New Equity Interests issued and outstanding as of the Effective Date for the benefit of management of the Reorganized Debtors and New Arclin. The New Management Incentive Plan is intended to provide incentives to certain key employees to continue their efforts to foster and promote the long-term growth and performance of New Arclin.

*Stockholders Agreement*

As of the Effective Date, each person or entity that receives New Equity Interests or New Warrants will execute a joinder to the Stockholders Agreement as a condition to receiving their distributions under the Plan. All participants under the New Management Incentive Plan will execute a joinder to the Stockholders Agreement.

*Distributions*

The issuance, grant, and reservation of the New Equity Interests authorized in Article V of the Plan will not require any further act or action by any stockholder or creditor of the Debtors, under any applicable law, regulation, order or rule. All securities to be issued will be deemed issued as of the Effective Date regardless of the date on which they are actually distributed.

*Securities Issuance in Accordance with Section 1145*

The Confirmation Order will provide that the issuance of New Equity Interests on account of Claims and in accordance with the New Management Incentive Plan will be exempt from the registration requirements of the Securities Act to the extent provided by section 1145 of the Bankruptcy Code.

Certificates evidencing shares of the New Equity Interests that are received by holders of ten percent (10%) or more of the outstanding New Equity Interests calculated on a fully diluted basis or by holders that are otherwise "underwriters" within the meaning of section 1145(b) of the Bankruptcy Code with respect to the securities will bear a legend substantially in the form below:

> THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON JANUARY __, 2010 PURSUANT TO THE JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE OF ARCLIN US HOLDINGS INC. AND ITS DEBTOR AFFILIATES, DATED AS OF

SEPTEMBER 21, 2009 AND CONFIRMED BY THE BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, ON DECEMBER __, 2009. THESE SECURITIES WERE ISSUED PURSUANT TO AN EXEMPTION FROM THE REGISTRATION REQUIREMENT OF SECTION 5 OF THE SECURITIES ACT OF 1933, AS AMENDED, (THE "ACT") PROVIDED BY SECTION 1145 OF THE BANKRUPTCY CODE, 11 U.S.C. § 1145, AND HAVE NOT BEEN REGISTERED UNDER THE ACT, AND TO THE EXTENT THAT THE HOLDER OF THESE SECURITIES IS AN "UNDERWRITER" AS DEFINED IN SECTION 1145(b)(1) OF THE BANKRUPTCY CODE, THESE SECURITIES MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN EXEMPTION FROM REGISTRATION THEREUNDER.

Any holder that would receive legended securities as provided above may instead receive certificates evidencing New Equity Interests, as applicable, without such legend if, before the Effective Date, such entity delivers to New Arclin (i) an opinion of counsel reasonably satisfactory to New Arclin and its board of directors to the effect that the shares of New Equity Interests to be received by such entity should not be subject to the restrictions applicable to "underwriters" under section 1145(b) of the Bankruptcy Code and may be sold without registration under the Securities Act and (ii) a certification that it is not an "underwriter" within the meaning of section 1145(b) of the Bankruptcy Code. Any holder receiving securities so legended may subsequently deliver the opinion and certification referred to in (i) and (ii) above, and New Arclin will remove such legend from all such certificates held by such holder.

*Exit Facility*

On the Effective Date, New Arclin, the Reorganized Debtors and certain of the CCAA Debtors and Canadian Partnerships, as borrowers or guarantors, will enter into the Exit Facility with availability of up to $40 million. The amounts owed under the Exit Facility will be allocated among the Reorganized Debtors, the CCAA Debtors and the Canadian Partnerships as set forth in the Restructuring Transactions and in the Plan Supplement. The Exit Facility will provide liquidity for working capital and other general corporate purposes of New Arclin following the conclusion of the Reorganization Cases. In addition, the proceeds of the Exit Facility will be used to repay in full all amounts outstanding under the DIP Facility, Allowed Administrative Claims (including Professional Fee Claims); Priority Tax Claims, Other Priority Claims and Other Secured Claims, and may be used to fund other indebtedness of the Reorganized Debtors. The terms of the Exit Facility will be set forth in the Plan Supplement.

*New Term Debt*

On the Effective Date, the Reorganized Debtors, New Arclin and certain of the CCAA Debtors and the Canadian Partnerships, as borrowers or guarantors, will issue the New Term Debt to the holders of Allowed First Lien Claims in accordance with Section 4.2.2 of the Plan. The New Term Debt will be new second lien indebtedness issued on the terms and subject to the conditions set forth in the Plan Supplement in an aggregate face amount of up to $60 million. The New Term Debt will be allocated among the Reorganized Debtors, the CCAA Debtors and the Canadian Partnerships as set forth in the Restructuring Transactions and in the Plan Supplement.

## Means for Implementing the Plan

### *Continued Corporate Existence*

After the Effective Date, subject to the Restructuring Transactions, the Reorganized Debtors will continue to exist as separate corporate entities in accordance with the applicable law in the applicable jurisdiction in which they are incorporated or formed under their respective Organizational Documents in effect before the Effective Date except as their Organizational Documents may be amended pursuant to the Plan. New Arclin will be formed on or before the Effective Date. On the Effective Date, without any further corporate action, the Reorganized Debtors' Organizational Documents will be amended as necessary to satisfy the provisions of the Plan and the Bankruptcy Code and will include, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities.

### *Continuation of Certain Retiree and Workers' Compensation Benefits*

From and after the Effective Date, the Reorganized Debtors will be obligated to pay retiree benefits and any similar health, disability or death benefits in accordance with the terms of the retiree benefit plans or other agreements governing the payment of such benefits (all as defined in and in accordance with section 1114(a) of the Bankruptcy Code), subject to any rights to amend, modify or terminate such benefits under the terms of the applicable retiree benefits plan, other agreement or applicable nonbankruptcy law. In addition, the Debtors will continue the Defined Benefit Plan after the Effective Date, and the Reorganized Debtors will comply with all funding obligations under the Defined Benefit Plan or under applicable law including, without limitation, any amounts that were required to be paid by the Debtors before the Petition Date; provided, however, the board of directors of the Reorganized Debtors or New Arclin may determine after the Effective Date to amend, modify or terminate the Defined Benefit Plan in accordance with ERISA.

From and after the Effective Date, the Reorganized Debtors will continue to pay Claims arising before or after the Petition Date under their existing workers' compensation programs.

### *Critical Vendors*

Notwithstanding any provision of the Plan, the Debtors, the Reorganized Debtors and New Arclin will be authorized in their sole discretion, in accordance with the Critical Vendor Order, to make payments on a regular basis to certain critical suppliers and shippers. As of the Petition Date, the Debtors owed critical suppliers $9.3 million in the aggregate on account of goods delivered to the Debtors, and the Claims of critical shippers did not exceed $900,000 in the aggregate. The Bankruptcy Court authorized the Debtors to pay such critical vendors $6.3 million for their claims on an interim basis and the full amounts owed of $9.3 million and $900,000, respectively, on a final basis.

## Restructuring Transactions

On the Effective Date, and pursuant to the Plan or the applicable Plan Supplement documents, the applicable Debtors or Reorganized Debtors will enter into the Restructuring Transactions contemplated herein and in the Plan Supplement, and will take any actions as may

be necessary or appropriate to effect a restructuring of their respective businesses or the overall organizational structure of the Reorganized Debtors. The Restructuring Transactions may include one or more mergers, consolidations, restructurings, conversions, dissolutions, transfers or liquidations as may be determined by the Debtors or the Reorganized Debtors to be necessary or appropriate. The actions to effect the Restructuring Transactions may include: (a) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable state law or other applicable law and any other terms to which the applicable entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion or dissolution pursuant to applicable state law; and (d) all other actions that the applicable entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable state law in connection with the restructuring transactions. The chairman of the board of directors, the president, the chief executive officer and the chief financial officer of each Debtor will be authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such other actions, as may be necessary or appropriate, to effectuate and further evidence the terms and conditions of this Plan. The secretary or assistant secretary of the appropriate Debtor will be authorized to certify or attest to any of the foregoing actions.

**Releases**

As part of the Plan, the releases set forth below will be granted pursuant to the Plan and the Confirmation Order:

*Debtors' Releases*

**ON THE EFFECTIVE DATE, THE DEBTORS WILL RELEASE AND BE PERMANENTLY ENJOINED FROM ANY PROSECUTION OR ATTEMPTED PROSECUTION OF ANY AND ALL CAUSES OF ACTION WHICH IT HAS OR MAY HAVE AGAINST ANY PRESENT OR FORMER DIRECTOR, OFFICER, EMPLOYEE OR DIRECT OR INDIRECT STOCKHOLDER OF THE DEBTORS; <u>PROVIDED, HOWEVER,</u> THAT THE FOREGOING WILL NOT OPERATE AS A WAIVER OF OR RELEASE FROM ANY CAUSES OF ACTION ARISING OUT OF (I) ANY EXPRESS CONTRACTUAL OBLIGATION OWING BY ANY SUCH DIRECTOR, OFFICER, OR EMPLOYEE OR DIRECT OR INDIRECT STOCKHOLDER OF THE DEBTORS OR (II) THE WILLFUL MISCONDUCT OR GROSS NEGLIGENCE OF SUCH DIRECTOR, OFFICER, OR EMPLOYEE OR STOCKHOLDER IN CONNECTION WITH, RELATED TO, OR ARISING OUT OF THE REORGANIZATION CASES, THE PURSUIT OF CONFIRMATION OF THE PLAN, THE CONSUMMATION OF THE PLAN, THE ADMINISTRATION OF THE PLAN, OR THE PROPERTY TO BE DISTRIBUTED UNDER THE PLAN.**

ON THE EFFECTIVE DATE, THE DEBTORS WILL RELEASE AND BE PERMANENTLY ENJOINED FROM ANY PROSECUTION OR ATTEMPTED PROSECUTION OF ANY AND ALL CLAIMS AND CAUSES OF ACTION, INCLUDING ANY CLAIMS OR CAUSES OF ACTION, INCLUDING THE AVOIDANCE ACTIONS, WHICH THEY HAVE OR MAY HAVE AGAINST ANY LENDERS OR DIP LENDERS IN THEIR CAPACITY AS SUCH, OTPP AND THEIR RESPECTIVE MEMBERS, OFFICERS, DIRECTORS, AGENTS, FINANCIAL ADVISORS, ATTORNEYS, EMPLOYEES, PARTNERS, AFFILIATES AND REPRESENTATIVES AND THEIR RESPECTIVE PROPERTY IN CONNECTION WITH (I) ACTIONS TAKEN AS OR IN ITS CAPACITY OF BEING A LENDER, DIP LENDER OR DIRECT OR INDIRECT OWNER AND (II) THE REORGANIZATION CASES.

ON THE EFFECTIVE DATE, AND EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR IN THE CONFIRMATION ORDER, THE DEBTORS, THE REORGANIZED DEBTORS, NEW ARCLIN, EACH LENDER AND DIP LENDER IN ITS CAPACITY AS SUCH, AND OTPP AND EACH OF THEIR RESPECTIVE MEMBERS, OFFICERS, DIRECTORS, AGENTS, FINANCIAL ADVISORS, ATTORNEYS, EMPLOYEES, PARTNERS, AFFILIATES AND REPRESENTATIVES AND THEIR RESPECTIVE PROPERTY WILL BE RELEASED FROM ANY AND ALL CLAIMS, OBLIGATIONS, RIGHTS, CAUSES OF ACTION, AVOIDANCE ACTIONS AND LIABILITIES WHICH THE DEBTORS, OR THE REORGANIZED DEBTORS, MAY BE ENTITLED TO ASSERT, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS, OR OTHERWISE, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR THEREAFTER ARISING, BASED IN WHOLE OR IN PART UPON ANY, ACT OR OMISSION, TRANSACTION, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, INCLUDING, BUT NOT LIMITED TO, THE NEGOTIATION, SOLICITATION, CONFIRMATION AND CONSUMMATION OF THE PLAN; PROVIDED, HOWEVER, THAT NOTHING WILL RELEASE ANY PERSON FROM ANY CLAIMS, OBLIGATIONS, RIGHTS, CAUSES OF ACTION, OR LIABILITIES BASED UPON ANY ACT OR OMISSION IN CONNECTION WITH, RELATING TO, OR ARISING OUT OF, THE REORGANIZATION CASES, THE SOLICITATION OF ACCEPTANCES OF THE PLAN, THE PURSUIT OF CONFIRMATION OF THE PLAN, THE CONSUMMATION OF THE PLAN, THE ADMINISTRATION OF THE PLAN, OR THE PROPERTY TO BE DISTRIBUTED UNDER THE PLAN ARISING OUT OF SUCH PERSON'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

*Other Releases*

EACH HOLDER OF A CLAIM RELATED TO THE DEBTORS (WHETHER OR NOT ALLOWED) AGAINST, OR EQUITY INTEREST IN, THE DEBTORS, AND EACH PERSON OR ENTITY PARTICIPATING IN EXCHANGES AND DISTRIBUTIONS UNDER OR PURSUANT TO THE PLAN, FOR ITSELF AND ITS RESPECTIVE SUCCESSORS, ASSIGNS, TRANSFEREES, CURRENT AND FORMER OFFICERS, DIRECTORS, AGENTS AND EMPLOYEES, IN EACH CASE IN THEIR

**CAPACITY AS SUCH, WILL BE DEEMED TO HAVE RELEASED ANY AND ALL CLAIMS AND CAUSES OF ACTION AGAINST (A) THE DEBTORS, THE REORGANIZED DEBTORS OR NEW ARCLIN, (B) THE LENDERS AND THE DIP LENDERS IN THEIR CAPACITY AS SUCH, (C) OTPP AND (D) ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, ATTORNEYS, ADVISORS, PROFESSIONALS OR AGENTS ARISING BEFORE THE EFFECTIVE DATE.**

**ON THE EFFECTIVE DATE, IN CONSIDERATION FOR THE OBLIGATIONS OF THE DEBTORS AND THE REORGANIZED DEBTORS UNDER THE PLAN AND THE DISTRIBUTIONS TO BE DELIVERED IN CONNECTION WITH THE PLAN, ALL HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTORS WILL BE PERMANENTLY ENJOINED FROM BRINGING ANY ACTION AGAINST THE DEBTORS, THE REORGANIZED DEBTORS, NEW ARCLIN, THE LENDERS, THE DIP LENDERS OR OTPP AND THEIR RESPECTIVE DIRECTORS, OFFICERS, AGENTS, FINANCIAL ADVISORS, ATTORNEYS, OTHER PROFESSIONALS, EMPLOYEES, PARTNERS, MEMBERS, SUBSIDIARIES, MANAGERS, AFFILIATES AND REPRESENTATIVES SERVING IN SUCH CAPACITY AS OF THE CONFIRMATION DATE, AND THEIR RESPECTIVE PROPERTY, IN RESPECT OF ANY CLAIMS, OBLIGATIONS, RIGHTS, CAUSES OF ACTION, DEMANDS, SUITS, PROCEEDINGS, AND LIABILITIES RELATED IN ANY WAY TO THE DEBTORS, THE REORGANIZATION CASES, THE PLAN OR THE DISCLOSURE STATEMENT; PROVIDED, HOWEVER, NOTHING IN THIS SECTION WILL BE CONSTRUED TO RELEASE OR EXCULPATE ANY PERSON OR ENTITY FROM FRAUD, GROSS NEGLIGENCE, WILLFUL MISCONDUCT, CRIMINAL CONDUCT, UNAUTHORIZED USE OF CONFIDENTIAL INFORMATION THAT CAUSES DAMAGES OR FOR PERSONAL ULTRA VIRES ACTS.**

*Knowledge of Claims*

**EACH PARTY TO WHICH THIS SECTION APPLIES WILL BE DEEMED TO HAVE GRANTED THE RELEASES SET FORTH IN THIS SECTION NOTWITHSTANDING THAT IT MAY HEREAFTER DISCOVER FACTS IN ADDITION TO, OR DIFFERENT FROM, THOSE WHICH IT NOW KNOWS OR BELIEVES TO BE TRUE, AND WITHOUT REGARD TO THE SUBSEQUENT DISCOVERY OR EXISTENCE OF SUCH DIFFERENT OR ADDITIONAL FACTS, AND SUCH PARTY EXPRESSLY WAIVES ANY AND ALL RIGHTS THAT IT MAY HAVE UNDER ANY STATUTE OR COMMON LAW PRINCIPLE, WHICH WOULD LIMIT THE EFFECT OF SUCH RELEASES TO THOSE CLAIMS OR CAUSES OF ACTION ACTUALLY KNOWN OR SUSPECTED TO EXIST AT THE TIME OF EXECUTION OF THE RELEASE.**

*The Cadillac Fairview Corporation Limited Indemnity*

Notwithstanding the foregoing releases set forth herein in sections 9.6 through 9.8 of the Plan, OTPP will not be released from any obligations it may have under the OTPP Indemnity; provided, however, all rights, claims and defenses that OTPP may have with respect to the OTPP Indemnity will be expressly preserved.

**Conditions to Confirmation and the Effective Date of the Plan**

There are several conditions precedent to Confirmation and the Effective Date. Subject to applicable legal requirements, the Debtors with the consent of the Required First Lien Lenders may waive any of these conditions upon the terms and subject to the conditions set forth in Sections 8.1 and 8.2 of the Plan.

*Conditions to Confirmation*

The Bankruptcy Court will not enter the Confirmation Order unless and until the following conditions have been satisfied or duly waived pursuant to Section 8.3 of the Plan:

The Confirmation Order will be reasonably acceptable in form and substance to the Debtors and the Required First Lien Lenders.

All exhibits to the Plan, including the Plan Supplement, will be in form and substance reasonably satisfactory to the Required First Lien Lenders.

*Conditions to the Effective Date*

The Effective Date will not occur, and the Plan will not be consummated, unless and until each of the following conditions have been satisfied or duly waived pursuant to Section 8.3 of the Plan:

- The Confirmation Order has been entered, has not been reversed, stayed, modified or amended and has become a Final Order.

- The Bankruptcy Court will have entered an order (contemplated to be part of the Confirmation Order) authorizing the Debtors, the Reorganized Debtors and New Arclin to take all actions necessary or appropriate to implement the Plan, and the other transactions contemplated by the Plan and the implementation and consummation of all contracts, instruments, releases and other agreement or documents created in connection with the Plan.

- The closing of the Exit Facility will have occurred.

- The Canadian Court will have made the CCAA Plan Order and the transactions contemplated under the CCAA Plan have been completed or waived in accordance with the terms of the CCAA Plan.

*Waiver of Conditions to the Confirmation or Effective Date*

The conditions to Confirmation and the conditions to the Effective Date set forth above may be waived in whole or in part by the Debtors, with the consent of the Required First Lien Lenders, at any time without an order of the Bankruptcy Court.

*Effect of Nonoccurrence of Conditions to the Effective Date*

If each of the conditions to the Effective Date is not satisfied or duly waived in accordance with Section 8.3 of the Plan, then upon motion by the Debtors made before the time that each of such conditions has been satisfied or duly waived and upon notice to such parties in interest as the Bankruptcy Court may direct, the Confirmation Order will be vacated by the Bankruptcy Court; provided, however, that, notwithstanding the Filing of such motion, the Confirmation Order may not be vacated if each of the conditions to the Effective Date is either satisfied or duly waived before the Bankruptcy Court enters an order granting such motion. If the Confirmation Order is vacated pursuant to Section 8.4 of the Plan, (a) the Plan will be null and void in all respects, including with respect to: (i) the discharge of Claims and termination of Equity Interests pursuant to section 1141 of the Bankruptcy Code; (ii) the assumptions, assignments or rejections of Executory Contracts and Unexpired Leases pursuant to Section 6.1 of the Plan; (iii) the releases described in Section 9.6 of the Plan; and (iv) the consolidation of the Debtors described in Article II of the Plan; and (b) nothing contained in the Plan will: (i) constitute a waiver or release of any Claims by or against, or any Interest in, the Debtors; or (ii) prejudice in any manner the rights of the Debtors or any other party in interest.

## Limited Consolidation

Based upon the valuation of the Debtors' in relation to the First Lien Claims and Second Lien Claims, holders of General Unsecured Claims are not entitled to any distribution under the Plan. Accordingly, the Plan will serve as a motion by the Debtors seeking entry of an order consolidating, upon the Effective Date, the Estates and all of the debts of all of the Debtors for the limited purposes of classifying and treating the Claims pursuant to Article IV of the Plan, including for voting, Confirmation and distributions to be made under the Plan. Pursuant to such order (which may be the Confirmation Order): (i) all assets and liabilities of the Debtors will be deemed merged; (ii) all guarantees by one Debtor of the obligations of any other Debtor will be deemed eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint or several liability of any of the Debtors will be deemed to be one obligation of the consolidated Debtors; (iii) each and every Claim Filed or to be Filed in the Reorganization Case of any of the Debtors will be deemed Filed against the consolidated Debtors and will be deemed one Claim against and a single obligation of the consolidated Debtors; and (iv) subject to the Restructuring Transactions, prepetition Intercompany Claims will be Reinstated, eliminated or extinguished as appropriate in the judgment of the Debtors and the Required First Lien Lenders to effectuate the Restructuring Transactions contemplated by the Plan. Such limited consolidation (other than for the purpose of implementing the Plan) will not affect (i) the legal and corporate structures of the Debtors, subject to the right of the Debtors to effect the Restructuring Transactions as provided in Section 5.4 of the Plan; (ii) pre- and post-Effective Date guarantees that are required to be maintained (a) in connection with contracts or leases that were entered into during the Reorganization Cases or Executory Contracts and Unexpired Leases that have been or will be assumed or (b) pursuant to the Plan; and (iii) the vesting of assets in the Reorganized Debtors.

Unless an objection to such limited consolidation is made in writing by any creditor or claimant affected by the Plan, Filed with the Bankruptcy Court and served on the parties listed in Section 11.12 on or before the Voting Deadline, or such other date as may be fixed by the

Bankruptcy Court, the consolidation order (which may be the Confirmation Order) may be entered by the Bankruptcy Court. In the event any such objections are timely Filed, a hearing with respect thereto will occur at the Confirmation Hearing. Notwithstanding this provision, nothing herein will affect the obligation of each and every Debtor to pay quarterly fees to the Office of the United States Trustee in accordance with 28 U.S.C. § 1930.

## Modification or Revocation of the Plan

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code, the Debtors reserve the right to alter, amend or modify the Plan and the exhibits to the Plan, including the Plan Supplement, in each case with the consent of the Required First Lien Lenders, before the substantial consummation of the Plan.

The Debtors reserve the right to revoke or withdraw the Plan as to any or all of the Debtors before the Confirmation Date. If the Debtors revoke or withdraw the Plan as to any or all of the Debtors, or if Confirmation as to any or all of the Debtors does not occur, then, with respect to such Debtors, the Plan will be null and void in all respects, and nothing contained in the Plan will: (i) constitute a waiver or release of any claims by or against, or any Interests in, such Debtors; or (ii) prejudice in any manner the rights of any Debtors or any other party in interest.

## Preservation of Rights of Action

Except as otherwise provided herein or in the Confirmation Order, or in any contract, instrument, release, indenture or other agreement entered into in connection with this Plan, in accordance with section 1123(b) of the Bankruptcy Code, following the Confirmation Date, the Reorganized Debtors will retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all claims, rights or causes of action (including the Avoidance Actions), suits and proceedings, whether in law or in equity, whether known or unknown, that the Debtors or their estates may hold against any person or entity without further approval of the Bankruptcy Court. The Reorganized Debtors or their successor(s) may pursue such retained claims, rights or causes of action, suits or proceedings as appropriate, in accordance with the best interests of the Reorganized Debtors or their successor(s) who hold such rights.

## NEW ARCLIN

## New Arclin Corporate Structure

The Debtors will be reorganized in accordance with the Restructuring Transactions set forth in the Plan Supplement. It is currently intended that New Arclin will be the ultimate parent holding company of the Arclin Group and will be formed on or before the Effective Date. Until the Plan Supplement is filed, there can be no assurance as to the corporate structure of the Arclin Group after the Effective Date.

### *Business Plan and Strategy for New Arclin*

The Arclin Group has conducted a comprehensive strategic business review, including the development of a business plan that addresses both short-term and longer-term issues

required to stabilize and revitalize the Debtors' and their nondebtor affiliates' businesses (the "Business Plan"). The Business Plan, developed over a number of months, establishes a corporate vision and mission and a team oriented strategy that the Reorganized Debtors and CCAA Debtors intend to implement to increase sales, reduce operating costs and enhance cash flows.

Initiatives to increase sales are expected to include:

- sharing in existing long-term customers' growth;

- increasing the share of sales to existing long-term customers;

- expanding the new customer base; and

- developing new products.

Operating cost reduction initiatives are expected to include:

- overhead reductions;

- closure of unprofitable operations; and

- improvements in quality, yield and productivity.

Cash flow improvements are expected to result from:

- the cost reduction actions set forth above;

- a return to normal payment terms with suppliers; and

- improved management of receivables.

*Liquidity and Capital Resources*

On the Effective Date, the Debtors intend to enter into an Exit Facility with availability of up to $40 million. The Exit Facility will provide the Debtors with sufficient liquidity to pay all Administrative Claims, Professional Fee Claims, Priority Tax Claims, Other Priority Claims and Other Secured Claims. In addition, the Exit Facility will provide the Debtors with sufficient liquidity to operate their business in the ordinary course and fund the obligations of the Reorganized Debtors and New Arclin.

**Selected Unaudited Historical Combined Financial Statements**

The Debtors have included selected unaudited historical combined financial statements for the Debtors, the CCAA Debtors and the CCAA Partnerships for the fiscal year ended December 31, 2008 and the six months ended June 30, 2009 at Exhibit II hereof (the "Unaudited Historical Combined Financials"). See "Risk Factors – The Arclin Group's Financial Results Will Not Be Comparable with the Historical Financial Results of the Debtors."

**Projected Financial Statements**

*The Projections*

As a condition to confirmation of a plan, the Bankruptcy Code requires, among other things, that the Bankruptcy Court determine that confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor. This standard is referred to as "feasibility." In connection with the development of the Plan, and for purposes of determining whether the Plan satisfies this feasibility standard, the Debtors' management has analyzed the ability of the Debtors to meet their obligations under the Plan and retain sufficient liquidity and capital resources to conduct business.

The projections, which together with the Unaudited Historical Combined Financials are attached hereto as Exhibit II (the "Projections"), should be read in conjunction with the "Risk Factors" section below and with the assumptions, qualifications and footnotes to the tables containing the Projections (which include projected income statements, projected balance sheets, and projected statements of cash flows).

The Projections assume an Effective Date of December 31, 2009 with Allowed Claims and Allowed Equity Interests treated as described in the Plan. Except as otherwise provided in the Plan, expenses incurred as a result of the Bankruptcy Cases are assumed to be paid on the Effective Date. If the Debtors do not emerge from chapter 11 as currently scheduled, additional Administrative Expense Claims will be incurred until such time as a plan of reorganization is confirmed and becomes effective. These additional Administrative Expense Claims could significantly impact the Debtors' cash flows if the Effective Date is materially later than the Effective Date assumed in these Projections.

It is important to note that the Projections and estimates of common stock equity values for the Arclin Group may differ from the actual realized performance and are highly dependent on significant assumptions concerning the future operations of the Arclin Group. These assumptions include pricing for the Debtors' and CCAA Debtors' products, volume, raw material prices, plant operating performance, growth of the business, labor and other operating costs, regulatory environment, inflation, foreign exchange rates, and the level of investment required for capital expenditures and working capital. Please refer to the "Risk Factors" section below for a discussion of many of the factors that could have a material effect on the information provided in this section.

The estimate of common stock equity value for the Arclin Group is not intended to reflect the values that may be attainable in public or private markets. They also are not intended to be appraisals or reflect the value that may be realized if assets are sold.

**THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARDS COMPLYING WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS. THE DEBTORS' INDEPENDENT ACCOUNTANT HAS NOT REVIEWED THE ACCOMPANYING PROJECTIONS TO DETERMINE THE REASONABLENESS THEREOF AND, ACCORDINGLY, HAS NOT EXPRESSED AN**